# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEGO A/S, LEGO SYSTEMS, Inc., and LEGO Juris A/S | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3:18-cv-02045 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZURU Inc. | ) | |
| | ) | |
| Defendant. | ) | DECEMBER 13, 2018 |

# THE LEGO GROUP'S MEMORANDUM OF LAW IN
# SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND
# PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

I.      ZURU's Infringing Figurines ................................................................................ 6

II.     The LEGO Group's Design Patents ..................................................................... 10

III.    ZURU'S Infringing Brick ..................................................................................... 13

IV.     The LEGO Group's Friends Copyrights .............................................................. 17

V.      ZURU's Infringing Friends Image ....................................................................... 21

ARGUMENT ................................................................................................................. 22

I.      The Applicable Legal Standards ........................................................................... 22

II.     The LEGO Group is Likely to Succeed on the Merits of Its Copyright,
        Trademark and Patent Infringement Claims ......................................................... 23

        A.      The LEGO Group is Likely to Succeed on its Minifigure Figurine
                Copyright Infringement Claims ................................................................. 23

        B.      The LEGO Group is Likely to Succeed on its Minifigure Trademark
                Infringement Claims .................................................................................. 29

                a.      The Polaroid Factors Demonstrate a High Likelihood of Confusion ....... 29

                        i.      Polaroid Factor Analysis for the Minifigure Figurine
                                Trademark ................................................................................ 30

                                1.      The Minifigure Figurine Trademark Is Strong ................ 30

                                2.      The Marks are Highly Similar .......................................... 32

                                3.      The Products are Highly Similar ...................................... 35

                                4.      The Likelihood that ZURU will Bridge the Gap ............. 36

                                5.      Actual Confusion ............................................................. 36

                                6.      ZURU's Bad Faith ........................................................... 38

                                7.      ZURU's Products are Poor Quality ................................. 42

                                8.      The Sophistication of Toy Buyers ................................... 43

        C.      The LEGO Group is Likely to Succeed on its Friends Figurine Copyright
                Infringement Claim .................................................................................... 43

        D.      The LEGO Group is Likely to Succeed on its Design Patent Infringement
                Claim ......................................................................................................... 48

                a.      ZURU's Infringing Bricks Infringe the Asserted Patents ......................... 49

|  |  | i. | Construing the Claims | 50 |
|  |  | ii. | comparison of the Asserted Patents and the Infringing Bricks | 54 |
|  | b. | | The LEGO Group is Likely to Prevail on Design Patent Validity at Trial | 61 |
| VI. | | | The LEGO Group Has Suffered and Will Suffer Irreparable Harm | 62 |
| VII. | | | The Balance of Hardships Favors Granting the Requested Relief | 66 |
| VIII. | | | The Public Interest Favors Injunctive Relief | 67 |
| IX. | | | The Equities in this Case Favor No Bond or a Nominal Bond | 68 |
| CONCLUSION | | | | 69 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Laboratories v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)............................................................................64

*Arminak & Associates, Inc. v. Saint-Gobain Calmar, Inc.*,
    424 F. Supp. 2d 1188 (C.D. Cal. 2006) ...............................................................50

*Arrow Fastener Co. v. Stanley Works*,
    59 F.3d 384 (2d Cir. 1995)............................................................................30, 43

*AstraZeneca LP v. Apotex Corp.*,
    633 F.3d 1042 (Fed. Cir. 2010)............................................................................64

*Bio-Technology General Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996)..............................................................................64

*Boisson v. Banian, Ltd.*,
    273 F.3d 262 (2d Cir. 2001).................................................................................27

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*,
    150 F.3d 132 (2d Cir. 1998).................................................................................25

*Cisco Technology, Inc. v. Certification Trendz Ltd.*,
    No. 15-00965, 2015 WL 3936360 (D. Conn. June 26, 2015)...............................23

*Clear Channel Outdoor, Inc. v. City of New York*,
    594 F.3d 94 (2d Cir. 2010)............................................................................66, 68

*Crocs, Inc. v. International Trade Commission*,
    598 F.3d 1294 (Fed. Cir. 2010)................................................................49, 50, 55

*DiTocco v. Riordan*,
    815 F. Supp. 2d 655 (S.D.N.Y. 2011)..............................................................26, 47

*Doctor's Associates, Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996)............................................................................68, 69

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)........................................................................................63, 65

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
    543 F.3d 665 (Fed. Cir. 2008)................................................................49, 50

*Feist Publications, Inc. v. Rural Telephone Service Co.,*
499 U.S. 340 (1991)........................................................................................23, 44

*Ferguson v. Tabah,*
288 F.2d 665 (2d Cir. 1961)........................................................................68

*Gaste v. Kaiserman,*
863 F.2d 1061 (2d Cir. 1988)........................................................................24, 44

*Gorham Co. v. White,*
81 U.S. 511 (1872)........................................................................................49, 58

*Gruner + Jahr USA Publishing v. Meredith Corp.,*
991 F.2d 1072 (2d Cir. 1993)........................................................................29, 42

*Guthrie Healthcare System v. ContextMedia, Inc.,*
826 F.3d 27 (2d Cir. 2016)........................................................................67

*Hamil America, Inc. v. GFI,*
193 F.3d 92 (2d Cir. 1999)........................................................................26, 27, 47

*Hasbro, Inc. v. Lanard Toys, Ltd.,*
858 F.2d 70 (2d Cir. 1998)........................................................................62

*Home Box Office, Inc. v. Showtime/Movie Channel, Inc.,*
832 F.2d 1311 (2d Cir. 1987)........................................................................62

*Hoop v. Hoop,*
279 F.3d 1004 (Fed. Cir. 2002)........................................................................61

*Hybritech Inc. v. Abbott Laboratories,*
849 F.2d 1446 (Fed. Cir. 1988)........................................................................63

*Jeneric/Pentron, Inc. v. Dillon Co.,*
259 F. Supp. 2d 192 (D. Conn. 2003)........................................................................67

*Jorgensen v. Epic/Sony Records,*
351 F.3d 46 (2d Cir. 2003)........................................................................25, 44

*L.A. Gear, Inc. v. Thom McAn Shoe Co.,*
988 F.2d 1117 (Fed. Cir. 1993)........................................................................53, 54, 58

*Leary v. Manstan,*
118 F. Supp. 3d 460 (D. Conn. 2015)........................................................................24

*LEGO A/S v. Best-Lock Construction Toys, Inc.*,
  874 F. Supp. 2d 75 (D. Conn. 2012) ................................................................67

*Lever Brothers Co. v. American Bakeries Co.*,
  693 F.2d 251 (2d Cir. 1982) ...........................................................................30

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  799 F.2d 867 (2d Cir. 1986) ...........................................................................30

*McGregor-Doniger Inc. v. Drizzle Inc.*,
  599 F.2d 1126 (2d Cir. 1979) .....................................................................30, 35

*McKain v. Estate of Rhymer*,
  166 F. Supp. 3d 197 (D. Conn. 2015) ..........................................................26, 46

*Merriam-Webster, Inc. v. Random House, Inc.*,
  35 F.3d 65 (2d Cir. 1994) ...............................................................................30

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
  818 F.2d 254 (2d Cir. 1987) .........................................................30, 36, 38, 39

*Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*,
  182 F.3d 133 (2d Cir. 1999), *overruled on other grounds by Bristol-Myers
  Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992) .........................30

*My-T Fine Corp. v Samuels*,
  69 F.2d 76 (2d Cir. 1934) ...............................................................................68

*Nokia Corp. v. InterDigital, Inc.*,
  645 F.3d 553 (2d Cir. 2011) ......................................................................68, 69

*OddzOn Products, Inc. v. Just Toys, Inc.*,
  122 F.3d 1396 (Fed. Cir. 1997) ...............................................................49, 53, 55

*Opticians Ass'n of America v. Independent Opticians of America*,
  920 F.2d 187 (3d Cir. 1990) ............................................................................63

*Orient Express Trading Co. v. Federated Department Stores*,
  842 F.2d 650 (2d Cir. 1988) ...........................................................................30

*Paco Rabanne Parfums, S.A. v. Norco Enterprises, Inc.*,
  680 F.2d 891 (2d Cir. 1982) ...........................................................................32

*Pavlica v. Behr*,
  397 F. Supp. 2d 519 (S.D.N.Y. 2005) ..............................................................46

*Perfect Fit Industries, Inc. v. Acme Quilting Co.*,
   618 F.2d 950 (2d Cir. 1980)........................................................................38

*Polaroid Corp. v. Polarad Electronics Corp.*
   287 F.2d 492 (2d Cir. 1961)........................................................29, 30, 63

*Polymer Techs., Inc. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996)................................................................64

*Reebok International Ltd. v. J. Baker, Inc.*,
   32 F.3d 1552 (Fed. Cir. 1994)................................................................64

*Repp v. Webber*,
   132 F.3d 882 (2d Cir. 1997)............................................................26, 46

*Richardson v. Stanley Works, Inc.*,
   597 F.3d 1288 (Fed. Cir. 2010)......................................................52, 53

*Russian Kurier, Inc. v. Russian American Kurier, Inc.*,
   899 F. Supp. 1204 (S.D.N.Y. 1995)........................................................62

