## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-------------------------------x
LEGO A/S; LEGO SYSTEMS, Inc.;    :
and LEGO JURIS A/S,              :
                                 :
         Plaintiffs,             :
                                 :
v.                               :   Civil No. 3:18-cv-2045(AWT)
                                 :
ZURU INC.,                       :
                                 :
         Defendant.              :
-------------------------------x
```

### RULING ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs LEGO A/S, LEGO Systems, Inc., and LEGO Juris A/S have moved for a preliminary injunction restraining defendant ZURU Inc. from manufacturing, selling, offering for sale, displaying, and importing products that infringe the plaintiffs' copyrights, trademarks, and design patents.  For the reasons set forth below, the plaintiffs' motion is being granted.

I.   **FACTUAL BACKGROUND**

A. **The LEGO Plaintiffs and Their Copyrights, Trademarks, and Design Patents**

Plaintiffs LEGO A/S ("LAS"), LEGO Systems, Inc. ("LSI"), and LEGO Juris A/S ("LJAS") (collectively, the "LEGO Group") filed a Verified Complaint against defendant ZURU Inc.  LAS is a private company with a place of business in Denmark; LSI is a Delaware corporation having its principal place of business in Enfield, Connecticut; and LJAS is a private company with a place

of business in Denmark. The LEGO Group is an industry leader in designing and manufacturing toys and play materials for children of all ages worldwide, including toy building elements, figurines, and toy sets in the construction toy category.

The LEGO Group's Minifigure figurine (the "Minifigure figurine") is one of the LEGO Group's iconic construction toys. See Verified Compl. ("Compl.") (ECF No. 1), at ¶ 13. LAS owns several copyrights registered with the United States Copyright Office, including Registration Number VA0000655230 and Registration Number VA0000655104 (the "Minifigure Copyrights"), which "protect the 3D sculpture and derivative works of the Minifigure figurine." Id., at ¶ 14. The LEGO Group displays the © symbol on the plastic of the Minifigure figurine itself in various locations, e.g. the leg element and the torso element, as well as on various product packaging in connection with the Minifigure figurine. See id., at ¶¶ 15-17.

The LEGO Group introduced its Friends™ line of toy products in 2012. This line includes "a series of miniature figurines (the 'Friends figurine') representative of LEGO© Friends characters™." Id., at ¶ 57.

LAS owns copyrights registered with the United States Copyright Office, i.e. Registration Numbers VA 1-876-291, VA 1-876-279, VA 1-876-378, and VA 1-876-373 (the "Friends Copyrights"), which protect the 3D sculpture and derivative

2

works of the Friends figurine. Since at least 2012, the LEGO Group "has continuously displayed '© LEGO' in the plastic of the Friends figurine" in various elements of the Friends figurine, such as on top of the head element. Id., at ¶ 59.

The LEGO Group has obtained design patents in the United States for its bricks and building elements. See id., at ¶ 44. The LEGO Group owns the following patents that are at issue in this motion: U.S. Patent No. D688,328S (the "'328 Patent"); U.S. Patent No. D641,053S (the "'053 Patent"); and U.S. Patent No. D614,707S (the "'707 Patent") (collectively the "Asserted Patents."). See id., at ¶ 45. U.S. Patent No. D701,923S ("the '923 Patent") is a subject of this action but not of the motion for a preliminary injunction.

**B. ZURU Inc. and Its Products**

The defendant, ZURU Inc., is a corporation formed under the laws of the British Virgin Islands and has offices in Hong Kong. ZURU "designs, manufactures, and markets innovative toys and consumer products." Def.'s Mem. in Support of Mot. to Dismiss (ECF No. 31-1), at 2.[1] Non-party ZURU, LLC is an Oregon limited liability company, with its principal place of business in California. Its sole member is ZURU Inc.

---

[1] The page numbers from the parties' briefings refer to the page numbers of the ECF at the top, and not the page numbering at the bottom.

ZURU sells figurines in its MAX Build More 15 MAX Figures set (the "Infringing Figurines"), which the LEGO Group maintains are substantially similar to the overall look and feel of the plaintiffs' Minifigure figurine. The LEGO Group contends that the "Infringing Figurines are advertised on ZURU's websites," which provide links to purchase the Infringing Figurines to the Walmart website. Compl., at ¶¶ 25-26. The Infringing Figurines are also sold in Walmart's retail stores in the U.S. The Infringing Figurines became available for sale to the public though Walmart retail locations and the Walmart Website on or about October 1, 2018.

The plaintiffs also contend that the product packaging for the Infringing Figurines and ZURU's MAX Build More and Mayka Toy Block Tape lines of construction toys are substantially similar to the overall look and feel of the Minifigure figurine.

The plaintiffs contend that "ZURU manufactured, sold, offered to sell and imported and/or currently manufactures, sells, offers to sell, and imports, in the United States certain building bricks that are substantially similar to the Asserted Patents (the 'Infringing Bricks') in at least three different products: the MAX Build More Building Bricks Value Set (759 Bricks), MAX Build More Building Bricks Value Set (253 Bricks), and the MAX Build More Building Bricks Accessories and Wheels Value Set (250 Pieces)." Id., at ¶ 50.

4

The plaintiffs contend that "ZURU uses an image on product packaging for its Mayka Toy Block Tape that is strikingly and substantially similar to the overall look and feel of the Friends Copyrights (the "Infringing Friends Image")." Id., at ¶ 62.

## C. Claims Not a Subject of the Preliminary Injunction Motion

Counts IV (Common Law Trademark and Trade Dress Infringement, Unfair Competition, and Misappropriation) and VII (Violation of the Connecticut Unfair Trade Practices Act) of the Verified Complaint are not a subject of the preliminary injunction motion. The Stud Trademarks and the '923 Patent are not a subject of the motion for a preliminary injunction even though the Stud Trademarks are a subject of Count II and the '923 Patent is a subject of Count VI.

## II. LEGAL STANDARD

In Salinger v. Colting, 607 F.3d 68, 77, 79 (2d Cir. 2010), the court held that the test for the grant of a preliminary injunction based on alleged copyright infringement is "the four-factor test set forth by the Supreme Court in eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L.Ed.2d 641 (2006), while intimating that the eBay formulation applies to all applications for preliminary injunctions." Lego A/S v. Best-Lock Const. Toys, Inc., 874 F. Supp. 2d 75, 80 (D.

Conn. 2012) (citing <u>Salinger</u>, 607 F.3d at 77, 79). Under that
test,

> the court must consider four factors. First, the party
> requesting the injunction must demonstrate either (a) a
> likelihood of success on the merits, or (b) sufficiently
> serious questions going to the merits to make them a
> fair ground for litigation and a balance of hardships
> tipping decidedly in the movant's favor. <u>Salinger</u> at 79.
