## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEGO A/S, LEGO Systems, Inc., and LEGO Juris A/S | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:18-cv-02045(AWT) |
| v. | ) ) ) | |
| ZURU Inc. | ) ) | |
| Defendant. | ) ) ) | APRIL 12, 2022 |

## *REDACTED* DEFENDANT'S LOCAL RULE 56(a)2 STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT

Pursuant to Rule 56(a)2 of the Rules of the United States District Court for the District of Connecticut (the "Local Rules"), Defendant Zuru Inc. ("Zuru") respectfully submits the following statement in response to Plaintiffs', Lego A/S, Lego Systems, Inc. and Lego Juris A/S ("Lego"), Local Rule 56(a)1 Statement and in opposition to Lego's Motion for Partial Summary Judgment. Zuru also includes its Additional Material Facts pursuant to Rule 56(a)2(ii).

1.     The LEGO Group owns copyright Registration No. VA0000655104 (the "'104 Registration") and Registration No. VA0000655230 (the "'230 Registration") (together, the "Asserted Copyrights"). Verified Complaint (ECF No. 1) at ¶ 14. *See also* Exhibit 1 (true and accurate copy of the '104 Registration, *produced as LEGOGROUP0010538* through *LEGOGROUP0010541*); Exhibit 2 (true and accurate copy of the deposit materials for the '104 Registration, *produced as LEGOGROUP0014566* through *LEGOGROUP0014570*; Exhibit 3 (true and accurate color copy of the Minifigure figurine deposit material for the '104 Registration, *produced as LEGOGROUP0014564*; Exhibit 4 (true and accurate copy of the '230 Registration

and associated deposit materials, certified by the U.S. Copyright Office, *produced as LEGOGROUP0010653* through *LEGOGROUP0010661*); Exhibit 5 (true and accurate color copy of the '230 Registration deposit materials, *produced as LEGO000151* through *LEGO000155).*

**RESPONSE:** Zuru admits Lego owns the Asserted Copyrights. Zuru denies the validity of the Asserted Copyrights. (ECF No. 236-1 ("Zuru SOF") 1-41.)

2.     Attached hereto as Exhibit 6 are true and accurate copies of correspondence exchanged between the United States Copyright Office and then-counsel for the LEGO Group in connection with registration of the Asserted Copyrights, *produced as LEGOGROUP0014571* through *LEGOGROUP0014588.*

**RESPONSE:** Admitted.

3.     ZURU does not dispute the LEGO Group's ownership of the Asserted Copyrights.

**RESPONSE:** Zuru admits Lego owns the Asserted Copyrights. Zuru denies the validity of the Asserted Copyrights. (ECF No. 236-1, Zuru SOF 1-41.)

4.     The LEGO Group owns trademark Registration No. 4,903,968 (the "Asserted Trademark"). Exhibit 7 (true and accurate copy of the 4,903,968 trademark registration, *produced as LEGOGROUP0010594* through *LEGOGROUP0010595).*

**RESPONSE:** Zuru admits Lego owns the Asserted Trademark. Zuru denies the validity of the Asserted Trademark. (ECF No. 236-1, Zuru SOF 1, 5, 7, 9-13, 23-32.)

5.     ZURU does not dispute the LEGO Group's ownership of the Asserted Trademark.

**RESPONSE:** Zuru admits that Lego Juris A/S owns the Asserted Trademark. Zuru, however, denies the validity of the Asserted Trademark. (ECF No. 236-1, Zuru SOF 1, 5, 7, 9-13, 23-32.)

6.     The LEGO Group has been in the business of selling LEGO Minifigure figurines since 1978. Exhibit 8 (Excerpt of Jared Carr Dep. Tr.) at 251:25–252:11, 255:3–10; *see also*

Exhibit 9 (Response to Office Action regarding Trademark Registration No. 4,903,968) at 11 (10/20/2015 Declaration of Michael Hecht in Support of Acquired Distinctiveness) at ¶ 5.

**RESPONSE:** Admitted that Lego has sold the minifigure since 1978. However, Lego's minifigure was added to its existing construction toy play system. (ECF No. 236-1, Zuru SOF 1, 6-8.) Moreover, for reasons shown below, the undisputed evidence shows Lego did not sell the asserted copyright works—the "Basic Minifigures"—beginning in 1978, and Lego has no evidence showing it did.

7.    Tangible copies of the Minifigure figurine were first published internationally when copies of LEGO sets containing the Minifigure figurine were displayed and offered for sale at the International Toy Fair (January 7-12, 1978) in England. Ex. 8 at 246:25–249:22, 252:9–11; *see also* Ex. 1. ZURU has no evidence to the contrary. Exhibit 10 (Excerpt of Anna Mowbray Dep. Tr.) at 415:7-421:8; *see generally* Exhibit 11 (05/17/2021 ZURU's Resp. to Pls.' 2d Set of Interrog.) at 10–20 (Response to Int. No. 13, identifying no such evidence).

**RESPONSE:** Denied and, therefore, disputed. *First*, the testimony Lego cites shows its corporate designee, Jared Carr, had no independent knowledge that tangible copies of Lego's minifigure were displayed and offered for sale at the International Toy Fair (January 7-12, 1978) in England, and he does not even know what "copyrighted work" Lego purportedly "first published" on January 7, 1978, as stated on Lego's "Basic Minifigures" application. (ECF No. 236-1, Zuru SOF 37.) Rather, Mr. Carr relied on: (1) the certificate of registration, which does not establish the actual date of first publication; and (2) a publication showing the date of the International Toy Fair, but, as Mr. Carr admitted, the publication does not identify any Lego products. Thus, there is no evidence that the tangible copies of the minifigure were in fact published at the International Toy Fair on January 7-12 in England. *Second*, even assuming some

version of a minifigure were displayed and offered for sale at the International Toy Fair in England, Lego has failed to produce any evidence that those alleged tangible copies of the minifigure were the "Basic Minifigures" that Lego asserts Zuru is allegedly infringing. (ECF No. 236-1, Zuru SOF 33, 34, 38-40.) *Third*, Lego's citation to Anna Mowbray's deposition transcript and Zuru's interrogatory response do not support its contention, as these citations show Lego has failed to establish that tangible copies of the minifigure were in fact published at the International Toy Fair on January 7-12 in England. Moreover, undisputed evidence shows the "Basic Minifigures" were never published together as a unit, and that some of them were never published at all, let alone on January 7-12, 1978, in England. (ECF No. 236-1, Zuru SOF 40.)

8.    The Minifigure figurine was first published in the United States when copies of LEGO sets containing the Minifigure figurine were displayed at the New York Toy Fair (February 19-22, 1978). Ex. 8 at 254:12–255:10.

**RESPONSE:** Denied and, therefore, disputed. *First*, the testimony Lego cites shows its corporate designee, Mr. Carr, had no independent knowledge that tangible copies of Lego's minifigure were first published in the United States on February 19-22 at the New York Toy Fair, and he does not even know what "copyrighted work" Lego purportedly "first published" on January 7, 1978, as stated on Lego's "Basic Minifigures" application. Rather, Mr. Carr relied on: (1) the certificate of registration, which does not establish the actual date of publication; and (2) on Lego product catalogs that simply show product offerings in 1978 but do no reference the New York Toy Fair. Thus, there is no evidence that the tangible copies of the minifigure were in fact published at the New York Toy Fair on February 19-22. *Second*, even assuming some version of a minifigure were displayed and offered for sale at the New York Toy Fair in 1978, Lego has failed to produce any evidence that those alleged tangible copies of the minifigure were the "Basic

Minifigures" that Lego asserts Zuru is allegedly infringing. (ECF No. 236-1, Zuru SOF 33, 34, 38-40.) Moreover, undisputed evidence shows the "Basic Minifigures" were never published together as a unit, and that some of them were never published at all, let alone on February 19-22 in New York. (ECF No. 236-1, Zuru SOF 40.)

9.    In 1978, the Minifigure figurine was available for purchase in the United States and Europe only as part of certain LEGO sets. Exhibit 12 (Declaration of Jared Carr) at ¶ 4 and Ex. A (1978 LEGO Catalogue (Dep. Ex. 211), *produced as LEGOGROUP0016412*).

**RESPONSE:** Denied and, therefore, disputed. *First*, the Jared Carr Declaration Lego submitted is inconsistent with his deposition testimony. During his deposition, Mr. Carr repeatedly would not define what Lego meant when it uses the term "Lego Set," so he should not be heard to do so now. (Ex. 53 [Carr Tr. Vol. I, 29:23-39:11].) *Second*, in 1978, Lego did not sell the minifigure only as part of a "set." Lego also sold it as a standalone product in "blister packs." (ECF No. 236-1, Zuru SOF 20.) *Third*, as a matter of law, Lego's purported fact is not relevant because Lego bears the burden of proving it affixed all minifigures it sold, in the United States "or elsewhere," between 1978 and 1989 (when the copyright notice requirements were changed), with proper notice—not only those it sold in 1978 in the United States. (*See* Zuru SJ Opposition Br. at 13-19.) *Fourth*, Lego has failed to provide any evidence that the minifigures shown in the 1978 catalogue it cites are the "Basic Minifigures" over which Lego claims copyright protection, and other undisputed evidence shows Lego never published the "Basic Minifigures" together as a unit, let alone in 1978. (ECF No. 236-1, Zuru SOF 33, 34, 38-40.)

