## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------ x
LEGO A/S; LEGO SYSTEMS, INC.;    :
and LEGO JURIS A/S,              :
                                 :
        Plaintiffs,              :
                                 :
                                 :   Civil No. 3:18-cv-2045 (AWT)
v.                               :
                                 :
ZURU INC.,                       :
                                 :
        Defendant.               :
------------------------------ x
```

### SUPPLEMENT TO ORDER RE PLAINTIFFS' EMERGENCY
### <u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>

Plaintiffs LEGO A/S, LEGO Systems, Inc., and LEGO Juris A/S (collectively "LEGO") moved for a Temporary Restraining Order restraining defendant ZURU Inc. ("ZURU") from manufacturing, selling, offering for sale, distributing, displaying or authorizing the sale of the ten figurines proposed by ZURU (the "Third-Generation Figurines") in its Notice of Intent to Manufacture and Sell Non-Infringing Figurines (ECF No. 305) (the "Notice"), and confirming that the Third-Generation Figurines are subject to the Preliminary Injunction (ECF No. 87) and Ruling on Motion for Contempt (ECF No. 139) (the "Contempt Order"). On February 5, 2024, the court issued the Order Re: Plaintiffs' Emergency Motion for Temporary Restraining Order (ECF No. 344). In accordance with the Mandate (ECF No. 361), dated April 16, 2025, the court provides this analysis with

respect to the issues of substantial similarity and likelihood
of confusion.

The Mandate states:

> We therefore find that a remand pursuant to this
> Court's procedure in United States v. Jacobson is
> appropriate for the district court to supplement the
> record by providing its assessment of whether the
> Third-Generation figurines are substantially similar
> to or likely to be confused with Lego's Minifigure. 15
> F.3d 19, 22 (2d Cir. 1994). In particular, we instruct
> the district court on remand to apply the more
> discerning observer test in its assessment of
> substantial similarity.

> . . . .

> Because the district court did not perform any
> analysis in applying the preliminary injunction to the
> Third-Generation figurines, we cannot discern whether
> its ruling was based on unprotectable elements of
> Lego's Minifigure. Accordingly, as stated above, we
> remand the case to the district court pursuant to
> Jacobson. See Jacobson, 15 F.3d at 22. On remand, the
> district court must use the more discerning observer
> standard stated above to assess whether the Third-
> Generation figurines are substantially similar to
> Lego's Minifigure so as to fall within the scope of
> the preliminary injunction order. In doing so, it must
> not base its finding of substantial similarity on
> unprotectable elements of the Minifigure. The court
> must also assess whether the Third-Generation
> figurines are likely to be confused with Lego's
> Minifigure. See [Vans, Inc. v. MSCHF Product Studio,
> Inc., 88 F.4th 125, 135-136 (2d Cir. 2023)].

Mandate at 7, 10-11. The court addresses only the issues it has
been directed to address by the Mandate.

## I.    Substantial Similarity

To demonstrate that substantial similarity exists between a
defendant's work and the protectible elements of a plaintiff's

work, "[t]he plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea. The means of expression are the 'artistic' aspects of a work; the 'mechanical' or 'utilitarian' features are not protectible." Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995) (quoting Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994)).

The '104 Registration describes the nature of the work as "toy sculptures" and the nature of the authorship as "3-Dimensional sculpture." ECF No. 243-1, at 4. The '230 Registration describes the nature of the work as "toy sculpture" and the nature of the authorship as "3-Dimensional sculpture." ECF No. 243-4, at 3. The copyrighted, sculptural features of expression are plainly visible in the exemplary portions of the Asserted Copyrights' deposit materials.

Both sides incorporated by reference the record from the preliminary injunction proceedings and their submissions in connection with their cross-motions for summary judgment. See Pls.' Mem. in Supp. of Emergency Mot. for Temporary Restraining Order (ECF No. 307) ("Pls.' Mem."), at 13-14; Pls.' Reply in Supp. of Emergency Mot. for Temporary Restraining Order (ECF No. 324) ("Pls.' Reply"), at 31; Def. ZURU's Opp. to Pl. TLG's Emergency Mot. for Temporary Restraining Order (ECF No. 313)

("Def.'s Opp."), at 42.[1] Those submissions include the following expert reports: The November 8, 2021 expert report by Elizabeth B. Knight (ECF No. 322, Ex. A) (the "Knight Report"); the December 17, 2021 rebuttal report by Elizabeth B. Knight (ECF No. 322, Ex. B) (the "Knight Rebuttal Report"); the November 8, 2021 expert report of Lee Loetz (ECF No. 312-5, Ex. 1) (the "Loetz Report"); and the December 17, 2021 rebuttal expert report of Lee Loetz (ECF No. 312-5, Ex. 2) (the "Loetz Rebuttal Report"). LEGO also submitted in support of the instant motion the Declaration of Elizabeth B. Knight (ECF No. 322) (the "Knight Declaration"), and ZURU submitted the Declaration of Lee Loetz (ECF No. 312-5) (the "Loetz Declaration").

