**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------- x
LEGO A/S; LEGO SYSTEMS, INC.;      :
and LEGO JURIS A/S,                :
                                   :
         Plaintiffs,               :
                                   :
                                   :   Civil No. 3:18-cv-2045 (AWT)
v.                                 :
                                   :
                                   :
ZURU INC.,                         :
                                   :
         Defendant.                :
------------------------------- x
```

**<u>RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>**

I.   BACKGROUND ........................................................ 3

II.  LEGAL STANDARD ................................................... 5

III. DISCUSSION ......................................................... 8

A.  Claim for Copyright Infringement (Count I) and Copyright
Non-Infringement and Invalidity Defenses and Counterclaims ... 8

  1.  First Element of Feist Test: Ownership of Valid
  Copyright ........................................................ 9

    a.  Ownership; Presumption of Validity ................... 10

    b.  The Statutory Notice Requirements ................... 15

    c.  Fraud on the Copyright Office ....................... 32

    d.  Invalidity as Functional, Useful Article ............ 35

    e.  Patent and Copyright Clause of the Constitution ...... 43

  2.  Second Element of the Feist Test: Illegal Copying .... 44

    a.  Actual Copying ...................................... 45

    b.  The Copying is Illegal .............................. 48

B.  Claims for Trademark Infringement (Counts II and III); and
Trademark Non-Infringement and Invalidity Defenses and
Counterclaims  ...................................................... 66

  1.  First Element: Valid Trademark Entitled to Protection  68

    a.  Distinctiveness ..................................... 70

    b.  Functional Trade Dress .............................. 79

      i.  Composition of the Asserted Trademark............... 84

      ii.  First Prong: Essential to Use or Purpose ......... 94

iii.   Second Prong: Affects Cost or Quality ........... 97

iv.   Third Prong: Putting Competitors at a Significant, Non-Reputational Disadvantage ......................... 103

c.   Fraud on the USPTO ................................. 110

d.   Inconsistent Appearance ............................ 116

e.   Abandonment ....................................... 118

2.   Second Element: Consumer Confusion .................. 120

a.   Strength of the Mark ............................... 121

b.   Degree of Similarity Between the Two Marks ......... 124

c.   Proximity of the Products .......................... 137

d.   Likelihood that the Prior Owner Will "Bridge the Gap" 139

e.   Actual Confusion ................................... 140

f.   The Defendant's Good Faith (Or Bad Faith) in Adopting Its Own Mark  ....................................... 156

g.   Quality of the Defendant's Product ................. 161

h.   Sophistication of the Buyers ....................... 163

i.   Balancing the Polaroid Factors ..................... 168

C.   Claim for Common Law Trademark and Trade Dress Infringement, Unfair Competition, and Misappropriation (Count IV)   ................................................. 171

D.   Claim for Violation of CUTPA (Count VII) .............. 172

E.   Equitable Defenses (Fifteenth Defense) ................ 174

IV.   CONCLUSION ............................................ 176

## I.    BACKGROUND

Plaintiffs LEGO A/S ("LAS"), LEGO Systems, Inc. ("LSI"), and LEGO Juris A/S ("LJAS") (collectively, "LEGO") and defendant Zuru Inc. ("Zuru") have filed cross-motions for summary judgment. At issue in the cross-motions are the following copyrights and trademark owned by LEGO: copyrights registered with the United States Copyright Office at Registration Numbers VA0000655230 and VA0000655104 (the "Asserted Copyrights"), and a trademark registered with the United States Patent and Trademark Office ("USPTO") at Registration Number 4,903,968 (the "Asserted Trademark").

The Asserted Copyrights and the Asserted Trademark relate to LEGO's Minifigure figurine. LEGO sells decorated toy minifigurines ("LEGO Minifigures"), which are developed based on the Minifigure figurine. Zuru has developed two versions of its own decorated toy figures ("MAX Figures"). The first version ("First Generation MAX Figures") was developed before LEGO filed this action. The second version ("Second Generation MAX Figures") was developed after LEGO filed this action.

LEGO has filed a seven count Complaint (ECF No. 1), and Zuru, Inc.'s Answer and Counterclaims (ECF No. 94) contains sixteen affirmative defenses and fifteen counterclaims. A number of claims in the Complaint and a number of Zuru's defenses and counterclaims are not at issue in the cross-motions for summary

judgment. LEGO moves for partial summary judgment as to liability on the following claims in the Complaint: Count I (copyright infringement of the Minifigure figurine), Counts II and III (trademark infringement with respect to the Minifigure figurine in violation of 15 U.S.C. §§ 1114(a) and 1125(a)(1)(A), respectively) and Count VII[1] (violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, et seq. ("CUTPA")). LEGO also moves for summary judgment on Zuru's First and Second Defenses and Counterclaim Counts III and IV (copyright non-infringement and invalidity); Third and Fourth Defenses and Counterclaim Counts V and VI (trademark non-infringement and invalidity); and Fifteenth Defense (equitable defenses of waiver, ratification, acquiescence, laches, unclean hands, and estoppel). See LEGO Mot. for Partial Summ. J. (ECF No. 245).

Zuru moves for summary judgment on the following claims in the Complaint: Count I (copyright infringement of the Minifigure figurine), Count II (trademark infringement with respect to the Minifigure figurine in violation of 15 U.S.C. § 1114(a)), Count IV (common law trademark and trade dress infringement, unfair competition, and misappropriation) and Count VII (violation of CUTPA). Zuru's motion does not include its affirmative defenses

---

[1] The motion refers to this as Count IV, but based on the fact that LEGO spells out the name of the statute and gives the statutory citation, the court takes the motion to refer to Count VII.

and counterclaims. See Zuru Mot. for Summ. J. (ECF No. 237).

For the reasons set forth below, LEGO's motion is being granted in part and denied in part; it is being denied with respect to Count VII (the CUTPA claim) and being granted in all other respects. Zuru's motion is being denied.

## II.   LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce of Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is

-5-

well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge . . . ." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most

favorable to the non-movant . . . and draw all reasonable inferences in [the non-movant's] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990) (alteration and omission in original)). Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (Calabresi, J., dissenting) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)).

Also, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Weinstock, 224 F.3d at 41. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," id., if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial," Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (emphasis, quotation marks and citations omitted).

-7-

"Accordingly, unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A. Claim for Copyright Infringement (Count I) and Copyright Non-Infringement and Invalidity Defenses and Counterclaims

Works of authorship protected by the Copyright Act include "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). The copyright registered with the United States Copyright Office at Registration Number VA0000655104 describes the nature of the work as "toy sculptures" and the nature of the authorship as "3-Dimensional sculpture." Pls.' Ex. 1 (ECF No. 243-1) at 4. The copyright registered with the United States Copyright Office at Registration Number VA0000655230 describes the nature of the work as "toy sculpture" and the nature of the authorship as "3-Dimensional sculpture." Pls.' Ex. 4 (ECF No. 243-4) at 3. The copyrighted sculptural features of expression are plainly visible in the exemplary portions of the Asserted Copyrights' deposit materials.

The embodiment of the three-dimensional design covered by the Asserted Copyrights is set forth in paragraph 24 of the report of LEGO's expert, Elizabeth Knight. See Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight (ECF No. 247-13). Knight provides an analysis of the "design and visual expression of the

-8-

Minifigure figurine." Id. ¶ 24. Knight's analysis is as follows:

> The overall design of the Minifigure figurine is a simple,
> yet thoughtful and elegant combination of geometric shapes
> that together express the human form. As shown in the
> images above, the Minifigure figurine has ornamental design
> features comprised of basic shapes, square, flat surfaces,
> edges made of right angles and slight curves. These
> individual shapes and forms together create an overall look
> and feel of the Minifigure figurine. Integral to that
> expression are the relative proportions such as; overall
> height to overall width, head height to body height, length
> of legs to overall height. Proportions are important to the
> overall look and feel as the individual shapes that make up
> the whole.
>
> The aesthetic design is not entirely realistic. The design
> of the Minifigure figurine is a simplified human form,
> inspired by construction brick elements and aesthetically
> and thematically similar. The Minifigure figurine visually
> fits in the construction play environment because it
> reflects combinations of geometric forms that exist in that
> world.

Id. ¶¶ 25-26.

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).

**1. First Element of Feist Test: Ownership of Valid Copyright**

With respect to the first element of the Feist test, LEGO contends that it is entitled to a presumption of validity with respect to the Asserted Copyrights, and Zuru maintains that the court should not presume that the Asserted Copyrights are valid. Zuru contends that the Asserted Copyrights are invalid for failure to comply with statutory notice requirements; invalid

-9-

for fraud on the Copyright Office; invalid as functional, useful articles; and invalid under the Patent and Copyright Clause of the United States Constitution.

### a. Ownership; Presumption of Validity

There is no genuine issue as to the fact that LEGO owns the Asserted Copyrights nor any genuine issue as to the fact that they are registered with the United States Copyright Office.

The Copyright Act of 1976, 17 U.S.C. §§ 101-805, as amended (the "1976 Copyright Act"), provides that a certificate of registration "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate" when the registration is made "before or within five years after first publication of the [registered] work." 17 U.S.C. § 410(c). See also Gaste v. Kaiserman, 863 F.2d 1061, 1065 (2d Cir. 1988) ("[U]nder section 209 of the 1909 Act, a valid certificate of registration creates a rebuttable presumption of compliance with the requirements for validity, including the statutory requirement of initial publication with notice."); Telerate Sys., Inc. v. Caro, 689 F. Supp. 221, 227 (S.D.N.Y. 1988) ("The 1976 Act added the five-year requirement because 'the longer the lapse of time between publication and registration the less likely to be reliable are the facts stated in the certificate.'" (citation omitted)). This presumption of validity "merely orders the burdens of proof," relieving a

-10-

copyright owner of the duty "to prove all of the multitude of facts that underline the validity of the copyright unless the [alleged infringer], by effectively challenging them, shifts the burden of doing so to the [purported owner]." Carol Barnhart Inc. v. Econ. Cover Corp., 773 F.2d 411, 414 (2d Cir. 1985) (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 157).

Here the first publication of the Minifigure figurine occurred in 1978 but the Asserted Copyrights were not registered until 1994, i.e. 16 years after the first publication. Thus, LEGO is not entitled to the statutory presumption of validity based on the certificate of registration. When a certificate of registration is made more than five years after first publication of a work, the "evidentiary weight to be accorded the certificate . . . shall be within the discretion of the court." 17 U.S.C. § 410(c).

Zuru contends that it has offered "a mountain of evidence that 'tends to show' Lego's registrations are invalid, including because (i) Lego made false representations to the Copyright Office about the manner in which its minifigures were packaged, sold, and affixed with copyright notice; (ii) Lego in any event failed to publish its minifigures with proper copyright notice, and thereby injected them into the public domain; and (iii) the minifigure is a functional 'useful article' that is ineligible for copyright protection." Redacted Mem. of Law in Supp. of Def.

-11-

Zuru Inc.'s Mot. for Summ. J. ("Zuru Mot. Mem.") (ECF No. 238) at 17.[2] For the reasons discussed below, the court concludes that Zuru has failed to create a genuine issue of material fact with respect to its claim that LEGO made false representations to the Copyright Office, its claim that LEGO failed to comply with the statutory notice requirements, and its claim that the Minifigure figurine is a functional, useful article that is ineligible for copyright protection.

Zuru argues that its "evidence is sufficient to support summary judgment," "[b]ut at a very minimum, it is enough to require Lego to bear the burden of proving the validity of its copyrights." Id. In support of this contention, Zuru cites to Brown v. Latin Am. Music Co., 498 F.3d 18 (1st Cir. 2007). However, in Brown, where twenty years had passed between the date of first publication stated in the registration certificate and the date of registration, the district court had "specific reason . . . to question the facts contained in the certificate," namely that the defendants conceded that five of the disputed poems were first published in 1957, but the certificate listed the first publication as being in 1979. Id. at 24 (quoting Brown v. Latin Am. Music Co., No. CV 05-

---

[2] With the exception of citations to deposition and hearing transcripts, the page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

1242(JAF), 2006 WL 8450668, at *3 (D.P.R. May 9, 2006), aff'd, 498 F.3d 18 (1st Cir. 2007)).

In Michael Grecco Photography, Inc. v. Everett Collection, Inc., plaintiff Grecco brought suit against defendant Everett for copyright infringement. 589 F. Supp. 2d 375 (S.D.N.Y. 2008), order vacated in part on reargument sub nom. Grecco v. Everett Collection, No. 07 CIV 8171(CM)(JCF), 2009 WL 969928 (S.D.N.Y. Apr. 7, 2009). "Although Grecco submitted copyright registrations for all the Images, Everett argue[d] that the registrations should be accorded little weight because they were obtained more than five years after the Images were first published." Id. at 381. The court's analysis with respect to the presumption of validity was as follows:

> Everett has not offered any evidence tending to show that the certificates of registration provided by Grecco are invalid, or that Grecco does not in fact own the copyrights in the Images covered by those registrations. And there is considerable evidence (including the various license agreements, which are discussed below) demonstrating that plaintiff does indeed own the copyright in these photographs. Therefore, the Court, in its discretion, will consider the certificates as prima facie evidence of valid copyrights in the Images. See Yurman Design, Inc. v. Golden Treasure Imps., Inc., 275 F. Supp. 2d 506, 515–516 (S.D.N.Y. 2003) (certificates of registration issued more than five years after works were first published are prima facie evidence of valid copyrights, because defendants did not come forward with any evidence that "would raise any question as to the validity of the copyrights covered by the registration certificates") . . . .

Id. at 382.

It seems appropriate for the court to exercise its

-13-

discretion to consider a certificate as prima facie evidence of a valid copyright in a case such as this where the party asserting invalidity fails to create a genuine issue of material fact as to any of the asserted grounds for invalidity, in other words, is not "effectively challenging" the validity of the copyright. Carol Barnhart Inc., 773 F.2d at 414. Otherwise, a party could, by merely making an unsupportable assertion that the copyright is invalid, shift to the copyright owner the duty "to prove all of the multitude of facts that underline the validity of the copyright." Id.

Therefore, the court concludes that under the circumstances of this case, LEGO is entitled to the presumption of validity and the burden of proof with respect to Zuru's invalidity defenses and counterclaims lies with Zuru. (The court notes, however, that in reaching its conclusions below that LEGO is entitled to summary judgment on Zuru's defenses and counterclaim that the Asserted Copyrights are invalid because the Minifigure figurine was published without proper copyright notice, the Asserted Copyrights are invalid for fraud on the Copyright Office, the Asserted Copyrights are invalid because the Minifigure figurine is a functional, useful article, and the Asserted Copyrights are invalid under the Patent and Copyright Clause of the United States Constitution, the court has not relied on the presumption of validity.)

-14-

### b. The Statutory Notice Requirements

Zuru contends that the Asserted Copyrights are invalid for lack of copyright notice "because Lego published its minifigures without proper copyright notice, and thereby injected any copyright in them into the public domain." Zuru Mot. Mem. at 27. The legal sufficiency of a copyright notice is "determined by the law in effect at the time of first publication of the work." 37 C.F.R. § 202.2(c)(1)(ii). LEGO has demonstrated that there is no genuine issue as to the fact that the Minifigure figurine was published with copyright notice that complied with the law in effect at the time.

The Minifigure figurine was created in 1977, and it was first published on January 7, 1978. The Asserted Copyrights were registered on January 21, 1994. The 1976 Copyright Act "changed the basis of copyright protection from publication of a work [with notice] to creation of a work." Societe Civile Succession Guino v. Renoir, 549 F.3d 1182, 1186 (9th Cir. 2008). "That change applies to works 'created on or after January 1, 1978.'" Id. (quoting 17 U.S.C. § 302). With respect to works "created before January 1, 1978, but not theretofore in the public domain or copyrighted," the 1976 Copyright Act provides federal copyright protection to works that comply with the applicable formalities set forth in the 1976 Copyright Act. 17 U.S.C. § 303(a).

The following rule applies to works first published between January 1, 1978 and February 28, 1989. See 17 U.S.C. §§ 302(a), 405(a) (stating the duration of copyright in a work created on or after January 1, 1978 and outlining exceptions to the notice requirement for copies distributed before the effective date of the Berne Convention Implementation Act of 1988); U.S. Copy. Off. Circular 92, App. Q n.2 (noting that "[t]he Berne Convention entered into force in the United States on March 1, 1989"); U.S. Copy. Off. Circular 3 (stating that "[d]ifferent laws govern works first published before January 1, 1978, and works first published between January 1, 1978, and February 28, 1989"). In order to receive federal copyright protection, (1) a work first published in this period must be published with proper notice (see 17 U.S.C. § 401(a)); unless (2) "the notice has been omitted from no more than a relatively small number of copies or phonorecords distributed to the public; . . . [(3)] registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public in the United States after the omission has been discovered; or . . . [(4)] the notice has been omitted in violation of an express requirement in writing that, as a condition of the copyright owner's authorization of the public distribution of copies or

-16-

phonorecords, they bear the prescribed notice." 17 U.S.C. § 405. LEGO was required to publish the Minifigure figurine with proper notice. In January 1978, a proper copyright notice had three elements: "(1) the symbol © (the letter C in a circle), or the word 'Copyright', or the abbreviation 'Copr.'; and (2) the year of first publication of the work; [or] in the case of compilations, or derivative works incorporating previously published material, the year date of first publication of the compilation or derivative work . . . ; and (3) the name of the owner of copyright in the work, or an abbreviation by which the name can be recognized, or a generally known alternative designation of the owner." Id. § 401(b).

Notice was to be included on "publicly distributed copies from which the work can be visually perceived, either directly or with the aid of a machine or device." Id. § 401(a). Notice was to be "affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright." Id. § 401(c). However, "a notice on a container in which the work may be expected to be kept by the user may be accepted (e.g., on a box containing a set of cards, or on a folder containing a group of maps)." Copy. Compendium 1 § 4.4.3.I.b (1973).

Here LEGO has shown that there is no genuine issue as to the fact that the copyright notice for the Minifigure figurine satisfied the statutory notice requirements in accordance with

-17-

<u>Uneeda Doll Co. v. Goldfarb Novelty Co.</u>, 373 F.2d 851 (2d Cir.

1967), the later-named "unit publication doctrine."

At issue in <u>Uneeda</u> was whether the abbreviation "U.D. Co.

Inc. 1965" appearing on the sole of a plastic doll's foot, when

read in conjunction with the legend "Uneeda Doll Co., Inc. 1966"

printed on the cardboard display package in which the dolls were

sold, constituted adequate compliance with the notice

requirements of the Copyright Act. The court identified the key

question as follows:

> The dispute, rather, is centered on the question of whether
> the abbreviation 'U.D. Co. Inc. 1965' which appears on the
> sole of the doll's left foot when read in conjunction with
> the legend 'Uneeda Doll Co., Inc. 1966' printed on the
> cardboard display package with a three-sided transparent
> plastic window in which the dolls are sold, satisfies the
> following demands of section 19: 'The notice may consist of
> the letter C enclosed within a circle, thus accompanied by
> the initials, monogram, mark, or symbol of the copyright
> proprietor: Provided, That on some accessible portion of
> such copies or of the margin, back, permanent base, or
> pedestal, or of the substance on which such copies shall be
> mounted, his name shall appear.' Clearly, the inscription
> on the left foot is the 'initials' of the copyright
> proprietor. This leaves the more difficult question of
> whether appellant has complied with the proviso to section
> 19. We hold that it has because the display on which
> appellant's name appears is 'the substance on which * * *
> (the dolls are) * * * mounted.' In so ruling, we are
> mindful of the difficulty of placing a legible, and
> complete copyright notice on a three and one half inch
> plastic doll without causing the disfigurement which § 19
> with its short form of notice was enacted to avoid.

<u>Uneeda</u>, 373 F.2d, at 853 (footnote and internal citations

omitted).

The court also stated:

> We also notice that the display package is not only an integral part of the product when it is sold but also can be used as a keeping place for the doll. At this point, it is pertinent to mention that in accordance with the tradition of construing the notice requirements liberally, courts have protected copyrights when the notice appears on one of two or more separate or detachable parts of a single item.

Id. at 853-54.

The court distinguished two situations: "Decidedly distinguishable is the situation where the inscription appears only on a simple wrapper or container. Different likewise are cases in which the only copyright notice was on a detachable tag." Id. at 854 (internal citations omitted).

Other courts have also concluded that toys were published with sufficient copyright notice when the copyright notice was included on the packaging for the toy. In Tonka Corp. v. Tsaisun, Inc., where the court cited to Uneeda as support for its conclusion, the court's analysis was as follows:

> The trial testimony and other evidence presented has shown that Tonka intended the POUND PUPPIES ® carrier to be an important part of the play value of the POUND PUPPIES ® product. Tonka specifically designed the POUND PUPPIES ® cardboard package for use as a carrier for the puppy and also as a kennel or doghouse in which to keep the puppy. Use of the package as a carrier and kennel for the puppy is suggested by the package itself and in certain advertisements.

No. Civ. 3-85-1885, 1986 WL 29980, at *16 (D. Minn. Nov. 6, 1986) (footnote omitted).

At issue in Monogram Models, Inc. v. Industro Motive Corp.,

-19-

492 F.2d 1281 (6th Cir. 1974), were plastic scale airplane model kits and the boxes in which they were sold. The court's analysis was as follows:

> Notice of Monogram's copyright was placed on the boxes containing the pieces of the plane and on the instruction sheets of the kits for both the Thunderchief and Skyraider kits of Monogram . . . . As we have just previously noted, the 'work' with which this cause is concerned is scale model airplane kits. In order to comply with Section 10 there must be publication with notice of the copyright, and such notice 'shall be affixed to each copy thereof published or offered for sale . . ..' For both of Monogram's kits, the A1-E Skyraider and the F-105 Thunderchief, there was publication of the work with notice of the copyright affixed to the container boxes and the instruction sheets of the kits. In our opinion such publication and notice comply with Section 10 . . . . Because the instruction sheets and the container boxes are integral parts of the model airplane kits and the notice on these parts complies with the necessary form for notice of copyright, the notices of copyright on the two kits were adequate.

Id. at 1284.

At issue in Koontz v. Jaffarian was "an electrical estimating package which included [a] manual, the magnetic tapes containing the program and the data compilation, and an instruction book." 787 F.2d 906, 908 (4th Cir. 1986). The "manual contained a copyright notice," but "there was no copyright notice on the magnetic tapes or in the program or the data compilation stored on the tapes." Id. The district court, "relying on the unit publication doctrine, held that the copyright notice affixed to Koontz's 1975 and 1979 MCP-5 manuals

-20-

acted to protect both the manuals and the software."[3] Id. at 909.

The Fourth Circuit stated:

> Courts adhering to the unit publication doctrine hold that copyright notice affixed "to one element of a publication containing various elements gives copyright protection to all elements of the publication." Koontz, 617 F.Supp. at 1112. Although the doctrine has not previously been considered by this court, it has been employed in a variety of circumstances by other courts of appeals.

Koontz, 787 F.2d at 909. With respect to the variety of circumstances in which other courts of appeal had applied the unit publication doctrine, the court cited Monogram Models, 492 F.2d at 1284-85, Uneeda, 373 F.2d at 853-54, and Lydiard-Peterson Co. v. Woodman, 204 F. 921 (8th Cir. 1913). The court concluded that "[i]n proper circumstances, linked elements of a publication should be collectively protected, and we agree with the district court that the unit publication doctrine should apply where, as here, the elements of the publication form a single commercial unit." Koontz, 787 F.2d at 909.

LEGO has produced evidence which establishes that there is no genuine issue as to the fact that the copyright notice for the Minifigure figurine satisfied the statutory notice requirements based on Uneeda and the unit publication doctrine. "In 1978, the LEGO® Minifigure figurine was available for purchase in the United States only as part of certain LEGO®

---

[3] The district court opinion is the first reported decision in which the court found a reference to the unit publication doctrine. See Koontz v. Jaffarian, 617 F. Supp. 1108, 1112 (E.D. Va. 1985).

Sets." Pls.' Ex. 12, Decl. of Jared Carr (ECF No. 243-12) ¶ 4. "In 1978, the Minifigure figurine did not come fully assembled. Each LEGO® set containing a Minifigure figurine sold in the United States contained Minifigure figurine component parts along with other LEGO® elements such as bricks and accessories, for assembly by the end user." Id. ¶ 5.

The LEGO Minifigures did not come fully assembled, but the notice appeared on more than one of their parts. "In 1978, the word 'LEGO' appeared in the plastic on the top of the knob on the head, the torso, and on the 'hips' of the Minifigure figurine." Id. ¶ 6 (accompanied by photographs). The Uneeda Pee Wee doll was a three and one half inch mini-doll. See Uneeda, 373 F.2d, at 853. The LEGO Minifigure is much smaller than the Uneeda Pee Wee doll, which makes it even more difficult to display a full copyright notice on the plastic. See Redacted Pls.' Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("LEGO Opp. Mem.") (ECF No. 264) at 18 (images of LEGO Minifigure in Set No. 644 next to Uneeda Pee Wee doll); Pls.' Ex. 50, actual Uneeda Pee Wee doll (ECF No. 276).

"1978 LEGO® sets containing the Minifigure figurine also included a copyright notice on the box. For example, Set No. 644 included the following copyright notice: 'Made by LEGO System A/S. Denmark. © 1978." Pls.' Ex. 12, Decl. of Jared Carr ¶ 7. In addition, "[i]n 1978, the building instructions and pamphlet

contained within boxes of LEGO sets also included a copyright notice. For example, the building instructions for Set No. 644 included the following copyright notice: '© 1978 LEGO Systems A/S.'" Id. at ¶ 8.

In 1978, the box housing LEGO sets with LEGO Minifigures had a perforated edge and tab. See Photographs accompanying Redacted Pls.' Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. (ECF No. 243) ¶ 14. Thus, the box itself suggested that it was meant to be a container in which consumers could keep LEGO sets, including the LEGO Minifigures. The plaintiffs have produced evidence that this was not merely coincidental. LEGO expert Knight gives the following opinion related to the perforated edge and tab:

> Storage is a consistent insight or need that toy designers learn in research with parents. Family rooms and homes become cluttered with small parts and pieces. A toy that delivers a solution to that common problem will be recognized as a benefit and feature to the parent. The design of the LEGO box uses a shape and perforated opening that is familiar to parents as a way to open and close a box, often seen in cereal boxes. Designing a package to be reused is often a way to add extra value to a toy.

Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 91.

Zuru points out that the "tabs did not permit the packaging to be resealed after opening." Redacted Def.'s Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. (ECF No. 239) ¶ 19. However, the pertinent question is not whether the packaging could be "resealed," but whether the tabs enabled

-23-

consumers to close the box. There is no genuine issue as to the fact that the tab provided a mechanism to close the box, much like a cereal box is closed, so that it could be used to store LEGO sets. "LEGO sets from 1978 can be purchased on websites such as BrickLink and eBay, with the boxes and building instructions intact." Pls.' Ex. 12, Decl. of Jared Carr ¶ 11. Thus, the boxes were containers in which LEGO Minifigures could be expected to be kept by the user.

Thus, LEGO satisfied the requirements of Uneeda and the unit publication doctrine. It placed multiple abbreviated notices on more than one part of a product that was too small to contain a complete copyright notice; posted the full copyright notice on the container that was not only an integral part of the product when it was sold, but also could be expected to be used by the consumer as a place to keep the product; and placed the notice on the building instructions contained in each box. These elements of a publication, i.e. the abbreviated notices on the parts of a small item, the notices on the containers, and the notices on the building instructions, were "linked elements of a publication" for a single commercial unit. Koontz, 787 F.2d at 909.