*Ryan v. Volpone Stamp. Co.*,
   107 F. Supp. 2d 369 (S.D.N.Y. 2000)..............................................63, 66

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)....................................................23, 62, 64, 65

*Sports Authority, Inc. v. Prime Hospitality Corp.*,
   89 F.3d 955 (2d Cir. 1996)............................................................33, 42

*In re Steelbuilding.com*,
   415 F.3d 1293 (Fed. Cir. 2005)..............................................................32

*Titan Tire Corp v. Case New Holland, Inc.*,
   566 F.3d 1372 (Fed. Cir. 2009)......................................................49, 61

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
   60 F.3d 27 (2d Cir. 1995)........................................................................65

*Tri-Star Pictures, Inc. v. Unger*,
   14 F. Supp. 2d 339 (S.D.N.Y. 1998)......................................................31

*Wal-Mart Stores, Inc. v. Samara Brothers*,
   529 U.S. 205 (2000)................................................................................31

**Page**

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012).................................................................................66

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001)..........................................................................26, 47

**Statutes**

15 U.S.C. § 1052(f)......................................................................................................31

15 U.S.C. § 1057(b).....................................................................................................29

17 U.S.C. § 106(2).................................................................................................5, 21

35 U.S.C. § 154(a)(1)..................................................................................................63

35 U.S.C. § 271..............................................................................................................3

35 U.S.C. § 289..............................................................................................................3

**Rules**

Fed. R. Civ. P. 65...................................................................................................22, 23

Fed. R. Civ. P. 65(c)....................................................................................................68

**Regulations**

37 C.F.R. § 1.153.........................................................................................................49

## <u>INTRODUCTION</u>

Plaintiffs LEGO A/S ("LAS"),  LEGO Systems, Inc. ("LSI"), and LEGO Juris A/S ("LJAS") (collectively, "the LEGO Group") respectfully submit this memorandum of law in support of their motion for temporary restraining order and preliminary injunction preventing Defendant ZURU Inc. ("ZURU") from manufacturing, selling, offering for sale, displaying and importing products that infringe the LEGO Group' design patents, copyrights, and trademarks.

The LEGO Group is a well-established industry innovator and leader in designing and manufacturing toys and play materials for children of all ages worldwide. Indeed, the LEGO Group's toy building elements, figurines and toy sets established the construction toy category. The LEGO Group has developed,  invested in and protected its intellectual property rights, including patents, trademarks, copyrights and trade dress.  Specifically, copyright and trademark law protects the iconic Minifigure and Friends figurines from a competitor's copying in a substantially or confusingly similar manner. Instead of creating its own, unique design, the defendant ZURU, a British Virgin Islands corporation operating out of Hong Kong, simply copied the overall look and feel of the Minifigure and Friends figurines with its Max Build More and Mayka lines of construction toys (collectively, the "Infringing Products"), selling substantially and confusingly similar figurines and using images on its product packaging to confuse consumers—children and their families—into thinking its products are the same as the LEGO Group's products.

Moreover, the LEGO Group protects certain of its building elements with design patents. Design patents are infringed when an ordinary observer would be deceived by the substantial similarity of the infringing product to the patent claims.  Here, ZURU copied the protected elements exactly and shows those infringing elements on its product packaging.

101497843

While the LEGO Group welcomes fair competition, ZURU's nationwide launch of the infringing Max Build More line of products in Walmart retail locations throughout the United States and online on www.Walmart.com (the "Walmart Website") during the holiday shopping season was anything but fair play.  Rather, its infringement of the LEGO Group's intellectual property is pervasive and willful. Unless enjoined, ZURU will continue to exploit the actual and inevitable consumer confusion caused by its inferior Infringing Products during this prime holiday buying season while causing irreparable harm to the LEGO Group's goodwill and reputation.

The LEGO Group firmly believes its founder's motto: only the best is good enough. Confused consumers buying infringing ZURU products will not be getting the best, but rather infringements.

## FACTUAL BACKGROUND

The LEGO Group has been in the business of selling its Minifigure figurines since 1978. Verified Compl. at ¶ 13. The Minifigure figurine is protected by federal copyright and trademark registrations, which protect the 3D sculpture of the figurine, as well as any derivative works. *Id.* at ¶¶ 14,18, 19.  Over forty years, the LEGO Group has amassed significant goodwill and a strong reputation for quality connected to its Minifigure figurine.  *See id.* at ¶ 10 and 13.  In 2012, the LEGO Group launched its Friends™ line of products, including the popular Friends figurine. *Id.* at ¶ 57. Like the Minifigure figurine, the Friends figurine is protected by multiple federal copyright registrations and has a prominent copyright notice (©) in the plastic and on product packaging.  *Id.* at ¶ 58.

101497843

-2-

.

As an innovator in the construction toy industry for more than 50 years, the LEGO Group has a robust and active patent portfolio, including a number of design patents that protect the ornamental design of unique construction bricks and building elements.  *Id.* at ¶ 44.   These design patents afford the LEGO Group the right to exclude others from making, using, selling, offering to sell, displaying or importing articles with the patented design.  35 U.S.C. §§ 271 and 289.

Upon information and belief, on or about October 1, 2018, ZURU launched its infringing line of Max Build More construction toys.  Verified Compl. at ¶ 29.  On November 12, 2018, shortly after the LEGO Group became aware of ZURU's activities, it immediately demanded, via letter sent by post and e-mail (the "First Demand Letter"), that ZURU cease and desist from the sale of products that infringe the LEGO Group's patents, trademarks, and copyrights.  Declaration of Elizabeth Alquist ("Alquist Decl."), Ex. 2.   The First Demand Letter requested compliance by November 26, 2018.   *Id.*  When no substantive answer was received or compliance satisfied, a second demand letter ("the Second Demand Letter") was delivered to ZURU by e-mail on December 3, 2018.  Alquist Decl., Ex. 9. Later, on December 5, 2018, ZURU finally provided the LEGO Group with a substantive response stating that it would not cease sale of the infringing Max Build More products and would not comply with the LEGO Group's demands.  Alquist Decl., Ex. 10.  The LEGO Group had no choice but to seek immediate relief, and informed ZURU and its U.S. intellectual property counsel of that intent on December 11, 2018. Alquist Decl., Ex. 11. ZURU responding transparently seeking further

delay[1] through the holiday buying season while all but admitting to infringement.  *Id.*  The

LEGO Group provided one, final opportunity for ZURU to remove its infringing products from

shelves and view on websites.  *Id.* At 6:40 a.m. today, December 13, 2018, ZURU sent another

email claiming it is willing to have all of its products removed from its website and "we will

recall product currently with Walmart, and that we have started to action that today."  *Id.*  As of

this filing, however, ZURU's product continues to be available on the Walmart Website for sale,

including in this District. It appears that ZURU is again engaged in delay tactics to avoid a court

order.  It is evident that only a Court Order will ensure that ZURU stop infringement of the

LEGO Group's patents, trademarks, and copyrights, necessitating this action.

### The Minifigure Figurine and the LEGO Group's Intellectual Property Rights

In 1978, the LEGO® brand introduced its Minifigure figurine.  Verified Compl. at ¶ 13.

The Minifigure figurine (which is manufactured in various colors, proprietary representations as

well as licensed and unlicensed representations and fanciful configurations) is a toy sculpture

that has interchangeable parts such as a head, hair, torso, arms, legs and can feature a multitude

of facial expressions and clothing styles.  *Id.*   For over 40 years, the Minifigure figurine has

been included in numerous varieties of LEGO® brand toy sets.  *Id.*

LAS owns numerous copyrights registered with the United States Copyright Office,

including Registration Number VA0000655230 and Registration Number VA0000655104 (the

"Minifigure Copyrights"), covering the sculpture of the Minifigure figurine.  Verified Compl. at

---

[1] Part of its delay tactic was to claim, falsely, that it disabled links on its website to
Infringing Minifigure figurines products on December 12th.  To the contrary, those links were
still active all day December 12th, although disabled on December 13, 2018.

¶ 14 and Exhibits A and B.  The LEGO Group is entitled to protection from unauthorized copying of the Minifigure figurine under the Minifigure Copyrights.  This includes derivative works, such as substantially similar sculpture toy figurines, and two-dimensional renderings of such figurines. *See* 17 U.S.C. § 106(2).

LJAS owns numerous trademarks registered with the United States Patent & Trademark Office including Registration Number 4,903,968 ("the Registered Minifigure Trademark"), covering "*toy figures; play figures; positionable toy figures; modeled plastic toy figurines; three dimensional positionable toy figures sold as a unit with other toys; construction toys; toy construction sets*" in Class 028.  Verified Compl. at ¶ 18 and Exhibit C. The LEGO Group also has common law trademark rights in the Minifigure figurine set forth in Exhibit C, by virtue of its continuous use of the mark  in commerce throughout the United States since 1978 (together with the Registered Minifigure Trademark, the "Minifigure Trademarks").  *Id*. at ¶ 19.