> Second, the movant must show that it is likely to suffer
> irreparable injury in the absence of an injunction,
> paying particular attention to the question of whether
> the remedies available at law, such as monetary damages,
> are inadequate to compensate for that injury. <u>Id.</u> at 80.
> Third, the court must consider the balance of hardships
> between the parties and grant the injunction only if
> that balance tips in the movant's favor. <u>Id.</u> Fourth, the
> court must ensure that the "public interest would not be
> disserved" by the issuance of a preliminary
> injunction. <u>*Id.,*</u> quoting <u>eBay</u> at 391, 126 S.Ct. 1837.

<u>Id.</u>

## III. DISCUSSION

### A. Likelihood of Success on the Merits Or Sufficiently Serious Questions Going to the Merits

#### 1. Copyright Infringement re the Minifigure Figurine (Count I) and the Friends Figurine (Count V)

"To maintain an action for infringement, a plaintiff must
establish '(1) ownership of a valid copyright, and (2) copying
of constituent elements of the work that are original.'" <u>Kwan v.
Schlein</u>, 634 F.3d 224, 229 (2d Cir. 2011) (quoting <u>Feist
Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.</u>, 499 U.S. 340, 361,
(1991).

The LEGO Group owns a valid copyright for the Minifigure figurine and the Friends figurine as they own the Minifigure Copyrights, covering the 3D sculpture of the Minifigure figurine (see Compl., Ex. A and B), and the Friends Copyrights, covering the 3D sculpture of the Friends figurine (see Compl., Ex. L-O). Therefore, the plaintiffs have met their burden with respect to the first element.

"To satisfy the second element, plaintiff 'must also show copying by defendants.... Copying may be inferred where a plaintiff [1] establishes that the defendant had access to the copyrighted work and [2] that substantial similarities exist as to protectible material in the two works.'" Leary v. Manstan, 118 F. Supp. 3d 460, 465 (D. Conn. 2015) (quoting Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986)).

### a. Access to the Minifigure figurine and the Friends figurine

"Actual copying may be established 'either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony.'" Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998) (quoting Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992)).

Access means that an alleged infringer had a "reasonable possibility"—not simply a "bare possibility"—of

[accessing] the prior work; access cannot be based on
mere "speculation or conjecture." Gaste v.
Kaiserman, 863 F.2d 1061, 1066 (2d Cir. 1988) . . . In
order to support a claim of access, a plaintiff must
offer "significant, affirmative and probative
evidence." Scott v. Paramount Pictures Corp., 449
F.Supp. 518, 520 (D.D.C.1978), aff'd, 607 F.2d 494 (D.C.
Cir. 1979) (table), cert. denied, 449 U.S. 849, 101
S.Ct. 137, 66 L.Ed.2d 60 (1980) . . . .

Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003).

Here, the plaintiffs produced evidence that established
that the defendant had access to their products. The defendant
offers no evidence to the contrary.

The plaintiffs have shown with direct evidence that the
defendant had access to the LEGO Group's Minifigure figurine
because the Minifigure figurine was included in the initial
product advertisements for ZURU Inc.'s Mayka Toy Block Tape.
When the LEGO Group contacted ZURU Inc. in August 2017 to demand
that its property be taken off ZURU Inc.'s website, the
defendant removed the Minifigure figurine image from the Mayka
Toy Block Tape.  As to indirect evidence, there is a more than
reasonable possibility that ZURU Inc. had access to the
Minifigure figurine because the figurine has been sold in large
quantities since 1978 and the LEGO Group has engaged in
substantial promotional advertising and marketing efforts
related to the Minifigure figurine for over 40 years. It
implausible that a competing toy company in the figurine
business would have not known of the Minifigure figurine.

The plaintiffs have also produced evidence that establishes that there is more than a reasonable possibility that the defendant had access to the Friends figurine. The Friends figurine has been sold in numerous varieties of LEGO® brand toy sets since 2012, and the LEGO Group has undertaken substantial promotional, advertising, and marketing efforts with respect to the Friends figurine during that period. In addition, the Friends line of products has been widely-recognized in the international toy community, winning "Toy of the Year" for the best toy overall at the 2013 International Toy Fair in New York City, in addition to winning or being nominated for a number of additional awards. All of this would be common knowledge for toy companies competing in the figurine business.

Moreover, as discussed below, there are striking similarities between the Minifigure figurine and the Infringing Figurines, and between the Friends figurine and the Infringing Friends Image, and access can be inferred from the striking similarities. See McKain v. Estate of Rhymer, 166 F. Supp. 3d 197, 201 (D. Conn. 2015) ("In the absence of any proof of [direct] access, a complaint may establish a 'striking similarity' between the two works.").

### b. Substantial Similarities as To Protectible Material

The standard test for substantial similarity between two items is whether an "'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the

same.'" [Hamil America Inc. v. GFI, 193 F.3d 92, 100 (2d
Cir. 1999) (quoting Peter Pan Fabrics, Inc. v. Martin
Weiner Corp., 274 F.2d 487, 489 (2d Cir.1960)
(L.Hand, J.)). If "an average lay observer would
recognize the alleged copy as having been appropriated
from the copyrighted work," then the two products are
substantially similar. Hamil America, 193 F.3d at
100; see Knitwaves, Inc. v. Lollytogs, Ltd., 71 F.3d
996, 1003 (2nd Cir. 1995). The fact-finder must examine
the works for their "'total concept and feel.'" Hamil
America, 193 F.3d at 102 (quoting Knitwaves, 71 F.3d at
1002).

Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir.

2001). "Consideration of the total concept and feel of a work,

rather than specific inquiry into plot and character

development, is especially appropriate in an infringement action

involving children's works, because children's works are often

less complex than those aimed at an adult audience." Williams v.

Crichton, 84 F.3d 581, 589 (2d Cir. 1996) (citing Reyher v.

Children's Television Workshop, 533 F.2d 87, 91 (2d Cir.

1976), cert. denied, 429 U.S. 980 (1976).

 The evidence at the hearing showed that the total concept

and feel of the defendant's Infringing Figurines is

substantially similar to that of the plaintiffs' Minifigure

figurine. At the hearing, the plaintiffs' expert witness,

Elizabeth Knight ("Knight"), demonstrated the substantial

similarities between the Minifigure figurine and the Infringing

Figurines by showing the results of a side-by-side comparison of

the figurines and also by showing the results of an overlay of

images of the figurines. The side-by-side comparison and the overlay demonstrated there is very little in terms of differences between the plaintiffs' and defendant's products.