10.    The Minifigure figurine did not come fully assembled; each LEGO set contained Minifigure figurine component parts, along with other LEGO elements such as bricks and accessories, for assembly by the end user. Ex. 12 at ¶ 5.

**RESPONSE:** Admitted that the minifigure did not come fully assembled and instead can be moved, attached, disassembled, and reassembled. (ECF No. 236-1, Zuru SOF 2, 9-10.) Denied that each Lego "set" always contained minifigure component parts along with bricks and accessories. Beginning in 1978, the minifigure was available as a standalone product in "blister packs." (ECF No. 236-1, Zuru SOF 20.)

11. In 1978 the word "LEGO" appeared in the plastic on the top of the knob of the head, the torso, and on the "hips" of the Minifigure figurine. Ex. 12 at ¶ 6; *see also* Ex. 8 at 258:7–259:2. Representative images are included below:



**RESPONSE:** Admitted that the word "LEGO" appeared on the minifigure. Denied that simply affixing "LEGO" on the minifigure, without a copyright notice, was sufficient under the Copyright Act of 1976. (ECF No. 236-1, Zuru SOF 33.) Lego has failed to provide any evidence why it could not affix the copyright notice on the minifigure beginning with its first sales in 1978. Affixing "LEGO" on the minifigure demonstrates that Lego could have also included the copyright notice. Indeed, Lego admits it did so starting in 1998, which establishes that Lego could have included the copyright notice in the period of 1978-1989. (ECF No. 247 ("Lego SOF") 17.)

12.     In 1978, LEGO sets containing the Minifigure figurine also included a copyright notice on the box.  Ex. 8 at 484:9–485:23, 505:2–10.  For example, Set No. 644 includes a copyright following format: "Made by LEGO System A/S. Denmark. © 1978." [1]  Ex. 12 at ¶ 7.



**RESPONSE:** Admitted that the box shown above contained a copyright notice.  Denied, however, because Lego has failed to establish that the box was the proper location for a copyright notice to be placed because the cardboard boxes for the minifigures Lego sold in 1978 are not necessary and integral to the minifigures and do not serve as a durable and permanent storage container for the minifigures contained inside. (ECF No. 236-1, Zuru SOF 16-22; *see* <u>Exhibit 54</u> (Declaration of James Nunziati ("Nunziati Decl."), at 2-5; Exs. 55, 56.)  In addition, Lego has failed to provide any evidence that the minifigure in Set 644, or minifigures in any other set, are the "Basic Minifigures," which are the asserted copyrighted works at issue here. (ECF No. 236-1, Zuru SOF 33, 34, 38-40.)

---

[1] Set No. 644 was one set that was made available for inspection by counsel for ZURU on July 15, 2021. Digital images of the photographs taken by counsel for ZURU were produced as *IMG_51963* through *IMG_6085*. Digital images were also produced by the LEGO Group as *LEGOGROUP0018529* through *LEGOGROUP0019677*.

13.    In 1978, the building instructions contained within boxes of LEGO sets also included a copyright notice.  For example, the building instructions for Set No. 644 include the following copyright notice: "© 1978 LEGO System A/S."  Ex. 12 at ¶ 8.





**RESPONSE:** Admitted that the building instructions shown above contained a copyright notice.  Denied, however, because Lego has failed to provide any evidence that the minifigure depicted above, or depicted in any other Lego building instructions, are the "Basic Minifigures," which are the asserted copyrighted works at issue here. (ECF No. 236-1, Zuru SOF 33, 34, 38-40.)

Moreover, Lego has failed to establish that the instructions were the proper location for a copyright notice to be placed because: (a) the instructions were not needed for the minifigures to be used; (b) the instructions were not integral or essential to the minifigures; and (c) instructions are likely to be discarded by consumers, particularly because the Lego boxes containing minifigures were not permanent storage containers for the instructions (or the minifigures and other Lego elements in the boxes). (ECF No. 236-1, Zuru SOF 16; <u>Exhibit 54</u> (Nunziati Decl. at ¶ 13; Exs. 55, 56.)  In addition, beginning in 1978, Lego sold minifigures as standalone products in "blister packs" that did not come with instructions, showing instructions are not integral or essential to minifigures. (ECF No. 236-1, Zuru SOF 20.)

14.    In 1978, the boxes housing LEGO sets with Minifigure figurines were intended for permanent storage, as indicated by a perforated edge and tab.  Ex. 8 at 245:19–246:15, 445:3–25. A representative example (Set No. 644) is shown below:





**RESPONSE:** Denied and, therefore, disputed. *First*, the evidence cited does not support Lego's contention.  Lego's corporate designee testified that (a) he "had no idea" if the box with a perforated tab could be resealed; (b) that there were permanent storage options that were not the original cardboard boxes; and (c) that the cardboard boxes would have to be resealed "with glue or tape or elastic band or something." (ECF No. 236-1, Zuru SOF 9, ECF No. 236-12, Ex. 39 [Carr Tr. Vol. I at 246:17-21, 443:11-450:11]; *see also* ECF No. 236-1, Zuru SOF 17.)  *Second*, Zuru has provided evidence establishing that the product packaging for Lego minifigures is not part of the product, and consumers can store their minifigures wherever they like. (ECF No. 236-1, Zuru SOF 16-22; *see* Exhibit 54 (Nunziati Decl. at 2-5); Exs. 55, 56.)  *Third*, although some packaging for minifigures Lego sold between 1978 and 1989 contained a perforated tab to facilitate opening, these tabs did not permit the packaging to be resealed after opening. (ECF No. 236-1, Zuru SOF 19.)  *Fourth*, the evidence establishes that the minifigure in Set 644, as well as minifigures in all other sets, are not the "Basic Minifigures" that Lego asserts against Zuru here.  (ECF No. 236-1, Zuru SOF 33, 34, 38-40.)  *Fifth*, beginning in 1978, Lego sold minifigures in "blister packs," which were not durable or permanent and could not be reclosed or resealed after being opened. (ECF No. 236-1, Zuru SOF 20; Exhibit 54 (Nunziati Decl. ¶ 9).)

15.    There is evidence consumers used the perforated tab and box as storage. Ex. 8 at 449:3–5 ("I looked at boxes from 1978, held them, opened them, closed them.  They were fairly well-preserved."); *id.* at 553:19–22 ("[W]e have a big collector base.  People open with like precision, with razor blades and knives and things of that nature to preserve the packaging.").  *See also* Ex. 12 at ¶ 11 (LEGO sets from 1978 can be purchased on websites such as BrickLink and eBay, with the boxes and building instructions intact).

**RESPONSE:** Denied and, therefore, disputed. *First*, even if Lego's product boxes could be used for "storage," Lego admits there is need for consumers to do this, consumers often dispose of their product packaging quickly, and that consumers can play with minifigures however they want, with or without the boxes or the other contents of them. (ECF No. 236-1, Zuru SOF 16-22; *see* Ex. 57 [Rich Tr. at 52:12-53:4) ("I can see why some people would keep it and why some people would throw it away")]; Exhibit 54 (Nunziati Decl. at 2-5); Exs. 55, 56.) Moreover, beginning in 1978, Lego sold minifigures in "blister packs," which were not durable or permanent and could not be reclosed or resealed after being opened. (ECF No. 236-1, Zuru SOF 20; Exhibit 54 (Nunziati Decl. ¶ 9).)

16. Since 1978, boxes housing LEGO sets containing Minifigure figurines have contained a copyright notice (on the box and on the included building instructions) in the same and/or a substantially similar format as Set No. 644 above. Ex. 12 at ¶ 10.

**RESPONSE:** Denied and, therefore, disputed. The cardboard boxes and building instructions are not part of the minifigure product not integral or necessary to them, and do not need to remain with the minifigure for it to be used. (ECF No. 236-1, Zuru SOF 16-22.) In addition, Lego has failed to provide any evidence that the minifigure in Set 644, or minifigures in any other set, are the "Basic Minifigures" that Lego asserts against Zuru here. (ECF No. 236-1, Zuru SOF 33, 34, 38-40.) Further, starting in 1998, Lego placed the copyright notice on the minifigure itself, showing that it could have done so earlier. (ECF No. 236-1, Zuru SOF 17.)