LEGO acknowledges that "the stud projection on top of the head (but notably, not its position on the head), the inside radius of the c-shaped hands and the holes that receive stud projections at the base of the feet and back of legs are necessary for attachment and cannot be easily changed through alternative designs, yet remain capable of interacting with the LEGO Grid System." Knight Rebuttal Report ¶ 53 (footnote omitted). Thus, these features are utilitarian and not protectible.

"[W]here we compare products that contain both protectible

---

[1] The page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

and unprotectible elements, our inspection must be 'more

discerning'; we must attempt to extract the unprotectible

elements from our consideration and ask whether the <u>protectible</u>

<u>elements, standing alone,</u> are substantially similar." <u>Knitwaves</u>,

71 F.3d at 1002 (emphasis in original) (internal citations

omitted).

> No matter which test we apply, however, we have
> disavowed any notion that "we are required to dissect
> [the works] into their separate components, and
> compare only those elements which are in themselves
> copyrightable." Instead, we are principally guided "by
> comparing the contested design's 'total concept and
> overall feel' with that of the allegedly infringed
> work" as instructed by our "good eyes and common
> sense." This is so because "the defendant may infringe
> on the plaintiff's work not only through literal
> copying of a portion of it, but also by parroting
> properties that are apparent only when numerous
> aesthetic decisions embodied in the plaintiff's work
> of art--the excerpting, modifying, and arranging of
> [unprotectible components] . . . --are considered in
> relation to one another."

<u>Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.</u>, 602 F.3d

57, 66 (2d Cir. 2010) (alterations in original) (internal

citations omitted). <u>See also</u> <u>Knitwaves</u>, 71 F.3d at 1003 ("It is

commonplace that in comparing works for infringement purposes--

whether we employ the traditional 'ordinary observer' test or

the <u>Folio Impressions</u> 'more discerning' inquiry--we examine the

works' 'total concept and feel.'").

ZURU contends that the Minifigure figurine has

unprotectible features to a greater extent than is acknowledged

by LEGO. ZURU argues that "it is undisputed that copyright law does not protect functional features of a product design, which here include **15** features that TLG itself has described as contributing to the "Functionality of the Lego Minifigure" (Ex, A, SOF 9), and many more features that unquestionably facilitate functionality like movement, attachment, poseability, and compatibility (Ex. A, SOF 9.)[.]" Def.'s Opp., at 29. Paragraph 9 of ZURU's Local Rule 56(a)(1) Statement of Undisputed Material Facts (ECF No. 236-1) states that "[t]he minifigure has 15 'functional' features relating to 'assembly,' 'poseability,' and 'connectability,'" and relies on, among other things, the Loetz Report. In that report, Loetz states that "the Lego minifigure is highly 'functional' . . . as a standalone figurine (e.g., in the way that its elements move, rotate, etc.)." Loetz Report ¶ 55. He elaborates:

> Based on my own analysis of the Lego minifigure and my review of other documents and testimony in the record, I have identified all the following ways that the minifigure is capable of attachment or movement:
>
> FUNCTIONS OF THE MINIFIGURE
>
> 1. Stud on head allows for hair, helmet, hat, etc., connection.
> 2. Head swivels on neck.
> 3. Head is removable to switch with other styles.
> 4. Right arm is articulated with a hinge joint.
> 5. Left arm is articulated with a hinge joint.
> 6. Right hand has a "c-cup" clutching shape.
> 7. Right leg is articulated with a hinge joint.
> 8. Legs are removable and replac[eable].
> 9. Left leg is articulated with a hinge joint.

10. Left hand has a "c-cup" clutching shape.
11. Back of right leg has fitted "tube" holes to snap onto Lego studs.
12. Back of [left] leg has fitted "tube" holes to snap onto Lego studs.
13. Bottom of right foot has . . . fitted "tube" holes to snap onto Lego studs.
14. Bottom of left foot has . . . fitted "tube" holes to snap onto Lego studs.
15. Individual pieces of minifigure can connect to each[ ]other and to other Lego bricks and elements in various ways.

Id. ¶ 61. Seven of the features identified by Loetz are the ones identified by LEGO. (The difference in the number of features is that, while LEGO does not, ZURU counts separately both the right hand and the left hand, both the back of the right leg and the back of the left leg, and both the bottom of the right foot and the bottom of the left foot.)