Zuru advances three arguments in support of its motion for summary judgment.

First, Zuru argues:

-24-

> Lego's reliance on the unit publication rule fails because the six "Basic Minifigures" were not published as a unit . . . . Thus, the core predicate requirements for the unit publication rule are not met by the "Basic Minifigures" because the undisputed evidence shows they were never sold together as a unit in a box bearing a proper copyright notice.

Zuru Mot. Mem. at 29. As discussed below, with respect to Zuru's argument that the Asserted Copyrights are invalid for fraud on the United States Copyright Office, this argument is based on an incorrect interpretation of the unit publication doctrine (or rule).

Second, Zuru bases an argument on the following language from the district court opinion in Koontz v. Jaffarian: "The rule has been confined to situations where the elements are integral or essential parts of one another." 617 F. Supp. at 1112. Zuru's argument does not take into account the fact that, on appeal, the Fourth Circuit gave a different articulation of the unit publication doctrine, which is set forth above. While the Court of Appeals took Uneeda into account in explaining the doctrine, the district court did not. The district court's sole reference to Uneeda was in an entirely different context. See id. ("The purpose of copyright notice, as highlighted by 17 U.S.C. § 405(b), is to protect innocent infringers. Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851 (2nd Cir. 1967); Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 161 F.2d 406, 409 (2nd Cir. 1946) . . . .").

Third, Zuru makes a number of points with respect to notice on the packaging of a copyrighted work. Zuru cites to the Code of Federal Regulations for the proposition that "notice on the outer packaging of a copyrighted work . . . is insufficient if it is placed 'on the wrapper or container which is not a part of the work and which will eventually be removed and discarded when the work is put to use.'" Zuru Mot. Mem. at 30 (quoting 37 C.F.R. § 202.2 (1978)).

Zuru quotes Shapiro & Son Bedspread Corp. v. Royal Mill Assocs., 568 F. Supp. 972 (S.D.N.Y. 1983), where the court concluded that reliance on Uneeda was misplaced because the copyright notice was placed on a flyer or insert contained within the heat-sealed packaging of the bedspread. The court found that "[f]lyers are generally discarded with the unwrapping of the bedspread." Id. at 976. Shapiro & Son is not analogous. Here the copyright notice was printed on something that was designed to be used with the product going forward, the copyright notice was also displayed on the instructions contained in each LEGO set, and a proper abbreviation appeared on the plastic on the top of the knob on the head, the torso, and the "hips" of the LEGO Minifigures.

Zuru argues in its memorandum, with no citation to any evidence, that the packaging here "is of a form that 'will eventually be removed and discarded when the work is put to

use.'" Zuru Mot. Mem. at 31. It is undisputed that some consumers might elect to discard the boxes in which a LEGO set was sold. However, that fact does not address whether the boxes in which the LEGO sets were sold were designed for and could be expected to be used for permanent storage and were used by some consumers for that purpose. See Tonka, 1986 WL 29980, at *16. ("The court is cognizant that realistically the carrier may be discarded after a short period of time by many consumers. Nevertheless, it is entirely reasonabl[e] to presume that most consumers will keep the carrier for use with the puppy. Accordingly, as promoted and intended, the carrier is an integral part of the POUND PUPPIES® product.") Zuru points to no evidence that, like the flyer in Shapiro & Son, the box in which the LEGO sets were sold was generally, or was designed or intended to be, discarded after the box was opened.

Zuru also argues that:

undisputed evidence shows that Lego never intended for its consumers to permanently store their minifigures in the original cardboard packaging in which they were sold, including that (i) since its earliest sales of minifigures, Lego has sold separate "storage" devices for its Lego products (including bricks and minifigures), including "storage cloths" and a variety of plastic storage containers (SOF 21); (ii) Lego encourages its consumers to recycle their cardboard packaging (SOF 22); and (iii) Lego sold minifigures as standalone products in "blister packs" that could only be torn open and that have no intrinsic means to be reclosed (SOF 20).

Zuru Mot. Mem. at 31-32. However, the fact that LEGO has sold

-27-

separate storage devices for its products does not negate the design and the intended function of the box in which LEGO Minifigures were initially sold. See Tonka, 1986 WL 29980, at *16 ("[T]he fact that Tonka subsequently marketed other products in which to carry or house the POUND PUPPIES" -- in addition to the cardboard carrier kennel packaging containing the copyright notice in which the POUND PUPPIES were sold -- did not "negate the intent and function of the initial carrier kennel"). Nor does the fact that LEGO now encourages consumers to recycle packaging if they throw away the packaging. When asked about that during his deposition, LEGO's Jared Carr, the United States General Manager at LSI, explained that the document on which Zuru relies shows that LEGO "is just pointing out to consumers that [we are] using recyclable material and as a lot of companies do now, part of our sustainability initiative." Def.'s Ex. 39, Jared Carr Dep. Tr. Vol. 1, July 22, 2021 (ECF No. 236-12) at 460:10-14. The reference to "now" is significant because the document in question, defendant's Exhibit 33, is dated April 21, 2018 and mentions the fact that LEGO announced a sustainable packing initiative in 2015. See Def.'s Ex. 33 (ECF No. 239-34) at 2.

As to Zuru's argument about LEGO Minifigures being sold as a standalone product in blister packs that could only be torn open and could not be reclosed, LEGO has demonstrated that Zuru

has failed to create a genuine issue based on this contention. See Redacted Pls.' Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J. (ECF No. 265) Resp. to ¶ 20. Among other things, only Samsonite -- not LEGO -- sold certain LEGO Minifigures in blister packs. Samsonite did so in Canada, not in the United States, and it did so no earlier than the third quarter of 1978. See Unredacted Pls.' Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J. (ECF No. 263) Resp. to ¶ 20. Thus, in any event these products were sold well after the initial publication of the Minifigure figurine with proper copyright notice.

Therefore, Zuru has failed to create a genuine issue as to the fact that the Minifigure figurine was published with sufficient copyright notice.

Moreover, the court agrees with LEGO that Zuru is not "the type of defendant that the copyright notice requirement is designed to protect." Mem. of Law in Supp. of Pls.' Mot. for Partial Summ. J. ("LEGO Mot. Mem.") (ECF No. 242) at 31. "The purpose of a copyright notice is to prevent innocent persons who are unaware of the existence of the copyright from incurring the penalties of infringers by making use of the copyrighted work." Uneeda, 373 F.2d at 852 (internal quotation marks and citations omitted). It is undisputed that Zuru was aware of the Asserted Copyrights at the time it designed the infringing MAX Figures.

See Redacted Pls.' Local Rule 56(a)1 Statement in Supp. of Their

Mot. for Summ. J. ¶ 23; Redacted Def.'s Local Rule 56(a)2

Statement of Facts in Opp'n to Pls.' Mot. for Summ. J. (ECF No.

269) Resp. to ¶ 23; Def.'s Ex. 43, Elizabeth Knight Dep. Tr. Vol

1, Feb. 3, 2022 (ECF No. 236-16). In Uneeda, the court stated:

> Finally, '[e]ven if, as defendants urge, the copyright
> notice might not be sufficient for some purposes * * * the
> defendants, as willful infringers wholly aware of the
> existence of the copyright, are in no position to assert
> the insufficiency of the notice.' Dan Kasoff, Inc. v.
> Novelty Jewelry Co., 309 F.2d 745 (2d Cir. 1962). We remain
> 'unwilling to allow a barefaced infringer to invoke an
> innocent deviation from the letter that could not in the
> slightest degree have prejudiced him or the public.'
> National Comics Pubs. v. Fawcett Pubs., 191 F.2d 594, 603
> (2d Cir. 1951).

Uneeda, 373 F.2d at 854 (first alteration added). In response to

this argument, the defendant merely cites Neimark v. Ronai &

Ronai, LLP, 500 F. Supp. 2d 338 (S.D.N.Y. 2007) and Disenos

Artisticos E Industriales, S.A. v. Work, 676 F. Supp. 1254

(E.D.N.Y. 1987) for the proposition that "once a copyrighted

work is published without notice, it is in the public domain,

free for all to use," which is not on point. Zuru then cites to

Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487 (2d

Cir. 1960) for the proposition that "even a 'deliberate

copyist,' . . . may assert an invalidity defense based on lack

of copyright notice when it shows a proper notice 'could have

been embodied in the design without impairing its market

value.'" Redacted Def. Zuru's Opp'n to Pl. LEGO's Mot. for Summ.

J. (ECF No. 268) ("Zuru Opp. Mem.") at 25-26 (quoting Unredacted Mem. of Law in Supp. of Pls.' Mot. for Partial Summ. J. ("Unredacted LEGO Mot. Mem.") (ECF No. 246) at 31). The language from Peter Pan Fabrics relied on by Zuru appears in a specific context and it is not applicable here, but even accepting Zuru's interpretation of that language, the court concludes that National Comics Publication v. Fawcett Publications, 191 F.2d 594 (2d Cir. 1951), supplemented sub nom. National Comics Publication v. Fawcett Publications, 198 F.2d 927 (2d Cir. 1952); Dan Kasoff, Inc. v. Novelty Jewelry Co., 309 F.2d 745 (2d Cir. 1962)(decided after Peter Pan Fabrics); and Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851 (2d Cir. 1967) (decided after Peter Pan Fabrics) state the controlling legal principle in this Circuit.

Finally, Zuru asserts that it is not a willful infringer, relying on deposition testimony of LEGO expert Elizabeth Knight. A willful infringer is one that "had knowledge that its conduct represented infringement or . . . recklessly disregarded the possibility." Bryant v. Media Right Productions, Inc., 603 F.3d 135, 143 (2d Cir. 2010) (ellipsis in original) (quoting Twin Peaks Productions, Inc. v. Publications Intern., Ltd., 996 F.2d 1366, 1382 (2d Cir. 1993)). Zuru's use of Knight's testimony does not create a genuine issue as to the fact that Zuru was a willful infringer. Zuru pieces together portions of her

deposition testimony, mischaracterizing it. See Redacted Pls.'
Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J.
Resp. to ¶ 59. In fact, when Zuru asked Knight, "[Y]ou say a
number of times that Zuru intentionally copied the Minifigure,
correct?", her answer was, "It appears that they did." Def.'s
Ex. 43, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 at 168:24
to 169:3.

Therefore, LEGO is entitled to summary judgment on Zuru's
defense/counterclaim that the Asserted Copyrights are invalid
because the Minifigure figurine was published without proper
copyright notice.

### c. Fraud on the Copyright Office

"It is the law of this Circuit that the 'knowing failure to
advise the Copyright Office of facts which might have occasioned
a rejection of the application constitute[s] reason for holding
the registration invalid and thus incapable of supporting an
infringement action.'" Whimsicality, Inc. v. Rubie's Costume
Co., Inc., 891 F.2d 452, 456 (2d Cir. 1989) (alteration in
original) (quoting Eckes v. Card Prices Update, 736 F.2d 859,
861-62 (2d Cir. 1984)).

Zuru contends that:

[Lego] made knowingly false representations to convince the
Copyright Office that its minifigures were covered by an
obscure exception to the notice rules because they were
first published and then sold as a "unit of publication." .
. . If that exception applied, then, Lego said, it only had

to affix a notice to the outer packaging of the "unit," and if it did, all the copyrightable works within the packaging would be covered by that notice.

Zuru Mot. Mem. at 21 (emphasis added).

Zuru states, with respect to the "unit of publication option":

"The unit of publication option is a narrow and limited exception" to the "general rule" that "an applicant should prepare a separate application, filing fee, and deposit for each work that is submitted for registration."

Id. (quoting Compendium of U.S. Copy. Off. Prac. § 1103.1(A)). Zuru asserts that LEGO "had to convince the Copyright Office that the six 'Basic Minifigures,' the 'Figure with Brown Hair,' and the 'Astronaut'—the 'works' Lego was trying to register—were 'physically packaged or bundled together as a single unit' and 'first published on the same date.'" Id. (quoting Compendium of U.S. Copy. Off. Prac. at 1103).

Zuru further asserts that "[d]espite all this, Lego represented in its letter that these 'additional identifying materials' show 'the box bearing a proper copyright notice' for a 'unit [of] publication,' in which 'each of these elements'— meaning the six 'Basic Minifigures'—'were published.'" Id. at 24-25 (second alteration and emphasis in original).

LEGO has established that there are no genuine issues with respect to the fact that it did not make a false representation to the Copyright Office.

-33-

On March 15, 1994 counsel for LEGO received correspondence from the Copyright Examiner stating,

> The identifying material deposited does not show the location and form of the copyright notice prescribed by law . . . . If these figurines were published with a copyright notice, please send additional identifying material that clearly shows the prescribed form and location of the notice on each work.

Pls.' Ex. 6 (ECF No. 243-6) at 8. On May 20, 1994 counsel for LEGO responded:

> You have noted that the above-referenced works do not show a visible copyright notice. In fact, each of these elements were published in a box bearing a proper copyright notice. Under the unit publication rule, the copyright notice on the outer packaging covers each of the elements within.

> For each work, I am enclosing the original application form which was returned to us, together with additional identifying materials and a copy of the side panel of the box showing the copyright notice.

Id. at 2 (emphasis added).

Thus, there is no genuine issue as to the fact that LEGO represented to the Copyright Office that it was proceeding under the unit publication rule (or doctrine), not the unit of publication option. In fact, when Zuru purports to describe the letter from LEGO's counsel at page 25 of its memorandum, it has to misquote it by inserting the word "of" in order to make its point with respect to "unit [of] publication." Zuru Mot. Mem. at 25. Moreover, Zuru's contention that LEGO was seeking to convince the copyright office that the "Basic Minifigures," "Figure with Brown Hair," and "Astronaut," were first published

-34-

on the same date, id. at 21, is contrary to the record, which reflects that the Copyright Examiner understood that that was not the case. The March 15 letter from the Copyright Examiner said that "[t]he applications state that the works were first published on January 7, 1978, January 26, 1979, and January 29, 1987, respectively." Pls.' Ex. 6 at 8 (emphasis in original).

Therefore, LEGO is entitled to summary judgment on Zuru's defense/counterclaim that the Asserted Copyrights are invalid for fraud on the Copyright Office.

### d. Invalidity as Functional, Useful Article

LEGO argues that the Minifigure figurine is a sculptural work that is eligible for copyright protection because it is not an intrinsically useful article notwithstanding the fact that it has some functional elements. Zuru argues that "Lego's 'Basic Minifigures' copyright is invalid for the additional reason that the minifigure is an uncopyrightable useful article." Zuru Mot. Mem. at 32. Zuru maintains that "Star Athletica [v. Varsity Brands, Inc., 580 U.S. 405 (2017)] and its progeny mandate the conclusion that Lego's minifigure copyright is invalid. The minifigure is a mass-produced article of manufacture that is indisputably a creature of functionality—a 'useful article'—that can be moved, attached, disassembled, reassembled, played with, etc." Id. at 35. It contends that "[i]ndeed, Lego admits that the minifigure is intended for 'role play,' and that, despite

-35-

being just two inches tall, it has more than 15 'functional' features, including features relating to 'assembly,' 'poseability,' and 'connectability,' as shown above." Zuru Mot. Mem. at 35.

In Gay Toys, Inc. v. Buddy L Corp., 703 F.2d 970, 972 (6th Cir. 1983), the court explained the pertinent provisions of 17 U.S.C. §§ 101 and 102 as follows: "Section 102(a)(5) extends copyright protection under the statute to 'pictorial, graphic, and sculptural works.'" See 17 U.S.C. § 102(a)(5) ("Works of authorship include the following categories: . . . (5) pictorial, graphic, and sculptural works . . . .").

> "Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101. The portion of the definition that begins with the words "the design of a useful article, as defined in this section," "indicates that 'useful articles' are not generally copyrightable, although certain features of 'useful articles' may be copyrighted separately." Gay Toys, 703 F.2d at 972.

-36-

A useful article is defined as follows: "A 'useful article' is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a 'useful article'." 17 U.S.C. § 101. The court summarized the statutory scheme as follows:

> The statutory scheme of the provisions at issue in this case, then, is that copyright protection is extended to "pictorial, graphic, and sculptural works" generally; an exception to this general rule is carved out by exempting "useful articles" from copyrightability; nevertheless, certain particular features of "useful articles" may be separately copyrighted.

Gay Toys, 703 F.2d at 972.

"Numerous courts have recognized that various types of toys can qualify for copyright protection, in whole or in part, as 'pictorial, graphic or sculptural works' as defined by 17 U.S.C. § 101, even where there is some mechanical or functional element to the toy." Lanard Toys Ltd. v. Novelty, Inc., 375 F. App'x 705, 709 (9th Cir. 2010) (citing Hasbro Bradley, Inc. v. Sparkle Toys, Inc., 780 F.2d 189, 192 (2d Cir. 1985) ("transformer" changeable robotic action figures held copyrightable as sculptural works); Spinmaster, Ltd. v. Overbreak LLC, 404 F. Supp. 2d 1097, 1102-04 (N.D. Ill. 2005) (although its motor and main propeller were uncopyrightable "functional" elements, the hub, blades, and outer ring of a flying saucer toy, as well as the design of a separate controller and base station, were

"artistic" elements subject to copyright protection)).

Thus, the first question that should be addressed is whether the Minifigure figurine is an article that has intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. One of the cases highlighted by Zuru is Lanard Toys Limited v. Dolgencorp LLC, 958 F.3d 1337 (Fed. Cir. 2020). At issue in that case was "a toy chalk holder designed to look like a pencil." Id. at 1339. The court stated: "As the district court found, Lanard's '458 copyright for a 'Pencil/Chalk Holder' has an intrinsic utilitarian function—storing and holding chalk and facilitating writing or drawing—which makes it a useful article under the Copyright Act." Id. at 1345 (citation omitted).

The district court's analysis as to why the toy chalk holder was a useful article is helpful to the analysis in this case:

> A useful article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." See 17 US.C. § 101. To the extent Lanard contends that the Chalk Pencil is not a useful article simply because it is intended as a toy for children, this argument is not persuasive. While the Chalk Pencil may be a toy, it is nevertheless a toy with the intrinsic utilitarian function of storing and holding chalk to facilitate writing or drawing. See Hesterberg Decl. ¶ 4. Indeed, Lanard's packaging for the Chalk Pencil instructs the user how to insert chalk into the device, depicts a person's hand using the Chalk Pencil to draw on the sidewalk, and touts a "working eraser." See id., Ex. B. The Chalk Pencil is not like a toy which is designed only to portray the appearance

of another object, with no function other than in a child's imagination. Compare Gay Toys[, 703 F.2d at 973] ("To be sure, a toy airplane is to be played with and enjoyed, but . . . [o]ther than the portrayal of a real airplane, a toy airplane, like a painting, has no intrinsic utilitarian function."); Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 916 n.12 (9th Cir. 2010) (explaining that doll clothes are not "useful articles" because they are "intended only to portray the appearance of clothing" and have no utilitarian function given that "[d]olls don't feel cold or worry about modesty"). Nor is the Chalk Pencil designed merely to "simulate" writing. Compare Lanard Toys Ltd. v. Novelty, Inc., 375 F. App'x [at] 710 . . . ("A child can make the toy 'copters' fly high into the air, but that 'flight' is simply a portrayal of the real objects, and the toys are not capable of actually flying, or transporting people or supplies, like real helicopters."). Children do not hold the Chalk Pencil and imagine using it to draw, children can, and are intended to, actually draw with the device.

Lanard Toys Limited v. Toys "R" Us-Delaware, Inc., No. 3:15-CV-849-J-34PDB, 2019 WL 1304290, at *21 (M.D. Fla. March 21, 2019).

At issue in Gay Toys, as noted in the above passage, was a toy airplane. The pertinent passage from that case is:

But the statutory definition of "useful article" suggests that toys are copyrightable. To be a "useful article," the item must have "an intrinsic utilitarian function that is not merely to portray the appearance of the article." And a toy airplane is merely a model which portrays a real airplane. To be sure, a toy airplane is to be played with and enjoyed, but a painting of an airplane, which is copyrightable, is to be looked at and enjoyed. Other than the portrayal of a real airplane, a toy airplane, like a painting, has no intrinsic utilitarian function.

703 F.2d at 973 (footnote omitted). The court then observed, with respect to toys generally, that "toys do not even have an intrinsic function other than the portrayal of the real item." Id. at 974 (emphasis in original).

-39-

What these cases demonstrate is that a toy is not a "useful article" if it is simply to be played with and enjoyed and has no function other than in a child's imagination. If its intrinsic utilitarian function is merely to portray the appearance of a particular article, it is not "useful article," even if it has some mechanical or functional element. The consequence of there being a mechanical or functional element is that such an element is not protectable.

Zuru maintains that the Minifigure figurine is a useful article because of its "extensive functionality and compatibility with the Lego play system." Redacted Def. Zuru's Reply in Supp. of Mot. for Summ. J. ("Zuru Mot. Reply") (ECF No. 279) at 29. With respect to "functionality" Zuru points to LEGO's Minifigure Guidelines as evidence that "[t]he minifigure has 15 'functional' features relating to 'assembly,' 'poseability,' and 'connectability.'"[4]  Unredacted Pls.' Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J. ¶ 9. LEGO disputes that there are 15 "functional features." It

---

[4] Zuru also attempts to rely on a video prepared by Zuru expert Lee Loetz and attached to his declaration as Exhibit B. See ECF No. 243-7. This video was not produced during discovery and LEGO moves to strike it from the summary judgment record. See Fed. R. Civ. P. 37(c); see, e.g., Packard v. City of New York, No. 115CV07130ATSDA, 2019 WL 11287678, at *2 n.4 (S.D.N.Y. Oct. 30, 2019) (excluding video that was not produced in discovery). Zuru does not dispute that the video was not produced during discovery. Rather, Zuru contends that it is merely a "demonstrative tool." Zuru Mot. Reply at 29 n.9. Demonstrative exhibits are not admissible trial evidence. Accordingly, the court strikes the Loetz video from the summary judgment record because it was not disclosed during discovery.

maintains that there are no more than four "intrinsically utilitarian, and therefore potentially unprotectable, aspects of the Minifigure figurine . . . ." LEGO Opp. Mem. at 35. But even accepting Zuru's interpretation, the fact that there is some "mechanical or functional element to a toy" is not sufficient to establish that the toy itself has an intrinsic utilitarian function and cannot "qualify for copyright protection, in whole or in part." Lanard Toys Ltd. v. Novelty, Inc., 375 F. App'x at 709.

In support of its position, Zuru argues that it is an "undisputed fact that Lego designed [the Minifigure figurine] to be fully compatible with the Lego play system and to facilitate 'role play.'" Zuru Mot. Reply at 30. Zuru offers no analysis as to why the Minifigure figurine's compatibility with the other elements of the LEGO play system (at times referred to as the LEGO Grid System) is an intrinsic utilitarian function causing it to be a "useful article." In fact, emphasizing the degree to which the Minifigure figurine is compatible with the LEGO play system and facilitates role play serves to highlight the ways in which it is similar to toys that courts have determined are not useful articles. See Gay Toys, Inc., 703 F.2d at 973 ("To be sure, a toy airplane is to be played with and enjoyed, but . . . [o]ther than the portrayal of a real airplane, a toy airplane, like a painting, has no intrinsic utilitarian function.");

Lanard Toys Ltd. v. Novelty, Inc., 375 F. App'x at 710 ("A child can make the toy 'copters' fly high into the air, but that 'flight' is simply a portrayal of the real objects, and the toys are not capable of actually flying, or transporting people or supplies, like real helicopters.").

Zuru argues that Star Athletica mandates the conclusion that the Asserted Copyrights are invalid, citing to Lanard Toys Limited v. Dolgencorp LLC, 958 F.3d 1337 (Fed. Cir. 2020) and Inhale, Inc. v. Starbuzz Tobacco, Inc., No. 211CV03838ODWFFM, 2017 WL 4163990 (C.D. Cal. May 8, 2017). However, Star Athletica did not involve determination of whether a work was a useful article. Rather, it involved application of the "special rule for copyrighting a pictorial, graphic, or sculptural work incorporated into a 'useful article.'" Star Athletica, 580 U.S. at 411. See also id. at 409 ("Congress has afforded limited protection for these artistic elements by providing that 'pictorial, graphic, or sculptural features' of the 'design of a useful article' are eligible for copyright protection as artistic works if those features 'can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.'" (quoting 17 U.S.C. § 101)).

The rule applicable in Star Athletica, Lanard Toys v. Dolgencorp LLC, and Inhale, Inc. v. Starbuzz Tobacco, Inc. does

-42-

not come into play unless it has already been determined that the work is a useful article. Thus, in Lanard Toys Ltd. v. Dolgencorp LLC, the court stated:

> As the district court found, Lanard's '458 copyright for a "Pencil/Chalk Holder" has an intrinsic utilitarian function—storing and holding chalk and facilitating writing or drawing—which makes it a useful article under the Copyright Act. Thus, as the district court noted, the pertinent question is whether the copyright incorporates features that are sufficiently "separable" from the utilitarian aspects of the article to be eligible for copyright protection.

958 F.3d at 1345 (internal citations omitted). See also Inhale, Inc., 2017 WL 4163990, at *2 ("The Supreme Court found that [designs printed or sewn onto cheerleading uniforms] were copyrightable despite the fact that they were part of a useful article." (citing Star Athletica, 580 U.S. at 424)). Here, because there is no genuine issue as to the fact that the Asserted Copyrights are for an article that is not a "useful article," there is no need to proceed with the analysis required under Star Athletica.

Therefore, LEGO is entitled to summary judgment on Zuru's defense/counterclaim that the Asserted Copyrights are invalid because the Minifigure figurine is a functional, useful article.

**e. Patent and Copyright Clause of the Constitution**

During the course of this litigation, Zuru has asserted that:

> the asserted copyrights are invalid under the Patent and

-43-

Copyright Clause of the Constitution ("Patent Clause")
. . . . The Patent Clause therefore precludes the Lego Group
from claiming copyright, trademark, and/or trade dress
protection for the same subject matter claimed in at least
U.S. Patent Nos. 3,005,282, 3,874,113, 3,995,395,
4,028,844, 4,205,482, 4,643,691, 6,213,839, 9,067,147,
D253,711, D352,078.

Pls.' Ex. 11, Def. Zuru Inc.'s Resp. to Pls.' Second Set of

Interrogs. (Nos. 8-17) (ECF No. 243-11) at 16.

As LEGO explains, this argument is without merit:

ZURU appears to be relying on an outdated, and since
revised, United States Copyright Office Rule. See 46 FR
33248 (June 29, 1981) ("[A] copyright claim in a patented
design or in the drawings or photographs in a patent
application will not be registered after the patent has
been issued."). This rule was revised in 1995 and provides
that the existence of a patent does not affect a work's
eligibility for copyright protection. 37 CFR § 202.10(a),
as amended in 60 Fed. Reg. 15605, 15606 (Mar. 24, 1995)
("The availability of protection or grant of protection
under the law for a utility or design patent will not
affect the registrability of a claim in an original work of
pictorial, graphic, or sculptural authorship."); see also
Star Athletica, [580 U.S. at 508] ("[W]e have long held
that design patent and copyright are not mutually
exclusive."). Indeed, this Court has previously rejected
this argument. LEGO A/S, 404 F. Supp. 3d at 610 ("It is
clear that the same elements of a work protected under
patent law are also eligible for copyright protection.").

LEGO Mot. Mem. at 31-32.

Therefore, LEGO is entitled to summary judgment on Zuru's

defense/counterclaim that the Asserted Copyrights are invalid

under the Patent and Copyright Clause of the United States

Constitution.