The LEGO Group has established valuable trademark rights and goodwill in the Minifigure Trademarks by virtue of their long use and registration of the trademarks, the substantial promotional and marketing efforts under the trademarks, the expenditure of vast sums in advertising and promotional activities under that trademark, and third-party licensing agreements.  *Id*. at ¶ 20.  The products and services offered, sold, and advertised in connection with the Minifigure Trademarks have generated substantial revenue.  *Id*. at ¶ 21. Such revenue has exceeded over one billion dollars (USD).  *Id.*

As a result of the long and extensive use of the Minifigure Trademarks, and the significant sales, promotion, advertising, third-party licensing, and commercial success under those marks, the Minifigure figurine has achieved such widespread public exposure and

recognition that it is distinctive and is well-known and famous among the general consuming public of the United States.  *Id.* at ¶ 22.

**I.      ZURU's Infringing Figurines**

ZURU sells figurines (the "Infringing Figurines") in its Max Build More 15 Max Figures sets, below, that are confusingly, strikingly, and substantially similar to the overall look and feel of the LEGO® Minifigure figurine.

<u>**Set of ZURU Infringing Figurines**</u>



.



**Representative ZURU Infringing Figurine**

The images below show different views of the copyrighted and trademarked LEGO®

Minifigure figurine and a ZURU Infringing Figurine:



**Comparison of LEGO®  Minifigure figurine and ZURU Infringing Figurine**

*See id.* at ¶ 23.




**Comparison of LEGO®  Minifigure figurine sets and ZURU Infringing Figurine sets**



**Alternating LEGO®  Minifigure figurines and ZURU Infringing Figurines**

*Id.* at ¶ 24.

The Infringing Figurines are advertised on ZURU's websites,

https://buildtothemax.zuru.com (the "Max Website") and https://zuru.com (the "ZURU

Website"). *Id.* at ¶ 25.  The Max Website provides links to purchase the Infringing Figurines from Walmart on the Walmart Website and The Warehouse on www.thewarehouse.co.nz (the "Warehouse Website").  The Infringing Figurines are also sold by Walmart in its retail locations throughout the United States, including several locations in this District. *Id.* at ¶ 27.

Oftentimes, the products appear next to each other on racks in aisles, further exacerbating the risk of confusion.





*Id.* at ¶ 30.

ZURU's Infringing Figurines are unauthorized reproductions of the LEGO Group's copyrights and trademarks including the Minifigure Copyrights and Minifigure Trademarks. The LEGO Group has no agreement of any kind with ZURU that would authorize the manufacture or sale of the Infringing Figurines. *Id.* at ¶ 35. The Infringing Figurines are sold through many of the same trade channels as the LEGO® Minifigure figurine. *Id.*

## II.     The LEGO Group's Design Patents

The LEGO Group is famous throughout the world for its toy construction products. *Id.* at ¶ 44. Over the course of more than 50 years, the LEGO Group has designed and sold thousands of different unique bricks and building elements. *Id.* The ornamental designs of many of its bricks and building elements are protected by United States design patents. *Id.*

LAS owns U.S. Patent No. D701,923S ("the '923 Patent"), U.S. Patent No. D688,328S ("the '328 Patent"), U.S. Patent No. D641,053S ("the '053 Patent") and U.S. Patent No. D614,707S ("the '707 Patent") (collectively the "Asserted Patents.")  *Id.* at ¶ 45.   Each of the Asserted Patents remains in full force and effect.  *Id.*

The '923 Patent, entitled "Building Block From A Toy Building Set," was duly and legally issued on April 1, 2014 to LAS as assignee.  Verified Compl. at ¶ 46.



FIG. 7

**Figure 7 of the '923 Patent**

The '328 Patent, entitled "Building Block From A Toy Building Set," was duly and legally issued on August 20, 2013 to LAS as assignee.  Verified Compl. at ¶ 47.



FIG. 1

**<u>Figure 1 of the '328 Patent</u>**

The '053 Patent, entitled "Element Of A Construction Set," was duly and legally issued on July 5, 2011 to LAS as assignee.   Verified Compl. at ¶ 48.



**<u>Figure 1 of the '053 Patent</u>**

The '707 Patent,  "Element For A Toy Construction Set," was duly and legally issued on April 27, 2010 to LAS as assignee.  Verified Compl. at ¶ 49.



**Figure 1 of the '707 Patent**

### III.    ZURU'S Infringing Bricks

ZURU manufactured, sold, offered to sell, displayed and imported and/or currently

manufactures, sells, offers to sell, displays and imports, in the United States certain building

bricks that are identical or at least substantially similar to the Asserted Patents (the "Infringing

Bricks") in at least three different products:  the Max Build More Building Bricks Value Set (759

Bricks), Max Build More Building Bricks Value Set (253 Bricks), and the Max Build More

Building Bricks Accessories and Wheels Value Set (250 Pieces). Verified Compl. at ¶ 50.

Each Max Build More Building Bricks Value Set (759 Bricks) contains twelve (12)

Infringing Bricks that are identical to the '923 Patent. Verified Compl. at ¶ 52.  Each Max Build

More Building Bricks Value Set (253 Bricks) contains four (4) Infringing Bricks that are

identical to the '923 Patent.  *Id.*  A chart providing an exemplary drawing from the '923 Patent

.

and images of an Infringing Brick (left) compared to imagines of a genuine LEGO® brick

embodying the '923 Patent (right) is provided below:

| Exemplary Drawing from '923 Patent | Comparison of Bricks |
|---|---|
|  | |

*Id.*

Each Max Build More Building Bricks Value Set (759 Bricks) contains twenty-four (24)

Infringing Bricks that are identical to the '328 Patent.  Verified Compl. at ¶ 53.  Each Max Build

More Building Bricks Value Set (253 Bricks) contains eight (8) Infringing Bricks that are

identical to the '328 Patent.  *Id.*  A chart providing an exemplary drawing from the '328 Patent

and images of an Infringing Brick (left) compared to imagines of a genuine LEGO® brick

embodying the '328 Patent (right) is provided below:

| Exemplary Drawing from '328 Patent | Comparison of Bricks |
|---|---|
|  | |

*Id.*

Max Build More Building Bricks Value Set (759 Bricks) contains twenty-four (24) Infringing Bricks that are identical to the '053 Patent. Verified Compl. at ¶ 54. Each Max Build More Building Bricks Value Set (253 Bricks) contains eight (8) Infringing Bricks that are identical to the '053 Patent. *Id.* A chart providing an exemplary drawing from the '053 Patent and images of an Infringing Brick (left) compared to imagines of a genuine LEGO® brick embodying the '053 Patent (right) is provided below:

| Exemplary Drawing from '053 Patent | Comparison of Bricks |
|---|---|



*Id.*

Each Max Build More Building Bricks Accessories and Wheels Value Set (250 Pieces) contains ten (10) Infringing Bricks that are identical to the '707 Patent.  Verified Compl. at ¶ 55. A chart providing an exemplary drawing from the '707 Patent and images of an Infringing Brick (left) compared to imagines of a genuine LEGO® brick embodying the '707 Patent (right) is provided below:

| Exemplary Drawing from '707 Patent | Comparison of Bricks |
|---|---|



*Id.*

The LEGO Group has no agreement of any kind with ZURU that would authorize the manufacture, sale, offering to sell, or importation of the Infringing Bricks. Verified Compl. at ¶ 56.

## IV.    The LEGO Group's Friends Copyrights

In 2012, the LEGO Group introduced its Friends™ line of toy products, including a series of miniature figurines (the "Friends figurine") representative of LEGO® Friends™ characters.  *Id.* at ¶ 57.  From its launch, the Friends figurines had copyright notices on its product packaging as well as in the plastic of the actual figurines in various locations. *Id.* at ¶ 59 and 60.  For example, in the images below,  "© LEGO" is in the plastic of each element comprising the Friends figurine:



**© LEGO located on top of head element of Friend figurine**

101497843

-17-

  

**© LEGO located on back of arm element of Friend figurine**

**© LEGO located on the bottom of leg element of Friend figurine**

**© LEGO located on back of torso element of Friend figurine**

*Id.* at ¶ 59.

LAS owns numerous copyrights registered with the United States Copyright Office, including Registration Numbers VA 1-876-291, VA 1-876-279, VA 1-876-378,  and VA 1-876-373, covering the 3D sculpture of the figurine ("the Registered Friends Copyrights").  Verified Compl. at Ex. L,M,N,O.



**VA 1-876-291: Figure with Capri Pants (FRONT and REAR)**



**VA 1-876-279: Figure with Rolled Shorts (FRONT and REAR)**



**VA 1-876-378: Figure with Skirt (FRONT and REAR)**



**VA 1-876-373: Figure with Tiered Skirt (FRONT and REAR)**

*Id.*

The LEGO Group is entitled to protection from unauthorized copying of the Friends figurine under several copyrights owned by the LEGO Group, including the Registered Friends Copyrights. This includes derivative works, such as substantially similar sculpture toy figurines, and two-dimensional renderings of such figurines. *See* 17 U.S.C. § 106(2).

## V.      ZURU's Infringing Friends Image

ZURU uses an image on product packaging for its Mayka Toy Block Tape that is strikingly and substantially similar to the overall look and feel of the Friends Copyrights (the "Infringing Friends Image"), as shown below:

   

*Id.* at ¶ 62.

A side by side comparison of the Infringing Image and a genuine LEGO® Friends figurine protected by the Friends Copyrights is provided below:



*Id.* ¶ 63.