At the hearing, the plaintiffs also introduced into evidence physical specimens of the Minifigure figurine and the Infringing Figurines, arranged side-by-side. See Pls.' Ex. 1. Taking into account that exhibit, the court concludes that Knight testified persuasively that:

> When I first got them it took me a few minutes to determine which was which. They felt very much the same. So I had to study them closely to really determine what the differences were.

Prelim. Inj. Hrg. Tr. (ECF No. 66), at 223:13-16.

The average lay observer for purposes of this case would be an adult who is buying toys for a child, and as explained by Knight, adults do not pay as close attention to these products as children do. Also, as the defendant's expert, Richard Gottlieb ("Gottlieb"), testified, and Knight agreed, "it's harder for an adult" to see the small differences between the products because "[a]n adult looks very briefly. They don't pay a lot of attention." Prelim. Inj. Hrg. Tr. (ECF No. 65), at 153:20-22 (testimony of Gottlieb); see also id. (ECF No. 66), at 224:15-18 (testimony of Knight).

Knight also gave a persuasive explanation as to why there are substantial similarities between the Friends figurine and

11

the Infringing Friends Image. She pointed out the similarities in terms of scale and proportion, i.e. the length of the leg, the shape of the leg, the proportions or size of the torso, and the head and the hair. Thus, she supported that her conclusion that the overall look and feel was very much the same with specific details.

The defendant argues that the similarities between the Minifigure figurine and the Friends figurine, on the one hand, and the Infringing Figurines and the Infringing Friends Image, on the other hand, are not substantial when one makes a visual comparison. The defendant argues: "ZURU's products have flexible joints that provide more degrees of freedom for moving limbs. Additionally, Plaintiffs' figurines utilize geometric shapes, such as the trapezoidal torso, resembling robots; whereas ZURU's products feature cut-in waists, broad shoulders, and rounded hips resembling humanoid physiques." Def.'s Mem. in Support of Mot. to Dismiss (ECF No. 31-1), at 32. Also, the defendant's expert witness, Gottlieb, testified that the ZURU Inc. MAX Build More product is "substantially different" from the Minifigure figurine because the "MAX product looks a little bit more like an action figure" whereas "the LEGO product is really more of a construction element." Prelim. Inj. Hrg. Tr. (ECF No. 65), at 153:17, 153:24—154:6; see also Def.'s Closing Arg. (ECF No. 57), at 17.  However, these arguments deserve less weight than

Knight's analysis in light of the fact that the standard for
determining substantial similarity is whether an "ordinary
observer, <u>unless he set out to detect the disparities</u>, would be
disposed to overlook them, and regard the aesthetic appeal the
same." <u>Yurman Design, Inc. v. PAJ, Inc.</u>, 262 F.3d 101, 111 (2d
Cir. 2001) (emphasis added).

The defendant argues that the similarities between the
parties' products are common to other toy figurines. However,
Knight showed how various figurines can be very different in
form and proportion, creating different looks and feels that are
quite different from each other and from the Minifigure
figurine.

The defendant argues that, even if there are substantial
similarities between the Minifigure figurine and the Infringing
Figurines, the substantially similar elements are not
protectable because they are functional.

> The Copyright Act establishes that the broad category of
> "pictorial, graphic, or sculptural works" are eligible
> for copyright protection, provided, of course, that such
> works satisfy the Act's other requirements. See 17
> U.S.C. § 102. The Act, however, excludes any "useful
> article"—defined as "an article having an intrinsic
> utilitarian function that is not merely to portray the
> appearance of the article or to convey information"—from
> copyright eligibility. See 17 U.S.C. § 101; *see
> also* *328 17 U.S.C. § 102, Notes of committee on the
> Judiciary, House Report No. 94-1476 (stating that works
> of "artistic craftsmanship" are not protected by the
> Act, "insofar as their ... utilitarian aspects are
> concerned."). This limitation is in keeping with the
> notion that functional items are not eligible for the

13

> relatively long-term protections of copyright, as
> opposed to the more temporary rights provided by the
> Patent Act, 35 U.S.C. § 271 et seq.

Chosun Int'l, Inc. v. Chrisha Creations, Ltd., 413 F.3d 324,

327–28 (2d Cir. 2005), abrogated by Star Athletica, L.L.C. v.

Varsity Brands, Inc., 137 S. Ct. 1002, 197 L. Ed. 2d 354 (2017).

In Chosun Int'l, Inc., the court explained that

> while "useful articles", taken as a whole, are not
> eligible for copyright protection, the individual design
> elements comprising these items may, viewed separately,
> meet the Copyright Act's requirements. Specifically, if
> a useful article incorporates a design element that is
> physically or conceptually separable from the underlying
> product, the element is eligible for copyright
> protection.

Id. at 328. "Most courts in [the Second Circuit] appear to

define the 'functional' aspects of a toy implicitly as those

aspects that involve movement or attachment." Lego A/S, 874 F.

Supp. 2d at 98.

The Minifigure figurine and the Friends figurine have both

functional and design elements. The plaintiffs agree that the

Minifigure figurine has functional elements, such as "the bottom

of the feet and holes on the backside of the legs [which]

facilitate attachment to a base plate or brick." Pls.' Mem. of

Law in Opp. to Def.'s Mot. to Dismiss ("Pls.' Opp.") (ECF No.

45), at 36. However, the plaintiffs have shown that the

Minifigure figurine and the Friends figurine also contain design

elements that affect the look and feel of the toys by comparing

them to various toy human figurines that all look and feel different. See id., at 36-37. Therefore, the plaintiffs are likely to establish that the Minifigure figurine and the Friends figurine have protectable elements.

Based on the foregoing, the court concludes that the plaintiffs have demonstrated a likelihood of success on the merits with respect to Count I and Count V.

### 2. Trademark Infringement Under Section 32(a) (Count II) and Under Section 43(a)(1)(A) of the Lanham Act (Count III)

The plaintiffs claim, inter alia, that the defendant's actions with respect to the Infringing Figurines constitute trademark infringement as to the LEGO Group's Minifigure figurine. The Lanham Act defines trademark infringement as the use without consent of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1)(a). "The owner of a trademark may enforce the right to exclude others from using the trademark in an action for trademark infringement." Mashantucket Pequot Tribe v. Redican, 403 F. Supp. 2d 184, 190 (D. Conn. 2005).

Trademark infringement claims are analyzed under the following test: "[f]irst, . . . whether plaintiff's mark merits

protection, and second, whether defendant's use of a similar mark is likely to cause consumer confusion." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 115 (2d Cir. 2006).

With respect to the first prong, the LEGO Group owns a trademark for the Minifigure figurine registered with the US Patent and Trademark Office (the "Minifigure Trademark"), which constitutes prima facie evidence of the validity of the mark. See 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.").