17. The LEGO Minifigure figurine has continuously contained a copyright notice in various locations of the plastic since at least as early as 1998. Ex. 12 at ¶ 12; *see also* Verified Complaint (ECF No. 1), at ¶ 17. Representative images are depicted below:



© LEGO located inside head element of Minifigure figurine





© LEGO located on the top of leg element of Minifigure figurine

© LEGO located on the bottom of leg element of Minifigure figurine

© LEGO located on the torso element of Minifigure figurine

**RESPONSE:** Admitted.  However, that Lego admits it affixed the copyright notice on the minifigure starting in 1998 establishes (i) that the copyright notice Lego affixed to minifigures before then was deficient, but that (ii) Lego could have affixed a compliant notice during that time.

18.    Consumers can interact with Minifigure figurines ████████████████

████████████████████████████████████████ (Ex. 8 at 155:3–8; *see also*

Exhibit 13 (Excerpt of Coco Chan Dep. Tr.) at 295:3-296:6 ████████████████

████████████████████████████████

**RESPONSE:** Admitted. This fact and supporting evidence shows that no Lego minifigure

is integral or essential to any other elements, including product boxes or instructions.  Rather, As

Lego encourages its consumers to do, minifigures can be mixed and matched with any and all other

Lego products. (ECF No. 236-1, Zuru SOF 16-18.)

19.    On or about October 1, 2018, ZURU launched its MAX Build More line of

construction toys at Walmart, which includes the MAX Build More 15 MAX Figurines (the "MAX

Figurines"), MAX Base Plates, and "buckets" of MAX bricks in various sizes (including a 759

piece, a 253 piece and a 250 piece) (collectively, the "MAX Products").  Exhibit 14 (02/14/2019

Tr. Preliminary Injunction Hearing) at 52:5-8; Exhibit 15 (10/30/2019 Tr. Motion for Contempt

Hearing) at 9:11-16.

**RESPONSE:** Admitted.

20.    True and accurate physical samples of the MAX Figurines, which were available

for purchase at Walmart when the Complaint (ECF No. 1) was filed, were admitted into evidence

as Exhibit 4 at the December 14, 2018 hearing on Plaintiff's Motion for Temporary Restraining

Order ("TRO Hearing"), and Plaintiffs refer the Court to those products.  Exhibit 16 (12/14/18 Tr.

TRO Hearing) at 24:16-25:9, 33:25-34:11.  For the Court's convenience, the images below show

different views of a representative MAX Figurine. Verified Complaint, ECF No. 1, at ¶ 23.



**RESPONSE:** Admitted that the figurine depicted above was one of several first generation Zuru figurines and that Zuru's figurines were redesigned in 2019.

21.    The images below show different views of a representative LEGO Minifigure figurine that is protected by the Asserted Copyrights and the Asserted Trademarks.   Verified Complaint, ECF No. 1, at ¶ 13.



**RESPONSE:** Denied and, therefore, disputed. The minifigure depicted above is not "representative." *First*, Lego's expert, Elizabeth Knight, admitted that ███████████ ████████████████████████████████████████████████████████ ████████████ (ECF No. 236-1, Zuru SOF 15.) Ms. Knight admitted that █████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ (Ex. 58 [Knight Tr. Vol. I at 183:22-188:22].) Lego's brand design specialist testified ███████████████ ████████████████████ (Ex. 59 [Blair Tr. at 68:10-23, 141:22-143:11].) Lego has failed to establish the figurine depicted above was ever sold, and it is not any of the "Basic Minifigures" Lego asserts against Zuru here. (ECF No. 236-1, Zuru SOF 33, 34, 38-40.)

22.    The images below show different views of a LEGO Minifigure figurine that is protected by the Asserted Copyrights and Asserted Trademark (on the left), and a MAX Figurine (on the right). *Id.* at ¶ 24; *see also* Answer and Counterclaims, ECF No. 94, at ¶ 24.



**RESPONSE:** Denied and, therefore, disputed. As shown in Zuru's response to fact 21 above, incorporated herein by reference, the minifigure in the images above is not a representative minifigure because of its lack of a yellow head, it may not have ever been sold, and it is not one of the "Basic Minifigures" Lego asserts against Zuru here.

23.     Defendant ZURU, Inc. ("ZURU") had knowledge of the Asserted Copyrights and Asserted Trademark when it designed the MAX Products.  Ex. 14 at 52:19-25.

**RESPONSE:** Admitted.  However, as Lego's expert, Elizabeth Knight, acknowledges, notwithstanding her earlier testimony about Zuru's purported intent to copy Lego, ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████  (ECF No. 236-1, Zuru SOF 59.)  In addition, Lego admits it is appropriate and even necessary for a competitor to look at Lego products, and other competitor construction-toy products, in designing Lego-compatible figurines, and that Lego did this itself.  (ECF No. 236-1, Zuru SOF 55.)

24.     The design process for the MAX Figurines began sometime in the first quarter of 2017, █████████████████████████████████.  Exhibit 17 (Excerpt of 08/08/2021 ZURU's Supp. Obj. and Resp. to Pls' First Set of Requests for Admission) at No. 4; Ex. 13 at 219:3–221:1; *see also* Ex. 13 at 260:23–261:12.

**RESPONSE:** Admitted that Zuru began designing its first-generation figurines in or around the first quarter of 2017, and that draft control drawings for the body shape of the Max first generation figurines were close to final in September 2017.  Denied, however, that the "design process" was "substantially complete" in September 2017.  (Ex. 60 [Chan Tr. Ex. 266 (█████████ ███████████████████████]; Ex. 61 & 62 [Chan Tr. Exs. 268 and 269 ███████████████████████)].)

25.     ZURU had knowledge of the LEGO Minifigure figurine at the time it designed the MAX Products, including the MAX Figurines.  *See* Exhibit 18 (███████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████████); Ex. 10 at 326:23–327:3, 332 █████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████; *see also* Ruling on Pl.'s Motion for Preliminary Injunction

(ECF No. 86) at 8 ("The plaintiffs have shown with direct evidence that the defendant had access

to the LEGO Group's Minifigure figurine because the Minifigure figurine was included in the

initial product advertisements for ZURU Inc.'s Mayka Toy Block Tape.").

     **RESPONSE:** Admitted, though Lego's statement ignores that Zuru also had knowledge

of other Lego-compatible construction minifigures lawfully on the market, like Kre-O and Mega

Bloks, when it designed its Max figurines, and Zuru reviewed the differences between those other

different designs and Lego's minifigure to design a figurine that is different and distinct from

Lego's minifigure.  (Ex. 63, 61 & 62 [Chan Exs. 256, 268, 269]; *see* Ex. 64 [Chan Tr. Vol. 2 at

280:22-281:13].)  Lego has admitted the Kre-O and Mega Bloks figurines are non-infringing,

including because they are different geometries, different proportions, and different expressions.

(Ex. 65 [*Best Lock*, ECF No. 70 at 49:22-50:4], ECF No. 239-3 [*Best Lock,* ECF No. 70 at 67:15-

71:2]; ECF No. 239-3 [*Best Lock*, ECF No. 131 at 34, n. 10].)  Lego also admits there is nothing

wrong with having ████████████████████████████████████████.  (ECF

No. 236-1, Zuru SOF 55 [Knight Tr. Vol. 1 at 42:7-43:21, 140:12-141:5].)  Ms. Knight also

admitted Zuru had ████████████████████████████████████.  (ECF No.

236-1, Zuru SOF 55 [Knight Tr. Vol. 1 at 168:16-23, 225:13-16].)  Further, as Zuru shows in its

opposition brief, it is improper for Lego to rely on a preliminary injunction ruling to support

summary judgment.

     26.    ZURU █████████████████████████████████████

███████ Ex. 13 at 107:6-13 ████████████████████████████████

███████████████████████████████████████████████████████████

███████████"); *see also id.* at 258:13-19.

**RESPONSE:** Admitted, though Lego concedes there is nothing wrong with reviewing

Lego's minifigure to "████████████████████████████." (*See, e.g.*, Ex. 66 [Lego Response

to RFA 64]; Ex. 57 [Rich Tr. at 69:20-71:4].)  In addition, Lego admits ███████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████. (ECF No. 236-1,

Zuru SOF 55.)

27.    ZURU did not use ██████████████████████████████████████

███████████████████████████. Ex. 13 at 34:5-7.

**RESPONSE:** Admitted Zuru did not use "focus groups" during its design process, but

denied this is relevant to any issue in the case (Lego does not argue otherwise).  To the extent Lego

offers this contention to show the insufficiency of Zuru's design process, Lego's own experts

conceded the use of focus groups, outside consultants, or customer insight was unnecessary given

that Zuru was designing its figurines pursuant to a request from Walmart.  (Ex. 67 [Nowlis Tr. at

210:5-211:17]; Ex. 58 [Knight Tr. Vol. 1 at 34:12-35:3, 125:2-126:20].)  At various stages during

its design process, Zuru ███████████████████████████████████████████████

███████████████████████████████████████. (Ex. 68 [Mowbray Tr. Ex. 30

(Walmart proposal)]; Ex. 69 [Nunziati Tr. at 38:2-39:9, 42:17-43:18].)

28.    ZURU did not utilize ████████████████████████████████████

███████████████████████. Ex. 13 at 39:9-17.