Some of the eight remaining features that Loetz describes as "functions" of the Minifigure figurine are joints that enable movement with respect to the head, the arms, or the legs. (See Items 2, 4, 5, 7, and 9.) The remainder of those features that Loetz characterizes as "functions" relate to assembly of the Minifigure figurine, i.e., the head and legs are removable and individual pieces connect to each other. (See Items 3, 8, and 15.)

These features are not utilitarian. "[A] design may evince . . . separability, meaning that it has identifiable features that were designed independent of functional considerations and

which are capable of existing apart from the useful article." LEGO A/S v. Best-Lock Constr. Toys, Inc. (Best-Lock II), 404 F. Supp. 3d 583, 611 (D. Conn. 2019). As explained in LEGO A/S v. Best-Lock Construction Toys, Inc. (Best-Lock I), "[t]he question in each case . . . is whether [an] element is dictated by utilitarian considerations or, to put it another way, whether the element could be changed without affecting the functionality (i.e., capacity for movement and attachment) of the minifigure." 874 F. Supp. 2d 75, 99 (D. Conn. 2012).

LEGO expert Knight states that "the elements Loetz claims are functional (the design of the head, arms, torso, legs, and feet) can each be designed differently and take another form or shape (human or even creature) without affecting the capacity of the sculpture to move and/or attach." Knight Rebuttal Report ¶ 52. Knight demonstrates, using pictures, that "any Minifigure figurine movement can be accomplished through multiple alternative designs, including all assembly (which is internal) or poseability (shown below). . . . The Friends figurine can perform almost all of these motions, including internal assembly, even though it is a completely different toy figure design with a different overall look and feel." Id. ¶ 54-55 (accompanying pictures omitted). See also Best-Lock II, 404 F. Supp. 3d at 611-12 ("Merely having some incidental effect on the nature of that movement, without more, does not make an element

'functional.'").

ZURU argues that LEGO "does not attempt to identify what the 'copyright protected expression' of the minifigure actually is," Def.'s Opp., at 32, and then posits that LEGO's position as to what is the copyright protected expression can be determined by looking at a brief LEGO filed in Best-Lock, see id. ZURU also argues that LEGO "has waived any argument about which elements [of the Minifigure figurine] are protected. Accordingly, the Court should deem it undisputed that the features of the minifigure that are protected by copyright are limited, at the very most, to the combination of: (i) its trapezoidal torso which is wider at the bottom and narrower at the top; (ii) its square, block-like set of shoulders; (iii) arms extending from the upper side of the trunk, slightly below where shoulder starts; and (iv) square feet." Def. ZURU's Sur-Reply in Further Opp. to Pl. TLG'S Emergency Mot. for a Temporary Restraining Order (ECF No. 334) ("Def.'s Sur-Reply"), at 6.

However, LEGO is clear that its claims are based on its "copyrights covering the sculpture of its iconic Minifigure figurine," Pls.' Mem., at 7, and it describes the Minifigure figurine as a work of art that is recognizable as a unique sculptural expression of a human figure. See Knight Report ¶ 10(b). LEGO maintains that "[c]onsideration of the overall look and feel of the [Third-Generation] Figurines (as is

required) compels the conclusion that they are substantially similar to the Asserted Copyrights." Pls.' Reply, at 22. Thus, the court agrees with LEGO that ZURU's reliance on <u>SMS Group</u> is misplaced. <u>See</u> Pls.' Reply, at 25-26.

In the Knight Rebuttal Report, Knight shows what unprotectible elements of the Minifigure figurine must be extracted for purposes of conducting the more discerning inquiry, namely the stud projection on the top of the head, the inside radius of the c-shaped hands and the holes that receive stud projections at the base of the feet and the back of the legs. <u>See</u> Knight Rebuttal Report ¶ 57. In the Knight Declaration, Knight extends the analysis in the Knight Report and the Knight Rebuttal Report to the Third-Generation Figurines.

In the Knight Report, Knight shows side-by-side silhouettes of the Minifigure figurine and the 2018 ZURU figurine from the front view, the side view, and the top view, and in addition shows the results of an overlay of the figurines from each view. <u>See</u> Knight Report ¶ 45. Knight provides, in the Knight Report, a similar analysis with respect to a comparison between the Minifigure figurine and the 2019 redesigned ZURU figurine. <u>See</u> Knight Report ¶¶ 47-53.

In support of the Knight Declaration, Knight provides a similar analysis with respect to the Third-Generation Figurines.

See Knight Declaration Exs. C, D. Knight's opinions include the
following:

> The overall look and feel of each [Third-
> Generation] Figurine is substantially similar to the
> overall look and feel of the Asserted Copyrights . . .
> embodied by the LEGO Minifigure figurine as evidenced
> by a side-by-side comparison of photographs of the
> [Third-Generation] Figurines and LEGO Minifigure
> figurine. The [Third-Generation] Figurines and the
> Minifigure figurine incorporate similar combinations
> of geometric shapes with similar overall proportions,
> including rectangular shapes, and slight curves.