**2. Second Element of the Feist Test: Illegal Copying**

The second element that a plaintiff with a copyright

-44-

infringement claim must establish is infringement, i.e., "copying of constituent elements of the work that are original." Feist, 499 U.S. at 361. "A plaintiff with a valid copyright proves infringement by demonstrating that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122-23 (2d Cir. 1994) (emphasis in original).

> The plaintiff may prove copying by direct evidence, or by showing that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work. In the context of deciding whether the defendant copied at all (as distinguished from whether it illegally copied), 'similarity' relates to the entire work, not just the protectible elements.

Id. at 123 (emphasis in original) (internal citations omitted).

### a. Actual Copying

Here, direct evidence shows that there is no genuine issue as to the fact that Zuru actually copied the Minifigure figurine, particularly in light of the fact that "similarity" for this purpose relates to the entire work, not just the protectable elements.

Zuru admits that it "had knowledge of the Asserted Copyrights and Asserted Trademark when it designed the MAX Products." Redacted Def.'s Local Rule 56(a)2 Statement of Facts

in Opp'n to Pls.' Mot. for Summ. J. ¶ 23. Zuru also admits that it "began designing its first-generation figurines in or around the first quarter of 2017, and that draft control drawings for the body shape of the Max first generation figurines were close to final in September 2017." Id. Resp. to ¶ 24. Zuru further admits that it "had knowledge of the LEGO Minifigure figurine at the time it designed the MAX Products, including the MAX Figurines." Id. ¶ 25.

Zuru submitted a Private Brand Proposal to Walmart dated March 2017. See Pls.' Ex. 18 (ECF No. 247-4). Zuru's Chief Operations Officer Anna Jane Mowbray has admitted that in that Private Brand Proposal Zuru was "clearly using [LEGO Minifigures] as placeholders." Pls.' Ex. 10, Anna Jane Mowbray Dep. Tr. Vol. 2, June 9, 2021 (ECF No. 247-2) at 332:11-12.

It is undisputed that Zuru did not use any focus groups during its design process. Zuru admits that it reviewed the Minifigure figurine while designing the MAX Figures, but adds, "we try to like make it compatible like while different, so we have to review the details." Pls.' Ex. 13, Coco Chan Dep. Tr., Aug. 30, 2021 (ECF No. 247-3) at 107:11-13. Documents in Zuru's design file compare the MAX Figures to LEGO's Minifigure figurine. Zuru's design file includes, among other things, a design document that shows seven different points of comparison between LEGO's Minifigure figurine and the MAX Figure (referred

to at that time as the "Maykafig"), see Pls.' Ex. 19 (ECF No. 247-5), Dep. Ex. 257; Pls.' Ex. 13, Coco Chan Dep. Tr. Vol. 2, Aug. 31, 2021 at 232:14-15 ("But here, you can see there are seven different points of comparison to a LEGO Minifigure . . . ."), and a later document showing design changes, see Pls.' Ex. 19, Dep. Ex. 259. Coco Chan, Zuru's Head of New Product Development testified with respect to the design process:

> When we design it, we give a target to the designers that you need to make it different from the LEGO figurines. While it is compatible, that is our whole like target is very clearly delivered to the designers. So that is why they try to put it like what the difference is in their designs in their presentation. But I remember we still talked about it is still not good enough. So it is like the design process keeps going on for quite a few iterations, if I remember correctly, because they -- you can see the facial expression now is different from before because we keep asking them to have more like energy and more characters into the figures. And then they will -- afterwards they keep changing the body, the legs and everything else.

Pls.' Ex. 13, Coco Chan Dep. Tr. Vol. 2, Aug. 31, 2021 at 233:6-25.

Even if the court had concluded that there was a genuine issue of material fact as to whether LEGO had proved copying by direct evidence, there is no genuine issue as to the fact that Zuru had access to LEGO's work and the works are similar enough to support an inference that Zuru copied LEGO's work. In this context, a plaintiff must only show "probative similarity" to demonstrate the works are similar enough to support the required

inference.

> Probative similarity is a "less demanding test than" substantial similarity, and requires "only that there are similarities between the two works that would not be expected to arise if the works had been independently created." Michael Grecco Prods., Inc. v. Valuewalk, LLC, 345 F. Supp. 3d 482, 500 (S.D.N.Y. 2018) (internal quotation marks and citation omitted). When comparing works for the purpose of determining probative similarity, protectable and unprotectable elements need not be differentiated. Fisher-Price, 25 F.3d at 123.

Best-Lock, 404 F. Supp. 3d at 607-08.

Here, examination of the Minifigure figurine and the MAX Figure reveals that they are probatively similar, a fact which is confirmed by the documents in Zuru's design file and Zuru's explanation of its design process. See id. at 608 ("Visual examination of the products at issue in this case reveals that they are . . . 'probatively similar' . . . .")

Thus, no reasonable trier of fact could conclude that Zuru did not actually copy the Minifigure figurine in designing the MAX Figures.

### b. The Copying is Illegal

To satisfy this requirement a plaintiff must demonstrate that substantial similarity exists between the defendant's work and the protectable elements of the plaintiff's work.

"[T]he plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea. The means of expression

-48-

are the 'artistic' aspects of a work; the 'mechanical' or 'utilitarian' features are not protectible." Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995) (alteration in original) (quoting Fisher-Price, 25 F.3d at 123).

"In most cases, the test for 'substantial similarity' is the so-called 'ordinary observer test' . . . : whether 'an average lay observer would [ ] recognize the alleged copy as having been appropriated from the copyrighted work.'" Knitwaves, 71 F.3d at 1002 (second alteration in original) (citations omitted); see also Laureyssens v. Idea Group, Inc., 964 F.2d 131, 141 (2d Cir. 1992) (test is "whether 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same'") (quoting Peter Pan Fabrics, 274 F.2d at 489); Salinger v. Colting, 607 F.3d 68, 83 (2d Cir. 2010) (quoting Folio Impressions, Inc. v. Byer Cal., 937 F.2d 759, 766 (2d Cir. 1991) ("In considering substantial similarity between two items . . . what is required is only a visual comparison of the works . . . .").

"However, . . . where we compare products that contain both protectible and unprotectible elements, our inspection must be 'more discerning'; we must attempt to extract the unprotectible elements from our consideration and ask whether the protectible elements, standing alone, are substantially similar." Knitwaves,

-49-

71 F.3d at 1002 (emphasis in original) (citations omitted).

> No matter which test we apply, however, we have disavowed any notion that "we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable." Instead, we are principally guided "by comparing the contested design's 'total concept and overall feel' with that of the allegedly infringed work" as instructed by our "good eyes and common sense." This is so because "the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of [unprotectible components] . . . —are considered in relation to one another."

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 66 (2d Cir. 2010) (alterations in original) (internal citations omitted); see also Knitwaves, 71 F.3d at 1003 ("It is commonplace that in comparing works for infringement purposes— whether we employ the traditional 'ordinary observer' test or the Folio Impressions 'more discerning' inquiry—we examine the works' 'total concept and feel.'")

"Though substantial similarity often presents a jury question, it may be resolved as a matter of law where 'access to the copyrighted work is conceded, and the accused work is so substantially similar to the copyrighted work that reasonable jurors could not differ on this issue.'" Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 11 F.4th 26 (2d Cir. 2021) (quoting Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992)), aff'd sub nom. Andy Warhol Found. for the Visual Arts, Inc. v.

-50-

Goldsmith, 598 U.S. 508 (2023); see also Gaito, 602 F.3d at 67 ("Finally, and critically, it is patent that the overall visual impressions of the two designs are entirely different.").

LEGO asserts that the "ordinary observer test" is applicable here and that "[t]he ordinary observer test is easily satisfied because the overall look and feel of the Infringing MAX Figurines is substantially similar to the Minifigure figurine protected by the Asserted Copyrights." LEGO Mot. Mem. at 22 (footnote omitted). In addition, LEGO maintains that "the Infringing MAX Figurines are substantially similar to the LEGO Minifigure figurine under the more demanding 'discerning ordinary observer' standard." Id. at 22, n.8. Zuru maintains that it is entitled to summary judgment based on the requirement of substantial similarity because LEGO should be "held to the positions it took in its litigation against Best Lock," see Best-Lock, 404 F. Supp. 3d, and when it is, LEGO's infringement claim fails "because the Zuru figurines are different from the minifigure in all the same ways as the Kre-O and in more ways, and clearly are not 'virtually identical,' or even substantially similar, to any alleged protectable feature of the minifigure." Zuru Mot. Mem. at 41. Zuru asserts that:

> Lego makes no showing—and offers no argument—that these standards are satisfied here. It does not even argue, let alone show, that Zuru's designs are "virtually identical" to those of Lego. Nor does it argue, or show, that there is similarity of protected expression. On the governing legal

standard for infringement, Lego makes no argument, and offers no evidence, of any type.

Zuru Mot. Reply at 15.

As noted, Zuru argues that LEGO took certain positions in the Best-Lock litigation and judicial estoppel applies with respect to those positions. The court has already ruled against Zuru on that argument. See Lego A/S v. Zuru Inc., No. 3:18-CV-2045 (AWT), 2023 WL 2727552, at *5 (D. Conn. Mar. 31, 2023) ("Here, Zuru cannot show that even the first prerequisite for applicability of judicial estoppel is present . . . , i.e., Zuru cannot show that a factual position taken by the LEGO Group in this case is clearly inconsistent with a factual position it took in Best-Lock.").

In addition, Zuru relies on the following language from Best-Lock: "[W]hen one subtracts from a copyrighted object the unoriginal and unprotected elements, the copyright owner is 'left with a thin copyright, which protects only against virtually identical copying.'" Zuru Mot. Reply at 15 (quoting Best-Lock, 404 F. Supp. 3d at 614 (quoting Satava v. Lowry, 323 F.3d 805, 810-12 (9th Cir. 2003))). However, there is no support in the record for the proposition that here there are "unoriginal" elements to be subtracted in conducting the substantial similarity inquiry. The following language from Best-Lock, which quotes Satava, is not applicable here:

-52-

Taken together, the holdings in Fisher-Price, affirm the general principle that "expressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law," and when one subtracts from a copyrighted object the unoriginal and unprotected elements, the copyright owner is "left with a thin copyright, which protects only against virtually identical copying."

Best-Lock, 404 F. Supp. 3d at 614 (quoting Satava, 323 F.3d at 810-12). At issue in Satava were glass-in-glass jellyfish sculptures. The court noted that "no copyright protection may be afforded to the idea of producing a glass-in-glass jellyfish sculpture or to elements of expression that naturally follow from the idea of such a sculpture." Satava, 323 F.3d at 810. The court then observed that, "[i]t is true, of course, that a combination of unprotectable elements may qualify for copyright protection. . . . United States v. Hamilton, 583 F.2d 448, 451 (9th Cir. 1978) (Kennedy, J.) ('[O]riginality may be found in taking the commonplace and making it into a new combination or arrangement.')." Id. at 811 (emphasis in original) (internal citation omitted). But the court concluded that "[t]he combination of unprotectable elements in Satava's sculpture falls short of this standard." Id. The court explained:

We do not mean to suggest that Satava has added nothing copyrightable to his jellyfish sculptures. He has made some copyrightable contributions: the distinctive curls of particular tendrils; the arrangement of certain hues; the unique shape of jellyfishes' bells. To the extent that these and other artistic choices were not governed by jellyfish physiology or the glass-in-glass medium, they are original elements that Satava theoretically may protect

through copyright law. Satava's copyright on these original elements (or their combination) is "thin," however, comprising no more than his original contribution to ideas already in the public domain. Stated another way, Satava may prevent others from copying the original features he contributed, but he may not prevent others from copying elements of expression that nature displays for all observers, or that the glass-in-glass medium suggests to all sculptors. Satava possesses a thin copyright that protects against only virtually identical copying.

Id. at 812. Here, expression that is standard stock or common to a particular subject matter is not at issue. In designing the Minifigure figurine LEGO did not achieve originality by "taking the commonplace and making it into a new combination or arrangement," nor did it merely make an original contribution to an idea that was already in the public domain. Hamilton, 583 F.2d at 451.

LEGO acknowledges that there are "intrinsically utilitarian" features of the Minifigure figurine. LEGO Opp. Mem. at 35. Consequently, the court's inquiry here must be "more discerning" because that is the test that must be applied when the product contains both protectable and unprotectable elements. See Knitwaves, 71 F.3d at 1002 ("[T]he 'mechanical' or 'utilitarian' features are not protectible." (quoting Fisher-Price, 25 F.3d at 123)). LEGO maintains that "[o]nly the stud projection on top of the head (but notably, not its position on the head), the inside radius of the c-shaped hands and the holes that receive stud projections at the base of the feet and back

-54-

of legs are necessary for attachment and cannot be easily

changed through alternative designs, yet remain capable of

interacting with the LEGO Grid System." Pls.' Ex. 33, Ex. B,

Rebuttal Report of Elizabeth B. Knight (ECF No. 247-13) ¶ 53

(footnote omitted).

Zuru maintains that the Minifigure figurine has fifteen

features that are unprotectable elements. Zuru expert Loetz

states that "the Lego minifigure is highly 'functional' . . . as

a standalone figurine (e.g., in the way that its elements move,

rotate, etc.)." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz

(ECF No. 236-2) ¶ 55. He explains:

> Based on my own analysis of the Lego minifigure and my
> review of other documents and testimony in the record, I
> have identified all the following ways that the minifigure
> is capable of attachment or movement:
>
> FUNCTIONS OF THE MINIFIGURE
>
> 1. Stud on head allows for hair, helmet, hat, etc.,
> connection.
> 2. Head swivels on neck.
> 3. Head is removable to switch with other styles.
> 4. Right arm is articulated with a hinge joint.
> 5. Left arm is articulated with a hinge joint.
> 6. Right hand has a "c-cup" clutching shape.
> 7. Right leg is articulated with a hinge joint.
> 8. Legs are removable and [replaceable].
> 9. Left leg is articulated with a hinge joint.
> 10. Left hand has a "c-cup" clutching shape.
> 11. Back of right leg has fitted "tube" holes to snap
> onto Lego studs.
> 12. Back of right leg has fitted "tube" holes to snap
> onto Lego studs.
> 13. Bottom of right foot has [] fitted "tube" holes to
> snap onto Lego studs.
> 14. Bottom of left foot has [] fitted "tube" holes to

snap onto Lego studs.
15. Individual pieces of minifigure can connect to each[ ]other and to other Lego bricks and elements in various ways.

Id. ¶ 61. Seven of the features identified by Loetz are the ones identified by LEGO. (The difference in the number of features is that Loetz counts separately the "c-cup" clutching shape on the right hand and the left hand, the "tube" holes on the back of the right leg and the back of the left leg, and the "tube" holes on the bottom of the right foot and the bottom of the left foot.)

Some of the eight remaining features that Loetz describes as "functions" of the Minifigure figurine are joints that enable movement with respect to the head, the arms, or the legs. See Items 2, 4, 5, 7, and 9. The remainder of those features that Loetz characterizes as "functions" relate to assembly of the Minifigure, i.e., the head and legs are removable and individual pieces connect to each other. See Items 3, 8, and 15.

In determining what elements are unprotectable, "[t]he question in each case . . . is whether [an] element is dictated by utilitarian considerations or, to put it another way, whether the element could be changed without affecting the functionality (i.e., capacity for movement and attachment) of the minifigure." Lego A/S v. Best-Lock Construction Toys, Inc., 874 F. Supp. 2d 75, 99 (D. Conn. 2012). Zuru expert Loetz opines, "[i]n my

-56-

opinion, it would be difficult for Zuru to make its figurines more different from the minifigure without sacrificing functionality and other non-design considerations . . . ." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 5. But LEGO expert Knight shows that "the elements Loetz claims are functional (the design of the head, arms, torso, legs, and feet) can each be designed differently and take another form or shape (human or even creature) without affecting the capacity of the sculpture to move and/or attach." Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 52. Knight demonstrates, using pictures, that "any Minifigure figurine movement can be accomplished through multiple alternative designs, including all assembly (which is internal) or poseability (shown below) . . . . The Friends figurine can perform almost all of these motions, including internal assembly, even though it is a completely different toy figure design with a different overall look and feel." Id. ¶ 54-55 (accompanying pictures omitted).

Zuru also argues that the sizes and proportions of the Minifigure figurine are functional because they ensure compatibility with the LEGO Grid System. Zuru expert Loetz states: "In addition to designing the minifigure to have many functional features as a standalone product, Lego also designed the size and proportions of the fully assembled minifigure in accordance with precise measurements to ensure its compatibility

-57-

with the Lego system of play. Virtually every element of Lego's minifigure can attach to a brick within the Lego play system in multiple ways." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 62. Loetz opines that "[d]eviation from these exacting specifications would limit the functionality, and thus the play performance, of the figurines." Id. ¶ 63. However, LEGO expert Knight demonstrates that "[t]he Minifigure figurine fits within the LEGO Grid System, but the system does not require that all figures be the same size and scale." Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 58. Knight shows how "[t]he LEGO Grid System allows for . . . variations of sizes and scale, of figurines and models." Id. Knight demonstrates, using photographs, how "[a]s shown below, the Friends figurine is similar in size and scale to the Minifigure figurine, in particular even when it is expanded in vertical directions to similarly accessorize (scuba tanks, backpacks, shoes, flippers, etc.) [but] [a]s stated in my opening report, one need to merely add plates in the vertical direction to allow for alternative figurines to be fit within the system. The LEGO Grid System is infinitely scalable." Id. ¶ 60. In paragraph 62 of her rebuttal report Knight also illustrates how "one can design a toy figurine that has an entirely different look and feel, while incorporating holes in the back of the legs that allow for attachment in the seated position." Id. ¶ 62 (footnote omitted).

Thus, there is no genuine issue as to the fact that the size and proportions of the Minifigure figurine are not functional.

Thus, there is no genuine issue as to the fact that the only functional elements of the Minifigure figurine are those that facilitate attachment. Only the stud projection on top of the head, the inside radius of the c-shaped hands, and the holes that receive stud projections at the base of the feet and on the back of the legs are utilitarian.

LEGO maintains that when one excludes these unprotectable elements and conducts a more discerning inquiry, it has demonstrated that there is no genuine issue with respect to the fact that Zuru has appropriated the total concept and overall feel of the Minifigure figurine. See Knitwaves, 71 F.3d at 1003. The court agrees.

"The design of the Minifigure figurine is an original work of art [that is] . . . recognizable as a unique sculptural expression of a human figure." Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 10(b). The image in paragraph 57 of Knight's rebuttal report reflects the unprotectable elements of the Minifigure figurine that must be extracted for purposes of conducting the more discerning inquiry, namely the stud projection on the top of the head, the inside radius of the c-shaped hands and the holes that receive stud projections at the

base of the feet and the back of the legs.[5] See Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 57.

Zuru contends that the overall appearance of the MAX Figure is different from the Minifigure figurine. In the section of his report under the heading "Comparison of Zuru Figurines to Minifigures Depicted in Lego Copyright and Trademark Registrations," Zuru expert Loetz opines that "my analysis and opinions above about the differences between the appearance and design of the Zuru MAX figurines and the Lego minifigure apply comparably to the minifigures shown in the Lego registrations." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 147. He adds:

> I note, however, that the Zuru Max figurines that I have reviewed have additional differences from the Lego minifigures as shown in the Asserted Copyrights. In particular, none of the Zuru figurines I have reviewed have the head accessories (hair or helmets) shown on the Lego minifigures, none of the Zuru figurines has a clear head or a yellow head, and, to the extent the Lego minifigures shown in Lego's registrations have paint, coloring, or decorations on them (like facial decorations or "jackets"), none of the Zuru figurines I have reviewed have similar decorations.

Id. ¶ 148. The analysis and opinions "above" about the differences between the appearance and design of the MAX Figures and the Minifigure figurine are set forth in Loetz's report

---

[5] Thus, Zuru's argument that "Lego concedes that its design expert, Ms. Knight, 'did nothing to ensure her similarity opinions "were not premised on unprotectable features" of the Minifigure figurine,' and claims she has no obligation to do so," Zuru Mot. Reply at 11 (emphasis in original), and its argument that "Lego does not identify what the supposedly protectable features of the minifigure are, and it makes no showing that the parties' figurines are substantially similar, let alone virtually identical, when only 'protectable' expression is considered," id. at 18, lack merit.

under the heading "Comparison of Design of Zuru and Lego Figurines." In that section, Loetz cites to LEGO's Minifigure Guidelines for the proposition that LEGO "considers three of [the features of the Minifigure figurine] to be the 'essential characteristics that define a minifigure': (i) the shape of the head; (ii) the shape of the torso; and (iii) the shape of the foot. . . ." Id. ¶ 118. In the section where Loetz compares the design of Zuru's MAX Figure and the design of LEGO's Minifigure figurine, he compares a representative sample of a First Generation MAX Figure to LEGO Minifigures by comparing the heads and pointing out differences between them; then comparing the torsos and pointing out differences between them; and then comparing the legs and feet, and pointing out differences between them. He then concludes with respect to the First Generation MAX Figure that "given that the 'essential' minifigure characteristics of the head, torso, legs, and feet are different in the first generation Zuru figurine and the Lego minifigure, the overall appearance of the figurines is likewise different . . . ." Id. ¶ 132. See also id. ¶ 62. Loetz then repeats the process with respect to LEGO Minifigures and a representative sample of a Second Generation MAX Figure. See id. ¶¶ 134-41. He then reaches a similar conclusion: "Again, given the differences in each of the elements that comprise the 'essential characteristics' of the Lego minifigure, the overall

-61-

appearance of the second generation Zuru MAX Figurine is different from the Lego minifigure." Id. ¶ 142.

The approach taken by Loetz is not a reliable foundation for his opinion. Federal Rule of Evidence 702 sets forth the standard to be used by the court in evaluating the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In Daubert, the Supreme Court held that Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). In Kumho, the Court emphasized the relevance/reliability standard in determining the admissibility of expert testimony, stating that Rule 702 "establishes a standard of evidentiary reliability . . . requir[ing] a valid connection to the pertinent inquiry as a precondition to admissibility . . . [and] a reliable basis in the knowledge and experience of the relevant discipline." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999) (internal quotations and citations omitted).

A court must undertake "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Id. But "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Id. at 266.

As an initial matter, the descriptions of the works protected by the Asserted Copyrights are not set forth in the Minifigure Guidelines but in the deposit materials for the Asserted Copyrights. More importantly though, Loetz's methodology for conducting the more discerning inquiry is contrary to the manner in which that inquiry must be conducted. As explained in Gaito, "[n]o matter which test we apply, however, we have disavowed any notion that 'we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" 602

F.3d at 66 (second alteration in original) (citations omitted).
See also Knitwaves, 71 F.3d at 1003 ("Lollytogs' argument,
however, misconstrues the nature of our inquiry into
'substantial similarity.' We do not believe that we are required
by the 'more discerning ordinary observer test' to undertake so
mechanical and counterintuitive an exercise as Lollytogs
suggests.").

Zuru points to no other evidence in support of its position
that the total concept and overall feel of the MAX Figure is
different from that of the Minifigure figurine. On the other
hand, LEGO expert Knight explains that "[t]he Minifigure
figurine's whole sculpture (e.g., cylindrical head and body
features, including torso, arms, and legs) represents a human
figure and comprise the total look and feel of the sculptures."
Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 45.
Knight shows side-by-side silhouettes of the Minifigure figurine
and the First Generation MAX Figure from the front view, the
side view, and the top view. She then shows the results of an
overlay of the figures from each view. Knight states accurately
that

> [b]y reviewing an overlay of each figure, you can see that
> the basic elements of height, width, head size and
> proportion of head to bodies are almost identical. These
> similarities in terms of scale and proportion, i.e. the
> length of the leg, the shape of the leg, the proportions or
> size of the torso and the head, are all part of the overall
> look and feel of the figure. Tiny differences do not change

the overall look and feel of the figure.
Id. ¶ 46.

Knight provides a similar analysis with respect to a comparison between the Minifigure figurine and the Second Generation MAX Figure. The overlay shows that "[t]he overall shape and proportions are substantially similar to . . . the Minifigure Copyrights . . . . The overlay diagrams . . . show the very small differences in the overall shape of figures. The shoulders are slightly higher and the height of the head is a tiny bit taller. Neither of the changes would change the extreme similarity to the overall look and feel of the figure." Id. ¶ 49. She concludes further that "[t]he shape and proportions of leg to head to torso of the Redesigned ZURU Figurine are nearly identical to the Minifigure figurine." Id. "When comparing overlays of the silhouettes it is clear that there are few small shape differences," id. ¶ 51, and "[t]he changes made to the 2019 Redesigned ZURU Figurine do not change the overall look and feel," id. ¶ 50. Her analysis supports her conclusion that "ZURU has attempted to point out differences between the 2019 ZURU Figurine and the Minifigure figurine and the Copyrights and Trademarks, but they are so small in their visual effect that they have negligible effects on the overall visual expression." Id. ¶ 54. There is no genuine issue as to these conclusions reached by Knight.

Thus, there is no genuine issue as to the fact that Zuru actually copied LEGO's work, nor as to the fact that a more discerning observer would conclude that the total concept and overall feel of the First Generation and Second Generation MAX Figure is substantially similar to that of the Minifigure figurine. Therefore, LEGO is entitled to summary judgment on its claim for copyright infringement of the Minifigure figurine (Count I) and Zuru's First and Second Defenses and Counterclaim Counts III and IV (copyright non-infringement and invalidity), and Zuru's motion for summary judgment with respect to Count I is being denied.

**B. Claims for Trademark Infringement (Counts II and III); and Trademark Non-Infringement and Invalidity Defenses and Counterclaims**

"The Lanham Act provides for the registration of trademarks, which it defines in § 45 to include 'any word, name, symbol, or device, or any combination thereof [used or intended to be used] to identify and distinguish [a producer's] goods . . . from those manufactured or sold by others and to indicate the source of the goods . . . .'" Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209 (2000) (alterations and omissions in original) (quoting 15 U.S.C. § 1127). The Lanham Act defines trademark infringement as the use without the consent of the registrant of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale,

offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). "The Act similarly prohibits the infringement of unregistered, common law trademarks. See [15 U.S.C.] § 1125(a)(1)." Time, Inc. v. Petersen Publ'g. Co., 173 F.3d 113, 117 (2d Cir. 1999); see also Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc., 909 F.3d 1110, 1115 (Fed. Cir. 2018) ("[W]e think that it is confusing and inaccurate to refer to two separate marks—a registered mark and a common-law mark. Rather, there is a single mark, as to which different rights attach from the common law and from federal registration.")

"To prevail on a trademark infringement claim under the Lanham Act, the plaintiff must show that: (1) plaintiff owns a valid protectable mark; and (2) defendant's use of a similar mark is likely to cause consumer confusion as to the origin or association of the goods or services." Vans, Inc. v. MSCHF Prod. Studio, Inc., 88 F.4th 125, 135–36 (2d Cir. 2023); see also Time, Inc., 173 F.3d at 117 (citation and internal quotation marks omitted) ("To prevail on a trademark infringement claim under either [15 U.S.C. §§ 1114(1)(a) or 1125(a)(1)], a plaintiff must demonstrate that it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion."). "Because the Lanham Act is a strict liability

-67-

statute, a registrant need not prove knowledge or intent in order to establish liability." Innovation Ventures, LLC v. Ultimate One Distrib. Corp., 176 F. Supp. 3d 137, 153 (E.D.N.Y. 2016).

It is undisputed that LEGO owns the Asserted Trademark, Registration Number 4,903,968 (the "'968 Registration"). With respect to the other requirement in the first element of a claim for trademark infringement, LEGO contends that there is no genuine issue as to whether the Asserted Trademark is valid and entitled to protection. Zuru contends that the Asserted Trademark is invalid because the Minifigure figurine is not distinctive, invalid because the Minifigure figurine is a functional product configuration, invalid due to fraud on the USPTO, invalid due to inconsistent appearance, and invalid because it has been abandoned.