The Infringing Friends Image is included on product packaging for Mayka Toy Block Tape displayed and sold at least on Walmart.com and Amazon.com. *Id.* ¶ 64. The Infringing Friends Image is an unauthorized reproduction of the Friends Copyrights. *Id.* ¶ 65. The LEGO Group has no agreement of any kind with ZURU that would authorize the creation or sale of the Infringing Friend Image. *Id.* ¶ 66.

<u>**ARGUMENT**</u>

**I.     The Applicable Legal Standards**

The Court has the authority to issue a temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65 and its inherent authority. In appropriate circumstances, a

temporary restraining order may be granted *ex parte* without written or oral notice to the adverse party.  *Id.*  Temporary restraining orders are governed by the same standard applicable to a preliminary injunction. *Cisco Tech., Inc. v. Certification Trendz Ltd.*, No. 15-00965, 2015 WL 3936360, at *3 (D. Conn. June 26, 2015). Such relief requires applicants to show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm if an injunction is not granted; (3) the balance of equities tips in plaintiff's favor; and (4) injunctive relief is in the public's interest. *See Salinger v. Colting*, 607 F.3d 68, 79-82 (2d Cir. 2010) (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)). The LEGO Group demonstrates below that all four factors compel granting immediate injunctive relief in this case.

**II.    The LEGO Group is Likely to Succeed on the Merits of Its Copyright,  Trademark and Patent Infringement Claims**

   **A. The LEGO Group is Likely to Succeed on its Minifigure Figurine Copyright Infringement Claims**

To prevail on a copyright infringement claim, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  The LEGO Group owns the Registered Copyrights, covering the 3D sculpture of the Minifigure figurine. *See* Verified Compl. at Ex. A and B.  Representative images of the Registered Copyrights are provided below:




**Registration Number VA0000655230**          **Registration Number VA0000655104**

*Id.*

The LEGO Group's certificates of registration constitute *prima facie* evidence of the validity not only of its copyrights, but also of the originality of their works. *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir. 1988). Thus, the LEGO Group is likely to succeed in proving the first element of its copyright infringement claim.

To satisfy the second element, the LEGO Group "must also show copying by defendants. Copying may be inferred where a plaintiff (1) establishes that the defendant had access to the copyrighted work and (2) that substantial similarities exist as to protectible material in the two works." *Leary v. Manstan*, 118 F. Supp. 3d 460, 465 (D. Conn. 2015) (quoting *Walker v. Time Life Films, Inc*., 784 F.2d 44, 48 (2d Cir.1986)). "Actual copying may be established either by

direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (internal quotation marks and citation omitted).

Because direct proof of access is often impossible to prove, the law permits a plaintiff to carry its burden on this point through evidence that "an alleged infringer had a 'reasonable possibility'" of access to the original work. *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Gaste,* 863 F.2d at 1066). Here, the "reasonable possibility" that ZURU had access to the original work may be inferred by the fact the Minifigure figurine has been sold in numerous varieties of LEGO® brand toy sets since 1978 and that the LEGO Group has undertaken substantial promotional, advertising, and marketing efforts related to the Minifigure figurine for more than forty years. *See* Verified Compl. at ¶¶ 13, 21-22. Thus, the LEGO Group is likely to succeed in establishing that ZURU had access to the copyrighted works.

Here, however, there is direct proof of access. Initial product advertisements for the Mayka Toy Block Tape product contained genuine LEGO® Minifigure figurines, in addition to other intellectual property violations. Verified Compl. at ¶ 32. When the LEGO Group learned of that infringement, it contacted ZURU's predecessor and ZURU, notified them of the LEGO Group's intellectual property rights in the figurines, and demanded that its property be taken off of ZURU's website. Alquist Decl., Ex. 1. ZURU responded and ultimately complied by

removing images of genuine LEGO® products.[2]   Thus, it had actual knowledge of the LEGO

Group's copyrighted works.[3]

In assessing whether two works are substantially similar for purposes of copyright

infringement, the Second Circuit follows the "ordinary observer test."  *Yurman Design, Inc. v.*

*PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001) (sometimes called the "average lay observer" test).

Under this test, the question is whether "the ordinary observer, unless he set out to detect the

disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."

*Hamil America, Inc. v. GFI,*  193 F.3d 92, 100 (2d Cir. 1999) (quoting *Peter Pan Fabrics, Inc. v.*

*Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.).)  "If 'an average lay

observer would recognize the alleged copy as having been appropriated from the copyrighted

work,' then the two products are substantially similar."  *Yurman*, 262 F.3d at 111 (quoting *Hamil*

*Am.*, 193 F.3d at 100).  Especially in the case of works for children, the overall look and feel of

the works is also a factor in assessing substantial similarity.  *DiTocco v. Riordan*, 815 F. Supp.

---

[2] Little did we know ZURU was doing so only to launch more products with pervasive infringement of the LEGO Group's intellectual property rights.

[3] Moreover, even without proof of access, a plaintiff may establish copyright infringement when the works are so strikingly similar that access may be inferred.  *See McKain v. Estate of Rhymer*, 166 F. Supp. 3d 197, 201 (D. Conn. 2015); *see also Repp v. Webber*, 132 F.3d 882, 887 (2d Cir. 1997).  The Infringing Figurines are strikingly similar to the LEGO Minifigure Figurines.  Accordingly, even if access is not demonstrated by ZURU's actual knowledge or the over 120 million Minifigure figurines sold in the U.S. since 1978, (Verified Compl. at ¶ 13), the LEGO Group has proven striking similarity, and need not further demonstrate access.

2d 655, 671 n.10 (S.D.N.Y. 2011) ("[c]onsideration of the total concept and feel of a work . . . is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience." (quoting *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996))); see also *Boisson v. Banian, Ltd.*, 273 F.3d 262, 273 (2d Cir. 2001).

Here, ZURU easily meets the ordinary observer test, as the overall look and feel of its Infringing Figurines and Infringing Images is substantially similar to the Minifigure Copyrights. Indeed, "their aesthetic appeal is the same." *Hamil Am.,* 193 F.3d at 100. Infringing Figurine and Infringing Images are substantially similar in total concept and feel to the Minifigure copyrights, as demonstrated by the side by side comparison of representative examples shown below.  The photographs show views of a representative ZURU Infringing Figurine on the right and an example of a representative copyrighted Minifigure figurine on the left:



**Comparison of LEGO® Minifigure figurine and ZURU Infringing Figurine**

Verified Compl. at ¶ 24.

The photographs below show views of representative ZURU Infringing Images on the right and examples of representative copyrighted Minifigure figurines on the left:

 

 

Verified Compl. at ¶¶ 13 and 36.

A side-by-side comparison shows that the works are substantially and strikingly similar. Thus, the LEGO Group is likely to succeed on the merits on its copyright infringement claim related to the Minifigure figurine.

**B. The LEGO Group is Likely to Succeed on its Minifigure Trademark Infringement Claims**

To prevail on a trademark infringement claim, "the plaintiff must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993). The LEGO Group owns several trademarks registered with the United States Patent and Trademark Office, including Registration Number 4,903,968 covering the 3D sculpture of the Minifigure figurine. *See* Verified Compl. at Ex. C. The LEGO Group's certificate of trademark registration constitutes "evidence of the validity of the registered mark and of the registration of the mark, of the [the LEGO Group's] ownership of the mark, and of the [the LEGO Group's] exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b). Thus, the LEGO Group is likely to succeed in proving the first element of its trademark infringement claims.

**a.   The *Polaroid* Factors Demonstrate a High Likelihood of Confusion**

The Second Circuit set forth eight factors to consider in determining likelihood of confusion in the trademark context: "[1] the strength of the mark, [2] the degree of similarity between the two marks, [3] the proximity of the products, [4] the likelihood that the prior owner will bridge the gap, [5] actual confusion, . . . [6] the  . . .defendant's good faith in adopting its own mark, [7] the quality of the defendant's product, and [8] the sophistication of the buyers." *Polaroid Corp.*

*v. Polarad Elecs. Corp*. 287 F.2d 492, 495 (2d Cir. 1961); *see Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995) ("Under the law of this Circuit, courts deciding whether a plaintiff has established likelihood of confusion must consider the eight [*Polaroid*] factors.").

These factors are "not exclusive" and should not be applied "mechanic[ally]." *See Merriam-Webster, Inc. v. Random House, Inc*., 35 F.3d 65, 70 (2d Cir. 1994) (quoting *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993)).  No single factor or combination of factors is outcome determinative.  *See Lever Bros. Co. v. Am. Bakeries Co*., 693 F.2d 251, 253 (2d Cir. 1982).  Instead, "each factor must be evaluated in the context of how it bears on the *ultimate question* of likelihood of confusion as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986) (emphasis added); *see also Orient Express Trading Co. v. Federated Dep't Stores*, 842 F.2d 650, 654 (2d Cir. 1988) (affirming district court decision considering four of the eight *Polaroid* factors).  Courts, however, consider the first three factors (strength, similarity, and "proximity of the products") to be the most important.  *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256-57 (2d Cir. 1987) (affirming finding of trademark infringement).

The *Polaroid* factors demonstrate that ZURU's sale of the Infringing Figurine creates a high likelihood of confusion with the LEGO Group's Minifigure Trademarks.