With respect to the second prong, in evaluating the likelihood of confusion, courts in this circuit look to the Polaroid factors:

> (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith (or bad faith) in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers. Moreover, depending on the complexity of the issues, "the court may have to take still other variables into account."

Savin Corp. v. Savin Grp., 391 F.3d 439, 456 (2d Cir. 2004)

(quoting Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492,

495 (2d Cir. 1961)) (internal citations omitted). "[T]he list

of Polaroid factors is not exclusive and the analysis of the

factors is not a mechanical process. The Polaroid factors are

merely tools designed to help grapple with the 'vexing' problem

of resolving the likelihood of confusion issue." Merriam-

Webster, Inc. v. Random House, Inc., 35 F.3d 65, 70 (2d Cir.

1994) (internal citations and quotation marks omitted).

Additionally, "each factor must be evaluated in the context of

how it bears on the ultimate question of likelihood of confusion

as to the source of the product." Brennan's, Inc. v. Brennan's

Rest., L.L.C., 360 F.3d 125, 130 (2d Cir. 2004) (quoting Lois

Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867,

872 (2d Cir. 1986)).

Evaluating each of the Polaroid factors in light of the

current record, the court concludes that the plaintiffs are

likely to be able to establish that the defendant's use of the

Infringing Figurine is likely to cause confusion.  The

plaintiffs have produced evidence demonstrating that it is

likely that they will be able to establish that each of the

Polaroid factors supports such a conclusion.

### a. Strength of the Mark

"The strength of a mark is its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." New Colt Holding Corp. v. RJG Holdings of Fla., Inc., 312 F. Supp. 2d 195, 225 (D. Conn. 2004) (quoting Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 479 (2d Cir. 1996)). "When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce." CSL Silicones, Inc. v. Midsun Grp. Inc., 301 F. Supp. 3d 328, 356-57 (D. Conn. 2018).

The strength of a plaintiff's mark is not inherent, the court looks at the mark's acquired distinctiveness based on extrinsic evidence. In evaluating a mark's acquired distinctiveness, the court may examine "copying, advertising expenditures, sales success, length and exclusivity of use, unsolicited media coverage, and consumer studies (linking the name to a source)." In re Steelbuilding.com, 415 F.3d 1293, 1300 (Fed. Cir. 2005). "A showing of secondary meaning need not consider each of these elements. Rather, the determination examines all of the circumstances involving the use of the mark." Id.

The mark of the LEGO Group's Minifigure figurine is strong based on the extrinsic evidence presented by the plaintiffs, which includes, <u>inter alia</u>, a federally-registered trademark; substantial expenditures on promotional and marketing efforts; a long and continuous use of the mark since 1978; third-party licensing agreements; the substantial revenue from products and services connected to the Minifigure Trademark; and the widespread public exposure and recognition of the Minifigure figurine.

The defendant argues that the plaintiffs' mark is not strong with respect to the Minifigure figurine because it lacks exclusivity. The defendant asserts that there are other mini-figurine competitors in the market. However, this argument is unpersuasive because the LEGO Group has been policing its brand and most of the figurines pointed to by the defendant, <u>see</u> Def.'s Opp. to Pls.' Mot. for TRO and Prelim. Inj. ("Def.'s Opp.") (ECF No. 37), at 43, are "ones that the [LEGO Group] is either actively working to remove for intellectual property reasons or essentially already out of the market". Prelim. Inj. Hrg. Tr. (ECF No. 65), at 21:14-16 (testimony of David Buxbaum).

### b. Degree of Similarity Between Marks

The court looks to two factors when evaluating the degree of similarity between marks: "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect

the similarity has upon prospective purchasers." The Sports
Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 962 (2d Cir.
1996) (internal citations omitted).

Here, there is a high degree of similarity between the
marks. The court agrees with the plaintiffs that the Minifigure
figurine is substantially similar in overall impression to the
Infringing Figurines, based on the side-by-side comparison
conducted by Knight. The defendant points out a number of
differences between their product and the plaintiffs' product.
For example, the MAX Build More figurine has a square or
rectangular torso, instead of a trapezoidal one, see Def.'s
Opp., at 37, and the MAX Build More figurine does not have legs
that bulge forward at the top. See id., at 33. However,
differences such as these do not result in the creation of a
different overall impression than that created by the LEGO
Group's product. See Prelim. Inj. Hrg. Tr. (ECF No. 66), at
276:16-18 (testimony of Knight) ("If the difference is
minuscule, then it looks and feels the same."). The high degree
of similarity will cause confusion among prospective purchasers.
If someone like Knight has to look at the products for a few
minutes to determine which is which, prospective purchasers will
face a challenge in telling the difference too. See id., at
223:13-16.

### c. Proximity of the Products

The proximity of products is concerned with the "competitive distance between the products." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1134 (2d Cir. 1979).

> The "proximity-of-the-products" inquiry concerns whether and to what extent the two products compete with each other. We look to the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold.

Cadbury Beverages, Inc., 73 F.3d at 480 (internal quotation marks and citations omitted).

Here, both the plaintiffs' and defendant's products are toy figurines and toy construction products, and there is no difference between them in terms of the relevant market they target. ZURU Inc. simply presents itself as having the same quality product at a lower price.

### d. Likelihood that the Prior Owner Will Bridge the Gap

For this factor, the court evaluates ""whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, bridge the gap. If the senior user can show such an intention, it helps to establish a future likelihood of confusion as to source." Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1227 (2d Cir. 1987). Here,

there is no gap to be bridged because both companies already sell toy figurines and toy construction products.

### e. Actual Confusion

In The Sports Auth., Inc., 89 F.3d at 963 (internal quotation marks and citations omitted), the court stated:

> For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another. To show actual confusion, [the plaintiff] must demonstrate that [the defendant]'s use could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.

Additionally, "actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." Lois Sportswear, U.S.A., Inc., 799 F.2d at 875.

The plaintiffs have submitted evidence demonstrating that it is a likely that they will be able to establish that actual confusion has been experienced by consumers, including evidence that ZURU Inc. customers have used the LEGO name in connection with ZURU's Products. See Prelim. Inj. Hrg. Tr. (ECF No. 65), at 62:13-15 (testimony of Anna Mowbray).

### f. Bad Faith

To evaluate this factor, the court "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between

22

his and the senior user's product." Lang v. Ret. Living Pub. Co., 949 F.2d 576, 583 (2d Cir. 1991). Additionally, "actual or constructive knowledge may signal bad faith. Indeed, in this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987) (internal quotation marks omitted).