---

[2] Blue-sky design is creative brainstorming that is not focused on one particular design.  *See* Exhibit 33
(Declaration of Elizabeth B. Knight) at ¶ 11, Ex. A (11/08/2021 Expert Report of Elizabeth B. Knight) at
34–35. Play lab approaches consist of focus group testing of toys to determine children's preferences. *Id.*

**RESPONSE:**  Denied and objected to.  Zuru objects to this statement on the grounds the document on which Lego relies lacks sufficient foundation.  Zuru used b█████████████████████

███████████████████████████████████ (*E.g.*, Exs. 63, 61 & 62 [Chan Tr. Exs. 256, 268, 269]; *see* Ex 64 [Chan Tr. Vol. 2 at 280:22-281:13].)  Zuru also worked with ████████

████████████████████████████████████████████████████████████

█████████████████████████████████ (Ex. 68 [Mowbray Tr. Ex. 30]; Ex. 63, 61, & 62 [Chan Tr. Exs. 256, 268, 269]; *see* Ex. 64 [Chan Tr. Vol. 2 at 280:22-281:13].)

29.    <u>Exhibit 19</u> is a representative sample of documents from ZURU's design file for the MAX Figurine that it produced in this litigation.  *See* Ex. 19 (consisting of a compilation of documents produced by ZURU starting at Bates number *ZURU-00000959* and ending at Bates number *ZURU-00002286* (Dep. Ex. 245), and documents *produced as ZURU-00039680* through *ZURU-00039698–Confidential–Attorneys' Eyes Only* (Dep. Ex. 257), *ZURU-00003721* through *ZURU-00003726* (Dep. Ex. 258), *ZURU-00003716* through *ZURU-00003717* (Dep. Ex. 259)*, ZURU-00039684* through *ZURU-00039686–Confidential–Attorneys' Eyes Only* (Dep. Ex. 260), *ZURU-00001199* (Dep. Ex. 261)*, ZURU-00039687–Confidential–Attorneys' Eyes Only* (Dep. Ex. 262), *ZURU-00001055* (Dep. Ex. 263), *ZURU-00001200* (Dep. Ex. 265), *ZURU-00003727* (Dep. Ex. 267))*.  These documents include, among others:

a.    A compilation of documents produced by ZURU starting at Bates number *ZURU-00000959* (Dep. Ex. 245) which include images of the Minifigure figurine.

b.    *ZURU-00039680* (Dep. Ex. 257):  A ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████. *See* Ex. 13 at 232:12-17.

c. *ZURU-00003721* (Dep. Ex. 258): A document dated May 31, 2017 entitled "MAX Build More. MAX Figure" which shows different decorations, facial expressions, and accessories for the MAX Figurines. *See* Ex. 13 at 239:12-243:10.

d. *ZURU-00003716* (Dep. Ex. 259): A document that encompasses design changes that were made to the MAX Figurine depicted in *ZURU-00039680* (Dep. Ex. 257) because ███████████████████████████████████████████ ████████ Ex 13 at 233:6–234:5. These design changes include ███████████ ████████████████████████████████████████████████████ ████████ *Id.* at 249:6–251:5.

e. *ZURU-00039684* (Dep. Ex. 260): An August 21, 2017 document entitled ████████████████████████████████████████████████████████ ██████████████████████. *See* Ex. 13 at 254:25–255:15.

f. *ZURU-00001199* (Dep. Ex. 261): A September 4, 2017 document entitled "MAXBUILD Figures Main Body – Control Drawing" which explores a "ball joint system" and Coco Chan describes as "very close to the later stage of the final version." *See* Ex. 13 at 259:8–261:12.

g. *ZURU-00039687* (Dep. Ex. 262): ████████████████████████ ██████ *See* Ex. 13 at 261:12–262:13.

h. *ZURU-00001055* (Dep. Ex. 263): ████████████████████████ ██████ *See* Ex. 13 at 262:25–264:2.

i. *ZURU-00001200* (Dep. Ex. 265): A document dated June 6, 2018 entitled "MAXBUILD Figures Main Body – Control Drawing" ██████████████████

█████████████████████████████████████████████████████████."

*See* Ex. 13 at 264:4-265:2.

j.  *ZURU-00003727* (Dep. Ex. 267):  A document dated October 15, 2018 entitled

"MAX Build More Mini Pack (93 pcs & 1 figs).  *See* Ex. 13 at 272:13–273:17.

**RESPONSE:**  Admitted that the documents cited above are from Zuru's design file, but otherwise denied and objected to.  Zuru objects to Lego's improper compilation of assorted documents, and also on the grounds that the testimony and the documents speak for themselves. In that regard, Lego contends that the documents above are a "representative sample" of a compilation that Lego itself prepared, but that is disputed.  There are many documents from Zuru's design file that Lego does not include, including documents showing Zuru's possession of other competitor construction-toy products from Kre-O, Mega Bloks, and Roblox.  (*E.g.*, Exs. 63, 61, 62 [Chan Dep. Exs. 256, 268, 269]; Ex. 70 [ZURU-00002279].) Lego also ignores that ████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████.  (*See, e.g.*, Exs. 71 & 72 [Johansen Dep. Exs. 196 and 233]; Ex. 236-16 [Knight Tr. Vol. 1 at 42:7-43:21, 140:12-141:5, 147:24-148:10]; Ex. 58 [Knight Tr. Vol. I at 223:9-12]; Ex. 73 [Johansen Tr. Vol. 3 at 73:13-74:3].)

Zuru further specifically dispute Lego's characterization of the document referenced in paragraph (d) above, *ZURU-00003716* (Dep. Ex. 259).  The cited testimony ██████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████  (*See* ECF No. 247-3, Lego SOF, Ex. 13 at 233:6-234:5.)

30.    As of September 4, 2017, the MAX Figurine ███████████ Ex. 13 at 260:23–262:24.

**RESPONSE:** Admitted that draft control drawings for the body shape of the Max first generation figurine were close to final in September 2017. Denied that the Max figurine in September 2017 was ██████████ ████████████████████████████ ██████████████████████████████. (Ex. 60 [Chan Dep. Ex. 266 ████████████████████████████]; Ex. 64 [Chan Tr. Vol 2 at 196:9-16 ████████████████████████████)].)

31.    ZURU's proffered witness on the design of the MAX Figurine, Coco Chan, was unable to ████████████████████████████████████ (*see* Ex. 19 at *ZURU-0001199* (Dep. Ex. 261)) ████████████████ (*see* Ex. 19 at *ZURU-000039687* (Dep. Ex. 262) and Ex. 19 at *ZURU-00001055* (Dep. Ex. 263)), since ████████████████████. *See* Ex. 13 at 260:23–262:6, 263:8–264:2.

**RESPONSE:** Denied and, therefore, disputed. Lego's statement mischaracterizes the record and is unsupported by the cited testimony. Lego cites to a transcript where the question posed (several times) was ████████████████████████████████ ██████████████████." Nor was there a question in the cited transcript that asked the witness to identify "differences." (*See* ECF No. 247, Lego SOF 31, Ex. 13 at 260:23–262:6, 263:8–264:2.)

32.    True and accurate physical samples of the MAX Base Plates and the MAX Bricks, which were available for purchase at Walmart when the Complaint was filed, were admitted into evidence as Exhibit 8 (MAX Base Plate) at the December 14, 2018 TRO Hearing and Exhibit HHH (MAX Build More 253 piece and 759 piece) at the February 14, 2019 PI Hearing,

respectively. Ex. 16 at 33:25–34:11 and 41:8-20); *See* Ex. 14 at 144:3-21. Plaintiffs refer the Court

to the tangible products. For the Court's convenience, Plaintiffs attach as Exhibit 20 images of the

MAX Products packaging containing two dimensional images of the MAX Figurine submitted as

Exhibit 12 to ZURU's Answer and Counterclaim (ECF No. 94).

**RESPONSE:** Admitted.

33.    On December 14, 2018, the Court (Thompson, J.) entered a temporary restraining

order enjoining ZURU from manufacturing, selling, offering for sale, displaying or authorizing the

sale of the infringing products, *i.e.*, the MAX Products and Makya Toy Block Tape products.

Temp. Restraining Order, December 14, 2018, (ECF No. 19); *see also* Pls.' Mot. For Temp.

Restraining Order And Preliminary Injunction, (ECF No. 7) (defining infringing products as

ZURU's MAX Build More line of construction toys and Mayka Toy Block Tape).

**RESPONSE:**   Admitted, but for the reasons shown in Zuru's briefing, the Court's

injunction rulings provide no basis for summary judgment.

34.    In the short period of time the MAX Figurines were on the market, there were at

least three instances of actual consumer confusion. *See* Exhibit 21 (Screenshots of Walmart.com

and MAX Facebook Reviews (PI Hearing Ex. 43)) at 7–9; Ex. 14 at 27:20–28:7 (admitting Ex. 43

into evidence). *See also* Ex. 14 at 62:13-15 (Anna Mowbray: "I am aware of . . . maybe three

comments online that refer to MAX as being LEGO. So our customers put in the wrong brand

name."); Ex. 17 at No. 39 (admitting at least one customer actually confused ZURU figurines as

if they were offered for sale by the LEGO Group).