>
> By reviewing an overlay of the silhouette of each
> [Third-Generation] Figurine layered upon the
> Minifigure figurine, it is evident that there are only
> miniscule differences between the figurines.
>
> Some of the [Third-Generation] Figurines are
> slightly taller than the Minifigure figurine, have a
> slightly more narrow waist, or slightly higher arms.
> These differences do not change the overall look and
> feel of the figurines. . . .

Knight Decl. ¶¶ 9–11.

ZURU argues that "when the asserted minifigure copyright is
properly construed as limited to its features potentially
protected by copyright, there are **no similarities** between the
parties' figurines at all. Instead, the many discernable
dissimilarities prevent TLG from showing it is likely to prevail
on any claim for copyright infringement." Def.'s Opp., at 34
(emphasis in original) (internal quotation marks and citations
omitted). ZURU submits the Loetz Declaration in support of its
position. Loetz attaches to the Loetz Declaration the Loetz
Report and the Loetz Rebuttal Report, and extends the analysis

in those reports to the Third-Generation Figurines.

In paragraphs 32 through 38 of the Loetz Declaration, Loetz discusses "Differences Between Overall Impression Of Minifigure And Third-Generation Figurines," and in paragraphs 39 through 42, Loetz discusses "Specific Differences Between Third-Generation Figurines and Minifigure."

With respect to specific differences between the Third-Generation Figurines and the Minifigure figurine, Loetz states:

> I have also compared the individual elements of the minifigure and the Third-Generation Figurines. When the parties' figurines are broken down into their component parts (as is an intended part of the play pattern as construction toy figurines), there are many notable differences between corresponding features of the minifigure and the Third-Generation Figurines--and hardly any similarities other than that the features are intended to represent the same human body parts and be roughly the same size so they can connect with the same construction toy elements.

Loetz Decl. ¶ 39. Loetz continues: "Below is a summary of differences between the heads/necks, shoulders/torsos, arms/hands, waists, and legs/feet of each version of the Third-Generation Figurines and the minifigure." Id. ¶ 40. However, Loetz's methodology for conducting the "more discerning inquiry" is contrary to the manner in which that test must be applied. As explained in Gaito, "we have disavowed any notion that 'we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.' Instead, we are principally guided 'by comparing

the contested design's "total concept and overall feel" with
that of the allegedly infringed work' as instructed by our 'good
eyes and common sense.'" 602 F.3d at 66 (citations omitted)).

With respect to the total concept and overall feel of the
Third-Generation Figurines versus the Minifigure figurine, Loetz
states:

> As noted, it is my opinion that [for] the Third-
> Generation Figurines, Zuru has further emphasized the
> differences between the prior versions of its
> figurines and the minifigure, which leads to the
> Third-Generation Figurines having an even more
> different overall impression from the minifigure than
> the prior versions.
>
> Attached as **Exhibit 3** are photos of each version
> of the Third-Generation Figurines next to a
> minifigure, in the form of the below example (which
> shows Third-Generation Figurine Version 7): [Photo
> omitted.]
>
> Overall, the Zuru figurines are smaller,
> "skinnier," less smooth, more "movable," and more
> human-like than the minifigure. Contrary to the
> angular body shape of the minifigure, Zuru's figurines
> are more natural and organic in their appearance. They
> have rounded shoulders and legs. The shoulders, necks,
> and heads flow together more organically than the
> minifigure. They have ears on the sides of their
> heads, and chin/lower jaw definition.
>
> The Third-Generation Figurines have muscular
> definition in the shoulders (deltoids), chest, arms,
> and legs. The shoulders are broad and the waists are
> more narrow, as in a muscular, masculine human form.
> These features cause the Third-Generation Figurines to
> look more like "action figures" than construction-toy
> figurines (like the minifigure).

Loetz Decl. ¶¶ 32-35. The photos in Exhibit 3 show a front view
only of the Third-Generation Figurine and a Minifigure figurine.

In paragraph 54 of the Loetz Declaration, Loetz provides overlay images which compare, among other things, the shapes of the Minifigure figurine and two versions of the Third-Generation figurines. Unlike Knight, and despite the fact that what is at issue here is a copyright for a three-dimensional sculpture, Loetz provides only the front view; he does not provide overlay images comparing the shapes from the side view or the top view. Thus, the overlay comparison Loetz presents with respect to the overall look and feel of the Third-Generation Figurines versus the Minifigure figurine is deficient because it leaves out two of the three dimensions. On the other hand, Knight properly supports her opinions that: "The changes made to the 2019 Redesigned Figurines do not come close to altering the overall look and feel. . . . Mr. Loetz attempts to point out differences between the [Third-Generation] Figurines and the 2019 Redesigned Figurines. However, the 'differences' are so small in their visual effect that they have negligible, if any, effects on the overall visual expression as evidenced by the overlays shown in Exhibit C-D." Knight Decl. ¶¶ 15-16. As Knight stated in the Knight Report, "[b]y reviewing an overlay of each figure, you can see that the basic elements of height, width, head size and proportion of head to bodies are almost identical. These similarities in terms of scale and proportion, _i.e._ the length of the leg, the shape of the leg, the proportions or size of the

torso and the head, are all part of the overall look and feel of the figure. Tiny differences do not change the overall look and feel of the figure." Knight Report ¶ 46.