With respect to the second element of a claim for trademark infringement, LEGO contends that there is no genuine issue as to whether there is a likelihood of confusion between Zuru's MAX Figures and the Asserted Trademark. Zuru contends that, as a matter of law, the MAX Figures do not infringe the Asserted Trademark.

## 1. First Element: Valid Trademark Entitled to Protection

The Asserted Trademark consists of

the three-dimensional configuration of a toy figure

> featuring a cylindrical head, on top of a cylindrical neck, on top of a trapezoidal torso of uniform thickness, with flat sides and a flat back, where arms are mounted slightly below the upper surface of the torso, on top of a rectangular plate, on top of legs which bulge frontwards at the top and are otherwise rectangular with uniform thickness, on top of flat square feet.

Pls.' Ex. 7 (ECF No. 243-7) at 2 (original in all caps). The mark is depicted in a single drawing in the '968 Registration. See Pls.' Ex. 9 (ECF No. 243-9) at 8.

It is undisputed that the Asserted Trademark is for a product-design trade dress. In Wal-Mart Stores, the Court explained, with respect to product-design trade dress:

> The breadth of the definition of marks registrable under § 2 . . . has been held to embrace not just word marks, such as "Nike," and symbol marks, such as Nike's "swoosh" symbol, but also "trade dress"—a category that originally included only the packaging, or "dressing," of a product, but in recent years has been expanded by many Courts of Appeals to encompass the design of a product. See, e.g., Ashley Furniture Industries, Inc. v. Sangiacomo N. A., Ltd., 187 F.3d 363 (C.A.4 1999) (bedroom furniture); Knitwaves, [71 F.3d] (sweaters); Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780 (C.A.8 1995) (notebooks). These courts have assumed, often without discussion, that trade dress constitutes a "symbol" or "device" for purposes of the relevant sections, and we conclude likewise. "Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive." Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 162 . . . (1995).

529 U.S. at 209-10.

"For infringement in the period after registration, the Lanham Act entitles the owner of the registered mark to a presumption that the mark is valid, including that it has

acquired secondary meaning." Converse, Inc., 909 F.3d at 1117

(internal citations omitted). In Converse, the court stated:

> In the context of cancellation proceedings, we have held
> that this presumption shifts both the burden of persuasion
> and the initial burden of production to the challenger to
> rebut the presumption. . . . We see no reason why the
> effect of the presumption should be any different in the
> infringement context, and we join with the majority of
> circuits that have held that the presumption shifts both
> burdens to the party challenging secondary meaning.

Id.

Thus, Zuru has the initial burden of production with

respect to its contention that the Asserted Trademark is not a

valid and legally protectable mark.

### a. Distinctiveness

Zuru contends that "[t]he features at issue for the LEGO

Minifigures have not acquired distinctiveness, and are commonly

used by third parties." Zuru, Inc.'s Answer and Countercls. ¶

160.

"All trademarks, in order to be valid or protectable, must

be distinctive of a product's source, and 'courts have held that

a mark can be distinctive in one of two ways.'" Converse, Inc.,

909 F.3d at 1116 (quoting Wal-Mart Stores, 529 U.S. at 210).

> "First, a mark is inherently distinctive if '[its]
> intrinsic nature serves to identify a particular source.'"
> [Wal-Mart Stores, 529 U.S. at 210] (alteration in original)
> (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S.
> 763, 768 . . . (1992)). "Second, a mark has acquired
> distinctiveness, even if it is not inherently distinctive,
> if it has developed secondary meaning, which occurs when,
> 'in the minds of the public, the primary significance of a

-70-

> [mark] is to identify the source of the product rather than the product itself.'" Id. at 211 . . . (alteration in original) (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 . . . (1982)); see also 15 U.S.C. § 1052(f).

Id. at 1116. "The Supreme Court has held that unlike word marks and product-packaging trade dress, product-design trade dress can never be inherently distinctive." Id. "As a result, [such] 'a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning.'" Id. (quoting Wal-Mart, 529 U.S. at 216).

"Factors that are relevant in determining secondary meaning include '(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use.'" Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 226 (2d Cir. 2012) (quoting Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997)); see also Car-Freshner Corp. v. Am. Covers, LLC, 980 F.3d 314, 329 (2d Cir. 2020) ("Acquired distinctiveness, sometimes called secondary meaning, is determined by analyzing six factors: advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use."). "[N]o 'single factor is

determinative,' and every element need not be proved." Thompson
Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985)
(quoting Am. Footwear Corp. v. Gen. Footwear Co., 609 F.2d 655,
663 (2d Cir. 1979)). See also Easy Spirit, LLC v. Skechers
U.S.A., Inc., 515 F. Supp. 3d 47, 61 (S.D.N.Y. 2021) ("[N]o
single factor is determinative and every element need not be
proved.") (alteration in original) (quoting Thompson Med. Co.,
753 F.2d at 217); Focus Prods. Grp. Int'l, LLC v. Kartri Sales
Co., 647 F. Supp. 3d 145, 210 (S.D.N.Y. 2022) ("The Second
Circuit has identified six non-exclusive factors that bear on
[the secondary meaning] inquiry.").

LEGO contends that consideration of the secondary meaning
factors shows that Zuru has no evidence to rebut the presumption
of acquired distinctiveness. With respect to advertising
expenditures and sales success, LEGO points to the October 20,
2015 Declaration in Support of Acquired Distinctiveness Under
Section 2(f), Pls.' Ex. 9 (ECF No. 243-9) at 9-72 (the "Hecht
Declaration"), executed by Michael G. Hecht and submitted to the
USPTO in support of LEGO's application for the Asserted
Trademark. The Hecht Declaration was submitted in response to an
office action by the USPTO requesting evidence of acquired
distinctiveness. See Pls.' Ex. 9 at 2. With respect to
advertising, the Hecht Declaration states:

Between 1978 and the present, LSI has spent, on advertising

-72-

and promotion in the United States for LEGO toy sets containing such Minifigures and for such Minifigures sold separately, in excess of 200 . . . million dollars, including, among other things, extensive advertising on television and print media. Examples are in Exhibit A.

Hecht Declaration ¶ 7.[6]

With respect to sales success, it states:

5. The LEGO Minifigure in the configuration in the mark of this application was first sold in 1978. Sales in commerce, that is, in the U.S., also began in 1978 and millions have been sold in the U.S. each year since 1978. Since that time, worldwide sales of LEGO Minifigures have exceeded four billion.

6. The approximate number of LEGO Minifigures sold in the United States from 1978 to the present (separately or in construction toy sets) exceeds 120 . . . million. Total retail sales in the U.S., from 1978 to the present, of LEGO Minifigures sold separately and LEGO construction toy sets containing such Minifigures exceed one billion dollars.

Id. ¶¶ 5-6.

While the Hecht Declaration makes no mention of consumer studies or unsolicited media coverage linking the mark to a source, it does reflect that "LEGO Minifigures are so popular that there is an industry of producing products that facilitate collecting them, including a wide variety of books showing the Minifigures. Books include general encyclopedias and guides to

---

[6] The Hecht Declaration states that LSI has spent in excess of "200 hundred million dollars." Hecht Declaration ¶ 7. LEGO's Memorandum of Law in Support of LEGO's Motion for Partial Summary Judgment states that the number is $200 million dollars. See LEGO Mot. Mem. at 43. The court references the Hecht Declaration in accordance with LEGO's Memorandum of Law in Support of LEGO's Motion for Partial Summary Judgment here and throughout this ruling because the numbers used in that memorandum are consistent with the $1 billion figure in ¶ 6.

the Minifigures and books on the Minifigures with specific subject matter." Id. ¶ 10. In addition, the Hecht Declaration states that "[t]he familiarity of consumers with the Minifigure is reinforced by a wide variety of LEGO books, sticker books, video games and movies for children (shown often on television) featuring animated versions of these Minifigures as star characters." Id. ¶ 12.

With respect to attempts to plagiarize the mark, in Best-Lock, the court concluded that "no reasonable trier of fact could determine that Best-Lock did not actually copy Lego." 404 F. Supp. 3d at 608.

As to length and exclusivity of the use of the mark, as noted above, the Minifigure was first sold in 1978 and had been sold for approximately 37 years before the application for the Asserted Trademark was filed. The Hecht Declaration states:

> The use of the mark of this application, that is, the Minifigure, has been substantially exclusive, that is, only by The LEGO Group, apart from uses by occasional small infringers, which The LEGO Group usually polices. Except for these occasional small infringers, no other toy manufacturer uses the same configuration for plastic figurines sold in the U.S. as far as LSI is aware. Because the infringers are small, elusive and usually located in China, the policing often takes the form of requesting United States Customs and Border Protection to seize incoming shipments of construction toy sets containing copies of the Minifigure, or Minifigures or Minifigure parts imported separately, as infringements of the recorded U.S. copyright registration for the Minifigure, Reg No. VA-655-104, recorded with CBP under CBP Recordation No. COP 99-00203. This is more cost-effective than trying to sue small, elusive entities in China, whose export volumes to

the US. are trivial.

Id. ¶ 13. The Best-Lock litigation is an example of LEGO's steps to police activities by infringers.

The Hecht Declaration also reflects that LEGO has authorized licensees. See id. ¶ 9.

In response to an interrogatory from LEGO asking Zuru to state the facts upon which it based its claim that the Asserted Trademark has not acquired distinctiveness, Zuru stated, in relevant part, "[u]pon information and belief, the primary significance of the purported mark to consumers is that of a construction toy, and not an indicator of source." Pls.' Ex. 11, Def. Zuru Inc.'s Resp. to Pls.' Second Set of Interrogs. (Nos. 8-17) at 25. In connection with the instant motions, Zuru argues that there are several reasons why there is at least a genuine issue of material fact as to whether LEGO's asserted product-design trade dress has acquired distinctiveness.

First, Zuru contends that LEGO cannot rely on statements in the Hecht Declaration. It argues that "Mr. Hecht's declaration is inadmissible because Lego never disclosed him as a witness in this case . . ." and "[i]ndependently, Mr. Hecht's declaration is inadmissible as hearsay because it was filed in the Best Lock case, and is thus an out-of-court statement being offered for its truth." Zuru Opp. Mem. at 56-57. However, the Hecht Declaration was submitted in response to the office action by

the USPTO and is part of the public trademark prosecution file for the Asserted Trademark. See Pls.' Ex. 9; see also Redacted Reply Mem. in Further Supp. of Pls.' Mot. for Partial Summ. J. (ECF No. 281) ("LEGO Mot. Reply") at 37 n.39 ("Indeed, ZURU produced the full trademark prosecution file for the Asserted Trademark (Bates numbers ZURU-00040191 through -40317), including the Hecht Declaration, and used it as deposition exhibit 200.").

Zuru also argues that "Lego's 'distinctiveness' arguments go to the heart of Lego's misrepresentations." Zuru Opp. Mem. at 58; see also id. at 59 ("Lego must be held to the representations in made, and benefitted from, in Best Lock, that the Kre-O and Mega Bloks figurines are 'non-infringing,' 'different expressions' of the minifigure."). However, as discussed earlier, the court has already concluded that judicial estoppel does not apply. See Lego A/S v. Zuru Inc., 2023 WL 2727552, at *5.

In addition, Zuru contends that "[a]n undecorated minifigure is 'broadly generic' and 'extremely simplistic' so it can 'act[] as the perfect blank canvas' for 'any sort of character.'" Redacted Def.'s Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. ¶ 13 (second alteration in original). It argues that "[c]onsistent with Lego's view of its trade dress as 'generic,' Lego's corporate designees in this

case, who work for Lego and are consumers of Lego products, were unable to recognize the shape and form of the minifigure." Unredacted Def. Zuru's Opp'n to Pl. LEGO's Mot. for Summ. J. (ECF No. 267) ("Unredacted Zuru Opp. Mem.") at 54. Zuru relies in part on a LEGO/Newsweek promotional article in which Matt Ashton, LEGO vice president of design states that "[w]e are really lucky that the original Minifigure was designed in a way that gave us an extremely simplistic figure, which acts as the perfect canvas for us to now apply any sort of character." Def.'s Ex. 16 (ECF No. 239-17) at 10. But in the same paragraph Ashton is quoted as saying that "I would imagine that the original designers had little idea that the figure they created would ultimately turn into such a brand icon." Id.

The balance of Zuru's support for this particular contention comes from deposition testimony of LEGO employees. During that testimony these witnesses were unable to say with certainty whether images of figurines were LEGO Minifigures. See Unredacted Zuru Opp. Mem. at 54-56 (containing examples of statements by certain employees reflecting that they were unable to say with certainty whether an image of a figurine that was being shown during deposition was a LEGO Minifigure). Zuru does not tie the excerpted testimony to any of the secondary meaning factors. In any event, none of these snippets of deposition testimony constitutes an admission by LEGO as to a fact material

-77-

to the question of whether the Asserted Trademark has acquired secondary meaning.

Finally, Zuru argues that Hecht's statements in the Hecht Declaration "relating to Lego's sales, licensing, and marketing of the minifigure apparently pertain to the fully adorned, decorated, and accessorized minifigures that Lego brings to market—not the 'generic,' 'blank canvas' body form that Lego's asserted trade dress actually covers." Zuru Opp. Mem. at 57-58. The court agrees with LEGO that "this argument is belied by the fact that the USPTO registered the Asserted Trademark (that is, it agreed that it had acquired distinctiveness), knowing that the Asserted Trademark was the unadorned, three-dimensional configuration of the Minifigure figurine." LEGO Mot. Reply at 37. As noted above, the mark is depicted in a single drawing in the '968 Registration. That drawing is the very drawing that appears in the trademark prosecution file. See Pls.' Ex. 9 at 8.

Whether a mark has acquired distinctiveness is "'an inherently factual inquiry.'" Louboutin, 696 F.3d at 226 (quoting Yarmuth-Dion, Inc. v. D'ion Furs, Inc., 835 F.2d 990, 993 (2d Cir. 1987)). However, there are circumstances in which summary judgment is appropriate because there are no genuine issues of material fact. See id. ("Where, as here, the record contains sufficient undisputed facts to resolve the question of distinctiveness—not to speak of facts found by the District

Court that are based upon evidence of record and not clearly erroneous—we may do so as a matter of law."). This is such a case. Zuru's arguments with respect to whether the Hecht Declaration should be considered and judicial estoppel, and the argument that the statements by Hecht with respect to LEGO's sales, licensing and marketing of the LEGO Minifigures do not relate to the unadorned three-dimensional configuration of the Minifigure figurine, all lack merit. To the extent the excerpts of deposition testimony that Zuru relies on would be admissible, they are insufficient to create a genuine issue as to whether Zuru can rebut the presumption of distinctiveness in light of the evidence in the record, cited by LEGO, that is consistent with that presumption.

Therefore, LEGO has shown it is entitled to summary judgment with respect to Zuru's defense/counterclaim that the Asserted Trademark has not acquired distinctiveness.

### b. Functional Trade Dress

Zuru claims that the Asserted Trademark is invalid because the product-design trade dress is functional.

"As the Supreme Court observed in Qualitex, aspects of a product that are 'functional' generally 'cannot serve as a trademark.'" Louboutin, 696 F.3d at 218 (quoting Qualitex, 514 U.S. at 165). "This is so because functional features can be protected only through the patent system, which grants a limited

-79-

monopoly over such features until they are released into general use . . . ." Id. at 218-19. In Sulzer Mixpac AG v. A&N Trading Co., the court explained the "three-step functionality test." 988 F.3d 174, 183 (2d Cir. 2021). "In [this] Circuit, 'a product feature is considered to be "functional" in a utilitarian sense if it is (1) "essential to the use or purpose of the article," or if it (2) "affects the cost or quality of the article."'" Id. at 182 (quoting Louboutin, 696 F.3d at 219 (footnote omitted) (quoting Inwood Lab'ys, Inc., 456 U.S. at 850 n.10)).

> Product features are essential when they are "dictated by the functions to be performed by the article." [Louboutin, 696 F.3d at 219] (internal quotation marks omitted); accord Warner Bros., Inc. v. Gay Toys, Inc., 724 F.2d 327, 331 (2d Cir. 1983) ("[A] feature that merely accommodates a useful function is not enough.").

Id. "A feature affects cost or quality when it 'permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods.' Louboutin, 696 F.3d at 219 (internal quotation marks omitted)." Id. As to the third step:

> A feature can still be functional even if it is not essential to a product's use or purpose and does not affect a product's cost or operation. This is referred to as aesthetic functionality, where "the aesthetic design of a product is itself the mark for which protection is sought."

Id. (quoting Louboutin, 696 F.3d at 219-20 (emphasis in original)). "In such instances, this Court considers whether 'giving the markholder the right to use it exclusively would put

competitors at a significant non-reputation-related

disadvantage.'" Id. (quoting Louboutin, 696 F.3d at 220).

In Sulzer, the court stated,

> [a]t the start, we address the two prongs of the Inwood
> test, asking whether the design feature is either essential
> to the use or purpose or affects the cost or quality of the
> product at issue . . . . Next, if necessary, we turn to a
> third prong, which is the competition inquiry . . . .

Id. at 183 (alterations in original) (quoting Louboutin, 696

F.3d at 220).

"[I]f a design feature would, from a traditional

utilitarian perspective, be considered essential to the use or

purpose of the article, or to affect its cost or quality, then

the design feature is functional under Inwood and our inquiry

ends." Id. (quoting Louboutin, 696 F.3d at 220). "If and only if

a design feature is not functional in the traditional sense, do

we move to the fact-intensive test where the feature must be

'shown not to have a significant effect on competition in order

to receive trademark protection.'" Id. (quoting Louboutin, 696

F.3d at 220).

In Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch

Co., the plaintiff sought "trade dress protection for the

overall look of Snopants." There the court stated:

> Where the asserted trade dress extends to the "overall
> look" of the combination of features comprising a product
> or product line, the Court must evaluate the
> distinctiveness and functionality of those features taken
> together, not in isolation. See LeSportsac, Inc. v. K Mart

> Corp., 754 F.2d 71, 76 (2d Cir. 1985) (recognizing trade
> dress for "particular combination and arrangement of design
> elements" of a sports bag) . . . .

292 F. Supp. 2d 535, 543 (S.D.N.Y. 2003) (emphasis in original).

In Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., the court cited LeSportsac for the proposition that "despite [the] functionality of individual elements, [the] bag was nonfunctional 'when viewed in its entirety.'" 58 F.3d 27, 32 (2d Cir. 1995). In LeSportsac the court observed that "by breaking LeSportsac's trade dress into its individual elements and then attacking certain of those elements as functional, K mart misconceives the scope of the appropriate inquiry." 754 F.2d at 76.

A party can receive trade dress protection for the overall combination of functional features, but

> in order to receive trade dress protection for the overall
> combination of functional features, those features must be
> configured in an arbitrary, fanciful, or distinctive way.
> See TrafFix Devices, [Inc. v. Mktg. Displays, Inc., 532
> U.S. 23, 34 (2001)] where the Supreme Court rejected the
> trade dress protection claim because the sign
> manufacturer "has pointed to nothing arbitrary about the
> components of its device or the way they are assembled."

Antioch Co. v. W. Trimming Corp., 347 F.3d 150, 158 (6th Cir. 2003). "In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is nonfunctional." Id. "Nonetheless, the fact that a trade dress

is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea." Maharishi, 292 F. Supp. 2d at 543 (quoting Jeffrey Milstein, 58 F.3d at 32).

At issue in Antioch was a scrapbook album that had "several distinctive features," described as follows:

> The album utilizes a dual strap-hinge design that permits the pages to lie flat when the album is open, facilitates the turning of the pages, and enables the easy insertion of additional pages. Another design element of the CREATIVE MEMORIES album is its spine cover that conceals the dual strap-hinge, which causes it to be known as a "closed back" or "bookshelf" album. A third element of Antioch's album is the laminated, padded album covers. Finally, the CREATIVE MEMORIES album pages have ribbed edges that provide reinforcement, keep them separated, and hold the staples together. Antioch seeks trade dress protection for the CREATIVE MEMORIES album that encompasses these above-described features.

347 F.3d at 152. The court found that "[t]he dual strap-hinge design, spine cover, padded album cover, and reinforced pages are all components that are essential to the use of Antioch's album . . . ." Id. at 157. The court concluded that the overall design combination was not deserving of trade dress protection because "in order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way." Id. at 158.

For the reasons that follow, there is no genuine issue as to the fact that the Asserted Trademark is not functional either (i) as an overall combination of functional features, or (ii) under any of the three prongs of the Inwood test. Thus, LEGO is entitled to summary judgment on Zuru's defense/counterclaim that the Asserted Trademark is functional.

### i. Composition of the Asserted Trademark

Zuru makes an argument that presents the following question: Is the Asserted Trademark an overall combination of functional features, or are there merely some features of the Asserted Trademark that are functional in a utilitarian sense?

Zuru contends that it has

> demonstrated that every feature of the minifigure has at least one "function" in that they all facilitate movement and/or are capable of attachment to other elements, there is nothing "arbitrary, fanciful, or distinctive" in the way the component functional features of the minifigure are assembled to form the overall product configuration, and Lego designed the entire configuration of the minifigure to "work well" and "fit perfectly" with the Lego play system.

Zuru Opp. Mem. at 41-42.

Zuru argues that the fact that every feature of the Minifigure figurine has at least one function is established by evidence from its expert Lee Loetz; statements by LEGO's witnesses in this case; statements by LEGO in its advertising and promotional materials; LEGO's "admissions that every feature of the minifigure has a 'function,' including 15 features

relating to attachment, movement, and 'poseability,' (Zuru SOF 6-12.)," Zuru Opp. Mem. at 43; and the fact that "several utility patents claim the utilitarian advantages of virtually every feature of the minifigure— including the stud on the head, the connection between the torso and legs, the bottom of the torso, the legs and the feet, and the hands." Zuru Mot. Mem. at 47. Zuru argues that "[t]hese utility patents create a heavy presumption that Lego's asserted trade dress is functional." Id. (emphasis omitted).

In his report, Loetz opines that "the Lego minifigure is highly 'functional' . . . as a standalone figurine (e.g., in the way that its elements move, rotate, etc.)." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 55. Loetz cites to LEGO's Minifigure Guidelines, which "identify twelve separate features that represent" the functionality of the Minifigure figurine. Id. ¶¶ 56-57. Those features relate to assembly, poseability, and connectability. See id. ¶ 57. In paragraph 61 of his report, Loetz states that he has "identified all the . . . ways that the minifigure is capable of attachment or movement." Id. ¶ 61. The relevant language from paragraph 61 of Loetz's report is quoted in Part III.A.2.b.

Zuru contends there is no genuine issue as to the fact that:

Lego's corporate designee on the topic . . . and one of

-85-

Lego's longest-tenured minifigure designers, Chris Johansen, identified still more features of the minifigure that are "functional," including that (i) the head of the minifigure can rotate; (ii) the head of the minifigure can be removed and replaced with different heads; (iii) the head of the minifigure can be attached to the bottom of Lego system bricks, or even to other heads; and (iv) the torso of the minifigure can be removed and attached to studded bricks through the stud (or neck piece) on the top of the torso.

Unredacted Def.'s Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. (ECF No. 236-1) ¶ 10. In his report, Loetz states:

Mr. Johansen testified at his deposition to many ways that the minifigure is functional, including the following:
- The head of the minifigure can rotate.
- The head of the minifigure can be removed and replaced with different heads.
- The head of the minifigure can be attached to the bottom of Lego system bricks, or even to other heads.
- Elements like hair or hats can attach to the top of the head of a minifigure through the stud on the top of the head.
- The torso of the minifigure can be removed and attached to studded bricks through the stud (or neck piece) on the top of the torso.
- The bottom of the torso of the minifigure can attach to the top of studded bricks.
- The holes on the back of the legs of the minifigure can attach to studded bricks in a seated position.
- The arms of the minifigure can be rotated around.
- The hands of the minifigure can attach to accessories.

Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 59 (footnote omitted). Loetz also points to Johansen's inability to identify "any elements of the minifigure that do not involve attachment

or movement." Id. ¶ 60.

Zuru submits evidence that "Lego has promoted the functionality of the minifigure, and its play system more generally, including in a promotional article, on its website, and in its product catalogues." Redacted Def.'s Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. ¶ 23. It points to the fact that LEGO vice president Matt Ashton stated in a promotional article that "[t]he minifigure was 'originally designed with its functionality probably being pretty high on the design criteria to deliver great roleplay experiences.'" Id. ¶ 5. It also cites to product catalogs, including a "1982 Lego product catalogue" which "stat[ed] that minifigures have 'arms and legs that really move, plus sturdy hands for carrying, lifting and climbing.'" Id. ¶ 23.

The evidence from Loetz, statements by LEGO personnel, and statements by LEGO in promotional materials fail to create a genuine issue on the question of functionality.

The manner in which Zuru uses statements by LEGO designer Chris Johansen, the Minifigure Guidelines, and statements in LEGO's promotional materials, substitutes the lay meaning of the term "functional" for the legal meaning of that term. In In re Morton-Norwich Prod., Inc., the court took note of the fact that "the label 'functional' has dual significance." 671 F.2d 1332, 1337 (C.C.P.A. 1982). "It has been used, on the one hand, in lay

fashion to indicate 'the normal or characteristic action of anything,' and, on the other hand, it has been used to denote a legal conclusion." Id.

> Accordingly, it has been noted that one of the "distinct questions" involved in "functionality" reasoning is, "In what way is (the) subject matter functional or utilitarian, factually or legally?" In re Honeywell, Inc., 497 F.2d 1344, 1350 . . . (C.C.P.A. 1974) (Rich, J., concurring). This definitional division, noted in "truism" (4) in Deister, leads to the resolution that if the designation "functional" is to be utilized to denote the legal consequence, we must speak in terms of de facto functionality and de jure functionality, the former being the use of "functional" in the lay sense, indicating that although the design of a product, a container, or a feature of either is directed to performance of a function, it may be legally recognized as an indication of source. De jure functionality, of course, would be used to indicate the opposite-such a design may not be protected as a trademark.

Id. The court gave an example: "No doubt, by definition, a dish always functions as a dish and has its utility, but it is the appearance of the dish which is important in a case such as this . . . ." Id. at 1338.

Based on the context in which each of these statements by or on behalf of LEGO was made, there is no genuine issue as to the fact that the statements addressed de facto functionality. During Johansen's deposition, when he was being asked about functionality in the trademark context, Johansen inquired as to what the questioner meant by "functionality." See Def.'s Ex. 42, Chris Johansen Dep. Tr., July 15, 2021 (ECF No. 236-15) at 77:14-15. The questions directed to him were not put in the

context of the three prongs of the test for functionality.

LEGO does not dispute that "certain elements of the Minifigure figurine facilitate attachment or movement, and therefore have a 'function.'" LEGO Opp. Mem. at 45. It acknowledges that the stud projection on the top of the head, the inside radius of the c-shaped hands, and the holes that receive stud projections at the base of the feet and back of the legs are functional in that they "are necessary for attachment and cannot be easily changed through alternative designs, yet remain capable of interacting with the LEGO Grid System." Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 53. LEGO agrees that these elements of the Minifigure figurine are "intrinsically utilitarian." LEGO Opp. Mem. at 35. See Sulzer, 988 F.3d at 182 ("Product features are essential when they are dictated by the functions to be performed by the article." (internal quotation marks and citation omitted)). But LEGO's product-design trade dress is for the three-dimensional configuration of a toy figure that features the cylindrical head, the cylindrical neck, the trapezoidal torso, the rectangular plate, the legs which bulge forward at the top, and the flat square feet. It does not include the stud on the head, the c-cup clutching shapes in the hands, or the fitted tube holes in the legs and on the bottom of the feet, and LEGO does not seek protection for those features.