### i. *Polaroid* Factor Analysis for the Minifigure Figurine Trademark

#### 1. The Minifigure Figurine Trademark Is Strong

A trademark's strength is "its tendency to identify the goods sold under the mark as emanating from a particular….source." *McGregor-Doniger Inc. v. Drizzle Inc*., 599 F.2d 1126, 1131 (2d Cir. 1979); *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133,

101497843

139 (2d Cir. 1999) (vacating trial court order and remanding for entry of injunction), *overruled on other grounds by Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033 (2d Cir. 1992).  Strength depends on the mark's inherent distinctiveness and its marketplace distinctiveness.  *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339 (S.D.N.Y. 1998) (granting injunction).

The Minifigure Trademarks cover a product design consisting of a three-dimensional configuration of a toy figure shown below:



*See* Verified Compl. at Ex. C.  A product design can never be inherently distinctive as a matter of law.  *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205,  212-13 (2000).  However, a product design can acquire distinctiveness under the Lanham Act and gain federal registration based on extrinsic evidence.  *See* 15 U.S.C. § 1052(f).  The factors generally considered when determining whether a product design has acquired distinctiveness based on extrinsic evidence for federal trademark registrability are: (1) length and exclusivity of use of the mark in the United States; (2) the type, expense, and amount of advertising of the mark in the United States;

101497843

-31-

and (3) efforts in the United States to associate the mark with the source of the goods, such as unsolicited media coverage and consumer studies.  *See In re Steelbuilding.com*, 415 F.3d 1293, 1300 (Fed. Cir. 2005).

Here, the LEGO Group has demonstrated acquired distinctiveness to the USPTO and obtained a federally registered trademark.  *See* Verified Compl. at Ex. C.  The LEGO Group has established valuable trademark rights and goodwill in the Minifigure Trademarks by virtue of its long and continuous use of the marks since 1978, the substantial promotional and marketing efforts under the trademark, the expenditure of vast sums in advertising and promotional activities under that trademarks, and third-party licensing agreements.  *See* Verified Compl. at ¶¶ 13 and 22.   The products and services offered, sold, and advertised in connection with the Minifigure Trademarks has generated substantial revenue.  *Id.* at ¶ 21.  Such revenue has exceeded over one billion dollars (USD).  *Id.*  As a result of the foregoing, the Minifigure figurine has achieved such widespread public exposure and recognition that it well-known and famous among the general consuming public of the United States and abroad.  *Id.* at ¶ 22.

In short, use of the Minifigure Trademarks for more than four decades, with staggering sales, compels a finding that the Minifigure Trademarks are strong.  This critical factor, therefore, cuts decidedly in the LEGO Group's favor.

## 2.  <u>The Marks are Highly Similar</u>

 "Similarity" turns on whether the competing marks create the "same general overall impression" when viewed separately.  *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893 (2d Cir. 1982). Courts consider "1) whether the similarity between the two marks

101497843

-32-

.

is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers."
*Sports Auth., Inc. v. Prime Hosp. Corp.,*  89 F.3d 955, 962 (2d Cir. 1996).

Here, the Infringing Figurines and Infringing Images and the Minifigure Trademarks are strikingly and substantially similar.  *See* Verified Compl. at ¶ 23.  The Minifigure Trademarks consists of a three-dimensional configuration of a toy figure.  *See* Verified Compl. at Ex. C.  The photographs below show views of a representative sample of a ZURU Infringing Figurine on the right and a representative example of a trademarked Minifigure figurine on the left:



**Comparison of LEGO® Minifigure figurine and ZURU Infringing Figurine**

Verified Compl. at ¶ 24.

A photograph showing the overall similarities between alternating trademarked LEGO Minifigure figurines and ZURU Infringing Figurines is provided below:



**<u>Comparison of LEGO® Minifigure figurines and ZURU Infringing Figurines</u>**

*Id.*

Additional photographs showing the overall similarities between exemplary trademarked

LEGO Minifigure figurines and ZURU Infringing Images is provided below:






**Comparison of LEGO® Minifigure figurine and ZURU Infringing Images**

Verified Compl. at ¶¶ 13 and 36.

In short, because ZURU's Infringing Figurines and Infringing Images are highly similar to the Minifigure Trademarks this second critical factor also cuts in the LEGO Group's favor.

### 3.   The Products are Highly Similar

The proximity of products is concerned with the "competitive distance between the products." *McGregor–Doniger*, 599 F.2d at 1134.  Here, both ZURU's Infringing Figurines and the Minifigure figurine covered by the Minifigure Trademarks are toy figures.  The Infringing Images are used in connection with toy construction products.  Verified Compl. at ¶ 30.  The LEGO Group also uses its Minifigure Trademarks in connection with toy construction products. *Id.*  In short, because the products sold by ZURU and the LEGO Group are highly similar toy figures and construction toy products, this factor weighs decidedly in the LEGO Group's favor as well.

.

### 4.   <u>The Likelihood that ZURU will Bridge the Gap</u>

As stated above, ZURU and the LEGO Group both sell toy figures and construction toys, therefore there is no competitive gap to be bridged between the relevant commercial activities of the parties.   Thus, this factor tips in favor of the LEGO Group.

### 5.   <u>Actual Confusion</u>

While it is not necessary to show actual confusion, "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Mobil Oil Corp*., 818 F.2d at 259 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)).   Here, there is evidence of actual confusion—which proves out the "likelihood" of confusion—as ZURU's customers have used the LEGO Group's name in connection with ZURU's Infringing Figurines.   For example, the following image from ZURU's Facebook page, www.facebook.com/maxbuildmore,  posted on November 30, 2018, demonstrates actual confusion wherein multiple customers are using the LEGO Group's trademark (albeit incorrectly) in connection with an image containing the Infringing Figurines and product containing an Infringing Image:



Indeed, Max Build More products are regularly confused for the LEGO Group's products on its social media webpages.  An additional example of confusion, wherein a consumer refers to the Infringing Figurines are "LEGO people" is shown below.  Telling of ZURU's free riding with these lines of products, ZURU does not correct the confusion on its own social media pages.



In light of actual confusion in the marketplace, this factor also weighs in the LEGO Group's favor.

### 6.   ZURU's Bad Faith

Actual or constructive knowledge that adopting a mark may cause confusion in the marketplace is a strong indicium of bad faith.  *Mobil Oil*, 818 F.2d at 259.  Indeed, "the second comer [ZURU] has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer [the LEGO Group]."  *Id.* (quoting *Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc.*, 281 F.2d 755, 758 (2d Cir. 1960)); *see also Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir. 1980) (holding intentional copying of trademark gives rise to a presumption of a likelihood of confusion).

ZURU deliberately adopted, used and continued to use the Minifigure Trademarks in commerce without the LEGO Group's consent, knowing that it would be free riding off the LEGO Group's goodwill and reputation and creating confusion in the marketplace.   *See Mobil Oil*, 818 F.2d at 259 ("[W]e can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark." (internal quotation marks and citation omitted)).   ZURU's free riding and deliberate creation of market place confusion is further exacerbated by the fact that ZURU and the LEGO Group's products are oftentimes placed directly next to each other, with highly similar product packaging in the same aisles in Walmart in this District, as shown in the images below:

 







Verified Compl. at ¶ 30.

Further evidence of bad faith is demonstrated when ZURU does not correct actual confusion in the market place on its own social media pages. In addition, ZURU's dragging its feet to respond to two cease and desist letters during the holiday season, followed by additional transparent attempts at delay, and then continued, willful infringement demonstrates bad faith. *See* Alquist Decl., Ex. 2,3, 9-11.

In short, this factor favors the LEGO Group.

### 7.  **ZURU's Products are Poor Quality**

The seventh *Polaroid* factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *Sports Auth., Inc. v. Prime Hosp. Corp.,*  89 F.3d 955, 965 (2d Cir. 1996) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)).  "Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993).

Here, ZURU's Infringing Figurines appear to be comprised of inferior plastics or product design compared to those used by the LEGO Group.  Verified Compl. at ¶ 33.  The ZURU's Infringing Figurines' torso and leg components lack the LEGO Group's Minifigure figurine's "clutch power," *i.e.*, the ability of the building components to snap together tightly.  *Id.* Similarly, the feet of the Infringing Figurine have poor "clutch power" and do not snap together tightly with ZURU's other building brick elements.  *Id.*  The arms of the Infringing Figurines also easily snap off and the hand elements easily dislodge from the arms during play. *Id.*  The way in which ZURU's Infringing Figurines readily come apart with very little effort, even when it is not the intention of the user for the toy figure to come apart, demonstrates the poor quality of the toy.  *See id.*   The poor "clutch power" of the Infringing Figurines is a known problem amongst ZURU's consumers, as evidenced by the product review for the Max Build More 15 Max Figures on Walmart.com below:

★★★★

Awesome set my boys love them! The Only problem is the body comes apart extremely easy. So, one thing id suggest is hot glueing the legs and body together so they dont come apart easily when your kids are playing with them.

Ashley, October 25, 2018

👍 0    👎 0    🏳

*Id.* at ¶ 33.

In short, this factor favors the LEGO Group.