Here, the plaintiffs have produced evidence demonstrating that it is likely that they will be able to establish not only that the defendant had actual knowledge of confusion, but also that the defendant failed to correct such confusion on its own social media pages. See Pls.' Ex. 43. The plaintiffs will be able to bolster that evidence with circumstantial evidence, e.g. the number of infringing products, and the fact that ZURU Inc. continues to use the word "LEGO" on its packaging outside the United States, see Def.'s Ex. HHH, notwithstanding the discussions between the parties in 2017 concerning the "ZURU Mayka Lego Tape." Pls.' Mot. for TRO and Prelim. Inj., Ex. 1 (ECF No. 7-3).

### g. Quality of Defendant's Product

In evaluating this factor, the court looks to "whether the senior user's reputation could be jeopardized by virtue of the

fact that the junior user's product is of inferior quality." Prof'l Sound Servs., Inc. v. Guzzi, 349 F. Supp. 2d 722, 735 (S.D.N.Y. 2004), aff'd, 159 F. App'x 270 (2d Cir. 2005) (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 398 (2d Cir. 1995)). "Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp., 991 F.2d 1072, 1079 (2d Cir. 1993).

The plaintiffs have produced evidence demonstrating that it is likely that they will be able to establish that ZURU Inc. is taking unfair advantage of the goodwill earned by the products of the LEGO Group. A customer review on Walmart.com of the Infringing Figurines states that "the [o]nly problem is the body comes apart extremely easy. So one thing [I'd] suggest is hot glueing the legs and body together so they [don't] come apart easily when your kids are playing with them." Pls.' Ex. 43. (A close physical examination of the ZURU Inc. specimens in Pls.' Ex. 1 makes it clear how this could happen.) This customer review tends to support the testimony by David Buxbaum, the vice president Global Amazon Marketing and Commerce with the LEGO Group, that the Infringing Figurines are of lower quality than the LEGO Group's Minifigure figurine.

### h. Sophistication of Buyers

"In evaluating the sophistication of the buyers, the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." Prof'l Sound Servs., Inc., 349 F. Supp. 2d at 735 (internal quotation marks and citation omitted).

Here, as the plaintiffs point out, the relevant product is a set of toy figures selling for $12.97. The court agrees with the plaintiffs that the purchase of inexpensive toy figures, intended for use by children, does not require a high degree of sophistication. Moreover, the concern about confusion is heightened by the fact that, as stated by the defendant's expert, "[i]t's harder for an adult" to notice differences, as "[a]n adult looks very briefly. They don't pay a lot of attention," Prelim. Inj. Hrg. Tr. (ECF No. 65), at 153:20-22 (testimony of Gottlieb); see also id. (ECF No. 66), at 224:9-14 (testimony of Knight) ("moms and dads aren't paying as close attention as some kids do. They're busy, and shopping the way shopping is today, they're running through the aisles quickly. So if they look at a product for a couple seconds, they can easily be confused.").

Therefore, the court concludes that the plaintiffs have demonstrated that it is likely they will be able to establish

that each of the <u>Polaroid</u> factors supports the conclusion that
there is a likelihood of confusion. Consequently, the plaintiffs
have met their burden of demonstrating a likelihood of success
on the merits with respect to Count II and Count III.

### 3. Design Patent Infringement (Infringement of Asserted Patents Under 35 U.S.C. §§ 271 and 289) (Count VI)

To "[establish] a likelihood of success on the merits—the
patentee seeking a preliminary injunction in a patent
infringement suit must show that it will likely prove
infringement, and that it will likely withstand challenges, if
any, to the validity of the patent. . . . In assessing whether
the patentee is entitled to the injunction, the court views the
matter in light of the burdens and presumptions that will inhere
at trial." <u>Titan Tire Corp. v. Case New Holland, Inc.</u>, 566 F.3d
1372, 1376 (Fed. Cir. 2009).

"Whether a design patent is infringed is determined by
first construing the claim to the design, when appropriate, and
then comparing it to the design of the accused device." <u>OddzOn</u>
<u>Prod., Inc. v. Just Toys, Inc.</u>, 122 F.3d 1396, 1404 (Fed. Cir.
1997). The ordinary observer test is "the sole test for
determining whether a design patent has been infringed."
<u>Egyptian Goddess, Inc. v. Swisa, Inc.</u>, 543 F.3d 665, 678 (Fed.
Cir. 2008). To show infringement under the ordinary observer
test, the plaintiffs must show that "an ordinary observer,

familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." Crocs, Inc. v. Int'l Trade Comm'n, 598 F.3d 1294, 1303 (Fed. Cir. 2010).

### a. Construing the Claims

With respect to construing the claims, the Supreme Court has recognized that "a design is better represented by an illustration 'than it could be by any description and a description would probably not be intelligible without the illustration.'" Egyptian Goddess, Inc., 543 F.3d at 679 (quoting Dobson v. Dornan, 118 U.S. 10, 14 (1886)). Illustrations of the Asserted Patents are contained in the Verified Complaint (see ¶¶ 47, 48, 49) and in the plaintiffs' memorandum in support of their motion for a temporary restraining order and preliminary injunction. See ECF 7-1, at 51-57. In addition, the plaintiffs' expert, Knight, gave for each of the Asserted Patents a description of the claim using the illustrations and the actual construction toy building brick itself.

"A design patent only protects the novel, ornamental features of the patented design." OddzOn Prod., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997) (citing Lee v. Dayton-Hudson Corp., 838 F.2d 1186, 1188, 5 USPQ2d 1625, 1627 (Fed. Cir. 1988)). "Where a design contains both functional and

non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." Id.

"A design patent is directed to the appearance of an article of manufacture. An article of manufacture necessarily serves a utilitarian purpose, and the design of a useful article is deemed to be functional when the appearance of the claimed design is 'dictated by the use or purpose of the article.' If the particular design is essential to the use of the article, it can not be the subject of a design patent." L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1123 (Fed. Cir. 1993) (internal citations omitted). "The elements of the design may indeed serve a utilitarian purpose, but it is the ornamental aspect that is the basis of the design patent." Id.

Here, the plaintiffs have established that each of the Asserted Patents contains both functional and ornamental features. In addition, the plaintiffs have established that the appropriate claim construction in each instance is the design for a construction toy building brick illustrated in the figure for the relevant Asserted Patent.

With respect to the '053 Patent, Knight described the overall visual appearance of the '053 Patent design as "a unique form." Prelim. Inj. Hrg. Tr. (ECF No. 66), at 242:9. She explained:

> It's a slab that has one step up with a single stud
> projection on the first step and two on the top. It's
> got this sort of S curve that is sort of abstract, makes
> the form abstracted. It's nothing specific. It feels
> very open to possibilities. It doesn't say I want to be
> this kind of thing or a character or a structure. It
> feels like it could be a lot of different things.