**RESPONSE:** Objected to and denied. To begin, Zuru denied Request for Admission No.

39, and Lego inaccurately claims it is admitted. Zuru also objects to Exhibit 21 on the grounds

of hearsay, lack of foundation, and because Lego mischaracterizes the documents.

Even if the documents are admissible, the hearsay comments related to brick products generally (which are longer at issue in the case), not to figurines specifically. Moreover, a reasonable juror could find that the hearsay comments referred to Lego generically, or reflected an association between Lego and construction toys generally, and were not based on any specific features of Lego's asserted trade dress. Zuru's expert Mr. Ezell's survey results showed precisely that: consumers referred to Lego in a number of instances based on the unprotectable ideas of connectability and disassembly, rather than based on a confusing body form. (Ex. 70 [Ezell Rebuttal Report at ¶ 32].) And even if the three comments showed meaningful "confusion," three comments of out 46,000 comments is *de minimis* and does not support a likelihood of confusion. (Ex. 74 [ECF No. 65 [2/14/2019] Hrg. Tr. at 64:2-12].)[3]

35.    A likelihood of confusion survey designed and conducted by Dr. Stephen M. Nowlis, Ph.D., likewise supports a finding of likelihood of confusion for the MAX Figurines, finding a 20.0% net confusion rate in a 2018 Point of Sale Survey, and a 29.1% net confusion rate in a 2018 Post Sale Survey. Exhibit 22 (Declaration of Stephen M. Nowlis, Ph.D.) at ¶¶ 15–16 and Ex. A (11/08/2021 Expert Report of Stephen M. Nowlis, Ph.D) at 21 (2018 Point of Sale Survey results) and 56 (2018 Post Sale Survey results).

---

[3] *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir. 2001) (two allegedly confused consumers was de minimis and did not support a finding of a likelihood of confusion for bottled water and related goods); *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996) ("[P]laintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion"); *Petro Shopping Ctrs. L.P. v. James River Petroleum*, 130 F.3d 88, 95 (4th Cir. 1997) ("In light of its huge volume of commerce, [plaintiff's] meager evidence of actual confusion is at best de minimis."); *Advance Magazine Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 121 (S.D.N.Y. 2008) (granting plaintiff summary judgment on action for declaratory judgment of non-infringement where "only two of Defendants' four witnesses provide evidence of consumer confusion, which is insufficient to suggest actual confusion").

**RESPONSE:** Objected to and denied.  Lego's reliance on flawed and inadmissible surveys does not show an undisputed "fact," and does not entitle Lego to summary judgment.

Lego's surveys are flawed because they use an inappropriate "control."  As Lego states in its motion, "[w]ithout a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." (ECF No. 246, Lego Br. 40.)  But here, Dr. Nowlis did not use a proper control, for at least the following reasons:

(1) despite acknowledging that a proper control must be compatible with the Lego play system (Ex. 67 [Nowlis Tr. 305:19-25]), Nowlis used a control that is not a construction toy figurine, and the control's proportions would not function in the Lego grid system (*see* Ex. 75 [Loetz Rebuttal Report at ¶¶ 87-91]; Ex. 76 [Isaacson Rebuttal Report at ¶¶ 92-98]);

(2) similarly, despite testifying that "you want to make the control as similar as possible to the test stimulus but not infringe" the minifigure (Ex. 67 [Nowlis Tr. at 62:23-63:3, 204:5-13]), the Nowlis control is unquestionably much more different from the minifigure than the Kre-O and Mega Bloks figurines that Lego admits are "non-infringing," resulting in the Nowlis control's failure to accurately measure "noise," and its improper introduction of "noise" instead (Ex. 76 [Isaacson Rebuttal Report at ¶¶ 92-98]);

(3)  the control does not look like a realistic toy figurine, and it is aesthetically less pleasing with a giant head that makes it likely to topple over (Ex. 67 [Nowlis Tr. at 38:19-22]; Ex. 75 [Loetz Rebuttal Report at ¶¶ 87-88]; Ex. 76 [Isaacson Rebuttal Report at ¶ 85, 96]);

(4) Nowlis changed elements between the test and the control stimuli that are not at issue in this case (*e.g.*, Nowlis changed "Compatible with Major Brands" to "Compatible with Max Bricks," which means the survey does not measure net confusion for the asserted trade dress)

(Ex. 76 [Isaacson Rebuttal Report at ¶¶ 86-88]; Ex. 77, [Isaacson Tr. at 236:22-241:1]; Ex. 67 [Nowlis Tr. at 166:13-167:17, 173:2-15 (showing Nowlis improperly changed elements between the test and the control for his surveys that did not relate to the "overall look and feel" of the minifigure, and he did so because he thought (incorrectly) that Lego contended Zuru's use of "Compatible with Major Brands" was unlawful), 169:17-171:6 (conceding he changed "Compatible with Major Brands" because he believed that phrase had the potential to cause confusion); *see* Dkt. 1, Lego Complaint (nowhere alleging that use of the phrase "Compatible with Major Brands" was wrong or unlawful, thus showing that Dr. Nowlis improperly changed elements between his test and control stimuli that are not at issue in the case)]); and

(5) Nowlis designed his control to look like a figurine product called "Funko Pop," in a way that led consumers to say "Funko Pop" instead of "Lego" (which artificially raises the level of net confusion) (Ex. 75 [Loetz Rebuttal Report at ¶¶ 90-91]; Ex. 76 [Isaacson Rebuttal Report at ¶¶ 89-91]).

Dr. Nowlis agreed that if Zuru proves these flaws (and others) during *Daubert* motions or at trial, then his surveys would be "invalid" and should be given no weight.[4]

---

[4] Lego's own survey expert conceded that an improper control (like the one Lego's surveys used) invalidates the survey results. (Ex. 64 [Nowlis Tr. at 35:7-36:2 (Nowlis explaining that an improper control invalidates the survey results)].) And on that point, Nowlis further admitted that one must design a control that is as close to the test figurine as possible, while also not infringing on the disputed elements of the asserted trademark. (*Id*. at 36:3-24, 191:20-192:14, 218:24-219:8.)  Lego's expert also conceded that one must also create a plausible control that looks like a real product, functions like the real product, and that fairly falls within the same product category as the test. (*Id*. at 36:25-42:11 (discussing the need for the same product category, realism, and similar attractiveness), 227:24-228:7 (going through an example of a figurine that did not connect to the Lego grid system, and Lego's expert testifying that: "As we talked about before, the functional elements [of the example figurine] are removed. It's not compatible with the LEGO system. It doesn't attach. So I would never use this as my control.").) Lego's expert further conceded that you only should change the elements you are attempting to measure between the test and control. (*Id*. at 26:11-25.) Put another way, changing elements not related to the trade dress at issue injects improper noise into the survey, and makes Dr. Nowlis' surveys unreliable. (Ex. 72 [Isaacson Rebuttal Report at ¶¶ 86, 99-100].)

Moreover, as Zuru's survey expert Dr. Isaacson explains in his rebuttal report, which is incorporated by reference herein, Dr. Nowlis also used an improper "survey universe" and used leading and improper survey questions.  (Ex. 76 [Isaacson Rebuttal Report at ¶ 17, ¶¶ 32-70 (explaining that Nowlis's survey universe was screened incorrectly for all his surveys, including because he went four years back in time, screened purchasers too broadly by using the term "toy figures," limited some respondents to a physical store only, and limited some respondents to an online store only), ¶¶ 71-80 (explaining that Nowlis's survey questions were leading and vague)].)

Zuru's Isaacson and Ezell surveys further show that Dr. Nowlis's survey results are flawed and insufficient to support summary judgment for Lego.  Dr. Isaacson's survey showed a net confusion level of effectively 0%.  (ECF No. 236-1, Zuru SOF Ex. 6 (Isaacson Report) at ¶ 62.)  Mr. Ezell's rebuttal survey results, which used Dr. Nowlis's own survey design with a proper control, showed a net confusion level of 7.8% at most.  (Ex.78 [Ezell Rebuttal Report at ¶¶ 3, 16-34].)  As Dr. Nowlis testified, however, a likelihood of confusion survey result of less than 10% shows no likelihood of confusion.  (Ex. 67 [Nowlis Tr. at 50:22-51:14].)  And both Dr. Isaacson and Mr. Ezell explained why Dr. Nowlis's results show no likelihood of confusion. (Ex. 76 [Isaacson Rebuttal Report at ¶¶ 84-106]; Ex. 78 [Ezell Rebuttal Report at ¶ 33].)

36.     Following the issuance of the Court's temporary restraining order, ZURU immediately sought to "redesign" the MAX figurine.  Ex. 10 at 378:14–382:7.