## II. Likelihood of Confusion

In evaluating the likelihood of confusion, courts in this circuit look to the _Polaroid_ factors:

> (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith (or bad faith) in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers. Moreover, depending on the complexity of the issues, "the court may have to take still other variables into account."

_Savin Corp. v. Savin Grp._, 391 F.3d 439, 456 (2d Cir. 2004) (quoting _Polaroid Corp. v. Polarad Elecs. Corp._, 287 F.2d 492, 495 (2d Cir. 1961)) (internal citations omitted). "[T]he list of _Polaroid_ factors is not exclusive and the analysis of the factors is not a mechanical process." _Merriam-Webster, Inc. v. Random House, Inc._, 35 F.3d 65, 70 (2d Cir. 1994) (internal citations and quotation marks omitted). "[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." _Brennan's, Inc. v. Brennan's Rest., L.L.C._, 360 F.3d 125, 130 (2d Cir. 2004) (quoting _Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co._, 799 F.2d 867, 872 (2d Cir. 1986)).

The Asserted Trademark consists of

the three-dimensional configuration of a toy figure
featuring a cylindrical head, on top of a cylindrical
neck, on top of a trapezoidal torso of uniform
thickness, with flat sides and a flat back, where arms
are mounted slightly below the upper surface of the
torso, on top of a rectangular plate, on top of legs
which bulge frontwards at the top and are otherwise
rectangular with uniform thickness, on top of flat
square feet.

ECF No. 243-7, at 2 (original in all caps). The mark is depicted

in a single drawing in the registration. See ECF No. 243-9, at

8.

After evaluating the Polaroid factors in light of the

record here, the court concludes that LEGO is likely to be able

to establish that the Third-Generation Figurines are likely to

cause confusion. This is so because LEGO is likely to be able to

show that each of the six Polaroid factors that bear on the

ultimate question of likelihood of confusion as to the source of

the products at issue here supports such a conclusion.

### A.    Strength of the Mark

"When determining a mark's strength, courts consider both

the mark's inherent distinctiveness, based on the

characteristics of the mark itself, and its acquired

distinctiveness, based on associations the mark has gained

through use in commerce." CSL Silicones, Inc. v. Midsun Grp.

Inc., 301 F. Supp. 3d 328, 356–57 (D. Conn. 2018). "The Supreme

Court has held that unlike word marks and product-packaging

trade dress, product-design trade dress can never be inherently

distinctive." Converse, Inc. v. Int'l Trade Comm'n Skechers
U.S.A., Inc., 909 F.3d 1110, 1116 (Fed. Cir. 2018). In
evaluating a mark's acquired distinctiveness, the court may
examine "copying, advertising expenditures, sales success,
length and exclusivity of use, unsolicited media coverage, and
consumer studies (linking the name to a source)." In re
Steelbuilding.com, 415 F.3d 1293, 1300 (Fed. Cir. 2005). "A
showing of secondary meaning need not consider each of these
elements. Rather, the determination examines all of the
circumstances involving the use of the mark." Id.

    In ruling on an earlier motion by LEGO for injunctive
relief, the court concluded that "[t]he mark of the LEGO Group's
Minifigure figurine is strong based on the extrinsic evidence
presented by the plaintiffs, which includes, inter alia, a
federally-registered trademark; substantial expenditures on
promotional and marketing efforts; a long and continuous use of
the mark since 1978; third-party licensing agreements; the
substantial revenue from products and services connected to the
Minifigure Trademark; and the widespread public exposure and
recognition of the Minifigure figurine." Ruling on Mot. for
Preliminary Injunction (ECF No. 86), at 18. The record as it
currently stands still supports that conclusion. LEGO has
submitted evidence that between 1978 and 2015, it spent in
excess of $200 million on advertising and promotion, and that

the approximate number of Minifigures sold in the United States from 1978 to 2015 was in excess of 120 million. See Pls.' Mem. in Supp. of Mot. for Partial Summ. J. (ECF No. 246) ("Pls.' Summ. J. Mem."), at 43. With respect to length and exclusivity of use, LEGO has submitted evidence that the Minifigure figurine was first sold in 1978, and had been sold for approximately 37 years before the application for the Asserted Trademark was filed. See id. It has also submitted evidence that LEGO has authorized licensees, and that it takes steps to police activities by infringers. See id. at 43-44.