Zuru has proffered no evidence that the fact that the stud on the cylindrical head is intrinsically utilitarian means that the cylindrical head itself is intrinsically utilitarian, nor any evidence that the fact that the legs and the feet have fitted tube holes, which are utilitarian, means that the legs and the feet themselves are functional. The same is true with respect to the inside radius of the c-shaped hands.

Loetz opines that the Minifigure figurine is highly functional because of the way elements move, rotate, and relate to assembly. For example, the head swivels and is removable, the arms and legs have hinge joints, and the legs are removable. However, while the fact that elements of the Minifigure figurine are capable of movement establishes that the elements are "functional" in a de facto sense, that mere fact does not suggest that those elements are "functional" in a de jure sense. LEGO expert Knight provides examples of art that is capable of movement but is not functional in the utilitarian sense and is the product of original and artistic design. See Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 56 (Knight providing examples from the mobiles of Alexander Calder, with photographs). Knight also shows how the functions related to assembly of the Minifigure figurine are internal or a result of joints and therefore do not have an impact on the overall look of the Minifigure figurine. See id. ¶ 57 (image prepared by

Knight that reflects the utilitarian functions of the Minifigure figurine, juxtaposed with the diagram prepared by Zuru expert Loetz). Thus, Zuru has not created a genuine issue with respect to whether the fact that certain elements of the Minifigure figurine are capable of movement and relate to assembly makes them de jure functional.

Zuru argues that "several utility patents claim the utilitarian advantages of virtually every feature of the minifigure . . . ." Zuru Mot. Mem. at 47. Zuru asserts that:

> Lego has protected the minifigure through utility patents covering the "stud" on top of the head; the "c-cup" hands; and a "leg assembly" with four holes on the back of the legs to attach to bricks in a seated position, two holes on the underside of the feet to attach in a standing position, a disc-shaped holder with laterally extending pivots for pivotally mounting the two legs (i.e., the leg members), such that the two legs have slidable contact with the connecting plate, two "studs" on the top to attach to the underside of the torso element (or the underside side of other bricks), and a body member (torso) with a cavity adapted to receive a pair of coupling studs (like the leg studs or brick studs). (Ex. 13 [Depo. Ex. 75 ("Christiansen Patent") at Patent Abstract, Figs. 1-7, col. 1 lines 4-9, col. 1 lines 50-68, col. 2 lines 5-21, col. 2 line 44 to col. 3 line 11, Patent Claim 1]; Ex. 11 [Depo. Ex. 73 ("Pedersen Patent") at Patent Abstract, Figs. 1-3, col. 1 lines 14-20, col. 1 lines 38-45, col. 1 lines 48-50, col. 2 lines 3-7, col. 2 lines 58-62, col. 3 lines 31-51, Patent Claim 1]; Ex. 12 [Depo Ex. 74 ("Brick Studs Patent") at Figs. 1-12, col. 1 lines 10-15, col. 2 lines 8-44, col. 2 line 72 to col. 3 line 5, Patent Claims 1-7 (claiming the "cylindrical projections" as part of the utility patent's functional protection, which are colloquially called "studs")] . . . .).

Redacted Def.'s Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. ¶ 12 (alterations in original).

Zuru cites to TrafFix Devices, 532 U.S. at 29, for the proposition that "[a] utility patent is strong evidence that the features therein claimed are functional." However the three-dimensional configuration of the Minifigure figurine, which is the subject of the Asserted Trademark, is not part of any of the claims in the '282 Patent, the '482 Patent, or the '839 Patent.

Moreover, LEGO was granted a U.S. Design Patent for the Minifigure figurine, Des. 253,711. The claim is: "The ornamental design for toy figure, as shown." Pls.' Ex. 49 (ECF No. 265-15) at 2. There are nine drawings depicting the ornamental design of the toy figure. The overall look of the toy figurine in these drawings is the same as the overall look of the three-dimensional configuration of the toy figurine in the '968 Registration. As the court observed in Morton-Norwich, "[i]t is interesting to note that appellant also owns design patent 238,655 for the design in issue, which, at least presumptively, indicates that the design is not de jure functional. See In re Schilling, 421 F.2d 747, 750 . . . (C.C.P.A. 1970); In re Garbo, . . . 287 F.2d 192, 193-94 . . . ([C.C.P.A.] 1961)." 671 F.2d at 1342 n.3. Thus, there is no basis for Zuru's contention with respect to the expired utility patents.

Zuru argues that the components of the Minifigure figurine "are body parts and they are assembled in the locations where body parts appear in nature—the head on the top of the torso,

the arms protruding from the top sides of the torsos, the legs and feet below the torso, etc." Zuru Mot. Mem. at 47. Zuru then asserts that the Minifigure's features are assembled in "a non-arbitrary way to track the human form." Id. But LEGO does not contend that its product-design trade dress is for the human form. This case is analogous to LeSportsac, where the court explained that "LeSportsac does not claim a trademark in all lightweight nylon bags using hollow zipper pulls or carpet tape trim. It claims as its mark the particular combination and arrangement of design elements that identify its bags and distinguish them from other bags." 754 F.2d at 76. See also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 203 (2d Cir. 1979) ("Plaintiff does not claim a trademark in all clothing designed and fitted to allow free movement while performing cheerleading routines, but claims a trademark in the particular combination of colors and collocation of decorations that distinguish plaintiff's uniform from those of other squads." (footnote omitted)). Here LEGO claims only a trademark in the three-dimensional configuration of a toy sculpture having the features detailed in the Asserted Trademark.

Consequently, the court does not agree with Zuru that the "the non-arbitrary manner in which the component functional parts of the minifigure are assembled renders the entire product

-93-

configuration functional and unprotectable as trade dress as a matter of law." Zuru Mot. Mem. at 47.

### ii.    First Prong: Essential to Use or Purpose

"A feature is essential if [it] is dictated by the functions to be performed by the article." Louboutin, 696 F.3d at 219 (alteration in original) (internal quotation marks omitted). As discussed above, LEGO acknowledges that the stud projection on the top of the head, the inside radius of the c-shaped hands, and the holes that receive stud projections at the base of the feet and back of the legs are functional because they "are necessary for attachment." Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 53. What LEGO claims is protected is the overall look of a three-dimensional configuration of a toy figure.

Zuru contends that "Lego's witnesses have effectively admitted to 'de jure' functionality by acknowledging that Lego designed the minifigure to work with the Lego play system, and that it 'works really well in the system.'" Unredacted Mem. of Law in Supp. of Def. Zuru Inc.'s Mot. for Summ. J. ("Unredacted Zuru Mot. Mem.") (ECF No. 236) at 47 (emphasis in original). Zuru expert Loetz opines that "the Lego minifigure is highly 'functional' . . . with respect to the ways it 'fits' within the entire Lego system of play, which includes Lego construction bricks and models built out of them." Def.'s Ex. 7, Ex. A,

Expert Report of Lee Loetz ¶ 55. Loetz further opines that "Lego . . . designed the size and proportions of the fully assembled minifigure in accordance with precise measurements to ensure its compatibility with the Lego system of play." Id. ¶ 62. "Deviation from these exacting specifications would limit the functionality, and thus the play performance, of the figurines." Id. ¶ 63.

To support its position, Zuru cites to testimony by LEGO expert Knight, and LEGO designer Johansen; it also cites to the Minifigure Guidelines. However, when Knight was asked during her deposition whether she considered "the ability of the parties' figurines to fit with and scale with the LEGO play system to be a functional attribute of them," Def.'s Ex. 43, Elizabeth Knight Dep. Tr. Vol 1, Feb. 3, 2022 at 122:4-7, her response included a statement that the LEGO Grid System "is totally adaptable to any scale, small or large," id. at 122:13-14. This was consistent with her report, in which she stated:

> The Minifigure figurine fits within the LEGO Grid System, but the system does not require that all figures be the same size and scale. The LEGO Grid System allows for infinite variations of sizes and scale, of figurines and models. This open-ended system allows for endless creativity and flexibility for children to use it in any way they want. Structures, vehicles, and any element of a world can be scaled up to fit any size figure, this is one of the greatest features of the system. If a child wants to create a world for her Barbie doll, she can do that simply by scaling up or adding more bricks to accommodate the scale and proportions.

Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 58. Zuru produces no admissible evidence to the contrary.

Johansen's testimony is also contrary to Zuru's contention. Johansen was asked if he would "agree that this LEGO grid system enabled precision in the design of mini figure parts and accessories to ensure that they will fit within the LEGO play system." Def.'s Ex. 42, Chris Johansen Dep. Tr., July 15, 2021 at 101:15-19. Johansen explained, consistent with Knight's testimony and report:

> It's more to ensure that you can actually place whatever you have built within the LEGO grid, so to speak.
>
> If a part designed for mini figure like a hat, we saw the Roman helmet on one of the pages. If the plumes were too high and it didn't fit with the let's say the height of four LEGO system bricks and two plates, then you just add another plate and then it suddenly fits, so it's not like it has to stay precisely within the grid because you can always build your way out of it.

Id. at 102:4-16; see also Pls.' Ex. 39, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 (ECF No. 263-5) at 200:18-19 ("[A]ny scale can work within the brick system.").

Zuru also cites to pages 155 to 157 of the Minifigure Guidelines, which discuss the basics of the LEGO Grid System. Nothing in that discussion supports Zuru's assertion that the Minifigure figurine is de jure functional.

Based on the foregoing, Zuru has failed to demonstrate that there is a genuine issue of material fact as to whether the

Asserted Trademark is functional in a utilitarian sense because the design feature for which LEGO seeks protection is essential to the use or purpose of the Minifigure figurine.

### iii.    Second Prong: Affects Cost or Quality

"A feature affects cost or quality when it 'permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods.'" <u>Sulzer Mixpac AG</u>, 988 F.3d at 182 (quoting <u>Louboutin</u>, 696 F.3d at 219). Zuru contends that product features of the Minifigure figurine trade dress LEGO maintains are protected gives LEGO an advantage by permitting the Minifigure figurine to be manufactured at a lower cost. What LEGO maintains is protected is the overall look of a three-dimensional configuration of a toy figure.

With respect to the impact on manufacturing costs, Zuru argues that:

> the undisputed evidence shows that the design of the minifigure is a comparatively simple or cheap method of manufacturing the product . . . . Lego admits, the minifigure was designed to be "broadly generic" and a "perfect blank canvas" for creating any character imaginable. (SOF 13.) This "chameleon" characteristic saves costs because it allows Lego to use the same mold to create any figurine-character it wants. On the other hand, a competitor that is required to use a less "generic" design—such as a more "muscular" body shape—would be required to use multiple molds to produce figurines that are suitable for different characters, and would therefore be at a significant competitive disadvantage in terms of costs.

Zuru Mot. Mem. at 52 (further internal quotation marks and citations omitted). But Zuru cites to no evidence in support of

this argument.

On the other hand, LEGO expert Knight provides a detailed analysis of why the shape of the Minifigure figurine does not offer manufacturing advantages, and she takes into account the shapes and forms that together create its overall look. Knight explains the manufacturing process and why the plastic pieces of the Minifigure figurine are more difficult and costly to make using LEGO's manufacturing process. She also explains why Zuru's MAX Figures are easier to manufacture. See Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶¶ 89-95. Compare Schutte Bagclosures Inc. v. Kwik Lok Corp., 193 F. Supp. 3d 245, 262 (S.D.N.Y. 2016), aff'd, 699 Fed. App'x 93 (2d Cir. 2017) (finding "that the simple shape of the closures at issue facilitates the efficient use of the articles in automatic machines and reduces possible costs to the manufacturers of the closures and the purchasers of the closures").

Zuru also argues that "potential design changes that have been suggested . . . result in increased costs or decreased marketability." Zuru Mot. Mem. at 52. Zuru advances four contentions in support of this argument.

First, Zuru contends that "[a] Lego-compatible figurine that is larger than the minifigure--like Lego's now discontinued Belville figurine--is more costly than the minifigure to manufacture because of the additional plastic needed for the

figurine and for larger-sized accessories on scale with it."
Def.'s Redacted Local Rule 56(a)1 Statement of Undisputed
Material Facts ¶ 27. Second, and relatedly, Zuru contends that
"[m]aking the design of a Lego-compatible figurine more complex
and detailed than the minifigure, or decreasing the size and
smoothness of the 'printable' surfaces of the figurine, make it
more costly and difficult to add decorations and 'paint.'" Id. ¶
31. Zuru relies on the report of its expert Loetz, the
deposition testimony of LEGO designer Chris Johansen, and two
LEGO research reports as support for these contentions.

Zuru's first contention is premised on an assumption that
if one design requires more plastic than another design, then
the manufacturing costs for that design will always be higher.
However, Zuru does not proffer evidence that could support a
conclusion that that is an accurate assumption, either in
general or in the context of this case. As LEGO points out, Zuru
has not shown that "additional plastic is . . . the only, or
even the chief, cost consideration in the design process." LEGO
Opp. Mem. at 53. Zuru does not rebut the evidence submitted by
LEGO, in the form of Knight's rebuttal report, that

> the cost of the toy is made up of many elements, i.e.
> plastic resin, tooling, labor, number of parts (related to
> tooling)[,] decoration, packaging (materials, dimensions,
> weight), shipping, overhead, volume (the more you make, the
> less it costs), and profitability. Each of these elements
> is a tool for the team to work as they get a product into
> cost for a desired price point.

Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 74. Instead, Loetz simply states that "[a]s a general matter, the more plastic that is needed, the higher the cost of manufacturing," with no citation to any support for his statement and without any explanation as to whether there is a basis for finding that it is applicable in this case. Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 109.

Second, Loetz states, without elaboration, that "Zuru needed to design its figurine with flat surfaces that can be easily decorated, as it is more complicated and costly to manufacture and decorate complex or curved surfaces." Id. ¶ 108. But Zuru presents no evidence to rebut the evidence submitted by LEGO (in the form of paragraphs 89-94 of Knight's Rebuttal Report) that the shape of the Minifigure figurine does not offer an advantage in terms of manufacturing costs.

Zuru also relies on the deposition testimony of LEGO designer Chris Johansen. But Johansen disagreed that size was the determinative factor in the cost of the Belville figurine. See Def.'s Ex. 42, Chris Johansen Dep. Tr., July 15, 2021 at 233:24-234:5 ("I believe the complexity driving the cost. If I remember correctly, that [Belville] figure was made of a lot [of] elements that also had to be assembled. I don't think the scale necessarily had any effect on the cost."). In addition, when Johansen was asked if he had information about whether a

-100-

larger size figure cost more to manufacture than a standard Minifigure, he responded, "It shouldn't." Pls.' Ex. 36, Chris Johansen Dep. Tr., July 15, 2021 (ECF No. 263-2) at 209:13.

Zuru also cites to two research reports in support of its position that a figure larger than the Minifigure figurine is more costly to manufacture because of the need for additional plastic. See Def.'s Ex. 20 (ECF No. 236-5); Def.'s Ex. 21 (ECF No. 236-6). Those research reports comment on higher costs for LEGO's Belville line "compared to other themes," Defs.' Ex. 20 at 4, but they do not compare the cost of manufacturing the Belville figurine and the LEGO Minifigures, nor do they refer to the cost of additional plastic. Instead, Def.'s Ex. 20 merely states that "[h]igher costs are very much a matter of the complexity and the scale of the Belville adult figure." Id. at 4; see also Def.'s Ex. 21 at 4 (stating that "Belville is a more complex and cost intensive product line to manufacture than other LEGO themes primarily because of the scale of the adult Belville figurine and the need for larger elements" but making no comparison to the LEGO Minifigure). On the other hand, as referenced above, LEGO expert Knight explains how the cost of a toy is made up of many elements. See Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 74.

Third, relying on the testimony of LEGO designer Chris Johansen and a research report by LEGO, Zuru asserts that:

-101-

> Similarly, enlarging the head of the figurine relative to the size of the body—as Lego has implicitly suggested Zuru must do—not only decreases compatibility with the Lego play system (such as the ability for such oversized heads to attach to Lego head accessories scaled for the minifigure), but also results in a less aesthetically pleasing, and thus less marketable, figurine, as a Lego consumer study confirmed. (SOF 28.)

Unredacted Zuru Mot. Mem. at 52. See also Def.'s Redacted Local Rule 56(a)1 Statement of Undisputed Material Facts ¶ 28. However, the evidence cited to by Zuru does not support the contention that an enlargement of the head decreases compatibility with the LEGO Grid System. Also, with respect to a less aesthetically pleasing and thus less marketable figurine, the evidence cited to by Zuru simply refers to the fact that girls ages six to eight prefer the head of a figurine to look realistic in relation to the rest of the body of the figurine.

Fourth, relying on deposition testimony by LEGO expert Knight, Zuru argues that "making a figurine 'skinnier' than the minifigure, like the Lego Friends figurine, creates compatibility problems and cost increases, including by requiring consumers to purchase separate plastic 'adapters' to finagle attachment between the figurine and studded bricks." Unredacted Zuru Mot. Mem. at 52. Zuru offers no evidence to support this contention. In addition, as LEGO states, "Knight testified that the Friends figurine requires an adapter to attach to a LEGO brick in the seated position . . . however, she

-102-

did not testify regarding the cost of the adapter or offer testimony regarding whether other 'skinnier' figurines that could be designed would require an adapter." Unredacted Pls.' Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J. Resp. to ¶ 30.

Based on the foregoing, Zuru has failed to demonstrate that there is a genuine issue of material fact as to whether the Asserted Trademark is functional in a utilitarian sense because the design feature for which LEGO seeks protection allows the Minifigure figurine to be manufactured at a lower cost.

### iv.  Third Prong: Putting Competitors at a Significant, Non-Reputational Disadvantage

"[I]f a design's aesthetic value lies in its ability to confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs, then the design is functional." Qualitex, 514 U.S. at 170 (second alteration in original) (internal quotation marks and citation omitted).

"To be probative of non-functionality, 'alternative designs must be practical, feasible and effective.'" Schutte Bagclosures Inc., 193 F. Supp. 3d at 269-70 (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:75 (4th ed.)). "The existence of actual or potential designs that work equally well strongly suggests that the particular design [used by plaintiff] is not needed by competitors to effectively

compete[.]" Id. (second alteration in original) (quoting Valu

Eng'g, Inc. v. Rexnord Corp., 278 F.3d 1268, 1276 (Fed. Cir.

2002)).

Zuru argues that "the record is devoid of any evidence of

an alternative design for the minifigure that works 'equally

well' as the minifigure--which is not surprising given that the

minifigure was designed to fit 'perfectly' within the Lego play

system." Zuru Mot. Mem. at 49.

In support of its contention that there is no evidence in

the record of an alternative design that would work equally well

in the LEGO Grid System as the Minifigure figurine, Zuru asserts

that "[d]iscovery has revealed that none of the supposed

'alternative' figurine designs that Lego presented during the

preliminary injunction proceedings . . . comes close to matching

all the functionality of the minifigure, and some do not have

any of the minifigure's functionality." Id. at 49 (emphasis in

original). Zuru gives as examples of differences in

functionality the Lego Friends figurine, Fisher-Price Imaginext,

Fisher-Price Little People, Lego Family figurine, Childcraft,

Lego Belville, and Lego Maui. Id. at 49-50. Zuru asserts that

"[n]one of the alternatively designed figurines that Lego has

presented to the Court in this case have the same functionality

as the minifigure, including with respect to movement,

attachment, and compatibility or 'fit' with the Lego play

system." Redacted Def.'s Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. ¶ 24.

By limiting alternative designs to those presented during the preliminary injunction proceedings, Zuru does not take into account two alternative designs identified by LEGO. In support of its motion for summary judgment, LEGO submitted its "Friends Design Document," which reflects that in the course of developing the concept for the LEGO Friends® Figurine, LEGO created "several designs with different overall looks" that are capable of movement and attachment to the LEGO Grid System. Redacted Pls.' Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J.  ¶ 58; see Pls.' Ex. 32 (ECF No. 247-12). In addition, when Knight was asked during her deposition by counsel for Zuru whether she had determined whether a figurine that has features different from the Minifigure figurine still had the ability to move and attach, Knight responded, referring to the Friends figurine, that it is very different in form and still attaches to the LEGO Grid System. See Pls.' Ex. 39, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 at 235:22-25. While that response by Knight did not address movement, both sides rely on evidence from the preliminary injunction hearing and the Friends figurines submitted by LEGO as exhibits during that hearing are capable of movement. See Prelim. Inj. Hr'g, Feb. 14, 2019, Ex. 83.

LEGO also identified as a figurine that is capable of movement and attachment to the LEGO Grid System "[t]he control figure in the November 8, 2021 Report of Stephen Nowlis." Pls.' Ex. 33, Ex. B, Rebuttal Report of Elizabeth B. Knight ¶ 82. The images included in Knight's Rebuttal Report show that the control figure "has a very different overall look and fee[l] as compared to the LEGO Minifigure figurine." Id.

Zuru argues that:

> a trade dress that prevents competitors from selling their own products that fit perfectly with the Lego play system, or that requires competitors to use a design that doesn't fit with Lego elements, is unprotectable because it inhibit[s] legitimate competition by allowing a producer to control a useful product feature.

Zuru Mot. Reply at 33 (alteration in original) (internal quotation marks and citation omitted). Zuru argues further that:

> any competitor who is forced to sell an oversized figurine that could only be used with Lego models that are "expanded" to accommodate them (see Lego Opp. 40-41) would plainly be at a competitive disadvantage to Lego with respect to its consumers' ease and enjoyment of the play experience, as well as product costs.

Id.

Zuru expert Loetz shows photos of a MAX Figure and a LEGO Minifigure figurine fitting "snugly inside a model of a car built out of Lego bricks," accompanied by photos of the "the other figurines Lego has identified as supposedly providing alternative designs for a figurine." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 103. Loetz concludes that they "are not on

-106-

scale with the model and do not fit inside the car, and therefore, in my opinion would not provide a satisfactory play experience for consumers." Id. The other figurines that are shown by Loetz are the Fisher-Price Little People figurine, the LEGO Maui figurine, the LEGO Belville figurine, the Fisher-Price Imaginex figurine, the LEGO Family figurine, the C3 figurine, and the Childcraft figurine. See id. However, in her opening report, LEGO expert Knight explained the LEGO Grid System as follows:

> The Minifigure figurine fits within the LEGO Grid System, but the system does not require that all figures be the same size and scale. The Grid System allows for infinite variations of sizes and scale, of figurines and models. This open-ended system allows for endless creativity and flexibility for children to use it in any way they want. Adding plates—any number of plates—in the vertical direction allows for the Minifigure figurine to be accessorized with any number of different headgear. Similarly, the size and scale of the Minifigure figurine can be expanded in vertical directions to similarly accessorize (scuba tanks, backpacks, shoes, flippers, etc.). Other figures such as Friends™ Minidoll figurines (with different sizes and shapes), as well as creatures, are all similarly designed to fit in the LEGO Grid System. The aesthetic appearance, scale and proportions have no relevance to the function of the system. The LEGO Grid System is flexible, you can lower or raise or expand by adding plates or modules.

Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 40. Knight supports her position with photographs showing how each of the LEGO Minifigures, the Friends™ Minidoll figurine, the LEGO Belville figurine, and the LEGO Maui figurine fit into the LEGO Grid System. See id. She also includes a rendering of the

LEGO Grid System in three-dimensions showing how three varied size figurines, i.e. a LEGO Minifigure, a Friends™ Minidoll figurine, and a LEGO "Moana" figurine, all fit within the LEGO Grid System next to each other. See id. ¶ 41.

On the other hand, Loetz simply shows the same size model car for different size figurines. Thus he merely demonstrates that if a car is scaled to one size of figurine, different sizes of figurines will not fit inside that car, not that different sized figurines will not fit within the LEGO Grid System.

After asserting that the record is "devoid of any evidence of an alternative design for the minifigure that works 'equally as well' as the minifigure," Zuru states: "Instead, Lego relies on Ms. Knight's speculation that 'I think it's possible' that such a design could exist. (SOF 25, 26 (Ms. Knight agreeing she cannot identify any figurine that matches the functionality of the minifigure, while speculating that 'anything is possible').)" Unredacted Zuru Mot. Mem. at 49 (emphasis in original). But LEGO is not relying on the deposition testimony to which Zuru refers. Rather, Zuru is relying on that deposition testimony in an effort to create a genuine issue of material fact.

Paragraph 25 of Zuru's Local Rule 56(a)1 Statement of Facts reads:

-108-

> No other figurine that has ever been designed or sold matches all the functionality of the minifigure, including its "perfect" compatibility with the Lego play system. (Ex. 43 [Knight Tr. Vol. 1 at 169:24-170:16]; Ex. 44 [Knight Tr. Vol. 2 at 279:4-280:25]; see Ex. 8 [Dep. Ex. Knight 10 (demonstrative)].)

Redacted Def.'s Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. ¶ 25. Knight's statement "I think it's possible" appears at page 170, line 7 of the deposition transcript. Def.'s Ex. 43, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 at 170:7. It follows a line of questions that began with the following question: "Do you think a figurine that is outside the proportions of the LEGO Minifigure could be completely compatible with the LEGO Play System?" Id. at 169:11-14. Thus, as an initial matter, while the line of questioning is premised on a figurine that is outside the proportions of the LEGO Minifigure figurine, Zuru's Local Rule 56(a)1 Statement of Facts paragraph 25 is broader in scope. In addition, when Knight is being questioned by counsel for Zuru about the ability of a competitor to design a figurine that has the capabilities for movement and attachment identified in the chart produced by Zuru's expert Loetz, Knight responds that "it appears that they can do any of those things in a totally new form, sculpted form." Def.'s Ex. 44, Elizabeth Knight Dep. Tr. Vol. 2, Feb. 4, 2022 at 279:23-24. Also, when Knight is asked by counsel for Zuru whether she "[c]an . . . point to a single other figurine that can do all the 15 things identified . . . [in] Mr. Loetz's

report but that has . . . a totally new form," Knight responds: "I mean, the LEGO brand has designed a figure. I haven't seen a new design. Somebody can do it." Id. at 280:6-10, 280:15-17. Then in response to a follow up question, she states: "I don't know everything that's being done and what opportunities there are for companies to create new figures, but anything is possible." Id. at 280:22-25. Thus, Knight's deposition testimony relied on by Zuru fails to create a genuine issue of material fact with respect to the question of whether competitors are put at a significant, non-reputational disadvantage.

Based on the foregoing, Zuru has failed to demonstrate that there is a genuine issue of material fact as to whether the Asserted Trademark is functional in a utilitarian sense because its aesthetic value lies in its ability to put competitors at a significant, non-reputational disadvantage.

### c. Fraud on the USPTO

Zuru claims that the Asserted Trademark is invalid because LEGO committed fraud on the USPTO. See Zuru, Inc.'s Answer and Countercls. ¶ 128 ("LEGO fraudulently and inequitably obtained . . . trademark . . . protections, including through material misrepresentations and/or fraudulent nondisclosures to the USPTO, and then knowingly and improperly asserted such invalid and/or unenforceable intellectual property rights against ZURU Inc. . . . ."). LEGO moves for summary judgment on this

-110-

defense/counterclaim. Zuru maintains that there is at least a genuine issue of material fact with respect to whether the Asserted Trademark is invalid as a result of fraud on the USPTO.