### 8.  <u>The Sophistication of Toy Buyers</u>

This final factor "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Arrow Fastener, 59 F.3d at 398 (citing W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)).  Here, the relevant product is a set of 15 figures selling for $12.97.  Verified Compl. at ¶ 28.   That's less than $1 per figure.  The purchase of an inexpensive toy figure, intended for use by children, does not require a high degree of sophistication.  In short, the sophistication of the relevant purchaser factor favors the LEGO Group.

In sum, each of the *Polaroid* factors demonstrate that there is a likelihood of confusion between the ZURU Infringing Figurines and Infringing Images and the Minifigure Trademarks, and, therefore, weigh heavily in favor of granting the injunction.

### C.  **The LEGO Group is Likely to Succeed on its Friends Figurine Copyright Infringement Claim**

To prevail on a copyright infringement claim, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).*  The LEGO Group owns the Registered Friends Copyrights, covering the 3D sculpture of the Friends figurine.  Exhibits L,M,N,O.  The LEGO Group's certificates of registration constitute *prima facie* evidence of the validity not only of its copyrights, but also of the originality of their works. *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir. 1988).  Thus, the LEGO Group is likely to succeed in proving the first element of its copyright infringement claim.

To satisfy the second element, because direct proof of access is often impossible to prove, the law permits a plaintiff to carry its burden on this point through evidence that "an alleged infringer had a 'reasonable possibility'" of access to the original work.  *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Gaste,* 863 F.2d at 1066).  Here, the "reasonable possibility" that ZURU had access to the original work may be inferred by the fact the Friends figurine has been sold in numerous varieties of LEGO® brand toy sets since 2012 and that the LEGO Group has undertaken substantial promotional, advertising, and marketing efforts related to the Friends figurine for the last six years.  *See* Verified Compl. at ¶ 61. The LEGO Group's Friends line of products have been widely-recognized in the international toy community, winning "Toy of the Year" for the best toy overall in 2013 at the 2013 International Toy Fair in New York, New York.  *Id.* at ¶ 61.  Additional awards won by LEGO Group's Friends products include: "Best Toy" in the six-to-ten age group at the 2012 Nuremburg Toy Fair; 2013 "Activity Toy of the Year"; and 2013 "Girl Toy of the Year" at the 2013 International Toy Fair in New York, New York. *Id.*  LEGO® Friends products were also nominated for 2014 "Girl Toy of the Year" at the 2014 International Toy Fair in New York, New York. *Id.*  Thus, the LEGO Group is likely to succeed in establishing that ZURU had access to the copyrighted work.

101497843

-44-

Additionally, since at least 2012, the LEGO Group has continuously displayed "© LEGO" in the plastic of the Friends figurine in various locations. *Id.* at ¶ 59.  For example, in the images below,  "© LEGO" is in the plastic of each element comprising the Friends figurine:



**<u>© LEGO located on top of head element of Friend figurine</u>**



© LEGO located on the arm element of Friend figurine



© LEGO located on the bottom of leg element of Friend figurine



© LEGO located on the torso element of Friend figurine

Thus, ZURU has had constructive notice[4] of the LEGO Group's copyright protection for the Friends figurine.

Moreover, even without proof of access, a plaintiff may establish copyright infringement when the works are so strikingly similar that access may be inferred.  *See McKain v. Estate of Rhymer*, 166 F. Supp. 3d 197, 201 (D. Conn. 2015); *see also Repp v. Webber*, 132 F.3d 882, 887 (2d Cir. 1997).  As demonstrated below, the Infringing Friends Image is strikingly similar to the copyright protected Friends figurine.



**Infringing Friends Image and Image from Registered Friends Copyright VA 1-876-291**

---

[4] A copyright notice on the work creates at least "a triable issue of fact whether defendants were 'ignorant of the true facts.'"  *Pavlica v. Behr*, 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005).

Verified Compl. at ¶ 61.  Accordingly, even if access is not demonstrated by the $40 million global marketing push for the Friends line of products in 2012 alone, or the great success the product line has enjoyed since it was first launched six years ago (*id*.), the LEGO Group has proven striking similarity, and need not further demonstrate access.

As discussed above, ZURU infringes the Friends Copyright because is displays an image with an overall look and feel that is substantially similar to the average lay observer; indeed, "their aesthetic appeal as the same."  *Hamil Am.,* 193 F.3d at 100; *Yurman*, 262 F.3d at 111; *DiTocco*, 815 F. Supp. 2d at 671 n.10 ("[c]onsideration of the total concept and feel of a work . . . is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience.").

Here, the representative examples of the two works are substantially similar in total concept and feel, as demonstrated by the side by side comparison shown below.  The photograph shows the Infringing Friends Image on the left and an example of a representative copyrighted Friend figurine on the right:



**<u>Infringing Friends Image and LEGO® Friends™ figurine</u>**

Verified Compl. at ¶ 63.

Nearly every feature of the Infringing Friends Image mimics protectable expression contained in the Friends figurine. *See id.* A side-by-side comparison shows that the works are substantially and strikingly similar. *Id.* Thus, the LEGO Group is likely to succeed in proving substantial similarity between its Friends figurine and the Infringing Figurines.

### D. The LEGO Group is Likely to Succeed on its Design Patent Infringement Claim

To establish a likelihood of success on a design patent infringement claim, the LEGO Group must show (1) that it will likely prove infringement at trial, and (2) that it will likely

withstand challenges, if any, to the validity of the patent at trial.  *Titan Tire Corp v. Case New Holland, Inc*., 566 F.3d 1372, 1376 (Fed. Cir. 2009).

### a.   ZURU's Infringing Bricks Infringe the Asserted Patents

A design patent contains a single claim. 37 C.F.R. § 1.153. "Whether a design patent is infringed is determined by first construing the claim to the design ... and then comparing it to the design of the accused device." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404-05 (Fed. Cir. 1997). The Federal Circuit has established that the sole test for design patent infringement is the ordinary observer test. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008). The ordinary observer test originated in *Gorham Co. v. White*, 81 U.S. 511 (1872), where the Supreme Court held "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Id.* at 528. Thus, to show infringement under the ordinary observer test, a plaintiff must demonstrate that "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010) (citing *Egyptian Goddess*, 543 F.3d at 681).

Ordinary observers are those having "ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which [people] of ordinary intelligence give." *Gorham Co.*, 81 U.S. at 528. "[T]he ordinary observer is not any

observer but one who, with less than the trained faculties of the expert, is 'a purchaser of things

of similar design,' or 'one interested in the subject.'" *Arminak & Assocs., Inc. v. St.-Gobain*

*Calmar, Inc.*, 424 F. Supp. 2d 1188, 1196 (C.D. Cal. 2006) (quoting *Applied Arts Corp. v.*

*Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 430 (6th Cir. 1933)).

### i.  <u>Construing the Claims</u>

With respect to construing the claimed designs, "[a]s the Supreme Court has recognized,

a design is better represented by an illustration 'than it could be by any description and a

description would probably not be intelligible without the illustration.'" *Egyptian Goddess*, 543

F.3d at 679 (quoting *Dobson v. Dornan*, 118 U.S. 10, 14 (1886)). There is no need for the district

court "to provide a detailed verbal description of the claimed design, as is typically done in the

case of utility patents." *Egyptian Goddess*, 543 F.3d at 679 (citing *Contessa Food Prods., Inc. v.*

*Conagra, Inc.,* 282 F.3d 1370, 1377 (Fed. Cir. 2002)  (approving district court's construction of

the asserted claim as meaning "a tray of a certain design, as shown in Figures 4-5")); *see also*

*Crocs, Inc.*, 598 F.3d at 1302 ("This court has cautioned, and continues to caution, trial courts

about excessive reliance on a detailed verbal description in a design infringement case.")

(citation omitted).  For this reason, a detailed verbal claim construction is not required and may

actually be misleading; instead, a claim construction based on the figures may be used.  In other

words, we can look at the pictures.

The Asserted Patents cover construction bricks of the general shape and character as

represented in the images below and within the Asserted Patents included as Verified Complaint

Ex. D,E,F,G. These figures illustrate the overall visual effect of the ornamental design of the

Asserted Patents:



FIG. 7

**Figure 7 of the '923 Patent**



FIG. 1

**Figure 1 of the '328 Patent**



**Figure 1 of the '053 Patent**



**Figure 1 of the '707 Patent**

Claims of a design patent are also to be construed with the understanding that "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010) (quoting *OddzOn Prods.*, 122 F.3d at 1405). "If ... a design contains both functional and ornamental features, the

patentee must show that the perceived similarity is based on the ornamental features of the design. The patentee 'must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental.'" *OddzOn Prods.*, 122 F. 3d at 1405. Thus, a district court properly factors out the functional aspects of a design as part of its claim construction. *Id*.

Many designs or design elements perform some function; however, so long as a design choice has been applied to the design or design element in question, the design or design element is not dictated by function and the ornamental nature of the design or design element should be given patentable weight. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993) ("When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose."). Here, as with many designs, ZURU may allege that the design claimed in the Asserted Patents contains some functional elements. However, even if there are some functional elements, the Asserted Patent design claims are to be construed as encompassing the ornamental design applied to such elements. *Richardson*, 597 F.3d at 1294 (quoting *L.A. Gear*, 988 F.2d at 1123 ("The elements of the design may indeed serve a utilitarian purpose, but it is the ornamental aspect that is the basis of the design patent.")).  Thus, even if a construction toy building brick or any similar article of manufacture includes some functional elements, such as elements to connect to other construction toy building brick designs, the ornamental design applied in the design is properly considered part of the design claimed.