Id., at 242:9-16. When asked whether the design was dictated by

function, Knight explained that it is not, "[b]ecause it's got

all these shapes and forms and suggestions of proportion that

don't need to be there to connect." Id., at 245:1-3. Knight

highlighted the significance of the "S curve" which makes the

brick "something unusual." Id., at 245:6. In response to a

question from the court, she explained that the "S curve" was

"not a full S but we call it an S curve because it kind of goes

in both directions . . . ." Id., at 245:19-21.

The plaintiffs then introduced into evidence three of what

they call "official builds" comprised of LEGO bricks. Knight

showed how these builds "creatively illustrate the ornamental

features" of the '053 Patent. Id., at 248:1. Plaintiffs' Exhibit

88 is a LEGO vampire figurine in which the brick is akin to part

of the cloak in the area of the vampire's arm. Plaintiffs'

Exhibit 89 is a LEGO moose figurine in which the same brick

looks like antlers. Plaintiffs' Exhibit 90 is a LEGO tree

figurine in which that same brick is the tree branches.

With respect to the '707 Patent, Knight described the

overall visual appearance of the '707 Patent design as:

> It's a sort of an open rectangle. So it has four slabs,
> one on each side. It's open in the middle. It's sort of
> size feels like it's kind of cute and well balanced.
> "Cute" is a term we use in the toy industry. It's got
> two stud projections on the top and it connects on the
> bottom as well. So it's kind of a unique open-ended form
> that could be used horizontally or vertically.

Id., at 249:2-9. She describes it as not having any particular shape, but rather as being just an open form. See id., at 249:10-11. When asked whether the design was dictated by function, Knight explained that it is not: "The design of it is created so that it can become many different things. There's nothing specific about it." Id., at 251:24-252:1.

The plaintiffs then introduced into evidence three "official builds" comprised of LEGO bricks that creatively illustrate the ornamental features of the '707 Patent. Plaintiffs' Exhibit 91 is a LEGO head where the brick is used to make the frames of eyeglasses. Plaintiffs' Exhibit 92 is a LEGO small table with a lamp, where two of the bricks are put together with a top to make a little table. Plaintiffs' Exhibit 93 is a LEGO small television figurine.

With respect to the '328 Patent, Knight described the overall visual appearance of the '328 Patent design as:

> a sort of a really lovely, balanced form. So I'm talking
> about the proportion. So the length and width in
> proportion to all the other sides. It's kind of unique
> in that the top slab is slightly thicker than the front.
> I'm calling this the front. So the top is thicker. So
> that can imply a lot of different uses. It feels really
> open to be used in any direction, horizontal, vertical.

> And because there are two -- these two stud projections,
> feels like they can become very decorative in their use
> as well.

Id., at 256:2-12. When asked if the design was dictated by

function, Knight explained it was not, because "every element,

the proportion, the scale, the decision to put two stud

projections, the thickness of the wall, those are all things

that can help a creator make things. So they're design

elements." Id., at 256:10-13.

    The plaintiffs then introduced into evidence three

"official builds" comprised of LEGO bricks that creatively

illustrate the ornamental features of the '328 Patent.

Plaintiffs' Exhibit 94 is "a launcher of some sort. But what

they've done is taken that brick and put it on the side so it

looks like it's a rivet or a detail." Id., at 259:3-5.

Plaintiffs' Exhibit 95 is a LEGO chest figurine where the brick

is used "just to sort of show a latch or a detail." Id., at

259:10-11. Plaintiffs' Exhibit 96 is a LEGO bridge figurine

where the bricks are lined up so they look "like the rivets in

the construction of this bridge." Id., at 259:15-16.

### b. Comparing Asserted Patents to Infringing Bricks

    "The comparison step of the infringement analysis requires

the fact-finder to determine whether the patented design as a

whole is substantially similar in appearance to the accused

design. The patented and accused designs do not have to be

identical in order for design patent infringement to be found. See Braun Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 820, 24 USPQ2d 1121, 1125 (Fed.Cir.1992). It is the appearance of a design as a whole which is controlling in determining infringement. There can be no infringement based on the similarity of specific features if the overall appearance of the designs are dissimilar . . ." OddzOn Prod., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997). "The proper comparison requires a side-by-side view of the drawings of the . . . patent design and the accused products." Crocs, Inc., 598 F.3d at 1304.

The plaintiffs provided a side-by-side comparison of photographs for each of the bricks covered by the Asserted Patent and the corresponding ZURU product that infringes on that Asserted Patent. See Pls.' Mot. for TRO and Prelim. Inj. (ECF No. 7-1), at 56-57.

Although the patented and accused designs do not have to be identical, a side-by-side comparison in this case reveals that each Infringing Brick utilizes the same design features as the design for the corresponding LEGO brick covered by an Asserted Patent. Moreover, Plaintiffs' Exhibit 1 includes a physical specimen of each of the LEGO bricks paired with the relevant Infringing Brick, and the bricks in each pair are

indistinguishable except for extremely small letters identifying each as either a LEGO or ZURU product.

### c. Obviousness

Our precedents teach that "the ultimate inquiry under section 103 is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." Durling v. Spectrum Furniture Co., 101 F.3d 100, 103 (Fed. Cir. 1996) (citing In re Rosen, 673 F.2d 388, 390 (CCPA 1982)). Durling explains that this general principle translates into "whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design," id. (citing In re Borden, 90 F.3d 1570, 1574 (Fed.Cir.1996)), and that this in turn requires that "one must find a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design.'" Id. (quoting In re Rosen, 673 F.2d at 391). Once the primary reference is found, other "secondary" references "may be used to modify it to create a design that has the same overall visual appearance as the claimed design." Id. Further, these secondary references must be "'so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" Id. (quoting In re Borden, 90 F.3d at 1575 (alteration in original)).

Titan Tire Corp., 566 F.3d at 1380–81. The primary reference "must be a reference, a something in existence, the design characteristics of which are basically the same as the claimed design in order to support a holding of obviousness." In re Rosen, 673 F.2d 388, 391 (C.C.P.A. 1982). The secondary reference "may be combined only when the designs are "so related that the appearance of certain ornamental features in one would

suggest the application of those features to the other." In re Borden, 90 F.3d 1570, 1575 (Fed. Cir. 1996).

"At trial ... an issued patent comes with a statutory presumption of validity under 35 U.S.C. § 282. However, "*[b]efore trial* . . . these burdens and presumptions [are] tailored to fit the preliminary injunction context." Titan Tire Corp., 566 F.3d at 1377. "If   . . . the alleged infringer responds to the preliminary injunction motion by launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial. The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument." Id.