**RESPONSE:** Denied and, therefore, disputed.  Lego does not characterize the testimony accurately. The testimony Lego cites states that by the 26th of December, Zuru had started the redesign. (*See* ECF No.236-1, Lego SOF 36, Ex. 10 at 378:14–382:7.)

37.    The "redesign" process was █████████████████████████

████████████████████████████████████. Ex. 13 at 273:24–

274:12, 276:25–278:5; Ex. 10 at 383:19-23; <u>Exhibit 23</u> (ZURU's Design Documents for

Redesigned Figurine (Dep. Ex. 268), *produced as ZURU-00003611* through *ZURU-00003617*).

*See also* Ex. 13 at 275:7-19 (Explaining that ████████████████████████

████████████).

**RESPONSE:**  Admitted that the Zuru second generation figurine was "relatively close …

basically final" by around March of 2019.  Lego mischaracterizes the cited testimony, however.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████. (Ex. 79, ZURU-00003621.)

38.    The "redesign" process ████████████████████████████

████████████████████████████████████████████

██████████████████." Ex. 13 at 274:7–12; Ex. 22; *see also* Ruling on Motion for

Contempt (ECF No. 139) at 6 ("The defendant's design documents for the Redesigned Figurines

show that the defendant started with the plaintiff's Minifigure figurine and then considered using

different proportions with respect to various parts of the figurine, as well as using the same

proportions but shapes that were different from the plaintiffs' Minifigure figurine.").

**RESPONSE:** Denied and, therefore, disputed.  Lego does not accurately quote the witness

and it added words in the statement above that the witness did not use.  The testimony Lego cites

states that ██████████████████████████████████████

████████████████████████████████████████████

████████████████████. This shows Zuru considered numerous designs to try to

find additional differences it could make in its redesigned figurines while maintaining their core functionality.  Also, as shown by the design changes Zuru made, those changes further sacrificed utilitarian functionality, such as removing the connectional stud on the top of the head, which resulted in the head of Zuru's second generation figurine lacking any mechanism to attach to bricks from the top of its head.

Nor did Zuru make only "small" changes—a claim which is now debunked and undermined by Lego's admissions that the Kre-O and Mega Bloks figurines were creatively designed, different expressions of the minifigure, despite having "differences" that are no more prominent, and in many or all cases less prominent, than the Zuru figurines.  (ECF No. 236-1, Zuru SOF at 46-50.)  Lego's corporate designee admitted that █████████████████████████████ ██████████████████████████████████████████████████████████████."  (ECF No. 236-1, Zuru SOF 54.)  Zuru's toy design expert, Mr. Loetz, explained why the changes Zuru made were significant given the functional limitations Zuru faced. (ECF No. 236-1, Zuru SOF, Ex. 7 at ¶¶ 2-7 (summarizing his opinions, which are supported by the evidence in his report).)  And Zuru's lead designer testified that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████  (Ex. 80 [Chan Tr. Vol. 1 at 53:21-54:13, 95:17-96:20, 106:24-107:13]; Ex. 64 [Chan Tr. Vol. 2 at 223:11-12, 226:6-14, 234:7-235:7, 280:22-281:23].)

Finally, for the reasons shown in Zuru's briefing, the Court's ruling on Lego's motion for contempt provides no basis for summary judgment.

39.    ZURU did not make any changes to its "redesigned" MAX Figurine after the Court's July 8, 2019 ruling on the LEGO Group's Motion for Preliminary Injunction (ECF Nos.

86, 87) (the "PI"), and prior to the launch of the "redesigned" MAX Figurines on the Walmart website to ensure compliance with the PI.  *See* Ex. 15 at 55:7-15, 64:23–66:12.

      **RESPONSE:** Admitted that the Zuru second generation figurine was "relatively close . . . basically final" by around March 2019, but denied as to the remainder of the statement.  Lego's characterization of the testimony is not accurate, and Lego does not cite support in the record for its characterizations. The testimony Lego cites states that Zuru's marketing team, product team, and legal team all considered the Court's preliminary injunction ruling and concluded that the redesign was consistent with it.  And, as shown in Zuru's motion to dissolve the preliminary injunction, it was Lego who intentionally misled the Court about whether Zuru only made "de minimis" changes that were "little tiny differences."  (ECF No. 252 at 9 (citing the record).) These representations were false because Lego had already represented to Judge Haight that the Kre-O figurine that Lego admits is as or more different from the minifigure than the Zuru figurines was a "different expression" of the minifigure, with "different geometries" and "different proportions." (ECF No. 252 at 10-14 (quoting the record).)

      40.    True and accurate physical samples of the "redesigned" MAX figurine (hereinafter "Redesigned MAX Figurine") were admitted into evidence as Exhibits 6 and DD at the October 30, 2019 hearing on Plaintiffs' Motion for Contempt.  *See* Ex. 15 at 46:12-47:1; 84:11-12, 89:15-18.  *For* the Court's convenience, the images below show different views of a representative Redesigned MAX Figurine.

  

**RESPONSE:** Admitted.

41. The images below show different views of a LEGO Minifigure figurine that is protected by the Asserted Copyrights and Asserted Trademark (on the left), and a Redesigned MAX Figurine (on the right).

     

**RESPONSE:** Admitted that the figurine "on the right" is a second generation Max figurine. Otherwise denied. For the Lego minifigure image shown above, Lego did not claim any of the orange worker decorations (or the facial expressions/drawings, or the human-tone coloring of the hands or the face), in its asserted copyright registration (or asserted trade dress) registration. Lego apparently is trying to use worker decorations and unprotected colors to try to distract from

the fact that the body forms are different—even while Lego also takes the inconsistent position that different decorations, different facial expressions, and different colors are not a basis for Zuru to argue non-infringement in this case (*see* ECF No. 246, Lego Br. 11, 13, 32).

42.    The Redesigned MAX Figurine differs from the original MAX Figurine by increments of 2 millimeters or less.  *See* <u>Exhibit 24</u> (Dep. Ex. 271), *produced as ZURU-00039741- Confidential- Attorney's Eyes Only*; *see also* Ex. 13 at 286:16–287:25 ████████████████

**RESPONSE:**  Denied and, therefore, disputed.  Lego's own documents and testimony show that, when dealing with functional figurines that need to connect to the Lego-grid system, even changes in millimeters are quite significant and impact functionality. (*E.g.*, ECF No. 236-1, Zuru SOF 32 (█████████████████████████████████

████████████████████████████████████████

████████████████████████████████")).)  Moreover, based on Lego's Kre-O and Mega Bloks admissions in the *Best Lock* case, Judge Haight found the minifigure's size, dimensions, and proportions are functional because all Lego-compatible figurines "must have these elements so that they can be used in combination with blocks and base plates." *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 874 F. Supp. 2d 75, 102 (D. Conn. 2012).  And by focusing only on differences in "height," Lego understates and ignores other changes between the respective Zuru figurines, including changes in the head shape, the removal of the stud, and changes in the shapes of virtually all other features—arms, torso, legs, and feet.

43.    A likelihood of confusion survey designed by Dr. Stephen M. Nowlis, Ph.D. supports a finding of likelihood of confusion for the Redesigned Figurines, finding a 17.5% net confusion rate in a 2019 Point of Sale Survey and a 31.0% net confusion rate in a 2019 Post Sale

Survey.  Ex. 22 (Nowlis Decl.) at ¶¶ 15–16 and Ex. A at 38 (2019 Point of Sale Survey results) and 62 (2019 Post Sale Survey results).

**RESPONSE:**  Denied and, therefore, disputed.  Zuru incorporates by reference its response to Statement No. 35.  Among other things, Dr. Isaacson explained in detail why Lego's surveys are unreliable and do not show a likelihood of confusion, including because Dr. Nowlis used inappropriate survey controls, used inappropriate survey universe questionnaires, and asked inappropriately leading survey questions.  Moreover, Dr. Isaacson's and Mr. Ezell's surveys show that Dr. Nowlis's survey results are unreliable, and that there is no likelihood of confusion when a confusion survey utilizes a proper control and proper questions. (Ex. 76 [Isaacson Rebuttal Report at ¶¶ 84-106]; Ex. 78 [Ezell Rebuttal Report at ¶ 33].)

44.    Matthew Ezell did not design the Control that he used in his "replication survey," which was modeled after Dr. Nowlis's 2019 Post Sale Survey but used a different Control.  The Control images that Mr. Ezell used in his survey were provided to him by counsel for ZURU. Mr. Ezell does not know who created the Control images.  Exhibit 25 (Excerpt of Matthew Ezell Dep. Tr. ("Ezell Dep.")) at 89:1–91:22.