ZURU argues that "[t]here is no evidence that Lego has a strong mark in the body form of a blank, undecorated minifigure—which is the most Lego's trade dress protects." Def.'s Mem. in Supp. of Mot. for Summ. J. (ECF No. 236) ("Def.'s Summ. J. Mem."), at 54. However, as LEGO has pointed out, "ZURU cites no authority for its position that varying decorative elements render the Minifigure figurine trade dress unrecognizable, and such argument is belied by the fact that the Trademark Office registered the Minifigure figurine trade dress despite being aware of the various ways in which the Minifigure figurine may be adorned." Pls.' Mem. in Opp. to Def.'s Mot. for Summ. J. (ECF No. 262) ("Pls.' Summ. J. Opp."), at 54.

Based on the foregoing, LEGO is likely to be able to show that the Asserted Trademark is strong.

**B.    Degree of Similarity Between the Two Marks**

"Similarity" turns on whether the competing marks create the "same general overall impression" when viewed separately. Paco Rabanne Parfums, S.A. v. Norco Enters., Inc., 680 F.2d 891, 893 (2d Cir. 1982) (quoting RJR Foods, Inc. v. White Rock Corp., 603 F.2d 1058, 1060 (2d Cir. 1979)). Courts consider "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 962 (2d Cir. 1996).

LEGO is likely to be able to show that there is a high degree of similarity between the Minifigure figurine and the Third-Generation Figurines. Knight's analysis in the Knight Declaration with respect to the Third-Generation Figurines addresses the Asserted Trademark as well as the Asserted Copyrights. See Knight Decl. ¶ 9 ("The overall look and feel of each [Third-Generation] Figurine is substantially similar to the overall look and feel of the Asserted Copyrights and Asserted Trademark[] embodied by the LEGO Minifigure figurine as evidenced by a side-by-side comparison of photographs of the Proposed Figurines and LEGO Minifigure figurine."). Based on her analysis, Knight concludes that "[a]n ordinary observer would consider them to be substantially similar, particularly when displayed in product packaging. This is particularly true

because adult purchasers of toys generally do not inspect individual details close enough to recognize differences." Id. ¶ 11. The Loetz Declaration also addresses the Asserted Trademark, but for the reasons discussed above with respect to Loetz's analysis on the question "substantial similarity," the court concludes that his analysis is deficient. In that part of his analysis where he points to discrete differences between the Minifigure figurine and the Third-Generation Figurines, Loetz fails to address the question of whether the same general overall impression is created, and in that part where he does focus on the overall impression, he bases his analysis on viewing the three-dimensional configuration of toy figures from only one perspective. In addition, Loetz does not dispute that the toys are displayed in product packaging, nor that adult purchasers of toys generally do not inspect individual details closely enough to recognize differences.

### C. Proximity of the Products

The proximity of the products is concerned with the "competitive distance between the products." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1134 (2d Cir. 1979).

> The "proximity-of-the-products" inquiry concerns whether and to what extent the two products compete with each other. We look to the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are

> advertised, and the channels through which the goods are sold.

Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996) (internal quotation marks and citations omitted). In its summary judgment papers, ZURU argues that "[this] factor do[es] not support a finding of likely confusion because Zuru was admittedly--and upon Walmart's express request--trying to design a figurine that was 'completely compatible' with Lego." Def.'s Summ. J. Mem., at 55. But the record continues to reflect, as it did at the time of the ruling on LEGO's previous motion for injunctive relief, that both LEGO's and ZURU's "products are toy figurines and toy construction products, and there is no difference between them in terms of the relevant market they target." Ruling on Mot. for Preliminary Injunction (ECF No. 86), at 21.

Thus, LEGO is likely to be able to show that the proximity of the products supports a conclusion that there is a likelihood of confusion.

### D. Likelihood that the Prior Owner Will "Bridge the Gap"

With respect to this factor, the court evaluates "whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, bridge the gap. If the senior user can show such an intention, it helps to establish a future likelihood of confusion as to source."

Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217,
1227 (2d Cir. 1987). Here, there is no gap to be bridged because
both LEGO and ZURU already sell toy figurines and toy
construction products. Thus, this factor does not bear on the
ultimate question of likelihood of confusion as to the source of
the product.

### E.    Actual Confusion

"For purposes of the Lanham Act, actual confusion means
consumer confusion that enables a seller to pass off his goods
as the goods of another." The Sports Auth., Inc. v. Prime Hosp.