"Fraud in procuring a trademark registration . . . occurs when an applicant knowingly makes false, material representations of fact in connection with his application." MPC Franchise, LLC v. Tarntino, 826 F.3d 653, 658 (2d Cir. 2016) (omission in original) (quoting In re Bose Corp., 580 F.3d 1240, 1243 (Fed. Cir. 2009)). "[A] trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO." Id. at 659 (emphasis in original) (quoting Bose, 580 F.3d at 1245). "That is, to succeed on a claim that a trademark holder procured the mark by fraud, a plaintiff cannot merely show that the trademark holder 'should have known' that the application contained false statements of material fact." Id. (quoting Bose, 580 F.3d at 1244). "Moreover, the knowing misstatement must have been with respect to a material fact—one that would have affected the PTO's action on the applications." Orient Exp. Trading Co. v. Federated Dep't Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988) (emphasis in original). "A party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by 'clear and convincing evidence.'" MPC Franchise, 826 F.3d at 658 (quoting

Orient Exp., 842 F.2d at 653).

Zuru contends that LEGO made two fraudulent statements to the USPTO. First, Zuru points to the fact that:

> To obtain its asserted registration, Lego had to swear to the following:
>
>> [T]o the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive . . . .
>
> 15 U.S.C. § 1051(a)(3)(D).

Zuru Opp. Mem. at 50 (first alteration in original) (emphasis omitted).

Second, Zuru asserts that "[t]o attempt to make these showings, Lego submitted a sworn declaration." Id. Zuru points to paragraph thirteen of the Hecht Declaration where, as discussed above, Hecht stated, inter alia, "[t]he use of the mark of this application, that is, the Minifigure, has been substantially exclusive . . . ." Id. at 50-51 (quoting Hecht Declaration ¶ 13); see Part III.B.1.a.

With respect to the requirement that there be a false material representation, Zuru contends that LEGO told the USPTO that no other person had the right to use the mark even though it had made representations in the Best-Lock litigation "that Hasbro and Mega Bloks had a right to sell their figurines

-112-

because they were sufficiently 'different' from the minifigure (e.g., they were not 'identical' to the minifigure) . . . ." Zuru Opp. Mem. at 51. But, as LEGO explains, it "made no such statement in Best-Lock. Indeed, there was no trademark infringement claim at issue in Best-Lock . . . ." LEGO Mot. Reply at 33. In ruling on Zuru's motion to dissolve the preliminary injunction, the court set out the parts of the record in the Best-Lock case on which Zuru is relying. The record reflects that counsel for LEGO was responding to questions by Judge Haight during oral argument as to why LEGO had sued Best-Lock but had not sued Hasbro and Mega Bloks. The response to Judge Haight was that Best-Lock had been sued because its figure was identical to such an extent that you could use the same mold and it had the same exact dimensions and geometry. Consequently, in ruling on Zuru's motion to dissolve the preliminary injunction, the court found that "Zuru cannot show that a factual position taken by the LEGO Group in this case is clearly inconsistent with a factual position it took in Best-Lock." Lego A/S v. Zuru Inc., 2023 WL 2727552, at *5. Zuru's contention that LEGO represented that Hasbro and Mega Bloks had a right to sell their figurines rests solely on its interpretation of the record in Best-Lock, which the court has rejected. Thus, Zuru has failed to create a genuine issue with respect to this contention.

-113-

Zuru also contends that LEGO made a false material representation to the USPTO related to "Best Lock's 'use' of its figurine" because that was a "competitive use Lego failed to disclose to the Trademark Office." Zuru Opp. Mem. at 52. However, "[a] trademark applicant must disclose only those users who are known to have a right to use the same or a related mark." Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1353 (E.D.N.Y. 1994) (emphasis in original) (citing 37 C.F.R. 2.33(b)(1)). Also, "the fact that others used the mark does not, standing alone, establish that the applicant's use was not 'substantially exclusive.'" Victorinox AG v. B & F Sys., Inc., 114 F. Supp. 3d 132, 138 (S.D.N.Y. 2015) (quoting L.D. Kichler Co. v. Davoil, Inc., 192 F.3d 1349, 1352 (Fed. Cir. 1999)), aff'd sub nom. Victorinox AG v. B&F Sys., Inc., 709 F. App'x 44 (2d Cir. 2017), as amended (Oct. 4, 2017); see also Victorinox AG, 709 F. App'x at 48, as amended (Oct. 4, 2017) ("But, as the district court stated, other companies' use of the mark alone does not establish that Plaintiffs' use was not 'substantially exclusive.'").

With respect to materiality, Zuru simply asserts that "Lego fails to establish as a matter of law that its fraudulent statements were not 'material[.]'" Zuru Opp. Mem. at 52. But Zuru has the initial burden of production, and it has failed to point to evidence, or even make an argument, that supports its

position that notwithstanding the submissions by LEGO to the USPTO demonstrating advertising expenditures, sales success, attempts to plagiarize the mark, and the length of the mark's use, some question related to Best Lock about the exclusivity about the mark's use would have been material to the analysis by the USPTO. Zuru does not address the fact that "[n]o single factor among the six is determinative, and every element need not be proved." New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 315 (S.D.N.Y. 2010) (quoting Simon & Schuster, Inc. v. Dove Audio, Inc., 970 F. Supp. 279, 295 (S.D.N.Y. 1997)). Nor does Zuru address the fact that when Best-Lock introduced its product in 1998, LEGO's Minifigure figurine had been on the market for approximately 20 years. See RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc., 527 F. Supp. 3d 305, 318 (E.D.N.Y. 2021) ("[C]ourts often point to five years of exclusive use of a mark as evidence of secondary meaning.") (quoting Hello I Am Elliot, Inc. v. Sine, No. 19 CIV. 6905 (PAE), 2020 WL 3619505, at *10 (S.D.N.Y. July 2, 2020) (citing cases)). It simply cites to City of New York v. Tavern on the Green, L.P., 427 B.R. 233, 242-43 (S.D.N.Y. 2010) for the proposition that "deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark." See Zuru Opp. Mem. at 52.

Thus, Zuru has not created a genuine issue as to whether LEGO made a false material representation. Nor has it created a genuine issue as to whether there is clear and convincing evidence that LEGO knowingly made a representation with the intent to deceive the USPTO. It simply asserts that it has "has proffered substantial evidence of Lego's knowingly inconsistent representations." Zuru Opp. Mem. at 51. The facts here are far removed from those in MPC Franchise where, among other things,

> Tarntino was well aware that he was merely a one-third owner of the [corporation that in turn owned Pudgie's Horseheads]. Tarntino's misstatement of ownership was not a mistake . . . . Tarntino was not attempting to register the mark on behalf of the corporation in which he was a part owner; he registered it for himself.

826 F.3d at 661 (alteration and omission in original) (quoting MPC Franchise, LLC v. Tarntino, 19 F. Supp. 3d 456, 480 (W.D.N.Y. 2014)).

Based on the foregoing, LEGO has shown that it is entitled to summary judgment with respect to Zuru's defense/counterclaim that the Asserted Trademark is invalid due to fraud on the USPTO.

### d. Inconsistent Appearance

Zuru claims that the Minifigure Trademark is invalid because "LEGO's Minifigures have highly variable and inconsistent appearances." Zuru, Inc.'s Answer and Countercls. ¶ 159. Zuru asserts that "[t]he trademark is . . . invalid because

the Lego Group has used inconsistent and varying forms of decorations on its minifigurine. . . . Because the minifigurine does not have a consistent look or appearance, it cannot be trademarked and cannot be protected by trade dress." Pls.' Ex. 11, Def. Zuru Inc.'s Resp. to Pls.' Second Set of Interrogs. (Nos. 8-17) at 27.

The registration and the prosecution history for the Asserted Trademark show that the mark consists of the three-dimensional configuration of a toy figure. Zuru cites no authority to support its position that the Minifigure figurine does not have a consistent look or appearance.

Moreover, as LEGO notes,

> the materials submitted to the Trademark Office in response to the office action show numerous examples of the Minifigure figurine with different decorations and accessories, see, e.g., Ex. 9 (Hecht Decl.) at Ex. A and B (showing Minifigure figurines with decorations evoking, inter alia, a town person, a mummy, an explorer, a construction worker, a sailor, a law enforcement officer, a sumo wrestler, a skier, a baseball player, a surgeon, a Viking, Dracula, and Santa Claus, to name a few).

LEGO Mot. Mem. at 69. The court agrees with LEGO that "ZURU cannot prevail on this defense because the [USPTO], in issuing the registration, concluded the Minifigure figurine was protectable despite the use of different colors and decorations." Id. at 69-70.

Based on the foregoing, LEGO has shown that it is entitled to summary judgment with respect to Zuru's defense/counterclaim

-117-

that the Asserted Trademark is invalid because LEGO has used varying forms of decorations on the Minifigure figurine.

### e. Abandonment

Zuru claims that the Asserted Trademark is invalid because "the purported mark has been abandoned." Pls.' Ex. 11, Def. Zuru Inc.'s Resp. to Pls.' Second Set of Interrogs. (Nos. 8-17) at 27. Zuru states:

> Lego does not dispute that Lego Juris A/S is a holding company that legally owns the asserted minifigure trade dress, and that Lego Systems, Inc. is the distributor of Lego construction toys bearing the asserted trade dress. . . . Yet Lego has failed to put forth any evidence that Lego Juris A/S has used the trade dress itself, or exercised control over the goods of Lego Systems, Inc.

Zuru Opp. Mem. at 68. In response, LEGO explains: "Based on the lack of deposition questions on this issue, minimal explanation in its interrogatory responses, and the LEGO Group producing 23 license, operating, and assignment agreements . . . , the LEGO Group did not think ZURU would pursue this . . . defense." LEGO Mot. Reply at 44, n.45.

Zuru has not identified any evidence that LEGO Juris A/S has not exercised control over the Minifigure figurine or the goods of LEGO Systems, Inc. Nor has it identified any evidence that would create a genuine issue as to whether, as LEGO maintains, 15 U.S.C. § 1055 applies here. That section provides: "Where a registered mark . . . is or may be used legitimately by related companies, such use shall inure to the benefit of the

-118-

registrant . . . and such use shall not affect the validity of such mark or of its registration . . . ." 15 U.S.C. § 1055.

On the other hand, LEGO explains that "[d]uring discovery the LEGO Group produced four license agreements between LJAS and LEGO System A/S ('LSAS'), the parent company of LSI, dating back to 2008." LEGO Mot. Reply at 44 (footnotes omitted). LEGO submits the four license agreements between LJAS and LSAS (the "License Agreements") and the operating agreement between LSAS and LSI, which was executed in 2007 (the "Operating Agreement"). See Pls.' Ex. 56, Supplemental Decl. of Jared Carr (ECF No. 285-3) ¶¶ 4-5; Pls. Ex. 56, Exs. A-E (ECF Nos. 285-4, 285-5, 285-6, 285-7, 285-8).

LEGO states, accurately:

The License Agreements and Operating Agreement demonstrate that LJAS owns and controls the Asserted Trademark, which mark is used by LSAS through the actions of its subsidiaries like LSI. Specifically, the License Agreements set forth certain quality control standards, namely, adherence to quality instructions issued by LJAS with respect to all LEGO products. See, e.g. Pls.' Ex. 56, Ex. D § 2.1. Moreover, the License Agreements provide that all trademark use by LSAS inures to the benefit of LJAS, and that LSAS must comply with the LEGO Group's "fair play" guide with respect to use of trademarks. See e.g., id. §§ 3.1, 3.8. The Operating Agreement entitles LSI to, inter alia, use all trademarks licensed to LSAS in its marketing of LEGO products and further specifies that the use shall take place according to the LEGO Group's policies for trademarks. Pls.' Ex. 56, Ex. E § 1.3.

Unredacted Reply Mem. in Further Supp. of Pls.' Mot. for Partial Summ. J. (ECF No. 284) ("Unredacted LEGO Mot. Reply") at 45

(footnotes omitted).

Based on the foregoing, LEGO has shown it is entitled to summary judgment with respect to Zuru's defense/counterclaim that the Asserted Trademark is invalid because it has been abandoned.

### 2. Second Element: Consumer Confusion

In evaluating the likelihood of confusion, courts in this circuit look to the Polaroid factors:

> (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith (or bad faith) in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers. Moreover, depending on the complexity of the issues, "the court may have to take still other variables into account."

Savin Corp. v. Savin Grp., 391 F.3d 439, 456 (2d Cir. 2004) (internal citation omitted) (quoting Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)). "[T]he list of Polaroid factors is not exclusive and the analysis of the factors is not a mechanical process." Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 70 (2d Cir. 1994) (citation and quotation marks omitted). "[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 130 (2d Cir. 2004) (internal quotation marks omitted) (quoting Lois

Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986)).

### a. Strength of the Mark

"When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce." CSL Silicones, Inc. v. Midsun Grp. Inc., 301 F. Supp. 3d 328, 356-57 (D. Conn. 2018) (citation and internal quotation marks omitted). "The Supreme Court has held that unlike word marks and product-packaging trade dress, product-design trade dress can never be inherently distinctive." Converse, Inc., 909 F.3d at 1116. In evaluating a mark's acquired distinctiveness, the court may examine "copying, advertising expenditures, sales success, length and exclusivity of use, unsolicited media coverage, and consumer studies (linking the name to a source)." In re Steelbuilding.com, 415 F.3d 1293, 1300 (Fed. Cir. 2005). "A showing of secondary meaning need not consider each of these elements. Rather, the determination examines all of the circumstances involving the use of the mark." Id.

With respect to advertising expenditures, LEGO has submitted the Hecht Declaration which, as discussed in Part III.B.1.a, was submitted to the USPTO in response to an office

action requesting evidence of acquired distinctiveness. See Pls.' Ex. 9. The Hecht Declaration establishes that between 1978 and the date of the Hecht Declaration, i.e. October 20, 2015, LEGO spent in excess of $200 million on advertising and promotion in the United States for LEGO toy sets containing LEGO Minifigures and for LEGO Minifigures sold separately. See id. ¶ 7.

LEGO has also submitted evidence in the form of the Hecht Declaration with respect to sales success. As discussed in Part III.B.1.a, the Hecht Declaration shows that total retail sales in the United States from 1978 to the date of the declaration for LEGO Minifigures, sold separately and in LEGO construction toy sets containing LEGO Minifigures, exceeded $1 billion. See id. ¶ 6. The Hecht Declaration establishes that from 1978 to the date of the declaration, the approximate number of LEGO Minifigures sold in the United States (separately or in construction toy sets) exceeded 120 million, and the number of worldwide sales of LEGO Minifigures exceeded four billion. See id. ¶¶ 5-6.

With respect to length and exclusivity of use and copying, LEGO has submitted evidence also in the form of the Hecht Declaration. The Hecht Declaration establishes that the Minifigure was first sold in 1978 and LEGO's use of it "has been substantially exclusive, that is, only by The LEGO Group, apart

-122-

from uses by occasional small infringers, which The LEGO Group usually polices." Id. ¶ 13. With respect to copying, the court in Best-Lock concluded that "no reasonable trier of fact could determine that Best-Lock did not actually copy Lego." 404 F. Supp. 3d at 608.

As is also discussed in Part III.B.1.a, while the Hecht Declaration makes no mention of consumer studies or unsolicited media coverage linking the Asserted Trademark to a source, it does reflect that "LEGO Minifigures are so popular that there is an industry of producing products that facilitate collecting them." Pls.' Ex. 9 ¶ 10. Consumers' familiarity with LEGO Minifigures has been reinforced by a variety of books, sticker books, video games, and movies for children.

Zuru argues that LEGO's "purported evidence of the strength of its asserted trade dress . . . is inadmissible as hearsay and because it is testimony from an undisclosed witness." Zuru Opp. Mem. at 60. However, as discussed in Part III.B.1.a, Zuru's argument that LEGO cannot rely on statements in the Hecht Declaration lacks merit.

Zuru argues that "[t]here is no evidence that Lego has a strong mark in the body form of a blank, undecorated minifigure." Zuru Mot. Mem. at 54. Zuru asserts that "Lego's admissions, including that the body form is a 'broadly generic,' 'perfect blank canvas,' for Lego's signature head coloring,

-123-

decorations, and accessories to be added, further shows that any 'strength' in the 'appearance' of the Lego minifigure is based on features that are not protected by Lego's trade dress . . . ." Id. But, as LEGO points out, "ZURU cites no authority for its position that varying decorative elements render the Minifigure figurine trade dress unrecognizable." LEGO Opp. Mem. at 54. As LEGO also points out, the USPTO "registered the Minifigure figurine trade dress despite being aware of the various ways in which the Minifigure figurine may be adorned." Id. Exhibits A and B to the Hecht Declaration, which show LEGO Minifigures with various decorations, support LEGO's contention. See Pls.' Ex. 9, Ex. A and B. Zuru also argues that "Lego's trade dress is not distinctive . . . and it is not 'exclusive,' particularly in consideration of the Kre-O and Mega Bloks figurines that Lego admits are lawful competition despite their 'very similar' appearance." Zuru Opp. Mem. at 60. However, as discussed in Part III.B.1.a, that argument lacks merit.

Based on the foregoing, there is no genuine issue as to this factor, and it supports the conclusion that there is a likelihood of confusion.

### b. Degree of Similarity Between the Two Marks

"Similarity" turns on whether the competing marks create the "same general overall impression" when viewed separately. Paco Rabanne Parfums, S.A. v. Norco Enters., Inc., 680 F.2d 891,

893 (2d Cir. 1982) (quoting RJR Foods, Inc. v. White Rock Corp., 603 F.2d 1058, 1060 (2d Cir. 1979)). Courts consider "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers." Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 962 (2d Cir. 1996).

Zuru argues that it "has ample evidence, including expert analysis and Lego's admissions, showing Zuru's figurines are different from the minifigure with respect to every possible 'design feature' . . . ." Zuru Opp. Mem. at 61. See also Zuru Mot. Mem. at 55. Zuru argues further that it

> also has evidence showing the parties' figurines are not "similar," and are highly distinguishable, when features other than the asserted trade dress—such as the minifigure's signature "yellow head" and facial decorations, which do not appear on Zuru's figurines, and their different product packaging, branding, and labeling—are considered. (Zuru SOF Ex. 7[)]; (Loetz Report at pp. 66-73.)

Zuru Opp. Mem. at 61.

The expert analysis relied upon by Zuru is that done by its expert Loetz. Zuru maintains that "the evidence establishes that the minifigure's potentially protectable features (if there are any) are not present in the Zuru figurines . . . ." Zuru Mot. Mem. at 55. Loetz begins his analysis on this issue as follows:

> 117. At the outset of this discussion, it is notable that each of the elements of the Lego minifigure that Lego claims are part of its protected design look different on the Zuru Max figurine. Specifically, Lego describes what

its trademark in the minifigure "consists of" as follows (the internal numbering was added by me):

> THE MARK CONSISTS OF THE THREE-DIMENSIONAL CONFIGURATION OF A TOY FIGURE FEATURING (1) A CYLINDRICAL HEAD, (2) ON TOP OF A CYLINDRICAL NECK, (3) ON TOP OF A TRAPEZOIDAL TORSO OF UNIFORM THICKNESS, WITH FLAT SIDES AND A FLAT BACK, WHERE ARMS ARE MOUNTED SLIGHTLY BELOW THE UPPER SURFACE OF THE TORSO, (4) ON TOP OF A RECTANGULAR PLATE, (5) ON TOP OF LEGS WHICH BULGE FRONTWARDS AT THE TOP AND ARE OTHERWISE RECTANGULAR WITH UNIFORM THICKNESS, (6) ON TOP OF FLAT SQUARE FEET.

118. Of these supposedly "trademarked" features of the minifigure, Lego considers three of them to be the "essential characteristics that define a minifigure": (i) the shape of the head; (ii) the shape of the torso; and (iii) the shape of the foot. (Minifigure Guidelines at 11.)

119. As shown below with respect to both the first and second generation Zuru Max figurines, none of these supposedly trademarked "essential characteristics" of the Lego minifigure are present in the Zuru figurines.

Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶¶ 117-19 (footnote omitted).

As discussed in Part III.A.2.b, Federal Rule of Evidence 702 "establishes a standard of evidentiary reliability . . . requir[ing] a valid connection to the pertinent inquiry as a precondition to admissibility . . . [and] a reliable basis in the knowledge and experience of the relevant discipline." Kumho Tire Co., Ltd., 526 U.S. at 149 (internal quotations and citations omitted). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos, 303

-126-

F.3d at 266.

Loetz compares the Minifigure figurine to the First Generation MAX Figure. He observes that "[t]he only similarity is the internal shape of the 'c-cup' hand which, in my understanding, is not an element of the Lego minifigure that Lego claims it has exclusive rights to use . . . ." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 121. Loetz compares the head shape of a LEGO Minifigure and that of the First Generation MAX Figure and shows "that the Zuru figurine head is distinct from the Lego minifigure head in shape, size, color, and decorations." Id. ¶ 122. Next, Loetz compares the torsos of a LEGO Minifigure and the First Generation MAX Figure and points out a number of "differences in the shapes of the torsos of the figurines." Id. ¶ 127. For example, "[t]he Zuru figurine's neck has a ball joint to allow for a wider range of movement for the connected head," and "[t]he Zuru figurine's shoulders have a ball joint connection for a wider range of movement for the connected arms." Id. He concludes that "[o]verall, the difference in the shapes of the torsos is a defining distinction." Id. ¶ 128. Finally, Loetz compares the legs and feet of a LEGO Minifigure and the First Generation MAX Figure. He concludes that

> [a]ccording to the Lego trademark registration, the legs of the minifigure "bulge frontwards at the top and are otherwise rectangular with uniform thickness," and the feet

-127-

> of the minifigure "are flat square feet." As shown below, the legs and feet of the first generation Zuru figurine do not share those characteristics.

Id. ¶ 129. He identifies several respects in which the characteristics of the legs and feet are different.

Loetz then concludes that "given that the 'essential' minifigure characteristics of the head, torso, legs, and feet are different in the first generation Zuru figurine and the Lego minifigure, the overall appearance of the figurines is likewise different, and reveals that the Zuru Max figurine has a unique design." Id. ¶ 132 (footnote omitted).

Loetz then performs an analysis using the same methodology with respect to the Zuru Second Generation figurines. He concludes: "Again, given the differences in each of the elements that comprise the 'essential characteristics' of the Lego minifigure, the overall appearance of the second generation Zuru Max figurine is different from the Lego minifigure." Id. ¶ 142.

Loetz also compares the First Generation MAX Figures and Second Generation MAX Figures to the image of the Asserted Trademark from the '968 Registration and states that his "analysis and opinions above about the differences between the appearance and design of the Zuru Max figurines and the Lego minifigure apply comparably to the minifigures shown in the Lego registration[]." Id. ¶ 147.

However, the approach taken by Loetz is not a reliable foundation for his opinions, and they cannot be considered because "[w]hen evaluating the similarity of marks, courts consider the overall impression created by a mark. Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar." Brennan's, Inc., 360 F.3d at 133 (citing Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 117 (2d Cir. 1984)). From the very beginning of his analysis, Loetz makes it clear that he is juxtaposing fragments of each mark; in paragraph 117, he skips over the language about a three-dimensional configuration of a toy figure and begins numbering his version of the parts of the protected design with the cylindrical head, and then continues assigning numbers to other fragments. See Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 117.

LEGO, on the other hand, submits an analysis by its expert Knight that does not juxtapose fragments of each mark in determining whether the marks being compared are similar.

Knight explains that "[t]he Minifigure figurine's whole sculpture (e.g., cylindrical head and body features, including torso, arms, and legs) represents a human figure and comprise the total look and feel of the sculptures." Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 45. Knight shows a First

Generation MAX Figure side-by-side with the Minifigure figurine. Knight then shows a LEGO Minifigure and a First Generation MAX Figure side-by-side from a front view, a side view, and a back view. Knight then shows silhouettes of a LEGO Minifigure and a First Generation MAX Figure next to each other and then, next to that, the results of an overlay of the two silhouettes from three perspectives: a top view, a front view, and a side view. The overlays support Knight's conclusion, which is:

> By reviewing an overlay of each figure, you can see that the basic elements of height, width, head size and proportion of head to bodies are almost identical. These similarities in terms of scale and proportion, i.e. the length of the leg, the shape of the leg, the proportions or size of the torso and the head, are all part of the overall look and feel of the figure. Tiny differences do not change the overall look and feel of the figure. The ordinary observer or consumer would not notice the differences between the figures and would consider them to be almost identical.

Id. ¶ 46.

Knight also compares the Minifigure figurine and the Second Generation MAX Figure side-by-side from a front view, a side view, and a back view. She also includes at each point of her analysis the First Generation MAX Figure. Knight then shows silhouettes of the Minifigure figurine and the Second Generation MAX Figure next to each other and then, next to that, the results of an overlay of the two silhouettes from three perspectives: a top view, a front view, and a side view. The comparison of the overlays of the silhouettes supports her

conclusion that "it is clear that there are few small shape differences. . . . [L]ooking at the overall appearance it is in an irrefutable conclusion that the figurines are substantially, and confusingly, similar." Id. ¶ 51. Knight then shows overlays of silhouettes of the First Generation MAX Figure and the Second Generation MAX Figure. The comparison of these overlays supports her conclusion that "[w]hen silhouettes of the [First Generation MAX Figure] and the [Second Generation MAX Figure] are layered upon each other, it is clear that ZURU made very little changes to the [First Generation MAX Figure]." Id. ¶ 52.

Knight shows images that illustrate the amount of material added to and removed from the First Generation MAX Figure during the design of the Second Generation MAX Figure. These images, shown in paragraph 53 of her report, support her conclusion that "[t]he following images below illustrate the minimal amounts of material added to and removed from the [First Generation MAX Figure] during the design of the [Second Generation MAX Figure]." Id. ¶ 53.

Finally, Knight includes a side-by-side comparison of the Minifigure figurine and the Second Generation MAX Figure, with annotations pointing to the differences between the two that have been highlighted by Zuru. She notes that the Minifigure figurine is 40.33 millimeters high and the head is 21 percent of that figure, so the "[p]roportion of head size to stature [is]

-131-

equivalent to a 3 year old child," and she shows that the Second Generation MAX Figure is 41.6 millimeters high and the head is 27 percent of that figure, so the "[p]roportion of head size to stature [is] equivalent to a 1 year old child." Id. ¶ 53. Knight's analysis supports her conclusion that "[t]he similarities between the ZURU figurines and Minifigure figurine are prominent whereas the differences are negligible and would not be perceived by an ordinary observer, which is an adult purchaser of the toys. Adult purchasers do not inspect individual details of the figurines close enough to recognize any differences." Id. ¶ 57. Loetz does not dispute that the toys are displayed in product packaging, nor that adult purchasers of toys generally do not inspect individual details closely enough to recognize differences.

In his rebuttal report, Zuru expert Loetz argues that Knight's "overlays are flawed and do not support her opinion." Def.'s Ex. 75, Rebuttal Report of Lee Loetz (ECF No. 236-2) ¶ 96. With respect to Knight's comparison between the Minifigure figurine and the First Generation MAX Figure, Loetz states:

> 97. As an initial matter, and without any explanation, Ms. Knight altered the shapes of the Lego and Zuru figurines that she used in her overlays. . . . In particular, the images of the Zuru figurines that Ms. Knight used have sharper and more angular shapes than the actual Zuru figurines, which, other than the feet on the first-generation Max figurines, lack squares, rectangles, or sharp angles. In other instances, Ms. Knight simply changed the shape of the figurines.

-132-

98. For example, Ms. Knight's side-view of the minifigure on page 24 obscures the round "bulge" on the top part of the legs that is specifically identified by Lego as being a (supposedly) trademarked feature of the minifigure—and that is not present on the Zuru figurines. The feet of the minifigure in Ms. Knight's image are also misshapen, as they are taller than, and fail to depict the sharp rectangular shape of, the actual feet of the minifigure.