The many construction toy building brick designs invented by the LEGO Group show alternatives for accomplishing any functionality that may be allegedly associated with the design of the Asserted Patents or the various design elements of the Asserted Patents. Such ornamentation is not functional and thus is properly included in the construed design claim. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d at 1123. Additionally, ZURU has included copyright notices (© ZURU) in each of its construction bricks[5], including the Infringing Bricks, acknowledging the non-functional and protectable nature of the Infringing Bricks. Accordingly, the elements of the Asserted Patents' designs are not "'dictated by' the use or purpose of the article", *L.A. Gear*, 988 F.2d at 1123, and thus functionality should not significantly impact the claim construction of the Asserted Patents. Accordingly, an appropriate claim construction in this case is simply the design for construction toy building brick designs as illustrated in the figures of the Asserted Patents.

### ii.   Comparison of the Asserted Patents and the Infringing Bricks

"The comparison step of the infringement analysis requires the fact-finder to determine whether the patented design as a whole is substantially similar in appearance to the accused design. The patented and accused designs do not have to be identical in order for design patent

---

[5] In response to the Second Demand Letter, which points out that copyright notices are included on all ZURU bricks, including the Infringing Bricks, ZURU responded: "You noted that a copyright marking appears on the MAX BUILD MORE™ bricks.  Such marking was applied in error and has been removed immediately from any further produced product."  Alquist Decl., Ex. 10.  Stating that copyright notices were applied to more than 50 distinct, expensive, plastic molds "in error" strains credulity.

infringement to be found." *OddzOn Prods.,* 122 F.3d at 1405. "The proper comparison requires a side-by-side view" of the patent design and the accused product. *Crocs, Inc.*, 598 F.3d at 1304. The accused products in this case is ZURU's Infringing Bricks, which are included in ZURU's Max Build More Building Bricks Value Set (759 Bricks),  Max Build More Building Bricks Value Set (253 Bricks),  and the Max Build More Building Bricks Accessories and Wheels Value Set (250 Pieces).  Verified Compl. at ¶ 50.  Example views of ZURU's Infringing Bricks, along with corresponding exemplary images from the Asserted Patents, are positioned side-by-side below and fully detailed within the claim construction charts attached to the Verified Complaint as Ex. H,I,J,K.

| Exemplary Drawing from '923 Patent | Comparison of Bricks |
|---|---|
|  | |

| Exemplary Drawing from '328 Patent | Comparison of Bricks |
|---|---|
|  | |

| Exemplary Drawing from '053 Patent | Comparison of Bricks |
|---|---|
|  | |

101497843

-56-

.

| Exemplary Drawing from '707 Patent | Comparison of Bricks |
|---|---|
|  | |

See Verified Compl. at ¶¶ 52-55.

As is readily apparent from the side-by-side comparison, the representative example Infringing Brick's includes the same design features, distinguishable from the prior art and not to be discounted due to functionality, as the designs claimed in the Asserted Patents.  *See* Verified Compl. at Ex. H,I,J,K.  Thus, the Infringing Bricks have a deceptively similar and indeed identical overall visual effect that deceives purchasers and easily satisfies the ordinary observer test.  *Id.*

Moreover, a comparison of the commercial embodiment of the designs claimed in the Asserted Patents, genuine LEGO® brand construction toy building bricks, and ZURU'S

Infringing Bricks provide further support that the designs are confusingly similar under the ordinary observer test.  *See L.A. Gear*, 988 F.2d at 1125-26 ("When the patented design and the design of the article sold by the patentee are substantially the same, it is not error to compare the patentee's and the accused articles directly , indeed, such comparison may facilitate application of the *Gorham* criterion of whether an ordinary purchaser would be deceived into thinking that one were the other." (citation omitted)).

Exacerbating the likelihood of consumer deception, photos of the Infringing Bricks are displayed on the Max Build More Building Bricks Value Set (759 Bricks), Max Build More Building Bricks Value Set (253 Bricks), and the Max Build More Building Bricks Accessories and Wheels Value Set (250 Pieces) and available for easy view by consumers, as shown below:



**Infringing Bricks on Max Build More Building Bricks Value Set (759 Pieces)**

.



**Infringing Bricks on Max Build More Building Bricks Value Set (253 Pieces)**



**Infringing Brick on Max Build More Building Bricks Accessories and Wheels Value Set**

The same images are enlarged to show detail below.  The Infringing Bricks are circled in red.



**Infringing Bricks on Max Build More Building Bricks Value Set (759 Pieces)**



**Infringing Bricks on Max Build More Building Bricks Value Set (253 Pieces)**



**Infringing Brick on Max Build More Building Bricks Accessories and Wheels Value Set**

Verified Compl. at ¶ 51.

Accordingly, an ordinary observer, familiar with the prior art, and discounting any

functional elements, would be deceived into believing the designs of the Infringing Bricks are

101497843                                -60-

.

the same as the designs claimed in the Asserted Patents.  Accordingly, the LEGO Group is likely to prove infringement at trial. *See, e.g., Hoop v. Hoop*, 279 F.3d 1004, 1006 (Fed. Cir. 2002) ("We will affirm [a preliminary injunction under the patent laws] unless we find it to be an abuse of discretion, based upon an error of law, or a serious misjudgment of the evidence.").

**b.  <u>The LEGO Group is Likely to Prevail on Design Patent Validity at Trial</u>**

The LEGO Group must also show that it "will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp.*, 566 F.3d at 1376. "In assessing whether the patentee is entitled to the injunction, the court views the matter in light of the burdens and presumptions that will inhere at trial." *Id*. "At trial ... an issued patent comes with a statutory presumption of validity under 35 U.S.C. § 282. Because of this presumption, an alleged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by clear and convincing evidence, as well as the initial burden of going forward with evidence to support its invalidity allegation." *Id*.

"*Before trial* ... these burdens and presumptions [are] tailored to fit the preliminary injunction context." *Id* at 1377. "Thus, if a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue." *Id*.  If a Defendant comes forward with evidence of invalidity, Plaintiffs are entitled to respond. *Id*.

In addition to the presumption of validity, the prosecution of the Asserted Patents before the USPTO supports the validity of the Asserted Patents because the Asserted Patents  issued from

the USPTO after having a large number of references cited against it, none of which was close to the design of the Asserted Patents. *See* Alquist Decl., Ex. 4-7.

The clear differences between the claimed design and the prior art also support a conclusion that the Asserted Patents are valid. *Id.* Moreover, any elements that may be alleged as functional are clearly inconsequential to the overall visual effect, as outlined in the patent prosecution record, which also supports a conclusion that the Asserted Patents are valid. *Id*

Accordingly, the LEGO Group is likely to prevail on the merits of its patent infringement claims.

## VI.     The LEGO Group Has Suffered and Will Suffer Irreparable Harm

A party seeking injunctive relief must present evidence that it is likely to suffer irreparable harm. *Salinger v. Colting*, 607 F.3d 68, 79-82 (2d Cir. 2010).

In a trademark infringement case, proof of a likelihood of confusion establishes **both** irreparable harm and a likelihood of success on the merits. *See Hasbro, Inc. v. Lanard Toys, Ltd*., 858 F.2d 70, 73 (2d Cir. 1998) (reversing denial of a preliminary injunction); *see also Russian Kurier, Inc. v. Russian Am. Kurier, Inc*., 899 F. Supp. 1204, 1212 n.7 (S.D.N.Y. 1995) (granting preliminary injunction); *Home Box Office, Inc. v. Showtime/Movie Channel, Inc*., 832 F.2d 1311, 1314 (2d Cir. 1987) (affirming grant of preliminary injunction).  That is to say, **irreparable harm is presumed.**  This is because the party enforcing the trademark has no control over the quality and nature of the products/services bearing the infringing mark (and the resulting impact on the enforcing party's reputation):

> [T]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. *Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the actions of another.*

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990) (emphasis added) (internal quotation marks and citation omitted) (reversing denial of preliminary injunction); *see Ryan v. Volpone Stamp. Co.*, 107 F. Supp. 2d 369, 404 (S.D.N.Y. 2000) (granting preliminary injunction and holding that "[t]he mere loss of control over [plaintiff's] reputation is what constitute[s] the irreparable harm").  Based on the analysis of the *Polaroid* factors above, the LEGO Group is likely to demonstrate a high likelihood of confusion regarding its claim that ZURU infringes the LEGO Group's trademarks.  Thus, the LEGO Group has also demonstrated irreparable harm with regard to its trademark infringement claim.

The LEGO Group will also suffer irreparable harm through the continued infringement of the Asserted Patents by ZURU.  35 U.S.C. § 154(a)(1) provides "[e]very patent shall contain ... a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States...." "It is well-settled that, because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988). "If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts." *Id.* at 1457 (quoting *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985)). Accordingly, injunctive relief is an appropriate remedy for patent infringement. *See eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) ("We hold only that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards.").