Based on the analysis and testimony of the plaintiffs' expert, Knight, the court concludes that the plaintiffs are likely to prevail on the issue of obviousness. Knight demonstrated that no reference pointed out by ZURU Inc. has the same visual impression as the patented designs; and that if a designer of ordinary skill were to combine the references identified by ZURU Inc., the result would be very different from the patented designs.

With respect to the '053 Patent, as discussed above, Knight described the overall visual appearance of the patented design.

She also described the overall visual appearance of two references, i.e. U.S. Pat. No. D290,476 and U.S. Pat. No. D345,591. Knight testified that neither of those references captures the overall look of the design claimed in the '053 Patent, and it is apparent from looking at them that they do not because, as she testified, they are very different. See Prelim. Inj. Hrg. Tr. (ECF No. 66), at 243:15-18. Knight also explained, persuasively, why a designer of ordinary skill would not combine the two references to create the same overall visual appearance as the patented design, and what a designer of ordinary skill would do if the designer were to combine the references to form a design. She did so by looking at the two references and taking what was different about each of them and then combining those elements in a drawing. A copy of Knight's drawing is in her declaration. See Decl. of Elizabeth Knight (ECF No. 47-5), at ¶ 35.

With respect to the '707 Patent, as discussed above, Knight described the overall visual appearance of the patented design. She also described the overall visual appearance of two references, i.e. U.S. Pat. No. D360,658 and a reference from ZURU's opposition memorandum (see ECF No. 37, at 51). Knight testified that neither of those references captures the overall look of the design claimed in the '707 Patent, and it is apparent from looking at them that they do not because, as she

35

testified, they are very different. See Prelim. Inj. Hrg. Tr.
(ECF No. 66), at 251:7-10. Knight also explained, persuasively,
why a designer of ordinary skill would not combine the two
references to create the same overall visual appearance as the
patented design, and what a designer of ordinary skill would do
if the designer combined the references to form a design. She
did so by looking at the two references and taking what was
different about each of them and then combining those elements
in a drawing. A copy of Knight's drawing is in her declaration.
See Decl. of Elizabeth Knight (ECF No. 47-5), at ¶ 40.

     With respect to the '328 Patent, as discussed above, Knight
described the overall visual appearance of the patented design.
She also described the overall visual impression of two
references, i.e. U.S. Pat. D246,927 and a reference from ZURU's
opposition memorandum (see ECF No. 37, at 58). Knight testified
that neither of those references captured the overall look of
the design claimed in the '328 Patent, and it is apparent from
looking at them that they do not because, as she testified, they
are very different. See Prelim. Inj. Hrg. Tr. (ECF No. 66), at
257:8-11. Knight also explained, persuasively, why a designer of
ordinary skill would not combine the two references to create
the same overall visual appearance as the patented design, and
what a designer of ordinary skill would do if the designer
combined the references to form a design. She did so by looking

at the two references and taking what was different about each of them and then combining those elements in a drawing. A copy of Knight's drawing is in her declaration. <u>See</u> Decl. of Elizabeth Knight (ECF No. 47-5), at ¶ 45.

The defendant presents no evidence that rebuts Knight's analysis and opinions. Rather, the defendant relies on arguments of counsel in its briefs, and the court finds none of those arguments persuasive. Also, the defendant questions Knight's training and experience and contends her testimony should be discounted as internally inconsistent, flawed, and not credible. The court disagrees. The defendant points to a line of questioning by the court which it claims highlights flaws in Knight's reasoning. To the contrary, the court asked a number of questions to test Knight's analysis and, in each instance, Knight gave a clear and compelling response that made her analysis more persuasive.

Based on the foregoing, the court concludes that the plaintiffs have demonstrated a likelihood of success on the merits with respect to Count VI.

**B. <u>Irreparable Harm</u>**

The plaintiffs must show that they are "likely to suffer irreparable injury in the absence of an injunction, paying particular attention to the question of whether the remedies available at law, such as monetary damages, are inadequate to

compensate for that injury." Lego A/S, 874 F. Supp. 2d at 80
(citing Salinger, 607 F.3d at 79). The plaintiffs have met their
burden.

With respect to the Minifigure Trademark, "a showing of
likelihood of confusion establishes both a likelihood of success
on the merits and irreparable harm." Hasbro, Inc. v. Lanard
Toys, Ltd., 858 F.2d 70, 73 (2d Cir. 1988). "The most corrosive
and irreparable harm attributable to trademark infringement is
the inability of the victim to control the nature and quality of
the defendant's goods. Even if the infringer's products are of
high quality, the plaintiff can properly insist that its
reputation should not be imperiled by the acts of another."
Processed Plastic Co. v. Warner Commc'ns, Inc., 675 F.2d 852,
858 (7th Cir. 1982); see also Yale Elec. Corp. v. Robertson, 26
F.2d 972, 974 (2d Cir. 1928) ("If another [entity] uses [an
entity's mark], he borrows the owner's reputation, whose quality
no longer lies within his own control. This is an injury, even
though the borrower does not tarnish it, or divert any sales by
its use . . . .").

Here, the defendant contends that the plaintiffs have not
shown a likelihood of confusion. However, as discussed above,
the court finds that the plaintiffs have met their burden of
showing a likelihood of confusion with respect to the Minifigure
Trademark and the Infringing Figurines. The plaintiffs have, in

fact, demonstrated that analysis of each of the Polaroid factors supports a conclusion that the defendant's use of the Infringing Figurines is likely to cause consumer confusion. Therefore, the plaintiffs have established irreparable harm with respect to infringement of the Minifigure Trademark.

With respect to the Asserted Patents, "[i]t is well-settled that, because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1456–57 (Fed. Cir. 1988). "If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts." Id. at 1457 (quoting Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1233 (Fed. Cir. 1985)).

Harm to a patent holder's goodwill supports issuance of a preliminary injunction. See Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1558 (Fed. Cir. 1994) ("Harm to reputation resulting from confusion between an inferior accused product and a patentee's superior product is a type of harm that is often

not fully compensable by money because the damages caused are speculative and difficult to measure.").

Buxbaum testified concerning the immeasurable harm to the LEGO Group and its brand resulting from ZURU Inc.'s infringing products:

> If we have products that are not delivering our quality of play experience in their hands, they are less likely to ever come into the Lego brand or that category of toys . . . And secondly, the reason that's significant is that many of these kids will become parents themselves, and we're a generational toy. We've been in the market a very long time, and it's in many ways almost a right of passage that one generation exposes the next generation to our products. So if you have a child that has a poor experience and they never start playing with Lego, then they are probably not going to be introducing that to their children. So we don't just lose that one person's engagement in our brand, we lose potentially generations of that. And when you apply that to any scale that is incredibly bad for the long-term health of our brand.

TRO Hrg. Tr., at 45:7-46:1.