**RESPONSE:**  Admitted that Mr. Ezell did not personally know the graphic designer who created the control images, and that the survey control images were provided to Mr. Ezell by counsel (per his request).  Otherwise denied.  Mr. Ezell testified (and also noted in his report) that he gave counsel his instructions for the control design—including the images, poses, removal of head accessories, and angles of the photographs—based on his review of the record. (Ex. 81 [Ezell Rebuttal Report at ¶¶ 11, 19-21, 32-33]; Ex. 75 [Ezell Tr. at 57:13-58:19, 67:12-71:18, 79:13-80:6, 84:7-86:5, 87:11-88:3, 89:1-92:11, 97:22-98:13, 144:8-146:7 (Mr. Ezell explaining that he selected the control images, poses, and angles of the photographs, and that counsel provided the

images based on Mr. Ezell's input)].)  Based on what counsel provided to him per his directions, Mr. Ezell then selected the final control images for his survey.  (*Id.*)  Nor can Lego dispute that Mr. Ezell's approach to his survey control was wrong, as Lego's designated survey expert did not do the graphic design himself either.  (Ex. 64 [Nowlis Tr. at 191:7-15].)

45.    Mr. Ezell testified that he had not even seen the Court's preliminary injunction ruling until counsel for the LEGO Group showed it to him during his deposition.  Ex. 25 at 133:8–22.

**RESPONSE:**  Denied and, therefore, disputed.  Lego mischaracterizes the testimony.  In the cited testimony, Mr. Ezell testified that "I was generally aware at the time that I wrote the report, that the generation one toys were subject to an injunction," and "I didn't feel that I needed to in order to complete my task, which was to perform a replication based on Dr. Nowlis's survey." Moreover, Zuru incorporates its response to Statement No. 44.  Contrary to Lego's contention, Mr. Ezell testified he reviewed the record, including the asserted trade dress registration, in giving input for the image design of and his selection of the control.  Also, Lego's early success with a preliminary injunction does not show an undisputed fact.

46.    Mr. Ezell testified that he has only seen the MAX Figurine, or a Redesigned MAX Figurine, over Zoom meeting, and has never seen such figurines in person so that he could physically touch, hold, manipulate or play with them.  Ex. 25 at 65:16–66:13.

**RESPONSE:** Admitted.  But Lego's statement is irrelevant, as there is nothing wrong with a witness reviewing the Max figurines, and watching a display and demonstration of those figurines and their functional features, in a "Zoom" meeting, particularly during the Covid pandemic, and further given the scope of Mr. Ezell's work on this case (which was not to conduct a functionality or similarity analysis).  Moreover, Lego's expert Ms. Knight, who ███████

███████████████████████████████████████████████████████

████████████████████████████████████████████. (Ex. 82 [Knight Tr.

Vol. II at 304:4-311:13].)

47.    ZURU's expert Bruce Isaacson took an existing photograph of the Redesigned

MAX Figurine and made slight alterations to the figure in creating the Control for his point of sale

survey.  Exhibit 26 (Excerpt of Bruce Isaacson Dep. Tr.) at 20:9-25; 68:9-69:4.

**RESPONSE:** Denied and, therefore, disputed. The alterations Dr. Isaacson made were not

"slight."  Dr. Isaacson reviewed the record, including Lego's trademark registration and other

figurines like Kre-O, and created a construction toy figurine control that was as similar to the test

as possible while also not infringing on any of the disputed elements. (ECF No. 236-1, Zuru SOF

Ex. 6 at ¶¶ 6-12; Ex 85 [Johansen Dep. Ex. 187 (a "blank canvas" of Dr. Isaacson's control)]; Ex.

77 [Isaacson Tr. at 28:21-33:14, 70:13-73:5, 75:2-15, 224:13-229:14].) The overall impression of

the figurines below shows Dr. Isaacson's changes were not "slight," particularly as compared to

what Lego admits are "different expression" Kre-O and Mega Bloks figurines (*see* Ex. 77

[Isaacson Tr. at 224:13-229:14]):

| Minifigure | Kre-O | Mega Bloks | Nowlis Control | Zuru Control |
|------------|-------|------------|----------------|--------------|
|  |  |  |  |  |

48.    ZURU admits that the MAX Figurines are "toy figures," "play figures," "positionable toy figures," "modeled plastic toy figurines," and "construction toys."  Ex. 17 at Nos. 10-13, 16.

**RESPONSE:**  Admitted, though Lego's statements are presented in a misleading way.  It is undisputed that Zuru's Max figurines are construction toy figurines.  But, as Dr. Nowlis admitted, because construction toy figures are a more specific category of toy figures, not all purchasers of toy figures (like Godzilla) are purchasers of construction toy figures.  (Ex. 67 [Nowlis Tr. at 106:12-107:16, 112:13-113:3].)  Dr. Nowlis' surveys are flawed because he used an overly broad category of "toy figures" and did not accurately screen his survey universe for likely purchasers of the subset of construction toy figures.  (Ex.76 [Isaacson Rebuttal Report at ¶¶ 7, 17(i), 34-57].)

49.    ZURU admitted that its figurines "were displayed at Walmart retail locations in the United States in the same aisle as the Lego Group's products in at least some instances." Ex. 17 at No 26.

**RESPONSE:**  Admitted.  However, Lego admits that Zuru had ████████████ ████████████████████████████████████████ (Ex. 57 [Rich Tr. Vol. 22:24-23:8 (Lego's Senior Key Account Manager for Wal-Mart testifying ████████████ ████████████████)].)  Lego also admits that ████████████████████████ ████████████████████ (*Id.* at 79:8-19.)

50.    ZURU admits "that the intention with its [MAX] figurines was to target the price-conscious customers (including parents and their children) who might not be able to afford, or want to pay for, the high-priced construction brick and figurine products offered by Plaintiffs." Ex. 17 at No. 37.

**RESPONSE:** Admitted.  More specifically, Zuru was designing its figurines pursuant to

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ (ECF No. 236-1, Zuru SOF 44.)  In addition, Lego admits there

████████████████████████████████████████████████████

████████████████████████████████████████████. (ECF No.

236-1, Zuru SOF 42; *see* Ex. 57 [Rich Tr. at 68:12–71:4].)

51.     The price point for the Redesigned MAX Figurine 15-Pack was $12.97.  Ex. 16  at

37:14–17.

**RESPONSE:** Admitted. However, the price point of Zuru's product was determined in

conjunction ████████████. (*See* Exs. 83 & 84 [Mowbray Tr. at 357:8-360:4 and Ex. 33].)

52.     Final quality inspection reports for the MAX Figurine noted ████████████

████████████████████.  Ex. 13 at 308:11–309:11; Exhibit 27 (Final Quality Report and

Images (Dep. Ex. 277), *produced as ZURU-00024311–Confidential—Attorney's Eyes Only*), at 2

████████████████████████████).

**RESPONSE:**  Denied, mischaracterizes the evidence. The quality report Lego cites states

███████████████████████████████████████████████████."

(ECF No. 236-1, Lego SOF 52, Ex. 27.)  Lego does not present any evidence that ████████████

████████████████████████.  In fact, this document actually shows Zuru's

commitment to quality, by ████████████████████████████████████████

████  (*See, e.g.*, Ex. 74 [2/14/2019] Hrg. Tr. at 51:14-52:4].)  The evidence at the preliminary

injunction hearing also showed that the figurines were excellent quality. (ECF No. 65, PI Tr. at

41:9-25, 45:6-47:7, 51:2-13.) Mr. Loetz, a toy design expert, also found the Max figurines to be

high quality.  (*See* ECF No. 236-1, Zuru SOF Ex. 7 [Loetz Report] at ¶¶ 131; Ex. 75 [Loetz

Rebuttal Report at ¶ 140].)  Moreover, Lego itself admitted that Zuru "has a reputation with

retailers for a quality product, something that differentiates it with knockoffs that enter the market

at a similar time."  (ECF No. 236-1, Zuru SOF Ex. 36.)

53.    In 2019, Walmart Canada ████████████████████████████████████

████████████████████████████████████████████████████████████████████.

Exhibit 28 (Excerpt of James Nunziati Dep. Tr. ("Nunziati Dep.")) at 192:3–24.

**RESPONSE:** Denied, mischaracterizes the evidence. ████████████████████

████████████████████████████████████████████████████.  In fact, for the

reasons shown in Zuru's response to Statement No. 52, the evidence shows that Zuru's figurines

were of great quality.

54.    ZURU also sold Mayka Toy Block Tape (later rebranded as MAX Tape) to retailers

including Walmart, Target, and Amazon.  Ex. 10 at 132:1–15; Ex. 15 at 9:11-13.

**RESPONSE:** Admitted.

55.    ZURU used the LEGO® wordmark in connection with the marketing and sale of its

Mayka Toy Block Tape, referring to it as "Lego Tape."  Exhibit 29 (Letter from E. Alquist to M.

Mowbray); Exhibit 30 (08/29/2017 Letter from N. Kahn to E. Alquist) (acknowledging ZURU

removed references to "Zuru Mayka Lego Tape").