Corp., 89 F.3d 955, 963 (2d Cir. 1996) (internal quotation marks
and citations omitted). But "actual confusion need not be shown
to prevail under the Lanham Act, since actual confusion is very
difficult to prove and the Act requires only a likelihood of
confusion as to source." Lois Sportswear, U.S.A., Inc. v. Levi
Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986).

ZURU contends that "[t]he record demonstrates the
affirmative absence of actual confusion." Def.'s Opp., at 43. To
support this contention it relies on a survey conducted by its
expert, Dr. Bruce Isaacson, and submitted in connection with the
cross-motions for summary judgment. ZURU asserts: "Moreover, any
association between the parties' figurines resulted from the
fact that they are both tiny, plastic, compatible construction-
toy figurines—not from the asserted trade dress elements. Again,

because the Third-Generation Figur[ines] are even more different, actual confusion is even less likely." Id. (citation omitted).

As noted above, actual confusion is not required; a likelihood of confusion as to source is sufficient. Based on her comparisons of the Third-Generation Figurines and the Minifigure figurine, and her conclusion that "adult purchasers of toys generally do not inspect individual details close enough to recognize differences," Knight Decl. ¶ 11, Knight concludes that "[f]or the same reasons set forth in the Knight Report, and given the minor differences between the [Third-Generation] Figurines and the Minifigure figurine, consumers are likely to be confused, deceived or mistaken as to the source of the [Third-Generation] Figurines," id. ¶ 12 (footnote omitted). To the extent that Loetz's analysis and conclusions bear on the issue of likelihood of confusion, for the reasons discussed above with respect to Loetz's analysis on the question of "substantial similarity" and the degree of similarity between the two marks, the court concludes that his analysis is deficient.

Based on the foregoing, LEGO is likely to be able to show that this factor supports a conclusion that there is a likelihood of confusion.

## F.    The Defendant's Good Faith (Or Bad Faith) in Adopting Its Own Mark

To evaluate this factor, the court "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang v. Ret. Living Pub. Co., 949 F.2d 576, 583 (2d Cir. 1991). Additionally, "actual or constructive knowledge may signal bad faith." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987) (internal quotation marks omitted).

ZURU argues:

> There is no basis to conclude that, through its Third-Generation Figurine, Zuru intends to "deceive or confuse" consumers about an association between its figurines and TLG. To the contrary, Zuru took pains to include a great number of substantial modifications, in a good-faith attempt to comply with the Court's Contempt Order—and it has unquestionably done nothing to make its figurines more like the minifigure than its prior versions (and thus potentially more likely to be confused with the minifigure). Further, as noted, Zuru has always avoided many signature characteristics of the minifigure, including its yellow head and hands and facial decorations, which also shows Zuru has no intent to confuse consumers. Zuru also relied on TLG's admissions regarding differently sculpted figurines (such as Kre-O and Mega) as part of its design process for its Third-Generation Figurines.

Def.'s Opp., at 43. However, the pictures in both the Loetz Declaration, see ¶ 31, and the Knight Declaration, see ¶¶ 13-16, coupled with the fact that ZURU was put on notice in the Contempt Order, at 21, that it "had an obligation to keep a

'safe distance' from infringing conduct going forward," support
LEGO's position that it will likely be able to show that what it
said in its summary judgment papers is true with respect to the
Third-Generation Figurines:

> ZURU's bad faith argument fails to address that
> not only did ZURU repeatedly reference the Minifigure
> figurine throughout its truncated design process, it
> also designed a figurine that was confusingly similar
> to it – twice. Indeed, it is undisputed that ZURU knew
> of the Asserted Trademark when it designed the MAX
> Products, and it reviewed the Minifigure figurine
> throughout the design process. Def.'s 56(a)(2) ¶¶ 23,
> 26. These undisputed facts, coupled with the striking
> similarities between the Minifigure figurine and the
> MAX Figurines, evidence ZURU's bad faith. . . .
>
> . . . .
>
> . . . The fact that ZURU claims to have made efforts
> to depart from fully recreating the Minifigure
> figurine does nothing to change the fact that it was
> intimately aware of the level of similarity between
> the two products, and did nothing to avoid the
> likelihood of confusion.

Pls.' Reply Memo. in Further Supp. of Pls.' Mot. for Partial
Summ. J. (ECF No. 281) ("Pls.' Summ. J. Reply"), at 42–43.

ZURU states that the fact that it has avoided many
signature characteristics of the Minifigure figurine, including
its yellow head and hands and facial decorations, is evidence of
an absence of bad faith. However, as pointed out by LEGO in its
summary judgment papers, this "is yet another improper attempt
to dissect the relevant marks, and is also unavailing because
neither of those features are claimed in the Asserted

Trademark." Id. at 40 (footnote omitted).