99. Ms. Knight's "side view" of the Zuru figurine shown on page 24 (which appears to be intended to depict a first-generation Max figurine) is also modified and deformed. In Ms. Knight's image, the body of the Zuru figurine gently slopes inward at the waist area, but this is not an actual feature of the Zuru figurine. Likewise, the legs of the figurine in Ms. Knight's image show a concave slope, whereas the legs of the actual Zuru figurine do the opposite.

Id. at ¶¶ 97-99. However, Loetz does not support any of his points with any illustrations or overlays of the figurines of his own. One is required to closely scrutinize the images used by him to determine whether there is any validity to the points he makes, and the fact that such close scrutiny is required reinforces, rather than detracts from, Knight's ultimate conclusion.

With respect to Knight's comparison of the Minifigure figurine and the Second Generation MAX Figure, Loetz states:

The images of the Zuru figurines on page 28 are also different from the actual figurines. For example, Ms. Knight's image of the front view of the second generation Zuru figurine has a different torso from the actual second generation figurine, in that it is either wider than or the same width at the waist than the shoulders, whereas the actual figurine is more narrow at the waist. Likewise, the "chin" of the second generation figurine in Ms. Knight's sideview image is more angular and "sharp" than on the actual figurine, which has a curved chin. And the arms as

-133-

shown on the side view of the Zuru figurines are bent to a greater degree than the actual arms of the Zuru figurines. Id. at ¶ 100. Here, Loetz does provide an illustration, and it shows an "Actual Zuru Max Second Generation Figurine" next to a "Knight Drawing of Zuru Max Second Generation Figurine" with an overlay. Id. at ¶ 101. However, once again, one is required to closely scrutinize Loetz's overlay to determine whether there is any validity to the point he makes; again this requirement of close scrutiny reinforces Knight's ultimate conclusion. In addition, Loetz's criticism of the diagram in paragraph 49 of Knight's report cannot be applied to the depiction of the Second Generation MAX Figure shown by Knight beginning at paragraph 54 of her report (and the following paragraphs), where she states her conclusions regarding similarities.

Thus, Loetz has identified potential fodder for cross-examination, but he fails to create a genuine issue as to whether the approach taken by Knight to her overlay analysis is a reliable foundation for her opinions.

Zuru argues that it

also has evidence showing the parties' figurines are not "similar," and are highly distinguishable, when features other than the asserted trade dress—such as the minifigure's signature "yellow head" and facial decorations, which do not appear on Zuru's figurines, and their different product packaging, branding, and labeling—are considered. (Zuru SOF Ex. 7[)]; (Loetz Report at pp. 66-73.)

Zuru Opp. Mem. at 61. Loetz opines that "the paint, coloring, and decorations (in addition to body design differences) on the Zuru figurines further differentiate the Zuru figurines from the Lego minifigure depicted in the Lego Asserted Trademark, which is simply the 'blank canvas' form of the minifigure." Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 149. However, as LEGO points out, Zuru's argument that "the yellow head and different facial features of the Minifigure figurine somehow changes [the] conclusion . . . is yet another improper attempt to dissect the relevant marks, and is also unavailing because neither of those features are claimed in the Asserted Trademark." LEGO Mot. Reply at 40 (footnote omitted).[7]

Zuru also argues that "[b]ased on evidence cited [in the section of Zuru's memorandum discussing substantial similarity in the context of copyright infringement], including Lego's binding admissions from Best Lock that the Kre-O figurine is a 'different expression,' no reasonable juror could find that Zuru's figurines are similar to the minifigure in any protectable (non-functional) expressions." Zuru Mot. Mem. at 55. However, as discussed in Part III.A.2.b, the court has already

---

[7] LEGO also points out that "[d]espite ZURU's continued efforts to point to the yellow head of some Minifigure figurines, no color is claimed in the Asserted Trademark, and the LEGO Group makes many Minifigure figurines which do not contain the yellow head. Moreover, the LEGO Group has a trademark registration for the yellow head (U.S. Reg. No. 4520327), which it did not assert in this action." LEGO Mot. Reply at 40, n.40.

ruled against Zuru on that argument. See Lego A/S v. Zuru Inc., 2023 WL 2727552, at *5.

Finally, Zuru argues that the testimony of "Lego's own corporate designee on the topic of 'Lego's use of its Asserted Trademarks,'" shows "that Lego itself recognizes that Zuru's figurines do not capture the 'overall look and feel' of the minifigure." Unredacted Zuru Mot. Mem. at 42-43. Meghan Blair is a brand design specialist whose job is to "look[] after and manag[e] the expression of the LEGO brand across experiences." Pls.' Ex. 47, Meghan Blair Dep. Tr., June 24, 2021 (ECF No. 263-9) at 17:3-6. She was LEGO's corporate designee on "LEGO's use of its Asserted Trademarks in the U.S. since January 1, 2016, including but not limited to in products, marketing and advertising." Redacted Pls.' Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J. Resp. to ¶ 54. Her deposition was taken by video and she was shown a series of two-dimensional images. She "commented from her perspective as a specialist in design, including minute details of the LEGO Minifigure figurine." Unredacted Pls.' Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J. Resp. to ¶ 54. She pointed out the differences as being "the shape of the legs is more rounded, the shape of the arms has a larger biceps, the shape of the chin has softness to it, that's not as squared off cylindrically as the mini[]figure head," and that the "[s]hape of the torso . . .

-136-

looks like it has a different angle on the sides and isn't a purely trapezoidal shape like the mini[]figure torso." Def.'s Ex. 37, Meghan Blair Dep. Tr., June 24, 2021 (ECF No. 236-10) at 125:15-126:2. Blair's job is to ensure that the Minifigure figurine is depicted accurately and consistently in varying settings. Thus, her testimony is not probative on the question of what effect any similarity between the Minifigure figurine and Zuru's MAX Figures would have on prospective purchasers. Her testimony does not create a genuine issue of material fact with respect to this Polaroid factor.

Based on the foregoing, there is no genuine issue as to this factor, and it supports the conclusion that there is a likelihood of confusion.

### c. Proximity of the Products

The proximity of the products is concerned with the "competitive distance between the products." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1139 (2d Cir. 1979).

> The "proximity-of-the-products" inquiry concerns whether and to what extent the two products compete with each other. We look to the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold.

Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996) (internal quotation marks and citations omitted).

As to the nature of the products, it is undisputed that the LEGO Minifigures and the MAX Figures are toy figures. As to the class of customers to whom the goods are sold, it is also undisputed that the products are directed to the same class of customers, i.e. parents and children. As to the channels through which the products are sold, Zuru has admitted that "its figurines were displayed at Walmart retail locations in the United States in the same aisle as the Lego Group's products in at least some instances." Redacted Def.'s Local Rule 56(a)2 Statement of Facts in Opp'n to Pls.' Mot. for Summ. J. ¶ 49 (internal quotation marks omitted). Thus, LEGO has established that the two products compete with each other. See Rubik's Brand Ltd. v. Flambeau, Inc., No. 17CV6559PGGKHP, 2021 WL 363704, at *14 (S.D.N.Y. Jan. 31, 2021) (finding that the parties' products were in direct competition for the purpose of analyzing proximity because both products were 3x3 puzzle cubes sold in the same stores and "displayed and sold side by side in at least three retail settings"); Waddington N. Am. Bus. Tr. v. EMI Plastics, Inc., No. 02-CV-3781(FB), 2002 WL 2031372, at *1, *7 (E.D.N.Y. Sept. 5, 2022) (finding that the "defendant sells its products in the identical market and is in direct competition with plaintiff" where, inter alia, both parties "primarily sell their lines at wholesale to distributors" and "[t]he retail customers are primarily restaurants, caterers and grocers").

Zuru argues that this factor does "not support a finding of likely confusion because Zuru was admittedly—and upon Walmart's express request—trying to design a figurine that was 'completely compatible' with Lego," and "there is nothing wrong—i.e., illegal, immoral, or improper—with Walmart and Zuru undertaking this task, and to the contrary, consumers benefit from having additional options in their construction-toy systems." Zuru Mot. Mem. at 55. However, this argument does not address the considerations that are germane to the inquiry with respect to proximity of products.

Based on the foregoing, there is no genuine issue as to this factor, and it supports the conclusion that there is a likelihood of confusion.

### d. Likelihood that the Prior Owner Will "Bridge the Gap"

With respect to this factor, the court evaluates "whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, bridge the gap. If the senior user can show such an intention, it helps to establish a future likelihood of confusion as to source." Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1227 (2d Cir. 1987) (internal quotations marks and citation omitted). Here, there is no competitive gap to be bridged because both LEGO and Zuru already sell toy figurines and toy

-139-

construction products. Thus, this factor does not bear on the ultimate question of likelihood of confusion as to the source of the product.

### e. Actual Confusion

"For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." Sports Auth., Inc., 89 F.3d at 963 (internal quotation marks and citation omitted). But "actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." Lois Sportswear, U.S.A., Inc., 799 F.2d at 875.

LEGO maintains that "while not necessary, '[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.'" LEGO Mot. Mem. at 49 (alteration in original) (quoting Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987)) (further citation omitted). LEGO contends that "[i]n the short period of time the MAX Figurines were on the market, there were at least three instances of actual consumer confusion." Redacted Pls.' Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. ¶ 34. LEGO supports this statement with pages eight to ten of Exhibit 21, which are screenshots of Walmart.com and MAX Facebook reviews. See Pls.' Ex. 21 (ECF No. 243-21) at 8-10.

Zuru argues that "[e]ven if the documents are admissible, the hearsay comments related to brick products generally . . . , not to figurines specifically." Redacted Def.'s Local Rule 56(a)2 Statement of Facts in Opp'n to Pls.' Mot. for Summ. J. Resp. to ¶ 34. However, the comments identified by LEGO do relate to figurines. See Pls.' Ex. 21 at 8 ("Walmart has these and they are cheap. He loves these Legos and they have a big package of the little guys."); id. at 9 ("I saw these tonight at Walmart . . . they had a box of LEGO people."); id. at 10 ("He will definitely love the Lego people.").

Zuru also maintains that "even if the three comments showed meaningful 'confusion,' three comments of out 46,000 comments is de minimis and does not support a likelihood of confusion." Redacted Def.'s Local Rule 56(a)2 Statement of Facts in Opp'n to Pls.' Mot. for Summ. J. Resp. to ¶ 34. Three comments is not compelling evidence, but the comments are nonetheless relevant evidence.

"Evidence of actual confusion may consist of anecdotal or survey evidence." Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000), aff'd sub nom. Paco Sport, Ltd. v Paco Rabanne Perfumes, 234 F.3d 1262 (2d Cir. 2000). LEGO and Zuru have each proffered evidence on the question of likelihood of confusion in the form of surveys conducted by experts. LEGO expert Stephen Nowlis conducted four surveys, as

-141-

follows: (1) a survey that measured the extent to which the overall impression created a likelihood of confusion between First Generation MAX Figures and LEGO Minifigures at the point of sale ("2018 Point of Sale Survey"); (2) a survey that measured the extent to which the overall impression created a likelihood of confusion between Second Generation MAX Figures and LEGO Minifigures at the point of sale ("2019 Point of Sale Survey"); (3) a survey that measured the extent to which the overall impression created a likelihood of confusion between First Generation MAX Figures and LEGO Minifigures post sale ("2018 Post Sale Survey"); and (4) a survey that measured the extent to which the overall impression created a likelihood of confusion between Second Generation MAX Figures and LEGO Minifigures post sale ("2019 Post Sale Survey").

Zuru does not submit any survey evidence with respect to the First Generation MAX Figures, with respect to either the point of sale or post sale. Zuru expert Bruce Isaacson conducted a survey that measured the extent to which there was a likelihood of confusion between Second Generation MAX Figures and LEGO Minifigures at the point of sale. Zuru expert Matthew Ezell conducted a survey that measured the extent to which there was a likelihood of confusion between Second Generation MAX Figures and LEGO Minifigures post sale.

The objective of the surveys conducted by all three experts

-142-

was to measure "net confusion." "Net confusion is the difference between the likelihood of confusion found in the Test group and the likelihood of confusion found in the Control group (the Control group measures 'survey noise' and is thus subtracted from the Test group results)." Pls.' Ex. 22, Expert Report of Stephen M. Nowlis (ECF No. 243-22) ¶ 7 (footnote omitted); see also Def.'s Ex. 78, Rebuttal Report of Matthew G. Ezell (ECF No. 269-26) ¶ 3 (explaining that his survey results are "on a net basis after adjusting the survey results based on a proper control cell"). The likelihood of confusion for the test group is determined by having participants in the survey view MAX Figures. The likelihood of confusion for the control group is determined by having participants in the survey view a control figurine.

"When creating a survey control . . . a core principle is to create controls that share as many characteristics as possible with the test item, with the exception of any disputed characteristics." Def.'s Ex. 76, Rebuttal Report of Bruce Isaacson (ECF No. 269-24) ¶ 82 (citing Shari Seidman Diamond, Reference Manual on Scientific Evidence, Reference Guide on Survey Research, 399 (3d ed. 2011)). "Typically, this means that a control should be similar to the corresponding test item, except that the control should remove all disputed elements from the test item." Id. As explained by Nowlis,

18. It is very important that a likelihood of confusion survey uses an appropriate Control.

19. A Control is needed to account for what is known as "survey noise," and is similar in spirit to a placebo used to test, for example, a new medication.

20. Without a proper Control, there is no way to track the correct amount of survey noise, and thus no way to know the proper amount of survey noise to remove from a Test result to arrive at an overall level of net confusion (net confusion = Test percentage – Control percentage).

21. Without a proper Control, an individual reviewing the data generated by the survey will not be able to discern whether the results are due to confusion or survey noise.

22. It is critically important that the Control itself is not infringing. When a Control itself is infringing, it is not possible to generate an accurate level of net confusion.

Pls.' Ex. 22, Expert Report of Stephen M. Nowlis ¶¶ 18-22; see also Def.'s Ex. 78, Rebuttal Report of Matthew G. Ezell ¶ 3 (quoting Shari Seidman Diamond, Reference Manual on Scientific Evidence (3d ed. 2011)) ("In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.").

Nowlis's findings with respect to the four surveys he conducted were as follows:

a. For the 2018 Point of Sale Survey, net confusion was 20.0% (54.4% – 34.4%).

b. For the 2019 Point of Sale Survey, net confusion was 17.5% (41.7% – 24.2%).

c. For the 2018 Post Sale Survey, net confusion was 29.1% (70.4% – 41.3%).

d. For the 2019 Post Sale Survey, net confusion was 31.0%

-144-

(67.0% - 36.0%).

Pls.' Ex. 22, Expert Report of Stephen M. Nowlis ¶ 7.

Isaacson's findings with respect to the one survey he conducted were as follows:

16. Across Questions 1, 4, and 7, which measured confusion as to source and confusion as to connection or affiliation, 36.7% of respondents shown the test figurines provided a response referencing Lego, compared with 38.5% of those shown the control figurines. The net percentage, which is calculated as the test measure minus the control measure, is -1.8% (negative 1.8%). The negative net measure means that, compared with those shown the test figurines, a numerically greater percentage of respondents shown the control figurines answered that the figurines were made by Lego or by a company connected or affiliated with Lego.

17. Across those same questions, 48.2% of respondents shown the test figurines, and 42.5% of respondents shown the control figurines, provided a response that referenced a toy company other than Lego, including responses that mentioned either Zuru or other toy manufacturers.

Def.'s Ex. 6, Expert Report of Bruce Isaacson, Part 1 (ECF No. 239-6) ¶¶ 16-17 (footnotes omitted). Isaacson concluded that "[b]ased on the findings from my survey, I conclude that the Lego Measured Form, which is the trade dress measured in the survey, is not likely to cause relevant consumers to confuse the Zuru Max Build figurines measured in the survey with Lego." Id. ¶ 18.

Ezell's assignment was

to design and conduct . . . a survey to address the issue of likelihood of post-sale confusion with respect to the Zuru's MAX figures. Specifically, I was engaged to replicate a survey designed by Dr. Stephen Nowlis, his 2019

-145-

> Post Sale Survey design ("Nowlis Survey"), remedying its
> flawed control cell stimuli and adjusting the presentation
> of the test cell stimuli.

Def.'s Ex. 78, Rebuttal Report of Matthew G. Ezell ¶ 2. Ezell

concluded:

> Whereas the Nowlis Survey with its flawed control yielded
> 31% purported likelihood of confusion, the results of my
> replication survey evidence that, on a net basis after
> adjusting the survey results based upon a proper control
> cell, 7.8% of consumers of toy figures are likely to be
> confused as to the source, business affiliation or business
> connection of, or permission or approval of Zuru's MAX
> figures.

Id. ¶ 3. "This level of confusion supports a finding of no

likely confusion as it is below the threshold typically relied

on by courts." Id. (footnote omitted).

There are four areas where the experts offered by LEGO and

Zuru disagree about the ways in which their surveys were

conducted. The first three areas do not have an impact on the

admissibility of their opinions.

As to the first area of disagreement, "[i]n any survey,

including a likelihood of confusion survey, the universe of

respondents who complete the survey is one of the most important

and fundamental aspects of research design." Def.'s Ex. 76,

Rebuttal Report of Bruce Isaacson ¶ 32; see also Pls.' Ex. 22,

Ex. B, Rebuttal Report of Stephen M. Nowlis (ECF No. 243-23)

¶ 10 (footnotes omitted) ("The selection of a proper survey

universe/population is critical to conducting a proper

-146-

survey. For a test of forward confusion, the proper universe consists of potential purchasers of products or services sold by the junior user (Zuru).").

Isaacson contends that the survey universe constructed by Nowlis included respondents who are not relevant to this case. He states:

> Dr. Nowlis qualified a universe of respondents that is overinclusive. Respondents were qualified as purchasing "toy figures," which include many toys not relevant to this matter, including toys not likely to be purchased for children. In other respects, the universe is underinclusive, because two Nowlis Surveys qualified respondents as purchasing the toys only in either a physical retail environment (the 2018 Point of Sale Survey) or online (the 2019 Point of Sale Survey), even though these toys were sold both at physical retail and online, and other Zuru Max Build More toys currently are sold both at physical retail and online.

Def.'s Ex. 76, Rebuttal Report of Bruce Isaacson ¶ 17(i). Nowlis is equally critical of the survey universe used by Isaacson. He maintains that Isaacson did not focus on potential purchasers of the MAX Figures. He states:

> My survey population thus focused on consumers in the market for "toy figures," while Dr. Isaacson's survey focused on consumers in the market for "construction toys, building sets, figurines or minifigures." As Zuru's MAX Build More package clearly describes its product as "15 MAX FIGURES," (See Figure 1 below, underlining added), the correct survey population is in fact consumers who are in the market for "toy figures," which is how I defined my survey population in my surveys. On the other hand, Zuru's MAX Build More figures are not described on its packaging as either "construction toys," "building sets," "figurines," or "minifigures." As a result, it is clear that my survey focused on the type of product sold by the junior user (toy figures), whereas Dr. Isaacson's survey

did not.

Pls.' Ex. 22, Ex. B, Rebuttal Report of Stephen M. Nowlis ¶ 12.

Nowlis and Isaacson each give reasonable explanations for why they constructed their survey universe as they did, and these explanations appear to be based on their knowledge and experience. Thus, there is no issue here as to the inadmissibility of either of their opinions on this basis. Rather, the points raised would go to the weight the finder of fact would place on their opinions.

As to the second area of disagreement, Nowlis contends that Isaacson failed to approximate marketplace conditions in a number of ways. Citing a treatise, he asserts that "[i]t is axiomatic that 'the closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has.'" Id. ¶ 28 (footnote omitted). He asserts that "Isaacson did not allow survey respondents to see the back of the Zuru MAX Build More package. This is clearly a mistake, because in the actual marketplace, consumers are able to see the back of the package (and thus, the full package)." Id. ¶ 29. He also asserts that Isaacson's approach was flawed because

> Isaacson allowed respondents to take his survey on a smartphone. In fact, over half (53.6%) of his respondents took his survey when using a smartphone. This is also highly improper, because the images that respondents could see (the front of the box and closeups of the figures) in Dr. Isaacson's survey would have been small and potentially very difficult to see on a smartphone.

-148-

Id. ¶ 30 (footnote omitted). (Nowlis also asserts that the quality of the pictures shown to the respondents was "very poor," id. ¶ 31, but that is not self-evident from the images included in his report.) To the extent that Nowlis's criticism is valid, it is not a basis for finding that Isaacson's opinion is inadmissible. Rather, the points raised would go to the weight the finder of fact would place on his opinion.

As to the third area of disagreement, Isaacson asserts that "the leading nature of [Nowlis's] questions would tend to raise the survey's measures, by making it more likely that respondents would provide a single answer consisting of the first response that comes to mind, which was likely Lego." Def.'s Ex. 76, Rebuttal Report of Bruce Isaacson ¶ 71. Nowlis gives a detailed explanation for the reasons for structuring his survey as he did, and it appears he did so based on his knowledge and experience. Thus, to the extent that Isaacson's criticism is valid, it is not a basis for finding that Nowlis's opinion is inadmissible. Rather, the points raised would go to the weight the finder of fact would place on his opinion.

The fourth area of disagreement is whether the control figurines used by each expert in his survey or surveys was valid. Isaacson contends that "[t]he control figurines in the Nowlis Surveys were altered well beyond the elements disputed in this matter, making them invalid controls." Def.'s Ex. 76,

Rebuttal Report of Bruce Isaacson Part III. Isaacson explains that "a control should be similar to the corresponding test item, except that the control should remove all disputed elements from the test item. The controls in the Nowlis Surveys are invalid because they do not follow this principle." Id. ¶ 82.

Isaacson then quotes the description of the Asserted Trademark in the '968 Registration. See id. ¶ 83. Referring to that description, he states, "[a] valid control should change only these elements. However, in the Nowlis Surveys, the control images are substantially altered from the test images, and some of the alterations significantly change elements that are not related to the claimed trade dress." Id. ¶ 84 (emphasis added).

Isaacson then summarizes what he sees as the flaws in the control figurines used by Nowlis, as follows:

85.  The Nowlis Report displays the control images in that report's Figures 3, 4, 7, 8, 10, 12, 14, and 16. Comparing the control images to the test images indicates that the control figurines differ from the test figurines in ways that are not related to the claimed trade dress disputed in this matter, including the following:
    i.   The figurines in the control images have very large heads that are oversized, and also appear top-heavy or likely to make the figurine topple over.
    ii.  The figurines in the control images have rounded eyes, rather than squareshaped eyes.
    iii. The figurines in the control images have different expressions on their faces, which are much friendlier-looking than the expressions on the test figurines.

> iv.   The figurines in the control images have
>       articulated elbows and knees, rather than
>       straight elbows and knees, with much thinner
>       legs.
> v.    The figurines in the control images have
>       thinner feet that do not appear to have
>       sufficient size to fit stud-shaped holes that
>       connect to a brick.
> vi.   The figurines in the control images have
>       fingers that are longer than their thumbs,
>       while the test figurines have hands that are
>       symmetrical and u-shaped.

Id. ¶ 85 (emphasis added). In addition, he states that "changes were made to the control package that are also unrelated to the disputed claimed trade dress." Id. ¶ 86 (emphasis added).

Isaacson also conducted his own survey that measured the extent to which there was a likelihood of confusion between Second Generation MAX Figures and LEGO Minifigures at the point of sale. In his report, Isaacson states that his "control figurines were altered to modify elements from the test figurines that Lego has asserted are similar to elements of the Lego figurine shown and described in [the '968 Registration]." Def.'s Ex. 6, Expert Report of Bruce Isaacson, Part 1 ¶ 8. Isaacson explains:

> 10. My survey tested control versions of the Zuru Max Build
>     More figurines that were modified to remove or alter
>     features or product forms that are disputed as allegedly
>     similar to the Lego Measured Form. To create the control
>     figurines, staff at my firm, working under my
>     supervision, made the following alterations:
>     i.    The '968 registration describes figurines with
>           heads and necks that are cylindrical in shape. The
>           control figurines have heads that are angular in
>           shape, rather than cylindrical. The control

> > figurines' heads are larger than the test
> > figurines' heads to emphasize the angular head
> > shape.
>
> ii. The '968 registration describes figurines with "a
> trapezoidal torso of uniform thickness, with flat
> sides and a flat back." The control figurines have
> torsos that taper in from the shoulders toward the
> waist, and have angled or rounded sides.
>
> iii. The '968 registration describes figurines with
> arms that "are mounted slightly below the upper
> surface of the torso." The control figurines have
> arms attached either at the top of the torso, or
> slightly above the torso, and the arms are longer
> than those of the test figurines.
>
> iv. The '968 registration describes figurines with
> legs "which bulge frontwards at the top and are
> otherwise rectangular with uniform thickness, on
> top of flat square feet." The control figurines
> have tapered legs that are narrower toward the
> waist and wider toward the feet, and have rounded
> feet.
>
> v. Lego figurines are described as having a yellow
> cylindrical head. The control figurines have heads
> that are altered to be more angular than Lego's
> cylindrical figurine head. Also, the color of the
> heads on the control figurines is changed to gray.

Id. ¶ 10 (footnote omitted). The results of these "alterations"

are shown in Figure 3 in Isaacson's report. See id. ¶ 12. The

results of the alterations made by Nowlis in developing his

control images are shown in Figure 1 in Isaacson's rebuttal

report. Def.'s Ex. 76, Rebuttal Report of Bruce Isaacson at 6-

11.

Isaacson's report makes it clear that when he was designing

his control figurines, he did not take into account the

requirement that the court consider the overall impression

created by the Asserted Trademark when evaluating the similarity

of marks. As set forth in Brennan's, "[e]ach mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar." 360 F.3d at 133. See also Paco Rabanne Parfums, S.A. v. Norco Enters., Inc., 680 F.2d at 893. However, developing control figurines that would enable the court to only juxtapose fragments of the marks being compared is what Isaacson has done. This fact renders the control figurines used by Isaacson invalid.

Zuru expert Matthew Ezell conducted a survey that measured the extent to which there was a likelihood of confusion between Second Generation MAX Figures and LEGO Minifigures post sale. Ezell's report reflects that he used the same methodology that was used by Isaacson to develop control figurines. He states:

> In the control cell, survey respondents were shown the same images as the test cell but without the trade dress features that LEGO claims in its trademark registrations numbers 4,903,968 and 4,520,327. Specifically, the control cell toy images were modified to transform or remove the following features to the extent present in Zuru's MAX toy: "a trapezoidal torso of uniform thickness" with "flat sides," "torso[] on top of a rectangular plate, on top of legs which bulge frontwards at the top and are otherwise rectangular with uniform thickness, on top of...square feet" (Reg. No. 4,903,968); and "a cylindrical yellow toy figure head, on top of a yellow...neck" (Reg. No. 4,520,327). See images below or Appendix D page 115 for a larger view.

Def.'s Ex. 78, Rebuttal Report of Matthew G. Ezell ¶ 21. Ezell lists as modifications made in creating the control figurines

the following: "[d]esaturated color of bullet-shaped head to remove any yellow tint, resulting in a grayish color[;] [y]ellow neck not present[;] [f]urther tapered torso from shoulder to waist and emphasized curves of torso side[;] [a]rms mounted at or above upper surface of the torso[;] [t]orso mounted on rectangular plate . . . [n]ot visible in images shown[;] [t]apered legs from waist (narrower) to feet (wider)[;] [w]idth of D-shaped feet increased; flat feet needed for figure to stand." Id. at 9.

As did Isaacson, Ezell used control figurines that would enable the court to only juxtapose fragments of the marks being compared rather than the overall impression, as is required. Consequently, the control figurines used by Ezell are invalid.

As discussed in Part III.A.2.b, Federal Rule of Evidence 702 "establishes a standard of evidentiary reliability . . . requir[ing] a valid connection to the pertinent inquiry as a precondition to admissibility . . . [and] a reliable basis in the knowledge and experience of the relevant discipline." Kumho Tire Co., Ltd., 526 U.S. at 149 (internal quotations and citations omitted). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos, 303 F.3d at 266. Because the methodology used by Isaacson and Ezell

-154-

to develop control figurines is invalid, the foundation for their opinions on net confusion is not reliable and those opinions cannot be considered.

On the other hand, LEGO expert Nowlis has taken into account the overall impression created by the Asserted Trademark and designed control figurines that change the element that is disputed here, i.e. the overall impression created by the mark. Consequently, Nowlis's survey evidence is admissible.

Therefore, Zuru cannot rely on the expert evidence proffered by Isaacson and Ezell to create a genuine issue with respect to the question of whether there is consumer survey evidence showing that there is no likelihood of confusion as to source, but LEGO can rely on Nowlis's consumer surveys as evidence of a likelihood of confusion as to source. Because what is at issue then is LEGO's motion for summary judgment, the court must assess the record in the light most favorable to Zuru and drawing all reasonable inferences in its favor. See Weinstock, 224 F.3d at 41. While Nowlis's opinion is admissible, Zuru has proffered evidence that the universe of survey respondents constructed by Nowlis included respondents who are not relevant to this case and evidence that the nature of the questions used by Nowlis skewed the results of his surveys. A reasonable jury could credit these criticisms of the surveys done by Nowlis and conclude that it will place no weight on

Nowlis's conclusion that his surveys show a likelihood of confusion as to source. Therefore, the court does not consider Nowlis's consumer survey evidence in analyzing whether this factor supports a conclusion that there is a likelihood of confusion.

Based on the foregoing, all that should be considered at the summary judgment stage with respect to this factor is the very limited evidence of actual confusion. Thus this factor provides very limited support to the conclusion that there is a likelihood of confusion, and it should be not be given material weight.

### f. The Defendant's Good Faith (Or Bad Faith) in Adopting Its Own Mark

To evaluate this factor, the court "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang v. Ret. Living Pub. Co., 949 F.2d 576, 583 (2d Cir. 1991) (internal quotation marks and citation omitted). "[A]ctual or constructive knowledge may signal bad faith." Mobil Oil Corp., 818 F.2d at 259 (emphasis in original). "Bad faith can be found where prior knowledge of the senior user's mark or trade dress is accompanied by similarities so strong that it seems plain that deliberate copying has occurred." U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800

-156-

F. Supp. 2d 515, 536 (S.D.N.Y. 2011), aff'd, 511 Fed. App'x 81 (2d Cir. 2013).

As discussed in Part III.A.2.a, direct evidence shows that there is no genuine issue as to the fact that Zuru actually copied the Minifigure figurine. Zuru admits that it had knowledge of the Asserted Copyrights and Asserted Trademark when it designed the MAX products, and further admits that it had knowledge of the Minifigure figurine at the time it designed the MAX products, including the MAX Figures. In addition, Zuru's Chief Operations Officer Mowbray admits that in its Private Brand Proposal to Walmart in March 2017, Zuru was "clearly using [LEGO Minifigures] as placeholders." Pls.' Ex. 10, Anna Jane Mowbray Dep. Tr. Vol. 2, June 9, 2021 at 332:11-12. Also, documents in Zuru's design file compare the MAX Figures to LEGO Minifigures. See Pls.' Ex. 19, Dep. Ex. 257.

LEGO states that "ZURU clearly knew that designing the Infringing MAX Figurines could cause confusion which is why there were purportedly conversations during the design stage about needing to be 'further away from, for example, LEGO' and efforts to look 'more different than LEGO.' Ex. 13 (Chan Dep.) at 223; 274-75." Unredacted LEGO Mot. Mem. at 53. Zuru maintains that Chan's testimony "that Zuru wanted to make its figurines 'more different' and 'further away' from the minifigure" shows that Zuru was acting in good faith. Zuru Mot. Reply at 21.

However, Chan's deposition testimony reflects that at the point in time to which she was referring, Zuru had been put on notice that it could not sell the First Generation MAX Figures because "the Minifigure figurine is substantially similar in overall impression to the" First Generation MAX Figures. Ruling on Mot. for Prelim. Inj., LEGO A/S v. ZURU Inc., No. 3:18-CV-2045(AWT), 2019 WL 4643718 at *8 (D. Conn. July 8, 2019). See Pls.' Ex. 13, Coco Chan Dep. Tr. Vol. 2, Aug. 31, 2021 at 274:7-12 ("So we are receiving the information that we cannot sell the first generation. So we are looking at different options and what we can do to get even further away from the first generation. And then to see how we can be – like, look more different than LEGO."). But even though Zuru had been put on notice that its product was legally required to have a different overall impression, it continued to focus on making minor changes to discreet parts of the MAX Figures. See id. at 274:14-17 ("Like we experiment different heads, different body shape, different arm shape, different leg shape, different height of the character.")

Zuru argues that LEGO "admits there was nothing wrong with Zuru 'looking at' the minifigure when designing its figurines, and that, in fact, there is no other way for a competitor to design a product that is 'completely compatible' with Lego." Unredacted Zuru Mot. Mem. at 57. However, the evidence submitted

by LEGO shows that Zuru did not simply look at the Minifigure figurine, but looked at it and then developed a product that has similarities so strong that they support the conclusion that deliberate copying occurred.

> Zuru also argues that it is

> undisputed that Zuru did not incorporate the signature "yellow head" of the minifigure (SOF 57), that Zuru changed all the "essential characteristics" of the minifigure (SOF 53), and that Zuru did not copy Lego branding in any way (and instead added "Max" branding to the back of its second-generation figurine) (SOF 58)

id., and this shows that it did not act in bad faith. However, as LEGO points out, it is immaterial that Zuru did not incorporate a yellow head because the Asserted Trademark "covers the three-dimensional configuration of the Minifigure figurine, and does not claim any color. See Pls.' Ex 7. Further, the MAX branding on the back of the Redesigned Figurines did little to mitigate any potential for confusion, especially where such branding is not visible at the point of sale." LEGO Opp. Mem. at 56-57 (footnote omitted).

> Finally, Zuru argues that LEGO expert Knight

> disavowed [her prior opinion] and testified that she "does not know what their intention was," and that "[i]t seems possible to me" that Zuru's actual intent was to "come as close to the Minifigure as it could without infringing on Lego's rights"—which is the opposite of an intent to infringe Lego's trade dress by causing confusion. (SOF 59.)

Unredacted Zuru Mot. Mem. at 57. The prior opinion to which Zuru refers is Knight's opinion that "the only reasonable conclusion

is that ZURU intentionally copied the Minifigure figurine when designing the ZURU Figurines." Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 10(c). The court agrees with LEGO that Zuru's argument "mischaracterizes the cited testimony." Redacted Pls.' Local Rule 56(a)2 Statement in Opp'n to Def.'s Mot. for Summ. J. Resp. to ¶ 59. Knight never disavowed her opinion that the only reasonable conclusion is that Zuru intentionally copied the Minifigure figurine when designing the MAX Figures. During her deposition, she was asked whether it was her opinion that Zuru "wanted to cause confusion in the marketplace between its figurines and LEGO's figurines," and she responded, "I don't know what their intention was." Def.'s Ex. 43, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 at 168:16-18, 21-22. She was asked, "you say a number of times that ZURU intentionally copied the Minifigure, correct?" and her response was, "[i]t appears that they did." Id. at 168:24-25, 169:2-3. When Knight was asked whether it was her opinion that Zuru "wanted to come as close to the Minifigure as it could without infringing on LEGO's rights," she responded, "[i]t seems possible to me." Id. at 225:13-16. Thus, Knight never disavowed her opinion that the only reasonable conclusion is that Zuru intentionally copied the Minifigure figurine when designing the MAX Figures.

Based on the foregoing, there is no genuine issue as to

this factor, and it supports the conclusion that there is a likelihood of confusion.

### g. Quality of the Defendant's Product

This factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." Sports Auth., Inc., 89 F.3d at 965 (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 398 (2d Cir. 1995)). "Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1079 (2d Cir. 1993).

LEGO and Zuru both produce evidence with respect to this factor. LEGO submits a quality inspection report for a batch of MAX Figures that shows there were issues with, inter alia, clutch and dislocation. See Pls.' Ex. 27 (ECF No. 247-10). But, as Zuru points out, LEGO does not provide any evidence that the batch that was being tested was ever released or sold. Also, Zuru contends that "this document actually shows Zuru's commitment to quality, by conducting the test and indicating the affected batch should be put on hold." Unredacted Def.'s Local Rule 56(a)2 Statement of Facts in Opp'n to Pls.' Mot. for Summ. J. (ECF No. 267-1) Resp. to ¶ 52.

LEGO submits the opinion of its expert Knight that "[t]he ZURU Figurines have inferior quality when compared to the Minifigure figurine." Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 81. In addition, LEGO submits the following testimony of David Buxbaum, LEGO's vice president of Global Amazon Marketing and Commerce: "You can just tell that the clutch power on [the MAX Figure] is . . . not up to the what we would call our quality standards." LEGO Mot. Mem. at 53 (ellipsis in original) (quoting Pls.' Ex. 16, Tr. of Hr'g on Mot. for TRO, Dec. 14, 2018 (ECF No. 243-16) at 38:19-21). But ZURU submits the opinion of its expert Loetz, who states:

> I have played with Zuru's figurines extensively and do not believe they look or work like a "cheap" toy (i.e., a poorly constructed or poor quality toy). Instead, I find them to be of high quality, comparable to the Lego minifigure (albeit at a lower cost), and that they attach securely to studded bricks in a seated and standing position.

Def.'s Ex. 7, Ex. A, Expert Report of Lee Loetz ¶ 131; see also Def.'s Ex. 75, Rebuttal Report of Lee Loetz ¶ 140 ("I do not believe the Zuru figurines are poor quality products.")

LEGO submits evidence in support of its contention that "[i]n 2019, Walmart Canada was not willing to leave its current supplier for its house brand construction toys because ZURU needed to improve the clutch factor for the MAX line." Unredacted Pls.' Local Rule 56(a)1 Statement in Supp. of Their Mot. for Summ. J. (ECF No. 247) ¶ 53; but see also Pls.' Ex. 28,

James Nunziati Dep. Tr., June 16, 2021 (ECF No. 247-11) at 192:23-24 (suggesting that while the Walmart's Canada team thought Zuru needed to improve the clutch factor, Walmart's U.S. team had "a different opinion of the clutch"). Zuru submits evidence in support of its contention that "Lego itself admitted that Zuru has a reputation with retailers for a quality product, something that differentiates it with knockoffs that enter the market at a similar time." Redacted Def.'s Local Rule 56(a)2 Statement of Facts in Opp'n to Pls.' Mot. for Summ. J. Resp. to ¶ 52 (internal quotation marks omitted); see Def.'s Ex. 36 (ECF No. 236-9).

Based on the foregoing, there is a genuine issue of material fact as to this factor.

### h. Sophistication of the Buyers

"This final factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." Arrow Fastener Co., 59 F.3d at 398. "In evaluating the sophistication of the buyers, 'the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone.'" Pro. Sound Servs., Inc. v. Guzzi, 349 F. Supp. 2d 722, 735 (S.D.N.Y. 2004) (quoting McGregor-Doniger, 599 F.2d at 1137), aff'd, 159 F. App'x 270 (2d Cir.

-163-

2005).

There is no genuine issue as to the fact that Zuru's "intention with its [MAX] figurines was to target the price-conscious customers (including parents and their children) who might not be able to afford, or want to pay for, the high-priced construction brick and figurine products offered by [LEGO]." Redacted Def.'s Local Rule 56(a)2 Statement of Facts in Opp'n to Pls.' Mot. for Summ. J. ¶ 50 (citation omitted). Nor is there any genuine issue with respect to the fact that "[t]he price point for the [Second Generation MAX Figure] 15-Pack was $12.97." Id. ¶ 51 (citation omitted).

LEGO expert Knight states:

> As I have previously testified, the average observer or consumer for the products at issue in this case would be an adult who is buying toys for a child. These adults do not pay as close attention to the small differences between the products because they often look very briefly and don't pay a lot of attention. In fact[,] ZURU's expert Richard Gottlieb agreed with this position.

Pls.' Ex. 33, Ex. A, Expert Report of Elizabeth B. Knight ¶ 43 (footnote omitted). In making this statement, Knight relies on the testimony of Richard Gottlieb, who gave expert testimony on behalf of Zuru at a hearing on the motion for a preliminary injunction. Gottlieb testified that the products of LEGO and Zuru were "substantially different," looking at them "from the end user standpoint, which is typically a seven or eight year old child." Tr. of Prelim. Inj. Hr'g, Vol. 1, Feb. 14, 2019 (ECF

No. 65) at 153:17-20. But Gottlieb then continued: "It's hard for an adult. An adult looks very briefly. They don't pay a lot of attention." Id. at 153:20-22. Knight gave similar testimony at that hearing. She testified that she "would consider a mom or a dad who's the one buying the toys for their children." Tr. of Prelim. Inj. Hr'g, Vol. 2, Feb. 15, 2019 (ECF No. 66) at 224:4-5. Then when she was asked why the overall look and feel was important, she testified, "I think it's really important, because moms and dads aren't paying as close attention as some kids do. They're busy, and shopping the way shopping is today, they're running through the aisles quickly. So if they look at a product for a couple seconds, they can easily be confused." Id. at 224:9-14 (emphasis added). She was then asked if she agreed with Gottlieb's testimony that "it's hard for an adult or a parent here to see any of the small differences." Id. at 224:16-17. She said that she agreed. See CJ Products LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011) ("Purchasing inexpensive toys for children does not require any sophistication on the part of the buyer."); Rubik's Brand Ltd., 2021 WL 363704 at *19 ("Both 3x3 puzzle cubes in the instant case are relatively low priced. . . . Thus, purchasing either product is not a major expenditure for most consumers. In these circumstances, there is greater likelihood that a consumer will assume that the [defendant's product] is affiliated with the

Rubik's brand.").

    Zuru argues that

    while Ms. Knight initially testified that consumers of the parties' products spend only two or three seconds (an absurdly short time) making a purchasing decision, she disavowed that testimony too, and now admits consumers span a full range of "sophistication" based on how long they spend making a buying decision, with "a larger group in the middle." (Zuru SOF 60.)

Zuru Opp Mem. at 67. Knight's initial testimony in this case was at the preliminary injunction hearing. The reference to a disavowal by Knight relates to her deposition testimony. However, Knight did not disavow her testimony from the preliminary injunction hearing during her deposition.

    Knight's answers to questions from counsel for Zuru during her deposition do not provide a basis for citing to her testimony as evidence that buyers of the products at issue are sophisticated. Knight explained that her testimony during her deposition was based on "[y]ears of developing products and working with consumer insight, people at companies and doing focus groups and walk arounds through the stores." Pls.' Ex. 39, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 at 226:8-11. With respect to buyers, she testified that "I think there's a full range. I think some parents are moving fast, they see something at [$]14.99, that's what they want to spend on a birthday party, it's a construction set and they grab it. Other parents are taking more time." Def.'s Ex. 43, Elizabeth Knight Dep. Tr. Vol.

1, Feb. 3, 2022 at 230:8-12. She testified further that "[a]ll the people are in the full spectrum, but there's a larger group in the middle. . . . I think there's a range, but a lot of people move very quickly through stores when shopping." Id. at 232:5-7, 14-16. When asked, "Can people who move quickly through stores when shopping still be sophisticated consumers?" she responded, "If they take the time." Id. at 232:17-20. She also testified that "[i]t's commonly discussed that you had three seconds to get the attention of a consumer walking down the aisle." Pls.' Ex. 39, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 at 226:20-22.

> Zuru asserts that
>
> Lego's own documents show that consumers of toy construction products pay close attention to what they are purchasing—and do not blindly grab construction toy figurines off the shelves in two or three seconds. (Zuru AMF 8 (showing shoppers watching videos, carefully considering what product to purchase based on price, and relying on specific lists of product from their children).)

Zuru Opp. Mem. at 67. However, the internal documents to which Zuru refers, Defendant's Exhibits 97 to 100, are, as LEGO explains, "emails containing anecdotal stories of 'merchandiser success[es]' wherein employees of certain stores engage with consumers regarding their purchasing decision," Unredacted LEGO Mot. Reply at 43 (alteration in original). Thus they are not indicative of the ordinary purchaser. Nor is Zuru's description of what those documents "show" supported by the documents

themselves.

Zuru also cites to paragraphs 92, 115, and 139 of the rebuttal report of Zuru expert Loetz. In paragraph 92, Loetz simply states: "I do not believe Ms. Knight is giving consumers enough credit with regard to their ability to distinguish between products that look and are different." Def.'s Ex. 75, Rebuttal Report of Lee Loetz ¶ 92. He makes similar points in paragraphs 115 and 139. Moreover, unlike Knight, who bases her opinions on "[y]ears of developing products and working with consumer insight, people at companies and doing focus groups and walk arounds through the stores," Pls.' Ex. 39, Elizabeth Knight Dep. Tr. Vol. 1, Feb. 3, 2022 at 226:8-11, Loetz bases his views on his experience and observations as a consumer, and although he refers to decades of experience in the toy industry, he does not identify any experience relevant to this point. See Def.'s Ex. 75, Rebuttal Report of Lee Loetz ¶ 139.

Based on the foregoing, there is no genuine issue as to this factor, and it supports the conclusion that there is a likelihood of confusion.

### i. Balancing the <u>Polaroid</u> Factors

As discussed above, the list of <u>Polaroid</u> factors is not "exclusive," <u>Merriam-Webster, Inc.</u>, 35 F.3d at 70, but no additional factors have been identified by the parties. As also noted above, "the analysis of the factors is not a mechanical

process," id., and "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." Brennan's, Inc., 360 F.3d at 130 (internal quotation marks omitted) (quoting Lois Sportswear, U.S.A., Inc., 799 F.22d at 872).

The fourth Polaroid factor is likelihood that the prior owner will bridge the gap, and in this case that factor has no bearing on the question of likelihood of confusion as to the source of the product.

The seventh factor is the quality of the defendant's product and genuine issues of material fact exist as to whether that factor supports a conclusion that there is a likelihood of confusion. In deciding LEGO's motion for summary judgment, the court must "assess the record in the light most favorable to" Zuru as the non-movant. Weinstock, 224 F.3d at 41. Therefore, for purposes of balancing the Polaroid factors at the summary judgment stage, this factor should be viewed as supporting a conclusion that there is not a likelihood of confusion.

In the context of this case, the strength of the mark (the first factor), degree of similarity between the two marks (the second factor), proximity of the products (third factor), and the defendant's bad faith (the sixth factor) weigh particularly heavily in favor of the conclusion that there is a likelihood of confusion as to the source of Zuru's products. Sophistication of

the buyers (the eighth factor) also weighs in favor of a finding of likelihood of confusion. Actual confusion (the fifth factor) would weigh heavily in favor of the conclusion that there is a likelihood of confusion if Zuru had not produced evidence to create genuine issues of material fact with respect to Nowlis's opinions. But in any event that factor also weighs in favor of a finding of likelihood of confusion as to the source of Zuru's products even though it is not being given material weight. Finally, the quality of the defendant's product (the seventh factor) weighs against a finding of likelihood of confusion as to the source of Zuru's products.

Based on the analysis of the Polaroid factors set forth above, the court concludes that weighing the quality of the defendant's product (the seventh factor) against the factors that show there is a likelihood of confusion does not create a genuine issue as to the fact that there is a likelihood of confusion as to the source of Zuru's products when one considers the Polaroid factors.

Therefore, LEGO has demonstrated that there is no genuine issue of material fact with respect to its claim that it owns a valid protectable mark and Zuru used a similar mark that is likely to cause consumer confusion as to the source of Zuru's MAX Figures. Accordingly, LEGO is entitled to summary judgment on its claims in Counts II and III for fraudulent infringement

with respect to the Minifigure figurine and Zuru's Third and Fourth Defenses and Counterclaims Counts V and VI (trademark non-infringement and invalidity), and Zuru's motion for summary judgment with respect to Count II is being denied.

### C. Claim for Common Law Trademark and Trade Dress Infringement, Unfair Competition, and Misappropriation (Count IV)

Although LEGO refers to its common law trademark infringement claim in a footnote in its memorandum of law, Count IV is not listed in its motion as one of the claims on which LEGO is moving for summary judgment. Zuru lists Count IV in its motion as one of the claims on which it is moving for summary judgment. Zuru states:

> Lego's unfair competition claims are premised on Lego having valid copyrights and a valid trademark and/or Zuru having infringed those asserted rights. Because Lego has no such valid rights and Zuru did not infringe them if it does, Lego's claims for copyright and trademark infringement fail, and so do Lego's tagalong claims that turn on the same allegations.

Zuru Mot. for Summ. J. at 2, ¶ 7.

Because the court has determined that LEGO is entitled to summary judgment because there are no genuine issues of material fact with respect to its claim that the Asserted Trademark is valid and Zuru has infringed on the Asserted Trademark, Zuru's motion for summary judgment with respect to Count IV is being denied.

**D. Claim for Violation of CUTPA (Count VII)**

Both Zuru and LEGO move for summary judgment on the CUTPA claim. Zuru states in its motion that "Lego's unfair competition claims are premised on Lego having valid copyrights and a valid trademark and/or Zuru having infringed those asserted rights." Zuru Mot. for Summ. J. at 2, ¶ 7. It contends that "Lego has no such valid rights and Zuru did not infringe them if it does, Lego's claims for copyright and trademark infringement fail." Id.

The court has determined that LEGO is entitled to summary judgment because there are no genuine issues of material fact with respect to its claim that the Asserted Trademark is valid and Zuru has infringed on the Asserted Trademark, so Zuru's motion for summary judgment with respect to Count VII is being denied.

LEGO states that it "is entitled to judgment as a matter of law on its claims for trademark infringement (Counts II and III) and ZURU's non-infringement defense/counterclaim (Answer, Third Affirmative Defense; Counterclaim, Count V)." LEGO Mot. Mem. at 54-55. LEGO includes with that statement the following footnote:

> The LEGO Group is entitled to Summary Judgment on its Connecticut Unfair Trade Practices Act claim . . . for the same reason. See Pfizer, Inc. v. Miles, Inc., 868 F. Supp. 437, 442 (D. Conn. 1994) ("A violation of the Lanham Act is a per se violation of CUTPA . . . [t]o the extent defendants' actions violated the Lanham Act, . . . they should be held automatically to violate CUTPA.") (internal

-172-

quotation and citation omitted).

Id. at 55, n.24.

As referenced in Part II, "[t]he moving party bears the initial burden of 'informing the district court of the basis for its motion' and identifying those portions of the record that it 'believes demonstrate the absence of [a] genuine issue of material fact.'" United States v. Fireman's Fund Ins. Co., No. 99 CIV. 2622 (BSJ), 2001 WL 88226, at *2 (S.D.N.Y. Jan. 31, 2001) (quoting Celotex Corp., 477 U.S. at 323); see also CILP Associates, L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (internal quotation marks omitted) (alteration in original) ("The moving party bears the initial burden of showing that there [is] no genuine dispute as to a material fact."). "If the moving party meets its burden, the burden then shifts to the non-moving party to 'demonstrate to the court the existence of a genuine issue of material fact.'" Fireman's Fund Ins. Co., 2001 WL 88226, at *2 (quoting Lendiono v. Trans Union Credit Info. Co., 970 F.2d 1110, 1112 (2d Cir. 1992)).

A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id.

Here, LEGO does not discuss the substantive law, i.e. what elements a plaintiff must prove in order to prevail on a CUTPA claim. Nor does it identify the portions of the record it believes demonstrates the absence of a genuine issue of material fact with respect to each of the elements of a CUTPA claim. It merely cites Pfizer, Inc. v. Miles, Inc., 868 F. Supp. 437 (1994) for the proposition that

> [a] violation of the Lanham Act is a per se violation of CUTPA, Conn. Gen. Stat. § 42-110b. "To the extent defendants' actions violated the Lanham Act, . . . they should be held automatically to violate CUTPA." Dial Corp. v. Manghnani Inv. Corp., 659 F. Supp. 1230, 1239 (D. Conn. 1987).

Id. at 442. Neither Pfizer nor Dial Corp. cite to any precedent for the general proposition if a court grants summary judgment in favor of a plaintiff on a Lanham Act claim, the court should automatically grant summary judgment on an accompanying CUTPA claim.

Based on the foregoing, LEGO has failed to meet its initial burden at the summary judgment stage, and its motion for summary judgment on the CUTPA claim is being denied.

**E. Equitable Defenses (Fifteenth Defense)**

Zuru's Fifteenth Affirmative Defense (equitable defenses) is that "LEGO's claims are barred by the doctrines of waiver, ratification, acquiescence, laches, unclean hands, and estoppel." Zuru, Inc.'s Answer and Countercls. at 16. LEGO moves

for summary judgment on this affirmative defense in its entirety.

With respect to the doctrines of waiver, ratification, acquiescence, and laches, Zuru's response to an interrogatory asking for the factual basis for each of its affirmative defenses did not address any of these defenses. See Pls.' Ex. 11, Def. Zuru Inc.'s Resp. to Pls.' Second Set of Interrogs. (Nos. 8-17) Resp. to Interrogatory 12, at 7-10. In addition, Zuru now states that it does not intend to pursue these defenses. See Zuru Opp. Mem. at 69 n.16 ("Zuru does not intend to pursue its other equitable defenses . . . .").

With respect to estoppel, Zuru contends that:

> Lego is estopped as a matter of law from asserting in this case, contrary to its representations to Judge Haight in Best Lock, that the Kre-O and Best Lock figurines are "infringing," and when Lego is held to its Best Lock admissions, its claims in this case against Zuru fail as a matter of law because the Zuru figurines are more different from the minifigure than those other non-infringing figurines.

Zuru Opp. Mem. at 69. Zuru incorporates by reference the arguments it made in support of its motion to dissolve the preliminary injunction. See Zuru's Mem. in Support of Mot. to Dissolve Prelim. Inj. (ECF No. 251). As already noted in this ruling, judicial estoppel is not applicable because "Zuru cannot show that a factual position taken by the LEGO Group in this case is clearly inconsistent with a factual position it took in

Best-Lock." Lego A/S v. Zuru Inc., 2023 WL 2727552, at *5.

With respect to unclean hands, Zuru contends that its "unclean-hands defense is supported by all manner of evidence Zuru has presented relating to Lego's misconduct concerning the core disputed issues in this case—the validity of Lego's asserted copyrights and trade dress, and Zuru's alleged infringement of them." Zuru Opp. Mem. at 69. As Zuru bases its unclean hands defense on the arguments it has made with respect to its copyright and trademark invalidity defenses, LEGO is entitled to summary judgment on the unclean hands defense for the same reasons it is entitled to summary judgment on Zuru's copyright and trademark invalidity defenses.

Therefore, LEGO has shown it is entitled to summary judgment with respect to Zuru's Fifteenth Affirmative Defense.

## IV.   CONCLUSION

For the reasons set forth above, LEGO's Motion for Partial Summary Judgment (ECF No. 245) is hereby GRANTED in part and DENIED in part. It is being denied with respect to Count VII

(the CUTPA claim) and being granted in all other respects.

Defendant's Motion for Summary Judgment (ECF No. 237), filed by

Zuru Inc., is hereby DENIED.

It is so ordered.

Dated this 2nd day of April 2026, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