Unless enjoined, the LEGO Group will lose its hard-earned market share, which further supports a finding of irreparable harm. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-62 (Fed. Cir. 2008) (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001)); *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996); *Polymer Techs., Inc. v. Bridwell,* 103 F.3d 970, 975-76 (Fed. Cir. 1996)). In this case, the LEGO Group almost certainly will suffer great and unpredictable harm should ZURU continue its infringing activity, especially throughout the duration of the peak holiday shopping season.

Harm to a patent holder's goodwill also supports issuance of a preliminary injunction. *AstraZeneca LP v. Apotex Corp.,* 633 F.3d 1042, 1063 (Fed. Cir. 2010); *see also Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994) ("Harm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure."). Here, there is ample evidence (*see, e.g.,  supra*, § II. B. a. i. 5 (actual confusion)) that ZURU's infringing conduct will irreparably harm the goodwill and reputation of the LEGO Group.

In a copyright infringement case, finding of likelihood of success on the merits does not raise a presumption of irreparable harm. *Salinger,* 607 F.3d at 82.  The Second Circuit has held

irreparable harm exists in copyright infringement cases when a plaintiff's losses would be difficult to measure and monetary damages would be insufficient to remedy the harms.  *See eBay*, 547 U.S. at 391; *Salinger*, 607 F.3d at 80; *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 38 (2d Cir. 1995) (holding injunctive relief appropriate "to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that [the quantification of] damages must be based on more than speculation.").  Similar to its sister intellectual property rights, allowing copyright infringers to proceed without injunction amounts to a compulsory license and loss of goodwill and reputation.  Thus, for the same reasons that trademark law presumes irreparable harm, the LEGO Group is, in fact, irreparably harmed by ZURU's copyright infringement.

Moreover, it would be difficult to quantify the monetary damages owed to the LEGO Group.  The construction toy market is highly competitive.  Verified Compl. at ¶ 34.  Selling products that infringe the LEGO Group's copyrights will allow ZURU to increase its market share and sales, and enable ZURU to establish relationships with customers, and licensors potentially, for whom the LEGO Group competes.  *Id.*  That potential injury to the LEGO Group is unquantifiable.  *Id*. Finally, there are a number of other competitors in the field, and if infringement is permitted, others may be emboldened to infringe on the LEGO Group's Registered Copyrights, creating more compulsory licensees. If not enjoined, ZURU will continue to cause actual, irreparable harm to the LEGO Group.

101497843

-65-

**VII.    The Balance of Hardships Favors Granting the Requested Relief**

The balance of hardships favors granting the injunctive relief requested by the LEGO Group for several reasons.  Permitting ZURU to use the LEGO Group's patents, trademarks and copyrights greatly affects the LEGO Group's ability to protect its goodwill and reputation with its customers and business partners.  *See Ryan,* 107 F. Supp. 2d at 404 (finding irreparable harm exists because plaintiff cannot control the quality of defendant's products).  For example, without an injunction, the LEGO Group risks that ZURU will continue to "free ride" off the LEGO Group's goodwill and reputation.  Allowing ZURU to continue to use the LEGO Groups' patents, copyright and trademarks during the pendency of this action, especially in the midst of the busy holiday shopping season, will lead to loss of market share and only exacerbate the harm to the LEGO Group' goodwill and reputation for which there is no adequate remedy at law.

On the other hand, any harm ZURU might experience as a result of a temporary restraining order and preliminary injunction would be relatively minor because any inconvenience to ZURU is a self-inflicted wound. *See Clear Channel Outdoor, Inc. v. City of N.Y.*, 594 F.3d 94, 110 (2d Cir. 2010) (finding harm to plaintiffs caused by their violations of City ordinance the result of a "self-inflicted wound").  In short, ZURU deliberately used (and is continuing to use) the LEGO Group's patents, copyrights, and trademarks in commerce despite the fact the LEGO Group sent ZURU cease and desist letters informing ZURU of the LEGO Group's rights.  Alquist Decl., Ex. 2.  According to the Second Circuit, "[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." *WPIX, Inc. v. ivi, Inc.,*  691 F.3d 275, 287 (2d Cir. 2012) (internal quotation marks and citation

omitted).  ZURU has chosen to proceed at its own peril, and therefore, must live with the consequences.  Thus, the balance of hardships favors granting the preliminary injunction.

## VIII.   The Public Interest Favors Injunctive Relief

The public interest favors protection of the rights secured by valid trademarks because trademark law seeks to provide protection against consumer confusion and the public interest is "undoubtedly…better served by the elimination of this confusion."  *Guthrie Healthcare Sys. v. ContextMedia, Inc*., 826 F.3d 27, 50 (2d Cir. 2016).  Here, an injunction not only protects the LEGO Group's interest in maintaining control over its intellectual property and avoiding injury to its reputation and goodwill, but it also protects the public from consumer confusion.  *See id*. The relevant consumers here are children and their families.  Injunctive relief would bar ZURU from continuing to mislead and deceive these consumers and the public into believing there is an association, affiliation, or connection between ZURU and the LEGO Group, when in fact there is none.

Additionally, "[t]here exists a strong policy in favor of enforcing copyrights" and "the public interest favors enforcing [the LEGO Group's] copyrights."  *LEGO A/S v. Best-Lock Constr. Toys, Inc*., 874 F. Supp. 2d 75, 107 (D. Conn. 2012).  Likewise, "there exists a public interest in protecting rights secured by valid patents." *Jeneric/Pentron, Inc. v. Dillon Co.*, 259 F. Supp. 2d 192, 196 (D. Conn. 2003) (quoting *Hybritech*, 849 F.2d at 1458).

Thus, the public interest favors granting preliminary injunctive relief.

### IX.   The Equities in this Case Favor No Bond or a Nominal Bond.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Rule vests the district court with wide discretion in the matter of security. *See Doctor's Assocs., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996). The district court may dispense altogether with the filing of a bond where there has been no proof of likelihood of harm. *Ferguson v. Tabah,* 288 F.2d 665, 675 (2d Cir. 1961).

Defendant will suffer no legally cognizable harm from issuance of a temporary restraining order or a preliminary injunction because any inconvenience or harm it suffers will result solely from its own deliberate decisions to infringe the LEGO Group's intellectual property. Any less would permit knowing infringers to construct a business around infringement; a result this Court should not condone. *Clear Channel Outdoor, Inc. v. City of N.Y.*, 594 F.3d 94, 110 (2d Cir. 2010)*; see also My-T Fine Corp. v Samuels,* 69 F2d 76, 78 (2d Cir. 1934) ("[A]dvantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed.").

The purpose of the bond requirement is to assure "the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia Corp. v. InterDigital, Inc.,* 645 F.3d 553, 557 (2d Cir. 2011). Although a wrongfully enjoined party will be "entitled to a presumption in favor of recovery," this presumption only "applies to 'provable' damages . . . 'proximately caused by the injunction, up to the amount of the bond.'"

101497843

-68-

*Id.* at 559 (quoting *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1056 (2d Cir. 1990)).

Here, the Court should exercise its discretion and require no bond or a bond in a nominal amount. Indeed, ZURU admits that it will not be harmed by the removal of the Infringing Products from websites and retailers' shelves. At 6:40 a.m. today, December 13, 2018, ZURU sent another email claiming it is willing to have all of its products removed from its website and "we will recall product currently with Walmart, and that we have started to action that today." Alquist Decl., Ex. 11. Although compliance can only be ensured by entry of an injunction, ZURU's statements indicate that no bond is required. Moreover, the LEGO Group has shown that it has and will continue to suffer irreparable harm and, based on the evidence presented here, it is apparent that the LEGO Group is likely to prevail on its claims. Should the Court decide to issue a bond in a nominal amount, the LEGO Group suggests an amount of $50,000, reflecting a reasonable estimated amount of ZURU's potential lost profits for a 14-day period.[6]

## CONCLUSION

For the foregoing reasons, the Court should grant the LEGO Group's motion for temporary restraining order and preliminary injunction and enjoin ZURU, its employees, and all persons acting in concert with ZURU from manufacturing, selling, offering for sale, displaying and importing all products that infringe the LEGO Group's Asserted Patents, Minifigure

---

[6] In the preliminary injunction phase, the burden of establishing the amount of a bond necessary to secure against the wrongful issuance of the injunction falls to ZURU. *See Doctor's Associates*, 85 F.3d at 985.

Copyrights, Minifigure Trademarks, and Friends Copyrights immediately and during the

pendency of this action, as well as such other relief as the Court deems just and proper.

Dated: December 13, 2018

Respectfully submitted,

_____
Elizabeth A. Alquist (ct15643)
Eric TeVelde (ct29064)
Melanie J. Raubeson (ct30157)
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103-1212
Phone (860) 275-0100
Fax (860) 275-0343
eaalquist@daypitney.com
etevelde@daypitney.com
mraubeson@daypitney.com

*Attorney for Plaintiffs*

LEGO A/S,  LEGO SYSTEMS, INC., and
LEGO Juris A/S

101497843

-70-

## **CERTIFICATION**

I hereby certify that on December 13, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Elizabeth A. Alquist
Elizabeth A. Alquist

101497843

-71-