The defendant characterizes Buxbaum's testimony as speculative and based on a faulty premise that the MAX Build More products are inferior. However, the defendant's expert, Gottlieb, prepared a chart of the top ten toy companies in terms of brand value. It showed that the LEGO Group was way ahead all other toy companies in terms of brand equity and, moreover, that there was a substantial difference between it and the second place company. Gottlieb agreed that this meant that the LEGO Group has the largest amount of brand equity to lose. He also

agreed that the LEGO Group built up that brand equity based on its reputation "and a lot of hard work." Prelim. Inj. Hrg. Tr. (ECF No. 65), at 178:14. In addition, there is an evidentiary basis beyond Buxbaum's own observations for his conclusion that the MAX Build More products are inferior.

In contrast, ZURU Inc. offered positive "customer" reviews as if they were independent reviews, when in fact they were "sponsored ads", i.e. it paid those customers and/or gave them free product. See Prelim. Inj. Hrg. Tr. (ECF No. 35), at 92:23-93:1, 95:5-12 (testimony of Anna Mowbray).

The plaintiffs have also shown that the patent infringement will lead to the LEGO Group losing market share. See, e.g., Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008) (holding that loss of market share can constitute irreparable harm). As discussed above, the LEGO Group's bricks covered by the Asserted Patents and the corresponding Infringing Bricks are virtually indistinguishable. David Buxbaum testified: "[t]he challenge is that every time someone plays with something that they think is Lego that is not, they are not getting the same quality experience and therefore, they are likely to think less of our brand." TRO Hrg. Tr., at 44:17-45:1. Thus, not only is the LEGO Group at risk of losing sales to the defendant, it is also at risk of having someone turned away from the brand altogether.

With respect to copyright infringement, "the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." Salinger, 607 F.3d at 80 (quoting eBay, 547 U.S. at 391).

The plaintiffs have established that allowing the defendant to continue to sell the Infringing Figurines and the Infringing Friends Image is likely to result in considerable confusion, and as discussed above, lost goodwill and damaged reputation for the LEGO Group. In addition, the construction toy market is highly competitive and, as discussed above, selling products that infringe on the LEGO Group's copyrights would allow ZURU Inc. to increase its sales and market share, and would also enable it to establish relationships with customers for whom the LEGO Group competes. These injuries are unquantifiable.

Based on the foregoing, the court finds that the plaintiffs have shown that they will suffer irreparable harm if a preliminary injunction is not issued.

C. **Balance of Hardships**

"[A] court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." Salinger,

607 F.3d at 80. The balance of hardships analysis is related to the irreparable harm analysis. See id. at 81 (stating that "[t]hose two items, both of which consider the harm to the parties, are related.")

The plaintiffs' arguments are similar to those they make to show irreparable harm. The defendant argues that ceasing sale of the MAX Build More products and the Mayka Toy Block Construction tape would be a large burden on it and would require it to risk losing its relationships with valuable and sensitive retail clients. The defendant would also suffer lost sales and harm to its reputation with consumers.

However, the court finds that the irreparable harm to the plaintiffs, discussed above, outweighs the harm to the defendant, particularly in light of the fact that the defendant's injuries result solely from its own deliberate acts of infringement engaged in despite the fact that the LEGO Group sent ZURU Inc. cease and desist letters in connection with the issues raised in this litigation and had previously done so in 2017. See WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 287 (2d Cir. 2012) ("It is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product.") (internal quotation marks and citation omitted); Clear Channel Outdoor, Inc. v. City of N.Y., 594 F.3d 94, 110 (2d Cir. 2010) (finding harm to plaintiffs caused by their

violations of City ordinance the result of a "self-inflicted wound").

### D. **Public Interest**

The public interest favors issuing the preliminary injunction. "The public has a great interest in administration of the trademark law in a manner that protects against confusion." Guthrie Healthcare Sys. V. ContextMedia, Inc., 826 F.3d 27, 50 (2d Cir. 2016). The court agrees with the plaintiffs that injunctive relief would be in the public interest because it would bar ZURU Inc. from continuing to mislead and deceive the relevant consumers, i.e. children and their families, and the public into believing that there is some connection between ZURU Inc. and the LEGO Group when, in fact, there is none.

"[T]he public interest factor favors whichever party has shown a likelihood of success on the merits" and "there exists a strong policy in favor of enforcing copyrights." Lego A/S, 874 F. Supp. 2d at 107 (internal citations omitted). Likewise, "[t]here exists a public interest in protecting rights secured by valid patents." Jeneric/Pentron, Inc. v. Dillon Co., 259 F. Supp. 2d 192, 196 (D. Conn. 2003).

The defendant argues that "[w]ithout the high-quality and low-cost MAX Build More products, economically disadvantaged parents would not be able to purchase them and introduce their children to educational construction toys. The public has an

interest in open and free competition between such companies."
Def.'s Closing Arg., at 41. However, whether the MAX Build More
products of the same quality as those of the LEGO Group is a
hotly contested issue and, while the public has an interest in
open and free competition, it has a greater interest in fair
competition.

### E. **Bond**

"The court may issue a preliminary injunction or a
temporary restraining order only if the movant gives security in
an amount that the court considers proper to pay the costs and
damages sustained by any party found to have been wrongfully
enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c)'s
bond requirement serves a number of functions. It assures the
enjoined party that it may readily collect damages from the
funds posted in the event that it was wrongfully enjoined, and
that it may do so without further litigation and without regard
to the possible insolvency of the plaintiff. See Continuum Co.,
Inc. v. Incepts, Inc., 873 F.2d 801, 803 (5th Cir.1989). In
addition, the bond provides the plaintiff with notice of the
maximum extent of its potential liability." Nokia Corp. v.
InterDigital, Inc., 645 F.3d 553, 557 (2d Cir. 2011). "Although
. . . a wrongfully enjoined party is entitled to a presumption
in favor of recovery, that party is not automatically entitled

to the damages sought. The presumption applies to 'provable' damages." Id. at 559.

Here, the court finds that a bond in the amount of $25,000, to be posted within 30 days, is proper in light of the strong evidence that ZURU Inc. has infringed on the LEGO Group's intellectual property rights in such a variety of ways and, in the case of the Infringing Bricks, by producing indistinguishable products. Moreover, ZURU Inc. was put on notice in 2017 that it was infringing on the plaintiffs' intellectual property rights by another means in connection with one of ZURU Inc.'s products that is at issue in this action.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction (ECF No. 7) is hereby GRANTED, and the court is issuing a separate Preliminary Injunction order reflecting the terms of this ruling.

It is so ordered.

Dated this 8th day of July 2019, at Hartford, Connecticut.

/s/ AWT
<hr>
Alvin W. Thompson
United States District Judge