**RESPONSE:** Denied and, therefore, disputed.  Exhibit 30 is an inadmissible settlement communication that was sent without prejudice. Fed. R. Evid. 408.  Also, Exhibit 29 is hearsay, an incomplete document, lacks foundation, does not show that the ads are from Zuru, and does not reflect a complete true and accurate copy of any such ad from Google.com or from WSJ.com.  Any such alleged evidence is also irrelevant, as the use of the word "lego" (and the validity of any trademark registration concerning that word) is not at issue in this case.  Even if such ads are admissible, any use of the word "lego" was used generically to refer to and/or to show compatibility with plastic toy interlocking toy construction bricks, so Zuru did not improperly use any "LEGO®" "wordmark".

56.     ZURU used images of the LEGO Minifigure figurine in connection with its marketing and advertisement of Mayka Toy Block Tape on the ZURU Mayka Facebook page. Ex. 29; Ex. 30 (acknowledging ZURU removed the post on the ZURU Mayka Facebook page containing the LEGO Minifigure figurine). *See also* Ex. 10 at 147:14–22 (acknowledging ZURU eventually removed the Minifigure figurine from the Mayka Toy Block Tape packaging).

**RESPONSE:** Objected to on the grounds that Exhibit 30 is an inadmissible settlement communication that was sent without prejudice. Fed. R. Evid. 408. Also objected to on the grounds that Exhibit 29 is hearsay, an incomplete document, lacks foundation, does not show that the ads are from Zuru, and does not reflect a complete true and accurate copy of any such ad from Google.com or from WSJ.com.  Further, the cited testimony lacks foundation and context, and does not show that Zuru used images of a Lego minifigure in an ad.  The cited evidence is also irrelevant, as any such ad was not accused of infringement. Even if such ads are admissible, at best, any such alleged use would have been to show that the tape was compatible with Lego products, and therefore constituted fair use.

57.    True and accurate physical samples of the Mayka Toy Block Tape sold at the time of the filing of the Complaint—with packaging that includes two dimensional images of the MAX Figurines—were admitted into evidence as Exhibits 84 and 85 at the February 14, 2019 PI Hearing and Plaintiffs refer the Court to those products.  *See* Ex. 14 at 193:1–12, 194:5–13.  For the Court's convenience, images of the Mayka Toy Block Tape packaging are included as <u>Exhibit 31</u>. Answer and Counterclaims, Ex. 13.

**RESPONSE:**  Admitted.

58.    During the four-year design process for the LEGO Friends® Figurine, the LEGO Group created several designs with different overall looks.  *See* <u>Exhibit 32</u> (Friends Design Document *produced as LEGOGROUP0002164* through *LEGOGROUP0002182–Highly Confidential–Attorney's Eyes Only*).

**RESPONSE:** Objection. The document Lego cites does not describe a "four-year design process for the LEGO Friends® Figurine."  Rather, the document describes ██████████ ████████████████████████████████████████████████████████████████ ████████████████" *See*, ECF No. 247-12, Ex. 32 at LEGOGROUP0002166. In addition, to the extent that Lego is relying on two hypothetical figurines that it apparently previously considered but never commercialized, these two hypothetical designs further demonstrate that there are no adequate alternative designs that fit within the Lego grid system but that Lego would not claim are infringing. Lego has put forth no evidence that either of these hypothetical designs actually fit within the Lego grid system. Furthermore, Lego admits that ████████████ ██████████████████████████████████████████████. (ECF No. 236-1, Zuru SOF 32) ████████████████████████████████████████████████████████████████,"

████████████████████████████████████████████████████████████████████

█████████████████████.").

59.    *The* LEGO Group uses images of Minifigure figurines as symbols of the LEGO Group's services, further emphasizing its role as a source identifier. *See* <u>Exhibit 34</u> (Excerpt of Blair Dep. Tr.) at 48 ("[T]he mini figure figurine is used by the LEGO brand across retail spaces in the form of advertisements, large scale statues, also used in theme park experiences as mascots and across digital games and apps as characters to choose from."); Ex. 9 at 12 (Hecht Decl.) ¶ 11.

**RESPONSE:**  Denied. Lego's own VP of design, Matt Ashton, has described ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ (ECF No. 236-1; Zuru SOF 13.)  And until recently when Zuru called Lego out on it (Ex. 75 (Loetz Rebuttal Report at 12, n.4), Lego stated on its own website that the "idea is to make the minifigure as ***broadly generic as possible***".  Moreover, Lego's corporate designees in this case, who work for Lego and are consumers of Lego products, ████████████████████████████████████. (Zuru AMF 4-7).

## ADDITIONAL MATERIAL FACTS

1.    Ms. Knight testified that ████████████████████████████ ████████████████████████████████████████████. (Ex. 86 [Knight Tr. Vol. 2 at 323:11-324:19].)  However, she admitted that ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████. (*Id.* at 327:9-328:8, 333:12-336:15.)  She also admitted that ████████████████████████ ████████████████████████████████████████████████████████ ████████████ (*Id.* at 336:16-22.)

2.    In the *Best Lock* case, Lego stated that the makers of the Kre-O and Mega Bloks figurines had demonstrated their "***creative abilities*** to come up with their own particularized expression of an idea."  [*Best Lock*, Dkt. 70] at 49-50; Zuru 25, Ex. 65).]

3.    In support of its application to register the asserted minifigure trade dress, Lego submitted a declaration that included the following sworn statement: "[N]o other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive." (Ex. 87; Lego Trademark Application Declaration.)

4.    Lego witness Ben Beaty, who is a Lego employee and a consumer of Lego products, testified as follows regarding the following image of the minifigure from a Lego patent application (Exs. 88, 89 [Beaty Tr. at 13:8-10, 29:12-25, 58:6-22]; [Dep. Ex. 73]):



5.    Mr. Beaty testified as follows about a "Bendy and the Ink Machine" cat figurine and Blocko "Simpsons" figurines (Ex. 88, 90, 91 [Beaty Tr. at 66:7-14, 291:22-292:5]; [Dep. Exs. 113 and 141]):



6.    Lego witness Mr. Johansen—one of Lego's most senior minifigure designers—testified as follows regarding the following image of Zuru's "control" figurine—which is an

exaggerated version of Zuru's actual figurine (Exs. 92, 93, 95 [Johansen Vol. 1 at 39:16-22; Vol. 2 at 122:7-22]; [Dep. Ex. 187]):



7.    Lego witness Matt Rich testified as follows regarding the Fisher Price Imaginext (Batman) figurine on the bottom left and the Mega Bloks figurine on the bottom right that Lego admits are lawful competition (Exs. 94, 96, 102 [Rich Tr. at 47:6-20; 48:21-49:5; 57:6-8]; [Dep. Exs. 96 and 97])



8.    Lego's internal documents show that consumers of toy construction products ███  ███████████████████████. (Exs. 97, 98, 99, 100 [Beaty Depo Exs. 132, 134, 135, 136] (███████████████████████████████████████ ████████████████████████

9.    Lego does not dispute that Lego Juris A/S is a holding company that legally owns the asserted minifigure trade dress, and that Lego Systems, Inc. is the distributor of Lego construction toys bearing the asserted trade dress. (Ex. 101 [Carr Vol. I, at 173:5-175:21].) Lego has no evidence that Lego Juris A/S has used the trade dress itself, or exercised control over the goods of Lego Systems, Inc. Lego's corporate designee, Mr. Carr, ██████████████ ████████████████████████████████████████████████. (Ex. 101 [Carr Vol. I, at 110:5-114:24].) Lego has not produced evidence establishing that Lego Juris A/S is the parent company of Lego Systems, Inc., or of a license agreement between Lego Juris A/S and Lego Systems, Inc., let alone one that provides Lego Juris A/S with control over Lego Systems, Inc.'s use of the asserted trade dress.

Dated: April 12, 2022

Defendant Zuru, Inc.

By: *Fatima Lahnin*
Carmody Torrance Sandak & Hennessey, LLP – NH
Fatima Lahnin
195 Church St. 18th floor
PO Box 1950
New Haven, CT 06509-1950
Tel: 203-784-3116
Fax: 203-784-3199
mkurzman@carmodylaw.com
flahnin@carmodylaw.com

Quinn Emanuel Urquhart & Sullivan, LLP
Michael T. Zeller (phv10063)
Daniel C. Posner (phv 10604)
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017
Tel: 213-443-3000
Fax: 213-443-3100
michaelzeller@quinnemanuel.com
danposner@quinnemanuel.com

Claudia Bogdanos (phv20532)
51 Madison Avenue
New York, NY 10010
Tel: 212-849-7082
corystruble@quinnemanuel.com
charlesstraut@quinnemanuel.com

Eric Olavson (phv10570)
Senior Legal Counsel at Zuru Inc.
12020 Sunrise Valley Drive, Ste 100
Reston, VA 20191
Tel: (801) 560-5981
Fax: (855) 581-9683
Email: eric.olavson@zuru.com

## <u>CERTIFICATION</u>

I hereby certify that on April 12, 2022, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_/s/ Fatima Lahnin_
Fatima Lahnin