ZURU purports to rely on "admissions" by LEGO, and it refers to a "shift in positions" by LEGO. Def.'s Sur-Reply, at 9-10. The statements relied on by ZURU were the subject of the court's Ruling on Defendants' Motion to Dissolve Preliminary Injunction (ECF No. 297) ("Ruling on Motion to Dissolve"). In the Ruling on Motion to Dissolve, the court concluded that "Zuru cannot show that a factual position taken by the Lego Group in this case is clearly inconsistent with a factual position it took in Best-Lock." Id. at 13. As ZURU points out, the court did state: "As the LEGO Group contends, '[a]t most, statements about whether particular KRE-O or MEGA Bloks figurines do or do not infringe the Minifigure Copyrights "may be impeaching" and a proper subject for cross-examination.' Pls.' Opp. at 23 (quoting Remcor Products Co. v. Scotsman Group, Inc., 860 F. Supp. 575, 579 (N.D. Ill. 1994))." Id. at 17.

But ZURU does not offer any explanation of how the fact that such statements could be offered by it at trial (and almost certainly objected to) tends to support a conclusion that ZURU's design process with respect to the Third-Generation Figurines was undertaken in good faith. LEGO describes that design process as follows:

> Consistent with its "design" process for the MAX Figurine and Redesigned Figurine, it appears Zuru, once again, merely started with the Redesigned

Figurine, compared it to the Minifigure figurine, and shaved off or added millimeters of plastic. Zuru has yet to undertake a creative design process that did not begin with the Minifigure figurine. Indeed, the [Third-Generation] Figurines are nearly identical to versions of the Redesigned Figurine that Zuru considered in its truncated "redesign process." See Exhibit 2. Exhibit 3 includes a mix of images of figurines[6] considered in Zuru's truncated "redesign" process along with the [Third-Generation] Figurines. It is virtually impossible to ascertain which version is which.[7] This only underscores that Zuru, once again, did not undertake any meaningful creative design process in connection with designing the [Third-Generation] Figurines.

[Footnote 6: Because these images were taken from multiple different documents, each prepared by Zuru, the scaling in the demonstrative exhibits is not perfect.]

[Footnote 7: An answer key is provided on the bottom of page 2 of Exhibit 3.]

Pls.' Mem., at 20. LEGO is likely to be able to show that the process described in the Loetz Declaration can be fairly described as a "truncated redesign process."

All of the foregoing must be viewed in the context of ZURU's actions throughout the course of this litigation, as summarized in LEGO's reply, see Pls.' Reply, at 8-10. Also, the court notes that while LEGO quotes from the Contempt Order, there are significant parts of the Contempt Order that it does not quote.

Based on the foregoing, LEGO is likely to be able to show that this factor supports a conclusion that there is a likelihood of confusion.

### G.    Quality of the Defendant's Product

This factor does not bear on the ultimate question of likelihood of confusion because ZURU has only "manufactured two prototypes of each version of the Third-Generation Figurines." See Notice, at 11 n.6.

### H.    Sophistication of the Buyers

"In evaluating the sophistication of the buyers, 'the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone.'" Pro. Sound Servs., Inc. v. Guzzi, 349 F. Supp. 2d 722, 735 (S.D.N.Y. 2004) (quoting McGregor-Doniger, 599 F.2d at 1137), aff'd, 159 F. App'x 270 (2d Cir. 2005).

The parties do not specifically address this factor as it applies to the Third-Generation Figurines. But the following analysis, which was included in the Ruling on Motion for Preliminary Injunction, appears to be applicable here:

> Here, as the plaintiffs point out, the relevant product is a set of toy figures selling for $12.97. The court agrees with the plaintiffs that the purchase of inexpensive toy figures, intended for use by children, does not require a high degree of sophistication. Moreover, the concern about confusion is heightened by the fact that, as stated by the defendant's expert, "[i]t's harder for an adult" to notice differences, as "[a]n adult looks very briefly. They don't pay a lot of attention," Prelim. Inj. Hrg. Tr. (ECF No. 65), at 153:20-22 (testimony of

> Gottlieb); see also id. (ECF No. 66), at 224:9-14
> (testimony of Knight) ("moms and dads aren't paying as
> close attention as some kids do. They're busy, and
> shopping the way shopping is today, they're running
> through the aisles quickly. So if they look at a
> product for a couple seconds, they can easily be
> confused.").

Ruling on Mot. for Preliminary Injunction (ECF No. 86), at 25.

Thus, LEGO is likely to be able to show that this factor supports a conclusion that there is a likelihood of confusion.

## III. Conclusion

Accordingly, the court has concluded that LEGO has established that the Third-Generation Figurines fall within the scope of the preliminary injunction order.

Dated this 28th day of May 2025, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge